# Exhibit E

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU<br><br>    Plaintiff,<br><br>    v.<br><br>THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, Delaware Statutory Trusts,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

# INTRODUCTION

1.  Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), brings

this action against the fifteen (15) National Collegiate Student Loan Trusts ("Defendants," or "NCSLTs", or "the Trusts") under sections 1031(a), 1036(a), and 1054(a) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564(a), to obtain permanent injunctive relief, restitution, refunds, disgorgement, damages, civil money penalties, and other appropriate relief for Defendants' violations of Federal consumer financial law in connection with Defendants' servicing and collection of private student loan debt.

2. The Bureau has reviewed the debt collection and litigation practices of the fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts, which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), as performed by Defendants' Servicers and Subservicers (as defined below) pursuant to the various servicing agreements between Defendants and each such Servicer or agreements between a Servicer and a Subservicer.

3. To collect on defaulted private student loans, Defendants' Servicers filed collections lawsuits on behalf of Defendants in state courts across the country. In support of these lawsuits, Subservicers on behalf of Defendants executed and filed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt and, in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, Defendants' Servicers on behalf of Defendants filed at least 2,000 collections lawsuits without the documentation necessary to prove Trust ownership of the loans or on debt that was time-barred. Finally, notaries for Defendants' Servicers notarized more than 25,000 affidavits even

though they did not witness the affiants' signatures.

## JURISDICTION AND VENUE

4.      The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

5.      Venue is proper in this District because Defendants are located and do business in this District. 12 U.S.C. § 5564(f).

## PLAINTIFF

6.      The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws, including the CFPA. 12 U.S.C. §§ 5531(a), 5564(a)–(b).

## DEFENDANTS

7.      Defendants are any and all of the fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts," which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4) and their successors and assigns.

8.      Defendants are "covered person[s]" under 12 U.S.C. § 5481(6) because they engaged in "servicing loans, including acquiring, purchasing selling [or] brokering" and in the collection of debt. 12 U.S.C. § 5481(15)(A)(i), (x).

## **DEFENDANTS' UNLAWFUL ACTS OR PRACTICES**

9. The NCSLTs comprise fifteen (15) Delaware statutory trusts created between 2001 and 2007.

10. The basic purpose of each Trust is to acquire a pool of private student loans, execute the indentures and issue notes secured by the pools of student loans, enter into the so-called trust-related agreements, and provide for the administration of the Trusts and the servicing and collection of student loans.

11. Each Trust is an Owner-directed Delaware statutory trust formed under the laws of Delaware.

12. Defendants do not have employees, and all actions relating to the administration of the Trusts, servicing of the student loans, and collecting debt are carried out by Defendants' Servicers.

13. Defendants' Servicers are any Servicer, Primary Servicer, Subservicer, Special Servicer, Administrator, and any other individual or entity acting on behalf of the Trusts with respect to the servicing and collection of the student loans owned by the Trusts, whether retained directly by Defendants or retained by an individual or entity acting on behalf of Defendants.

14. Each Servicer is a "covered person" under 12 U.S.C. § 5481(6) because it engaged in "servicing loans, including acquiring, purchasing, selling, [or] brokering" and in "collecting debt." 12 U.S.C. § 5481(15)(A)(i), (x).

15. Each Servicer acted as an agent of the Trusts.

16. Since November 1, 2014, Defendants' Subservicer has been Transworld Systems, Inc.

17. The Trusts hold more than 800,000 private student loans sold by originating lenders to the Trusts.

18. Debt-collection activities on behalf of Defendants are carried out by Defendants' Servicers, including the Special Servicer and the Subservicers.

19. Defendants' Servicers and other entities executed, notarized, and filed deceptive affidavits on behalf of Defendants.

20. Defendants' Servicers and other entities, on behalf of Defendants, filed collections lawsuits lacking documentation needed to prove ownership of the loans.

21. In 2009, Defendants entered into a special servicing agreement with the Special Servicer in order to provide for the servicing, collection, and litigation of delinquent and defaulted loans. This agreement required the Special Servicer to hire Subservicers and enter into and adhere to the Default Prevention and Collection Services Agreement of March 1, 2009, as amended.

22. In 2012, upon the resignation of the Special Servicer and pursuant to the terms of the special servicing agreement, the Back-Up Special Servicer assumed the role of Special Servicer.

23. In 2012, the Special Servicer amended the Default Prevention and Collection Services Agreement of March 1, 2009 in order to expand the role of the Subservicer to Defendants with respect to the collection and enforcement of the student loans owned by Defendants.

## FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

24. In connection with collecting or attempting to collect debt from consumers, between November 1, 2012 and April 25, 2016, Subservicers, acting through

Defendants' Special Servicer and acting on behalf of Defendants, initiated 94,046 collections lawsuits in courts across the country.

25. In support of the collections lawsuits, Subservicers acting on behalf of Defendants submitted affidavits and documents in support of Defendants' claims that consumers owed debts to Defendants.

