UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| MUTINTA MICHELO, KATHERINE SEAMAN, | ) | |
| MARY RE SEAMAN, and SANDRA TABAR, | ) | |
| individually and on behalf of all others similarly situated, | ) | Index No.: 18-cv-1781 (PGG) |
| | ) | |
| | ) | |
| Plaintiffs, | ) | **AMENDED** |
| | ) | **CLASS ACTION** |
| v. | ) | **COMPLAINT** |
| | ) | |
| NATIONAL COLLEGIATE STUDENT LOAN | ) | |
| TRUST 2007-2; NATIONAL COLLEGIATE | ) | |
| STUDENT LOAN TRUST 2007-3; | ) | |
| TRANSWORLD SYSTEMS, INC., in its own right and | ) | |
| as successor to NCO FINANCIAL SYSTEMS, INC.; | ) | |
| EGS FINANCIAL CARE INC., formerly known as | ) | |
| NCO FINANCIAL SYSTEMS, INC.; and | ) | |
| FORSTER & GARBUS LLP, | ) | **Jury Trial Demanded** |
| | ) | |
| | ) | |
| Defendants. | ) | **FILED VIA ECF** |
| _____ | ) | |

Plaintiffs Mutinta Michelo, Katherine Seaman, Mary Re Seaman, and Sandra Tabar (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by the undersigned attorneys, allege as follows for this Amended Class Action Complaint against defendants National Collegiate Student Loan Trust 2007-2 and National Collegiate Student Loan Trust 2007-3 (together, the "Trust Defendants"); Transworld Systems, Inc. ("Transworld"), in its own right and as successor to NCO Financial Systems, Inc. ("NCO"); EGS Financial Care Inc. ("EGS"), formerly known as NCO Financial Systems, Inc.; and Forster & Garbus LLP ("Forster") (collectively, "Defendants").  These allegations are made on information and belief, and pursuant to the investigation by Plaintiffs' counsel.

**NATURE OF THE CASE**

1.      Defendants have engaged in a fraudulent scheme to make false representations to consumers and in court filings in order to obtain payment on debts that they cannot prove they are owed.  Defendants have no idea whether, and how much money, they are owed.  They nevertheless sue consumers, obtain judgments against them, and extract money from them.

2.      The National Collegiate Student Loan Trusts ("National Collegiate")[1] have no employees, and use Transworld to collect debts allegedly owed on student loans.  On behalf of National Collegiate, Transworld causes baseless lawsuits to be filed in state and local courts against consumers like Plaintiffs.  Transworld coordinates with law firms throughout the country to sue consumers on National Collegiate's behalf.

3.      In the past three years more than 38,000 such actions have been filed with the assistance of debt-collection law firms, including Forster.

4.      In September 2017, the Consumer Financial Protection Bureau ("CFPB") penalized National Collegiate and Transworld $21.6 million for prosecuting illegal debt-collection lawsuits.[2]

5.      The CFPB found that National Collegiate and Transworld sued consumers in state courts over purported debts that they couldn't prove were actually owed, or were too old to sue over.

---

[1]  There are at least fifteen National Collegiate Student Loan Trusts, including the two Trust Defendants presently named in this action.  "National Collegiate," as used herein, collectively refers to the larger group.

[2]  Proposed Consent Judgment, *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-UNA (D. Del. Sept. 18, 2017) (Dkt. No. 3-1), *available at* https://files.consumerfinance.gov/f/documents/201709_cfpb_national-collegiate-student-loan-trusts_proposed-consent-judgment.pdf; Consent Order, *In re Transworld Sys., Inc.*, Admin. Proc. No. 2017-CFPB-0018 (Consumer Fin. Prot. Bureau Sept. 18, 2017), *available at* https://files.consumerfinance.gov/f/documents/201709_cfpb_transworld-systems_consent-order.pdf.

6.      National Collegiate insiders have confirmed that National Collegiate sues consumers without documentation proving loan ownership.[3]

7.      Defendants have used a variety of illegal tricks to deceive consumers and state courts into believing that a National Collegiate Trust has a valid legal claim against consumers, when in reality it does not.

8.      For example, Defendants' boilerplate complaints against New Yorkers including Plaintiffs falsely state that the Trust (1) "is the original creditor" of the loan at issue in the action, and (2) is "authorized to proceed with this action."

9.      Both statements violate the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and New York General Business Law ("GBL") § 349.

10.     No National Collegiate Trust is the "original creditor" for the alleged loan underlying the alleged debt that Defendants sue over.  As Judge Shields of the Eastern District of New York recently explained, National Collegiate Trusts never originate student loans; instead they are the ultimate owners of bundles of student loan debt following a byzantine securitization process.  Defendants' "original creditor" lie is unlawful because unsophisticated consumers like Plaintiffs might not realize that they are dealing with an entity far removed from the actual loan origination—and thus less likely to possess proof of indebtedness.[4]

---

[3] *As Paperwork Goes Missing, Private Student Loan Debts May Be Wiped Away*, N.Y. Times, July 17, 2017, https://nyti.ms/2vvroKs (quoting Donald Uderitz of Vantage Capital Group) ("It's fraud to try to collect on loans that you don't own," Mr. Uderitz said.  "We want no part of that[.]"); *Behind the Lucrative Assembly Line of Student Debt Lawsuits*, N.Y. Times, Nov. 13, 2017, https://nyti.ms/2jlqMpZ (noting Vantage Capital's approval of the CFPB action against National Collegiate).

[4] *Winslow v. Forster & Garbus, LLP*, No. 15-cv-2996 (AYS), 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29 (E.D.N.Y. Dec. 13, 2017).

11.     None of National Collegiate's Trusts is "authorized to proceed" with actions like the ones that Defendants prosecuted against Plaintiffs.  New York law requires out-of-state entities that regularly file suit in this state's courts to register with its Department of State and pay tax.  National Collegiate flouts this law, even as its Trusts file countless state-court lawsuits against New Yorkers like Plaintiffs.[5]

12.     Defendants similarly employ illegal tactics later in the state-court litigation process.  National Collegiate and Transworld have engaged in the widespread practice of submitting false or deceptive affidavits to state courts in order to fraudulently obtain default judgments against consumers for unprovable debts.[6]

13.     The CFPB found that the Transworld employees or agents who fill out the affidavits filed on National Collegiate's behalf have falsely attested to personal knowledge of (1) the account records and the consumer's debt, and (2) the chain of assignments establishing entitlement to sue.  In fact, they robosign the affidavits without reviewing any such evidence.[7]

14.     In recent weeks, National Collegiate has confirmed these facts.  It has sued Transworld and various other entities involved in collecting debts allegedly owed on Trust-held loans, in the Delaware Court of Chancery (the "Delaware Action").  The Delaware Action acknowledges the "submission of false and misleading affidavits in collection cases" against

---

[5]  *Id.* at *29–34.