26. Affiants on behalf of Defendants executed, notarized, and caused to be filed affidavits—often attaching exhibits—in Defendants' collections lawsuits.

27. In these affidavits, the affiants swore that they had personal knowledge of the education loan records evidencing the debt.

28. In fact, in numerous instances, affiants lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits.

29. The affiants also swore in the affidavits that they were authorized and competent to testify about the consumers' debts through review of and "personal knowledge" of the business records, including electronic data, in their possession.

30. In fact, in numerous instances, affiants lacked personal knowledge of the business records, including the electronic data, showing that consumers owed debts to the Defendants.

31. Affiants were instructed to review data on a computer screen to verify information in the affidavits about the debts. Affiants, however, did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether those data meant that the debt was in fact owed to Defendants.

32. Each affiant also swore that he or she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents."

33. In fact, affiants lacked personal knowledge of the record management practices and procedures of Defendants and the practices and procedures of Defendants' agents.

34. In many affidavits, the affiants also swore, "I have reviewed the chain of title records as business records" regarding the relevant account.

35. In fact, in numerous instances, affiants did not review the chain of assignment records prior to executing the affidavits. In some cases, affiants reviewed only "chain of title" records that had been found online. In fact, at least one of Defendants' Servicers instructed affiants that they did not need to review the chain of assignment records before executing affidavits that represented that the affiant had reviewed those records.

36. In fact, affiants did not have access to deposit and sale agreements—the last link in the chain of assignment transferring loans into the Trust—until May 30, 2014.

37. In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the Trusts on dates certain.

38. In fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan.

39. In some instances, when affiants complained to management that they did not have personal knowledge of certain representations made in the affidavits, Defendants' Servicers instructed the affiants to continue signing the affidavits. In some instances, affiants felt "bullied" by management and followed the instructions for fear of losing their jobs.

40. On numerous occasions, to address a backlog of affidavits, employees of Defendants' Servicers such as interns and mailroom clerks were instructed to execute affidavits.

41. On numerous occasions, between November 1, 2012 and September 1, 2013, the Servicers filed stale affidavits that had earlier been executed by a previous Servicer. Contrary to the statements in the affidavits, the affiants in question were no longer "authorized to testify" in the matter and no longer had access or knowledge of the consumer's account records or debt.

42. Affiants also later provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the affidavits as described in Paragraphs 27–38.

## IMPROPERLY NOTARIZED AFFIDAVITS

43. Between November 1, 2012 and August 3, 2014, in connection with collecting or attempting to collect debt from consumers, Defendants' Servicers acting on behalf of Defendants filed at least 11,412 affidavits in collections lawsuits.

44. Between November 1, 2012 and August 3, 2014, Defendants' Servicers acting on behalf of Defendants improperly notarized virtually every affidavit executed and filed.

45. Affiants executed the affidavits on their own outside the presence of the notary.

46. Affiants placed executed affidavits in a specified location.

47. Defendants' Servicers' notaries later notarized stacks of previously signed affidavits all at once at their desks.

48. Contrary to the representations in the affidavits, affiants did not personally appear before notaries.

49. Contrary to the representations in the affidavits, notaries did not place the affiants under oath or witness their signatures.

50. On numerous occasions, notaries notarized affidavits executed by affiants on a prior date. At least one of Defendants' Servicers instructed notaries to ensure that the notarization date matched the date of execution, even if that meant backdating the notarization date.

51. In many cases, the notaries did in fact back date their notarization of the affidavits.

### FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

52. Defendants filed at least 1,214 collections lawsuits against consumers even though the documentation needed to prove they owned the loans was missing. Through these lawsuits, the Defendants obtained approximately $21,768,807 in judgments against consumers.

53. In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Defendants was missing.

54. In addition, the Defendants filed at least 812 collections lawsuits where the documentation did not support Trusts' ownership of the loans. The chain of assignment documentation shows that these loans were allegedly transferred to Defendants before they were in fact disbursed to consumers.

55. In at least 208 other collections lawsuits, the promissory note to prove that a debt was owed did not exist or cannot be located.

56. For each collections lawsuit described in Paragraphs 52–55, Defendants could not prove that a debt was owed to Defendants, if contested.

57. Defendants knew, or their processes should have uncovered, that these chain of assignment documents were missing or flawed, yet Defendants continued to file collections lawsuits.

## COLLECTION OF TIME-BARRED DEBT

58. In at least 486 collections lawsuits, in connection with collecting or attempting to collect debt from consumers, Defendants filed a collections lawsuit outside the applicable statute of limitations.

## THE CONSUMER FINANCIAL PROTECTION ACT

59. The CFPA provides that it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A). The CFPA grants the Bureau authority to commence a civil action against any person who violates a Federal consumer financial law, such as the CFPA. 12 U.S.C. § 5564(a).

## VIOLATIONS OF THE CFPA

60. The CFPA prohibits a covered person from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

61. Servicing loans and collecting debt are "consumer financial products or services" under the CFPA. 12 U.S.C. § 5481(15)(A)(i), (x).