[6]  Defendants take advantage of the fact that, under most states' civil procedure law, including New York's, the public employees who oversee the default-judgment process rely upon the representations and certifications of the attorneys who practice before the court.  Given that tens of thousands of such lawsuits are filed every year, judicial system personnel would be overwhelmed if they had to investigate the validity of every default judgment application.

[7]  Proposed Consent Judgment, *supra* note 2, at 3.  Indeed, these affidavits are churned out with such rapidity that they are signed in the absence of a notary, in violation of evidentiary law.  *Id.*

individuals like Plaintiffs, and blames Transworld and its affiliates for this "wrongdoing[] done in the name of the Trusts."[8]

15.    As the CFPB's findings reveal, National Collegiate and Transworld's business model depends upon a pattern and practice of abusing the judicial system; they could not collect on their securitized student loan debt in any other way.

16.    Essential to the scheme is the assistance of outside law firms like Forster.  These attorneys, who are sworn officers of the court, forsake their legal and ethical duties to the court by filing pleadings and affidavits that they know to be both deceptive, and insufficient as a matter of civil procedure and evidentiary law.

17.    While the boilerplate complaints and motions that Forster has filed on National Collegiate's behalf purport to be communications from an attorney, in fact they were not meaningfully reviewed by an attorney prior to filing.  Instead, they were created by automated systems and non-attorney support staff.

## JURISDICTION AND VENUE

18.    Defendants conduct business in the State of New York, and Defendants' fraud upon Plaintiffs was coordinated in this District.  Venue is proper in this District.

19.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1337, and under 15 U.S.C. § 1692k(d).

20.    This Court has jurisdiction over the New York state law claims pursuant to 28 U.S.C. § 1367.

---

[8]  Am. Compl. ¶ 5, *Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*, No. 2018-0167 (Del. Ch. June 15, 2018).

21.     This Court also has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the

Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum

or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any

member of a class of plaintiffs is a citizen of a state different from any defendant."

## PARTIES

**Plaintiffs**

22.     Plaintiff Mutinta Michelo is a resident of Texas, and previously resided in Bronx

County, New York.  Ms. Michelo is a consumer as that term is defined by 15 U.S.C. § 1692a(3).

Defendants initiated and maintained at least one action against Ms. Michelo alleging claims related

to consumer debt.

23.     Plaintiff Katherine Seaman ("K. Seaman") resides in Queens County, New York.

Ms. K. Seaman is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated

and maintained at least one action against Ms. K. Seaman alleging claims related to consumer debt.

24.     Plaintiff Mary Re Seaman ("Re Seaman") resides in Queens County, New York.

Ms. Re Seaman is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated

and maintained at least one action against Ms. Re Seaman alleging claims related to consumer

debt.

25.     Plaintiff Sandra Tabar resides in Kings County, New York.  Ms. Tabar is a

consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated and maintained at

least one action against Ms. Tabar alleging claims related to consumer debt.

**Defendants**

26.     Defendant National Collegiate Student Loan Trust 2007-2 is a Delaware statutory

trust that does business in New York.  Its trustee and agent for service of process is Wilmington

Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19890.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2007-2 holds 3,950 loans made to New York consumers, with principal amounts thereupon totaling $42,449,751.[9]

27.     Defendant National Collegiate Student Loan Trust 2007-3 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19890.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2007-3 holds 4,894 loans made to New York consumers, with principal amounts thereupon totaling $70,351,498.[10]

28.     Defendant Transworld Systems, Inc. is a California corporation that maintains its principal place of business at 500 Virginia Drive, Suite 514, Ft. Washington, Pennsylvania 19034.  Transworld does business in New York.  Transworld regularly attempts to collect debts alleged to be due to another.  Transworld is, either directly or indirectly, owned by Platinum Equity, LLC.  Until on or about November 3, 2014, Transworld was owned by Expert Global Solutions, Inc.  Transworld is the successor to Defendant NCO Financial Systems, Inc.

29.     Defendant NCO Financial Systems, Inc., presently doing business as EGS Financial Care, Inc., is a Pennsylvania corporation that maintains offices at 400 Horsham Road,

---

[9]  *See* Prospectus Supplement, National Collegiate Student Loan Trust 2007-2 (June 12, 2007), https://www.sec.gov/Archives/edgar/data/1223029/000089968107000462/ncslt20072-ps_061207.htm.

[10]  *See* Prospectus Supplement, National Collegiate Student Loan Trust 2007-3 (Sept. 17, 2007), https://www.sec.gov/Archives/edgar/data/1223029/000110465907069961/a07-23573_18424b5.htm.

Suite 130, Horsham, Pennsylvania 19044.  NCO does business in New York and regularly attempts to collect debts alleged to be due to another.

30.    Defendant Forster & Garbus LLP is a law firm, located at 60 Motor Parkway, Commack, New York 11725.  Forster does business in New York and regularly attempts to collect debts alleged to be due to another.  Forster has been retained by National Collegiate to collect on consumer debt that National Collegiate claims to own.  Pursuant to that retention, Forster files and maintains actions in New York State courts seeking debt collection.  As part of the filing of each such case, Forster, as it is obligated to do under New York State law, includes a certification pursuant to Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1a.

## CLASS ALLEGATIONS

31.    This action is brought on behalf of Plaintiffs individually and as a class action on behalf of the following class ("Class"):

> (a) all persons sued in state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was identified as plaintiff in the complaint, (c) within six years of the date of the filing of this action. Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.

32.    While the exact number of Class members can only be determined through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class.

33.    Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct, as complained of herein.

34.     There are common questions of law and fact affecting members of the Class, which common questions predominate over questions that might affect individual members.  These questions include, but are not limited to, the following:

    a.    Whether Defendants initiated state-court lawsuits against consumers without the intent or ability to prove the claims;

    b.    Whether Defendants filed materially deceptive pleadings and/or motions in connection with said lawsuits;

    c.    Whether Plaintiffs and the other members of the Class are entitled to damages, including punitive damages, costs, and/or attorneys' fees, for Defendants' acts and conduct as alleged herein, and the proper measure thereof.

35.     Plaintiffs will fairly and adequately represent the other members of the Class. Plaintiffs have no interests that conflict with the interests of other Class members.  Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members might be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

37.     Members of the Class can be identified from records maintained by Defendants, and can be notified of the pendency of this action by United States mail using a form of notice customarily used in similar class actions.