## **DECEPTIVE ACTS OR PRACTICES**

### COUNT I

### False and Misleading Affidavits and Testimony

62. The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

63. In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants or witnesses in court had personal knowledge of the education loan records evidencing the debt.

64. In fact, in numerous instances, affiants and witnesses lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits.

65. In numerous instances, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants and witnesses had personal knowledge of the record management practices and procedures of the Trust and the practices and procedures the Trust requires of its loan servicers and other agents.

66. In fact, affiants and witnesses lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures of Trusts' agents.

67. In numerous instances, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants and witnesses had reviewed the chain of title records and asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the Trust on dates certain.

68. In fact, on numerous occasions, affiants and witnesses had not reviewed the chain of title records and lacked personal knowledge that the loans were transferred,

11

sold and assigned to the Trust.

69. Defendants' representations set forth in Paragraphs 63–68 are material and likely to mislead consumers acting reasonably under the circumstances.

70. Defendants' representations set forth in Paragraph 63–68 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT II

### Improperly Notarized Affidavits

71. The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

72. In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that the affidavits submitted in support of its collections lawsuits were properly sworn and executed before a notary.

73. In fact, in numerous instances, the affidavits were unsworn and executed outside the presence of a notary.

74. Defendants' representations set forth in Paragraphs 72–73 are material and likely to mislead consumers acting reasonably under the circumstances.

75. Defendants' representations set forth in Paragraph 72–73 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT III

### Filing Lawsuits without the Intent or Ability to Prove the Claims, if Contested

76. The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

77. In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by

implication, that collections lawsuits were supported by valid and reliable legal documentation needed to obtain judgment.

78. In fact, in numerous lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to Defendants was missing.

79. In fact, in numerous lawsuits, a promissory note proving the existence of the debt was missing.

80. In fact, in numerous lawsuits, the Trusts could not prove their claims, if contested.

81. Defendants' representations set forth in Paragraphs 77–80 are material and likely to mislead consumers acting reasonably under the circumstances.

82. Defendants' representations set forth in Paragraph 77–80 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT IV

### Collection of Time-Barred Debt

83. The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

84. In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that the Trusts had a legal right to obtain judgment through its collections lawsuits.

85. In fact, in numerous instances, the statute of limitations on these loans had expired.

86. Defendants' representations set forth in Paragraphs 84–85 are material and likely to mislead consumers acting reasonably under the circumstances.

87.   Defendants' representations set forth in Paragraph 84–85 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## UNFAIR PRACTICES

## COUNT V

### Filing Lawsuits without the Intent or Ability to Prove the Claims, if Contested

88.   The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

89.   Under section 1031 of the CFPA, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

90.   In numerous instances, in connection with collecting or attempting to collect debt through collections lawsuits, Defendants filed collections lawsuits without the intent or ability to prove the claims, if contested.

91.   Defendants' acts or practices have caused or were likely to cause substantial injury to consumers, estimated to be at least $3.5 million in payments made in connection with these lawsuits.

92.   Consumers could not reasonably avoid the harm, and the harm was not outweighed by countervailing benefits to consumers or competition.

93.   Defendants' acts or practices set forth in Paragraph 90–92 constitute unfair acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

## CONSUMER INJURY

94.   Consumers have suffered or were likely to suffer substantial injury as a result of Defendants' violations of the CFPA. In addition, Defendants have been unjustly

enriched as a result of their unlawful acts or practices.

## THIS COURT'S POWER TO GRANT RELIEF

95. The CFPA empowers this Court to grant any appropriate legal or equitable relief including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, payments of damages or other monetary relief, limits on the activities or functions of Defendants, and civil money penalties. 12 U.S.C. § 5565(a). In addition, the CFPB may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## PRAYER FOR RELIEF

96. Wherefore, the Bureau requests that the Court:

   a. Permanently enjoin Defendants from committing future violations of the CFPA;

   b. Grant additional injunctive relief as the Court may deem to be just and proper;

   c. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including, but not limited to, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages or other monetary relief;

   d. Award the Bureau civil money penalties; and

   e. Award the Bureau the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: September 18, 2017

        Respectfully submitted,

        ANTHONY ALEXIS
        *Enforcement Director*

        Deborah Morris
        *Deputy Enforcement Director*

        /s/ Carolyn Hahn
        Carolyn Hahn
        (E-mail: Carolyn.Hahn@cfpb.gov)
        (Phone: 202-435-7250
        Edward Keefe
        (E-mail: Edward.Keefe@cfpb.gov)
        (Phone: 202-435-9198)
        *Enforcement Attorneys*
        Consumer Financial Protection Bureau
        1700 G Street NW
        Washington, DC 20552
        Telephone: (202) 435-9198
        Facsimile: (202) 435-7722
        Email: Carolyn.Hahn@cfpb.gov

        For the Consumer Financial Protection Bureau