## **FACTS**

**National Collegiate**

38.     At $1.3 trillion, the student loan debt load is second only to that of mortgages in terms of size and risk posed to American consumers.  National Collegiate holds $12 billion of this

debt, with more than $5 billion of it now classed as in default.

39.     National Collegiate and its agents file baseless state-court collection suits supported by boilerplate, robosigned legal filings that are unsupported by actual admissible evidence.

40.     National Collegiate and its agents engage in such tactics, because National Collegiate's constituent Trusts were too removed from any actual loan origination process to guarantee access to documentation evidencing a consumer's indebtedness.

41.     National Collegiate's constituent Trusts were created between approximately 2001 and 2007 by First Marblehead Corp.  Through subsidiary The National Collegiate Funding LLC, First Marblehead Corp. purchased, in bulk, student loans that had been originated by large lenders. The National Collegiate Funding LLC later sold those loans to one of the Trusts.  Each Trust then issued asset-backed securities.

**NCO and Transworld**

42.     As National Collegiate's Trusts have no employees, all acts performed nominally by a Trust, or on its behalf, are actually done by servicing agents or attorneys hired by these servicing agents.

43.     The servicing agents began debt collection activities against consumers once their loans were determined to be in default.  They also accepted payments made by consumers in response to these collection efforts, and oversaw custody of the resulting moneys.

44.     As of 2013, Defendant NCO acted as National Collegiate's servicing agent.

45.     On or about November 1, 2014, Defendant Transworld became National Collegiate's servicing agent.[11]

---

[11]  NCO and Transworld were both owned by Expert Global Solutions, Inc. until November 2014, when Transworld was sold to Platinum Equity.

46. The same personnel, practices, and form documents were employed by NCO and Transworld in collecting the National Collegiate debts before and after the changeover from NCO to Transworld.

47. Transworld—like NCO before it—has maintained a nationwide network of debt-collection law firms, including Forster ("Network Firms"), through which it coordinates and implements collections on National Collegiate's behalf.

48. Network Firms work on a contingency basis.

49. Network Firms are not permitted to contact National Collegiate directly, even for the purpose of obtaining requisite proof of a consumer's indebtedness on a student loan, and/or National Collegiate's entitlement to sue thereupon.

50. NCO and Transworld grade Network Firms on, among other indices, the rate at which they file suit against consumers on behalf of National Collegiate, and the speed with which judgments in such suits are procured and collected upon.

51. NCO and Transworld support staff work with non-attorney support staff at Network Firms to facilitate the prosecution of collection actions against consumers like Plaintiffs.

52. This coordination includes the content of state-court pleadings, and the preparation of affidavits necessary to procure judgments against consumers.

**Forster**

53. Forster is a debt collection law firm that exclusively, or nearly exclusively, represents purported creditors (both original and debt buyers) in state-court actions against consumers.

54. Forster has filed hundreds, if not thousands, of state-court lawsuits against New Yorkers allegedly indebted to a National Collegiate Trust.

55.     Forster's court filings on behalf of National Collegiate were mass-produced by non-lawyers at the push of a button, and then signed by attorneys who had done nothing to confirm the validity of the allegations and claims lodged against the consumer-defendants, including Plaintiffs.

56.     Forster did not possess, and did not review, any actual documentary support for the actions it prosecuted against any Plaintiff on any Trust Defendant's behalf.

57.     Forster's debt-collection litigation activities, including against Plaintiffs, are dependent upon: (1) a computer system used to communicate with clients like National Collegiate and Transworld, and to automatically generate court filings in actions against consumers like Plaintiffs; and (2) a non-attorney support staff that far outnumbers Forster's attorneys.

58.     Like all of Forster's litigation filings on behalf of National Collegiate, the pleadings filed against Plaintiffs were automatically generated based on a preexisting template.  These boilerplate pleadings are identical, save for the dates and the few pieces of information that have been auto-populated into the template using the electronic data provided by Transworld or NCO concerning the consumer being sued.

59.     Like all New York State attorneys, Forster's lawyers are obligated, under Rules of the Chief Administrator of the Courts (22 NYCRR) §§ 130-1.1 & 130-1.1a, to conduct a reasonable investigation into the legal and factual basis of any civil action that they initiate and maintain on a client's behalf.

60.     Forster attorneys ignore this obligation, robosigning National Collegiate complaints, and maintaining the actions for National Collegiate's benefit, without conducting such reasonable investigation.

61.     Indeed, during the time period relevant here, Forster's handful of attorneys signed so many complaints on a daily basis—not just for National Collegiate, but also for the country's

largest credit card debt buyers—that it was impossible for them to conduct such reasonable investigation.

62.     The default-judgment filings that Forster submits on National Collegiate's behalf are similarly auto-generated and robosigned, and/or filed in state courts without meaningful attorney review.

**Defendants Target Plaintiffs**

*Plaintiff Mutinta Michelo*

63.     On or about July 14, 2015, Forster initiated a lawsuit against Plaintiff Michelo, in Bronx County Civil Court, in which National Collegiate Student Loan Trust 2007-2 ("Trust 2007-2") was named as plaintiff, and Plaintiff Michelo as co-defendant.  The case is: *National Collegiate Student Loan Trust 2007-2 v. Michelo*, No. 10689-15/BX.

64.     This lawsuit was initiated at the direction of Transworld and/or NCO.

65.     The complaint in this lawsuit was prepared using a boilerplate template.  The same boilerplate complaint was used in hundreds, if not thousands, of cases that Forster filed on National Collegiate's behalf.

66.     The complaint against Plaintiff Michelo accused her of obtaining an "EDUCATIONAL LOAN" and being in default upon it.  This complaint set forth causes of action for breach of contract and account stated.

67.     The complaint stated, among other things, that "PLAINTIFF [*i.e.*, Trust 2007-2] IS THE ORIGINAL CREDITOR . . . ."

68.     The above statement is false, because Trust 2007-2 did not originate the purported loan underlying the alleged debt being sued upon.

69.     The complaint did not identify the entity that did actually originate the purported

loan, to the extent it even exists.[12]

70.    The complaint also stated that Trust 2007-2 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."

71.    The above statement is false, because Trust 2007-2 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

72.    New York law requires that "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

73.    An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."  N.Y. Gen. Ass'ns Law § 2(2).

74.    Trust 2007-2 is a "business trust" for the purposes of this law.

75.    Trust 2007-2 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

    a.    Trust 2007-2 maintains offices at 230 Park Avenue, and 100 Wall Street, in Manhattan.

    b.    Trust 2007-2 has undertaken extensive debt collection efforts in New York,

---

[12]  In addition to other law, New York City Administrative Code § 20-493.1 specifically requires that "the originating creditor of the debt" be identified in any debt-collection "communication with [a] consumer . . . ."

including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 328 state-court collection actions in New York courts over the past six years.[13]

c.    The documents defining Trust 2007-2's activities are focused on New York as the locus of all activity related to it. For example, these documents state that the finance settlement is to take place in New York; require Trust 2007-2 to maintain an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2007-2's purpose—will be offered through and "will be ready for delivery in book-entry form only through the facilities of The Depository Trust Company in New York, New York," which "is a New York-chartered limited-purpose trust company"; and Trust 2007-2's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

76.    The complaint that Forster filed against Plaintiff Michelo on or about July 14, 2015 on behalf of Trust 2007-2 contains a Rule 130-1.1a certification, dated July 6, 2015, attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2007-2's behalf.

77.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

---

[13] Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

78. The complaint filed against Plaintiff Michelo sought $22,047.88. No delineation was provided as to the extent to which this amount reflected interest or charges rather than principal.

79. On information and belief, at or about the time that this lawsuit against Plaintiff Michelo was commenced, Defendants Trust 2007-2, Forster, and Transworld and/or NCO reported to credit bureaus that the underlying alleged debt was valid and owed, and that it was the subject of legal action.

80. On or about December 9, 2016, Forster filed a notice of voluntarily discontinuing this lawsuit against Plaintiff Michelo.

81. On information and belief, Defendants Trust 2007-2, Forster, and Transworld and/or NCO did not report this discontinuance to credit bureaus. Instead, despite having discontinued the lawsuit against Plaintiff Michelo, these Defendants falsely reported to credit bureaus that the underlying alleged debt was valid and owed.

82. This improper credit-reporting has negatively affected Ms. Michelo's credit, thereby causing her economic and noneconomic harm.

**Plaintiffs Katherine Seaman and Mary Re Seaman**

83. On or about May 29, 2014, Forster initiated a lawsuit against Plaintiffs K. Seaman and Re Seaman (together, the "Seaman Plaintiffs"), in Queens County Civil Court, in which National Collegiate Student Loan Trust 2007-3 ("Trust 2007-3") was named as plaintiff, and the Seaman Plaintiffs as co-defendants. The case is: *National Collegiate Student Loan Trust 2007-3 v. Seaman*, No. 15713-14/QU.

84. This lawsuit was initiated at the direction of Transworld and/or NCO.

85. The complaint in this lawsuit was prepared using a boilerplate template. The same

16

boilerplate complaint was used in hundreds, if not thousands, of cases that Forster filed on National Collegiate's behalf.

86.     The complaint against the Seaman Plaintiffs accused them of being in default upon a promissory note agreement and set forth causes of action for breach of contract and account stated.

87.     This complaint stated, among other things, that "PLAINTIFF [*i.e.,* Trust 2007-3] IS THE ORIGINAL CREDITOR . . . ."

88.     The above statement is false, because Trust Defendant 2007-3 did not originate the purported agreement underlying the alleged debt being sued upon.

89.     The complaint did not identify the entity that did actually originate the purported agreement, to the extent it even exists.[14]

90.     The complaint also stated that Trust 2007-3 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."

91.     The above statement is false, because Trust 2007-3 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

92.     New York law requires that any "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

---

[14]  In addition to other law, New York City Administrative Code § 20-493.1 specifically requires that "the originating creditor of the debt" be identified in any debt-collection "communication with [a] consumer . . . ."

93.     An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."  N.Y. Gen. Ass'ns Law § 2(2).

94.     Trust 2007-3 is a "business trust" for the purposes of this law.

95.     Trust 2007-3 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

a.     Trust 2007-3 maintains offices at 230 Park Avenue, and 100 Wall Street, in Manhattan.

b.     Trust 2007-3 has undertaken extensive debt collection efforts in New York, including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 260 state-court collection actions in New York courts over the past six years.[15]

c.     The documents defining Trust 2007-3's activities are focused on New York as the locus of all activity related to it.  For example, these documents state that the finance settlement is to take place in New York; require Trust 2007-3 to maintain an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2007-3's purpose—will be offered through and "will be ready for delivery in book-entry

---

[15]  Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

form only through the facilities of The Depository Trust Company in New York, New York," which "is a New York-chartered limited-purpose trust company"; and Trust 2007-3's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

96.     The complaint that Forster filed against the Seaman Plaintiffs on or about May 29, 2014 on behalf of Trust 2007-3 contains a Rule 130-1.1a certification, dated May 12, 2014, attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2007-3's behalf.

97.     As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

98.     The complaint filed against the Seaman Plaintiffs sought $24,324.29.   No delineation was provided as to the extent to which this amount reflected interest and charges rather than principal.

99.     On or about March 30, 2015, Forster, on behalf of Trust 2007-3, filed an application for default judgment in this action against the Seaman Plaintiffs.[16]

100.    Submitted in conjunction with this application was an affidavit from Transworld employee James H. Cummins, who testified that: "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to [Transworld] that detail the education loan records."

101.    Mr. Cummins lacked personal knowledge of the business records, including the electronic data, showing that the Seaman Plaintiffs owed the alleged debt in question.

---

[16]  Notably, this application had been prepared by Forster months earlier, on or about October 21, 2014.

102.    Mr. Cummins was instructed to review data on a computer screen to verify information in the affidavit about this alleged debt.  However, he did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether the data meant that the debt was in fact owed to Trust 2007-3.

103.    Mr. Cummins further testified through the affidavit that: "I also have personal knowledge of the record management practices and procedures of [Trust 2007-3] and the practices and procedures [Trust 2007-3] requires of its loan servicers and other agents."

104.    Mr. Cummins lacked personal knowledge of the record management practices and procedures of Trust 2007-3 and the practices and procedures of its agents.

105.    Mr. Cummins' affidavit against the Seaman Plaintiffs was purportedly notarized by Dudley Turner, a DeKalb County, Georgia, Notary Public, on March 20, 2015.  The affidavit also contains a certification, from Georgia attorney Kristian Knochel (Georgia Bar # 426673), swearing that the affidavit's notarization was lawfully performed.

106.    This notarization was defective for various reasons, including, but not limited to:

a.    Mr. Cummins executed this affidavit outside the presence of Mr. Turner;

b.    Mr. Turner did not place Mr. Cummins under oath before Mr. Cummins signed it.

107.    The default judgment application that Forster filed against the Seaman Plaintiffs on behalf of Trust 2007-3 contains the signature of Forster attorney Joel Leiderman, who thereby certified pursuant to Rule 130-1.1a that he had engaged in meaningful review of the claims made on Trust 2007-3's behalf.

108.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

109.    Mr. Leiderman and Forster knew when they filed Mr. Cummins' affidavit that it

20

was not based on the requisite personal knowledge of proof of indebtedness.[17]   They filed this

affidavit anyway, because under New York law they could not have procured the default judgment

against the Seaman Plaintiffs without an affidavit of "proof of the facts constituting the

claim . . . and the amount due . . . ."  CPLR 3215(f).

110.    The application for default judgment against the Seaman Plaintiffs was granted by

the Queens County Civil Court Clerk on or about March 31, 2015.  With costs and fees added to

the amount sought in the complaint, the total judgment amount was $24,609.29.

111.    On or about April 15, 2015, Forster, on behalf of Trust 2007-3, caused an income

execution to be issued to Plaintiff Re Seaman's employer in conjunction with the recent default

judgment.

112.    Plaintiff Re Seaman's wages have been garnished due to this income execution,

thereby causing her both economic and noneconomic harm.

113.    Plaintiff K. Seaman fears she likewise will be subjected to garnishment on Trust

2007-3's unlawfully procured judgment, and thus has been harmed.

***Plaintiff Sandra Tabar***

114.    On or about January 14, 2014, Forster initiated a lawsuit against Plaintiff Tabar, in

Bronx County Civil Court, in which Trust 2007-2 was named as plaintiff, and Ms. Tabar as co-

defendant.  The case is: *National Collegiate Student Loan Trust 2007-2 v. Villasante*, No. 761-

14/BX.

115.    This lawsuit was initiated at the direction of Transworld and/or NCO.

---

[17]   Among other defects, this affidavit violated New York law, because it was impermissibly
created by a <u>nonparty</u> (Transworld).  <u>Only</u> "<u>the party</u>" seeking judgment—here, Trust 2007-3—
may swear out the requisite affidavit of proof in support of a default judgment application.  CPLR
3215(f) (emphasis added).

116.     The complaint in this lawsuit was prepared using a boilerplate template.  The same boilerplate complaint was used in hundreds, if not thousands, of cases that Forster filed on National Collegiate's behalf.

117.     The complaint against Ms. Tabar accused her of being in default upon a promissory note agreement and set forth causes of action for breach of contract and account stated.

118.     This complaint against Ms. Tabar stated, among other things, that "PLAINTIFF [*i.e.,* Trust 2007-2] IS THE ORIGINAL CREDITOR . . . ."

119.     The above statement is false, because Trust Defendant 2007-2 did not originate the purported agreement underlying the alleged debt being sued upon.

120.     The complaint did not identify the entity that did actually originate the purported agreement, to the extent it even exists.[18]

121.     The complaint also stated that Trust 2007-2 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."

122.     The above statement is false, because Trust 2007-2 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

123.     New York law requires that any "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

---

[18]  In addition to other law, New York City Administrative Code § 20-493.1 specifically requires that "the originating creditor of the debt" be identified in any debt-collection "communication with [a] consumer . . . ."

124.     An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."   N.Y. Gen. Ass'ns Law § 2(2).

125.     Trust 2007-2 is a "business trust" for the purposes of this law.

126.     Trust 2007-2 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

    a.     Trust 2007-2 maintains offices at 230 Park Avenue, and 100 Wall Street, in Manhattan.

    b.     Trust 2007-2 has undertaken extensive debt collection efforts in New York, including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 328 state-court collection actions in New York courts over the past six years.[19]

    c.     The documents defining Trust 2007-2's activities are focused on New York as the locus of all activity related to it.  For example, these documents state that the finance settlement is to take place in New York; require Trust 2007-2 to maintain an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2007-2's purpose—will be offered through and "will be ready for delivery in book-entry

---

[19]  Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

form only through the facilities of The Depository Trust Company in New York, New York," which "is a New York-chartered limited-purpose trust company"; and Trust 2007-2's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

127.    The complaint that Forster filed against Plaintiff Tabar on behalf of Trust 2007-2 contains a Rule 130-1.1a certification attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2007-2's behalf.

128.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

129.    The complaint filed against Plaintiff Tabar sought $11,782.40.  No delineation was provided as to the extent to which this amount reflected interest and charges rather than principal.

130.    The summons filed along with that complaint identified an address in the Bronx as the address for Ms. Tabar and her co-defendant.

131.    On or about February 27, 2014, an affidavit of service was submitted in connection with this lawsuit.  The affidavit was signed by Kerron Melville (License # 1314097) of Progress Process Service Inc.  Mr. Melville swore that he had served the summons and complaint upon Ms. Tabar by going to the Bronx address listed in the summons and leaving copies of these documents with a "john doe[] CO-TENANT" [sic] of Ms. Tabar.  Mr. Melville further swore that he had deposited copies of these documents in the mail.

132.    Both of these sworn statements by Mr. Melville were false.

133.    On or about April 3, 2014, Forster, on behalf of Trust 2007-2, filed an application for default judgment in this action against Ms. Tabar.

134.    Submitted in conjunction with this application was an affidavit from NCO

employee Dudley Turner, who testified that: "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to NCO that detail the education loan records."

135.    Mr. Turner lacked personal knowledge of the business records, including the electronic data, showing that Ms. Tabar owed the alleged debt in question.

136.    Mr. Turner was instructed to review data on a computer screen to verify information in the affidavit about this alleged debt.  However, he did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether the data meant that the debt was in fact owed to Trust 2007-2.

137.    Mr. Turner further testified through the affidavit that: "I also have personal knowledge of the record management practices and procedures of [Trust 2007-2] and the practices and procedures [Trust 2007-2] requires of its loan servicers and other agents."

138.    Mr. Turner lacked personal knowledge of the record management practices and procedures of Trust 2007-2 and the practices and procedures of its agents.

139.    This affidavit by Mr. Turner against Ms. Tabar was purportedly notarized by Danielle Gray, a Cobb County, Georgia, Notary Public, on February 18, 2014.  The affidavit also contains a certification, from Georgia attorney Kristian Knochel (Georgia Bar # 426673), swearing that the affidavit's notarization was lawfully performed.

140.    This notarization was defective for various reasons, including, but not limited to:

    a.  Mr. Turner executed this affidavit outside the presence of Ms. Gray;

    b.  Ms. Gray did not place Mr. Turner under oath before Mr. Turner signed it.

141.    The default judgment application that Forster filed against Ms. Tabar on behalf of Trust 2007-2 contains the signature of Forster attorney Joel Leiderman, who thereby certified

pursuant to Rule 130-1.1a that he had engaged in meaningful review of the claims made on Trust 2007-2's behalf.

142.   As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

143.   Mr. Leiderman and Forster knew when they filed Mr. Turner's affidavit that it was not based on the requisite personal knowledge of proof of indebtedness.[20]  They filed this affidavit anyway, because under New York law they could not have procured the default judgment against the Seaman Plaintiffs without an affidavit of "proof of the facts constituting the claim . . . and the amount due . . . ."  CPLR 3215(f).

144.   The application for default judgment against Plaintiff Tabar was granted by the Bronx County Civil Court Clerk on or about March 27, 2014.  With costs and fees added to the amount sought in the complaint, the total judgment amount was $12,062.40.

145.   On or about April 12, 2018, Plaintiff Tabar applied to the Bronx County Civil Court for an order to show cause to vacate this judgment.

146.   In her supporting affidavit, Plaintiff Tabar stated that she had only recently learned of the judgment, and that there had not been proper service of the summons and complaint that Forster filed against her on behalf of Trust 2007-2.

147.   Plaintiff Tabar's affidavit noted that the purported process server in the matter, Kerron Melville, had been disciplined by the New York City Department of Consumer Affairs for dishonest conduct.  She stated that the affidavit of service filed against her by Mr. Melville

---

[20]   Among other defects, this affidavit violated New York law, because it was impermissibly created by a nonparty (NCO).  Only "the party" seeking judgment—here, Trust 2007-2—may swear out the requisite affidavit of proof in support of a default judgment application.  CPLR 3215(f) (emphasis added).

described in-person service upon a male individual of whom she had no knowledge, and that she had never received a copy of the summons and complaint by mail, as Mr. Melville had sworn.

148.    Also through her affidavit, Plaintiff Tabar denied owing the alleged debt over which Trust 2007-2 had sued her, and asserted that Trust 2007-2 lacked standing to sue her.

149.    On or about June 18, 2018, the Bronx County Civil Court vacated Trust 2007-2's default judgment against Plaintiff Tabar, and restored the case to the trial calendar.

150.    On or about June 21, 2018, Plaintiff Tabar filed a discovery demand directing Trust 2007-2 and Forster to provide her with "all records pertaining to the alleged debt," including:

- The entire history of payments, and all statements sent to the account holder.

- A detailed breakdown of all interest and fees that Trust 2007-2 was seeking.

- All information and documents relating to Trust 2007-2's acquisition of the alleged debt, including, without limitation, executed copies of all assignments/transfers.

- All documents related to reporting made to any consumer reporting agencies.

151.    On August 13, 2018, Plaintiff Tabar appeared at Bronx County Civil Court for a pretrial conference as scheduled by the court.  Appearing for Trust 2007-2 on that date was Forster attorney Valerie Watts.

152.    As of that date, Trust 2007-2 and Forster still had not responded to Ms. Tabar's discovery demands.

153.    Before the conference convened, Ms. Watts informed Ms. Tabar that Trust 2007-2's judgment had been obtained in error, and that Trust 2007-2 and Forster would not be pursuing further action against Ms. Tabar or her co-defendant in connection with the alleged underlying debt.  On information and belief, these statements by Ms. Watts were at least partially the result of communications between an employee of Forster and an employee of NCO and/or Transworld.

27

154.    After the conference, Ms. Watts filed with the court a stipulation discontinuing Trust 2007-2's action against Plaintiff Tabar and her co-defendant, with prejudice.

155.    Plaintiff Tabar has incurred economic and noneconomic harm because of the actions of Defendants Trust 2007-2, Forster, and NCO and/or Transworld.  Among other pecuniary costs, she had to spend money: copying her Bronx County Civil Court case file; on transportation to and from that courthouse on multiple occasions; and on effectuating service of process of the court filings she submitted in seeking to have Trust 2007-2's judgment vacated and its action discontinued.  In addition, Plaintiff Tabar had to take time off of work and out of her personal life to go to the courthouse on multiple occasions.  Finally, she has suffered mental and emotional anguish and aggravation from, among other things, learning of the improperly obtained judgment against her years after the fact, and then having to litigate at the state-court level—which could have been avoided had Defendants Trust 2007-2, Forster, and NCO and/or Transworld timely recognized that they had no grounds for pursuing action against her.

**Defendants' Scheme Unravels**

156.    After many years in operation, and countless consumers victimized, a series of public events in the last several months finally shed a spotlight on Defendants' scheme.

### *Donald Uderitz Speaks Out*

157.    Donald Uderitz is the founder of Vantage Capital Group, a private equity firm that is the beneficial owner of National Collegiate.  His company keeps whatever money is left after National Collegiate's noteholders are paid off.

158.    Mr. Uderitz granted an interview to the *New York Times* for a July 17, 2017 article about National Collegiate's systematic inability to produce proof of indebtedness and entitlement

to sue.[21]

159.     Mr. Uderitz told the *New York Times* that an audit of Transworld which he had paid for revealed that, of a random sample of roughly 400 National Collegiate loans, not one had paperwork evidencing the chain of ownership.

160.     As the *New York Times* article states:

>       While Mr. Uderitz wants to collect money from students behind on their bills, he says he wants the lawsuits against borrowers to stop, at least until he can get more information about the documentation that underpins the loans.
>
>       "It's fraud to try to collect on loans that you don't own," Mr. Uderitz said.  "We want no part of that." (emphasis added).

**The CFPB's Findings**

161.     Several weeks after Mr. Uderitz's comments to the *New York Times*, the CFPB announced its findings against National Collegiate and Transworld following a years-long investigation.

162.     The CFPB penalized National Collegiate and Transworld for three categories of lawbreaking: (1) filing lawsuits without the intent or ability to prove the claims, if contested; (2) filing lawsuits over time-barred debt; and (3) filing false and misleading affidavits in support of lawsuits against consumers.

163.     As to the first category, filing baseless lawsuits, the CFPB found that, among other things:

>       Defendants filed at least 1,214 collections lawsuits against consumers even though the documentation needed to prove they owned the loans was missing.  Through these lawsuits, the Defendants obtained approximately $21,768,807 in judgments against consumers. . . .
>
>       In these lawsuits, documentation of a complete chain of assignment

---

[21]   *See supra* note 3.

evidencing that the subject loan was transferred to the Defendants was missing. . . .

In addition, the Defendants filed at least 812 collections lawsuits where the documentation did not support Trusts' ownership of the loans. The chain of assignment documentation shows that these loans were allegedly transferred to Defendants before they were in fact disbursed to consumers. . . .

In at least 208 other collections lawsuits, the promissory note to prove that a debt was owed did not exist or cannot be located. . . .

For each collections lawsuit described [above], Defendants could not prove that a debt was owed to Defendants, if contested. . . .

Defendants knew, or their processes should have uncovered, that these chain of assignment documents were missing or flawed, yet Defendants continued to file collections lawsuits.[22]

164.    As to suing over time-barred alleged debts, the CFPB found that:

In at least 486 collections lawsuits, in connection with collecting or attempting to collect debt from consumers, Defendants filed a collections lawsuit outside the applicable statute of limitations.[23]

165.    As to the false and misleading affidavits, the CFPB found that, among other things:

In the[] affidavits, the affiants swore that they had personal knowledge of the education loan records evidencing the debt. . . .

In fact, in numerous instances, affiants lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits. . . .

The affiants also swore in the affidavits that they were authorized and competent to testify about the consumers' debts through review of and "personal knowledge" of the business records, including electronic data, in their possession. . . .

In fact, in numerous instances, affiants lacked personal knowledge of the business records, including the electronic data, showing that consumers owed debts to the Defendants. . . .

---

[22] Compl. ¶¶ 52–57, *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-UNA (D. Del. Sept. 18, 2017) (Dkt. No. 1).

[23] *Id.* ¶ 58.

Affiants were instructed to review data on a computer screen to verify information in the affidavits about the debts.  Affiants, however, did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether those data meant that the debt was in fact owed to Defendants. . . .

Each affiant also swore that he or she had "personal knowledge of the record management practices and procedures of Plaintiff [National Collegiate] and the practices and procedures Plaintiff requires of its loan servicers and other agents." . . .

In fact, affiants lacked personal knowledge of the record management practices and procedures of Defendants and the practices and procedures of Defendants' agents. . . .

In many affidavits, the affiants also swore, "I have reviewed the chain of title records as business records" regarding the relevant account. . . .

In fact, in numerous instances, affiants did not review the chain of assignment records prior to executing the affidavits.  In some cases, affiants reviewed only "chain of title" records that had been found online.  In fact, at least one of Defendants' Servicers instructed affiants that they did not need to review the chain of assignment records before executing affidavits that represented that the affiant had reviewed those records. . . .

In fact, affiants did not have access to deposit and sale agreements—the last link in the chain of assignment transferring loans into National Collegiate—until May 30, 2014. . . .

In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to National Collegiates on dates certain. . . .

In fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan. . . .

In some instances, when affiants complained to management that they did not have personal knowledge of certain representations made in the affidavits, Defendants' Servicers instructed the affiants to continue signing the affidavits.  In some instances, affiants felt "bullied" by management and

<u>followed the instructions for fear of losing their jobs.</u>[24]

166.     Indeed, during a June 2017 deposition in an unrelated state-court action, a Transworld paralegal testified that the affiants review as many as <u>40 loan files</u> on a daily basis.[25]

**_The Trusts Admit That Consumers Were Defrauded_**

167.     On March 9, 2018, National Collegiate's Trusts commenced the Delaware Action against Transworld and the Trusts' other "servicers" of allegedly defaulted, Trust-owned loans.

168.     The Delaware Action blames Transworld and its co-defendants for so "miserably" performing their duties that "rampant fraud[]" occurred in the state-court collection suits filed on behalf of the Trusts and against consumers like Plaintiffs.[26]

169.     Describing this fraud, the Delaware Action adopts and expounds the CFPB's investigative findings.  Specifically, the Delaware Action explains how state-court collection suits were prosecuted against consumers in which:

  a.   Standing to sue could not be proved, because no documentation could be found that established Trust ownership of the loan underlying the alleged debt being sued upon; and

  b.   False and misleading affidavits sworn out by Trust agents were submitted to state courts as proof of Trust entitlement to judgment against consumers.[27]

---

[24]  _Id._ ¶¶ 27–39 (emphasis added).  The CFPB further found that these affidavits were improperly notarized, because, among other things, the notaries did not witness the affiants signing them.  _Id._ ¶¶ 43–51.

[25]  Bradley Luke Dep. Tr. 40:21–41:10, _Nat'l Collegiate Student Loan Trust 2006-3 v. Thurlow_, No. PORDC-CV-15-324 (Me. Super. Ct., Cumberland Cnty.) (June 16, 2017).

[26]  Del. Action Am. Compl. ¶¶ 4–5; _see supra_ note 8.

[27]  _Id._ ¶¶ 5, 71–104.

## AS AND FOR A FIRST CAUSE OF ACTION

**(FAIR DEBT COLLECTION PRACTICES ACT)**
**(Against Transworld, NCO, EGS, & Forster)**

170.    Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

171.    Each Plaintiff is a "consumer," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(3).

172.    Transworld is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

173.    NCO is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

174.    EGS is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

175.    The FDCPA was enacted to stop "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."  15 U.S.C. § 1692(a).

176.    The FDCPA identifies sixteen specific, nonexclusive prohibited debt collection practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Among the acts prohibited are: the false representation of "the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); "[t]he false representation or implication . . . that any communication is from an attorney[,]"15 U.S.C. § 1692e(3); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken[,]" 15 U.S.C. § 1692e(5); "[c]ommunicating . . . credit information which is known or which should be known to be false[,]" 15 U.S.C. § 1692e(8); and "[t]he use of

any false representation or deceptive means to collect or attempt to collect any debt[,]" 15 U.S.C. § 1692e(10).

177.   The FDCPA also prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.

178.   Defendants violated the FDCPA by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices.  Defendants' violations include, but are not limited to, the following:

a.   filing lawsuits against Plaintiffs and the other members of the class, as described herein, without the intent or ability to prove the claims, if contested;

b.   filing lawsuits against Plaintiffs and the other members of the class, as described herein, for the sole purpose of procuring default judgments against consumers and/or extracting settlements from them;

c.   falsely representing that a Trust Defendant was "authorized to proceed" with the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

d.   falsely representing that a Trust Defendant was the "original creditor" in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

e.   failing to identify, as required by law, the true originating entity for the loan being sued upon in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

f.   filing complaints against Plaintiffs and the other members of the class, as described herein, that were deceptive and misleading in that they were signed by an attorney but were not, in fact, meaningfully reviewed by an attorney;

g.   filing default judgment affidavits against Plaintiffs or other members of the class, as described herein, that were false or deceptive in that the affiant claimed personal knowledge of proof of indebtedness, when he or she in fact lacked such knowledge; and,

h.   communicating credit information adverse to any Plaintiff or other member of the class, as described herein—including in connection with state-court collection actions against consumers—where that information is false or should be known to be false.

179.   The acts and practices herein set forth were deceptive, misleading, and fraudulent. Plaintiffs and the Class have been damaged as a result of these violations—including both economic and noneconomic damages—and are entitled to relief as provided for by 15 U.S.C. § 1692k.

## AS AND FOR A SECOND CAUSE OF ACTION

### (N.Y. GEN. BUS. LAW § 349)
### (Against All Defendants)

180.   Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

181.   Plaintiffs are New York consumers entitled to the protection afforded under Article 22-A of the General Business Law ("GBL"), entitled "Consumer Protection from Deceptive Acts and Practices."

182.   GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

183.   A GBL § 349 cause of action accrues when consumer-oriented conduct would be deceptive and materially misleading to a reasonable consumer, and causes damages.

184.   Defendants' acts and omissions are directed at consumers and include, but are not limited to:

    a.   filing lawsuits against Plaintiffs and the other members of the class, as described herein, without the intent or ability to prove the claims, if contested;

    b.   filing lawsuits against Plaintiffs and the other members of the class, as described herein, for the sole purpose of procuring default judgments against consumers and/or extracting settlements from them;

    c.   falsely representing that a Trust Defendant was "authorized to proceed" with the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

    d.   falsely representing that a Trust Defendant was the "original creditor" in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

    e.   failing to identify, as required by law, the true originating entity for the loan being sued upon in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

f.   filing complaints against Plaintiffs and the other members of the class, as described herein, that were deceptive and misleading in that they were signed by an attorney but were not, in fact, meaningfully reviewed by an attorney;

g.   filing default judgment affidavits against any Plaintiff or other member of the class, as described herein, that were false or deceptive in that the affiant claimed personal knowledge of proof of indebtedness, when he or she in fact lacked such knowledge; and,

h.   communicating credit information adverse to Plaintiffs and the other members of the class, as described herein, herein—including in connection with state-court collection actions against consumers—where that information is false or known to be false.

185.   The acts and practices herein set forth were deceptive, misleading, and fraudulent. As a result of such practices, Plaintiffs and the other members of the Class were injured, suffered damages—including both economic and noneconomic damages—and are entitled to relief as provided for by GBL § 349(h).

### AS AND FOR A THIRD CAUSE OF ACTION

**(VIOLATIONS OF NEW YORK JUDICIARY LAW § 487)**
**(Against Forster)**

186.   Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

187.   New York Judiciary Law § 487 provides as follows: "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment

prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

188.    As set forth above, Forster violated New York Judiciary Law § 487 by engaging in a chronic, persistent pattern of conduct with the intent to deceive consumer-defendants and multiple New York courts.  Forster's violations include, but are not limited to:

a.    commencing actions against consumers on behalf of a Trust Defendant without sufficient factual basis, yet backed by an attorney's Rule 130 certifications falsely stating that, to the best of his or her knowledge, and after an inquiry "reasonable under the circumstances," the complaint and the contentions therein were not frivolous;

b.    filing complaints against consumers that falsely stated that a Trust Defendant was the "original creditor" with respect to the student loan at issue in the action;

c.    filing complaints against consumers that falsely stated that a Trust Defendant was "authorized to proceed with th[e] action";

d.    filing default judgment applications on behalf of a Trust Defendant without reasonable inquiry into the validity of the claims made against the consumer-defendant; and,

e.    submitting default judgment affidavits on behalf of a Trust Defendant where the affiant falsely attested to personal knowledge of proof of indebtedness.

189.    As a result of Forster's deceitful and fraudulent conduct, Plaintiffs and the other members of the Class have been injured—including both economic and noneconomic damages. Plaintiffs and the Class are entitled to relief, as provided for by New York Judiciary Law § 487, in an amount to be determined at trial.

## TOLLING OF THE STATUTES OF LIMITATIONS

**Discovery Rule Tolling**

190.    Plaintiffs could not have discovered, through the exercise of reasonable diligence, within the time periods of the statutes of limitation for the FDCPA and GBL § 349, that Defendants had perpetrated their fraudulent scheme against them.

191.    Plaintiffs did not know, and could not have known, essential elements of their claims until the publication of the CFPB's findings against National Collegiate and Transworld on September 18, 2017, including that Defendants have (1) filed lawsuits without the intent or ability to prove the claims, if contested, and (2) submitted affidavits where the affiant falsely attested to personal knowledge of proof of indebtedness.

192.    Therefore, the running of these statutes of limitations have been suspended with respect to any claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme by virtue of the discovery rule doctrine.

**Fraudulent Concealment Tolling**

193.    Throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiffs and the other members of the Class the fraudulent scheme described herein.  As such, neither Plaintiffs nor the other members of the Class could have discovered, even upon reasonable exercise of diligence, that Defendants had secured default judgments against them through the fraudulent scheme described herein.

194.    Among other things, the false and misleading statements contained in the affidavits that were signed by Transworld and/or NCO employees, and that Forster and National Collegiate's other outside law firms filed on behalf of Trust Defendants in support of applications for default

judgments against Plaintiffs and the other members of the Class, concealed the existence of Defendants' fraudulent scheme.

195.     Therefore, the running of the applicable statutes of limitations have been suspended until September 18, 2017, by virtue of the fraudulent concealment doctrine, with respect to any FDCPA and GBL § 349 claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment as follows:

i)      Declaring this Action to be a proper plaintiffs' class action, declaring Plaintiffs to be proper representatives of the Class, and declaring Plaintiffs' Counsel to be class counsel;

ii)     On the First Cause of Action, under the FDCPA, awarding Plaintiffs and the other members of the Class statutory and actual damages as provided by 15 U.S.C. § 1692k;

iii)    On the Second Cause of Action, under New York's Unfair and Deceptive Trade Practices Act, awarding such preliminary injunctive and ancillary relief as might be necessary to avert the likelihood of consumer injury during the pendency of this action; and entering a permanent injunction to prevent future violations of the GBL by Defendants;

iv)     On the Second Cause of Action, under New York's Unfair and Deceptive Trade Practices Act,, awarding statutory and actual damages as provided by GBL § 349(h);

v)   On the Third Cause of Action, under New York Judiciary Law § 487, awarding Plaintiffs and the other members of the Class monetary damages in an amount to be determined at trial, and treble damages, as provided by said statute;

vi)  Awarding Plaintiffs costs and expenses, including reasonable attorneys' fees and expenses; and

vii) Granting such other and further relief as the Court might deem just and proper.

Dated:   New York, New York
         September 14, 2018

Respectfully submitted,

**FRANK LLP**

By:   */s/ Gregory A. Frank*
Gregory A. Frank (GF0531)
Marvin L. Frank (MF1436)
Asher Hawkins (AH2333)
370 Lexington Avenue, Suite 1706
New York, New York 10017
Tel: (212) 682-1853
Fax: (212) 682-1892
info@frankllp.com