UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/13/2023

KATHERINE SEAMAN, et al., *individually and on behalf of all others similarly situated*,

Plaintiffs,

-against-

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, et al.,

Defendants.

18-CV-1781 (PGG) (BCM)

CHRISTINA BIFULCO, et al., *individually and on behalf of all others similarly situated*,

Plaintiffs,

-against-

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, et al.,

Defendants.

18-CV-7692 (PGG) (BCM)

**REPORT AND RECOMMENDATION TO THE HONORABLE PAUL G. GARDEPHE**

**BARBARA MOSES, United States Magistrate Judge.**

In these consolidated actions, plaintiffs Katherine Seaman, Mary Re Seaman, Sandra Tabar, Christina Bifulco, Francis Butry, and Cori Frauenhofer, suing individually and on behalf of all others similarly situated, allege that defendants National Collegiate Student Loan Trust 2007-2 (Trust 2007-2), National Collegiate Student Loan Trust 2007-3 (Trust 2007-3), National Collegiate Student Loan Trust 2004-2 (Trust 2004-2), and National Collegiate Student Loan Trust 2006-4 (Trust 2006-4) (collectively, the Trust Defendants); Transworld Systems, Inc. (TSI), in its own right and as successor to NCO Financial Systems, Inc. (NCO), and NCO, now known as EGS Financial Care Inc. (collectively, TSI-NCO); and Forster & Garbus LLP (Forster), engaged in a fraudulent scheme, carried out in state courts, to obtain payment on student loan debts "that they cannot prove they are owed," in violation of the Fair Debt Collection Practices Act (FDCPA), 15

U.S.C. §§ 1692-1692p, New York General Business Law (GBL) § 349, and New York Judiciary

Law (NYJL) § 487. *See* Consolidated Class Action Complaint (CCAC) (Dkt. 124) ¶¶ 1-17.[1]

The named plaintiffs allege that defendants filed debt collection lawsuits against them and

thousands of others in state court, knowing that they would unable to prove the underlying claims

if the suits were contested, but hoping to "extract money" from the alleged debtors through default

judgments or settlements without being put to their proof – which, in a substantial majority of the

state court cases, they did. CCAC ¶¶ 1, 274(a)-(b), 280(a)-(b). In order to carry out this scheme,

the Trust Defendants (which appeared as the plaintiffs in the collection lawsuits, *see id.* ¶¶ 88, 119,

161, 193, 222), TSI-NCO (which, as the Trust Defendants' servicing agent, directed the litigation

and managed the Trust Defendants' lawyers, *see id.* ¶¶ 47-57, 89, 120, 162, 194, 223), and Forster

(which served as the Trust Defendants' counsel of record in New York, *see id.* ¶¶ 35, 88, 119, 161,

193, 222) allegedly made a variety of standardized false representations in their pleadings and

affidavits, and engaged in other unfair and abusive practices, including falsely representing that

each Trust Defendant named as plaintiff was the "original creditor" on the debt and was

"authorized to proceed" with the action when in fact neither was true; filing affidavits in which a

TSI-NCO employee attested to "personal knowledge of proof of indebtedness, when he or she in

fact lacked such knowledge"; and filing complaints that were signed by Forster attorneys but never

"meaningfully reviewed by an attorney." *Id.* ¶¶ 274(c)-(g), 280(c)-(g). Additionally, the Trust

Defendants and TSI-NCO conveyed adverse credit information to the major credit bureaus about

---

[1] Unless otherwise specified, all docket citations in this Report and Recommendation are to the docket of the first-filed action, No. 18-CV-1781 (*Seaman*). The original lead plaintiff in that action was Mutinta Michelo, but on May 12, 2021, the parties stipulated to the dismissal of Michelo's claims (Dkt. 298), leaving K. Seaman as the lead plaintiff.

plaintiffs that was false, known to be false, or that they should have known to be false. *Id.* ¶¶ 274(h), 280(h).

Each of the named plaintiffs was sued by one of the Trust Defendants in a state court debt-collection proceeding initiated in New York between 2013 and 2015. CCAC ¶¶ 88, 119, 161, 193, 222. In each case, defendants obtained a default judgment, and in most cases, defendants also recorded a lien, obtained an income execution, garnished the named plaintiff's wages, and/or "falsely reported to credit bureaus that the underlying alleged debt was valid and owed." *Id.* ¶¶ 115-17, 149, 188-192, 219-21, 248-51. One of the named plaintiffs, Sandra Tabar, successfully moved to vacate the default judgment against her, after which defendants discontinued the case. *Id.* ¶¶ 150-60.

Now before me for report and recommendation are: (1) defendants' motion (Dkt. 371), made pursuant to Fed. R. Civ. P. 12(b)(1), as supplemented, *see* Def. R. 12(b)(1) Supp. Br. (Dkt. 408), to dismiss the Consolidated Class Action Complaint *in toto* for lack of subject matter jurisdiction; and (2) plaintiffs' motion (Dkt. 312), made pursuant to Fed. R. Civ. P. 23, as supplemented, *see* Pl. R. 23 Supp. Br. (Dkt. 409); Pl. Damages Supp. Br. (Dkt. 410), for class certification.

In their Rule 12(b)(1) motion, as supplemented, defendants argue that under the standards announced in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the named plaintiffs lack standing to bring any of their claims, against any of the defendants, on any of the theories of harm alleged in the CCAC, and therefore that this action should be dismissed in its entirety. *See* Def. R. 12(b)(1) Supp. Br. at 2-3, 10.

In their Rule 23 motion, as supplemented, plaintiffs ask the Court to do three things:

1.      Certify four classes pursuant to Fed. R. Civ. P. 23(b)(3) (the 23(b)(3) Classes), one

for each of the Trust Defendants, Pl. R. 23 Supp. Br. at 5, as follows:

| Class Definitions for Rule 23(b)(3) Classes[2] | Class Period | Defendants | Claims |
|---|---|---|---|
| All persons who have been sued in New York state-court debt collection lawsuits where the plaintiff was Trust 2004-2, with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel, and where a default judgment has been obtained. | 11/1/12 – 2/27/18 | TSI-NCO | FDCPA; GBL § 349 |
| | | Forster | FDCPA; GBL § 349; NYJL § 487 |
| | | Trust 2004-2 | GBL § 349 |
| All persons who have been sued in New York state-court debt collection lawsuits where the plaintiff was Trust 2006-4, with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel, and where a default judgment has been obtained. | 11/1/12 – 2/27/18 | TSI-NCO | FDCPA; GBL § 349 |
| | | Forster | FDCPA; GBL § 349; NYJL § 487 |
| | | Trust 2006-4 | GBL § 349 |
| All persons who have been sued in New York state-court debt collection lawsuits where the plaintiff was Trust 2007-2, with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel, and where a default judgment has been obtained. | 11/1/12 – 2/27/18 | TSI-NCO | FDCPA; GBL § 349 |
| | | Forster | FDCPA; GBL § 349; NYJL § 487 |
| | | Trust 2007-2 | GBL § 349 |
| All persons who have been sued in New York state-court debt collection lawsuits where the plaintiff was Trust 2007-3, with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel, and where a default judgment has been obtained. | 11/1/12 – 2/27/18 | TSI-NCO | FDCPA; GBL § 349 |
| | | Forster | FDCPA; GBL § 349; NYJL § 487 |
| | | Trust 2007-3 | GBL § 349 |

---

[2] Plaintiffs exclude from each proposed class definition "any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded judgment by a New York state-court judge after trial." Pl. R. 23 Supp. Br. at 5 n.7. As a practical matter, this would exclude only those debtors – if any – who (i) had a default judgment entered against them; (ii) obtained a vacatur of that default, and then (iii) lost on the merits after a post-vacatur trial. As discussed in more detail below, only approximately 1.5% of the debtors litigated and lost to defendants in state court at any stage. *See* Hawkins R. 23 Decl. (Dkt. 315) ¶ 40. It is unclear whether any of them lost at the post-vacatur stage.

2.      Certify four classes pursuant to Fed. R. Civ. P. 23(b)(2) (the 23(b)(2) Classes), one

for each of the Trust Defendants, Pl. R. 23 Supp. Br. at 6, as follows:

| *Class Definitions* *for* **Rule 23(b)(2)** *Classes* | **Class Period** | **Defendants** | **Claims** |
|---|---|---|---|
| All persons who have been or will be sued in New York state-court debt collection lawsuits with the plaintiff being Trust 2004-2, and with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel. | 11/1/12 – 2/27/18 | TSI-NCO | GBL § 349 |
| | | Forster | GBL § 349 |
| | | Trust 2004-2 | GBL § 349 |
| All persons who have been or will be sued in New York state-court debt collection lawsuits with the plaintiff being Trust 2006-4, and with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel. | 11/1/12 – 2/27/18 | TSI-NCO | GBL § 349 |
| | | Forster | GBL § 349 |
| | | Trust 2006-4 | GBL § 349 |
| All persons who have been or will be sued in New York state-court debt collection lawsuits with the plaintiff being Trust 2007-2, and with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel. | 11/1/12 – 2/27/18 | TSI-NCO | GBL § 349 |
| | | Forster | GBL § 349 |
| | | Trust 2007-2 | GBL § 349 |
| All persons who have been or will be sued in New York state-court debt collection lawsuits with the plaintiff being Trust 2007-3, and with TSI-NCO acting as [servicing agent] and Forster as plaintiff's counsel. | 11/1/12 – 2/27/18 | TSI-NCO | GBL § 349 |
| | | Forster | GBL § 349 |
| | | Trust 2007-3 | GBL § 349 |

and;

3.      Appoint plaintiffs' counsel, Frank LLP, as class counsel pursuant to

Fed. R. Civ. P. 23(g). Pl. R. 23 Br. (Dkt. 314) at 25.

For the reasons that follow, I respectfully recommend that defendants' motion to dismiss

under Rule 12(b)(1) be granted in part and denied in part, and that plaintiffs' motion for class

certification be granted in part. The Court should certify a single Rule 23(b)(3) class (which

includes plaintiffs' claims against all four Trust Defendants); appoint the named plaintiffs as class representatives; and appoint Frank LLP as class counsel.

## I.   BACKGROUND

### A.   Parties

Plaintiffs Katherine Seaman, Mary Re Seaman, and Sandra Tabar are current or former New York City residents and holders of student loan debt. CCAC ¶¶ 23-25. Plaintiffs Christina Bifulco, Francis Butry, and Cori Frauenhofer are residents of Erie County, New York, and likewise hold student loan debt. *Id.* ¶¶ 26-28.

Defendants are the four Trust Defendants that sued the six named plaintiffs in state court,[3] each alleging that it was the "original creditor" of the loan sued upon and/or "authorized to proceed with this action," *see* CCAC ¶¶ 29-32, 92, 95, 123, 126, 166, 198, 227; the Trust Defendants' servicing agent, TSI-NCO,[4] which directed the litigation and furnished evidentiary material, including affidavits, for use in the collection actions, *see id.* ¶¶ 33-34, 49-50, 89, 120, 162, 194, 223; and Forster, which served as the Trust Defendants' counsel of record in each action. *Id.* ¶¶ 35, 58-59, 101, 104, 132, 171, 174, 203, 206.

---

[3] Trust 2007-2 sued plaintiff Tabar. CCAC ¶ 119. Trust 2007-3 sued both Seaman plaintiffs in a single lawsuit. *Id.* ¶ 88. Trust 2004-2 sued plaintiff Bifulco and plaintiff Butry in separate actions. *Id.* ¶¶ 161, 193. Trust 2006-4 sued plaintiff Frauenhofer. *Id.* ¶ 222.

[4] NCO served as the Trust Defendants' servicing agent until approximately November 1, 2014, at which point, plaintiffs allege, TSI became their servicing agent. CCAC ¶¶ 49-50. However, "[t]he same personnel, practices, and form documents were employed by NCO and [TSI] in collecting the [Trust Defendants'] debts before and after the changeover from NCO to [TSI]." *Id.* ¶ 51. Defendants have substantially confirmed these facts. *See* Lyons Decl. (Dkt. 328) ¶ 12 ("Since November 2012, NCO and later TSI, has acted continuously and without interruption as Special Subservicer on behalf of the Trusts and a Custodian of Records for loans subject to their administration[.]"). NCO is now doing business as EGS Financial Care Inc., CCAC ¶ 34, and is sued under that name.

### B.       The Fraudulent Debt Collection Scheme

The Trust Defendants have no employees, and use their servicing agent TSI-NCO to collect debts owed on student loans. CCAC ¶¶ 2, 47. Plaintiffs allege that TSI-NCO causes baseless lawsuits to be filed on behalf of the Trust Defendants in state and local courts against student debt holders like plaintiffs. *Id.* ¶ 2. TSI-NCO coordinates with various law firms to sue the debt holders on the Trust Defendants' behalf, relying on Forster to do so in New York State. *Id.* ¶¶ 2, 35.

In the New York collection actions, defendants' boilerplate complaints falsely state that one of the Trust Defendants is the "original creditor" of the loan at issue and/or is "authorized to proceed" with the action. CCAC ¶ 8. In fact, no Trust Defendant originated any of the loans sued on; rather, the Trust Defendants "are the ultimate owners of bundles of student loan debt following a byzantine securitization process." *Id.* ¶ 10.[5] Nor, according to plaintiffs, were any of the Trust Defendants "authorized to proceed" in a New York court, because none of them registered with the New York Department of State and paid the tax required of "out-of-state entities that regularly file suit in this state's courts." CCAC ¶ 11.

Defendants make further misrepresentations later in the litigation process, including by submitting deceptive affidavits in connection with motions for default judgments. CCAC ¶ 12. The TSI-NCO employees who fill out and sign those affidavits falsely attest to "personal knowledge" of key facts such as the relevant account records, the consumer's debt, and – most significantly – the chain of assignments establishing the relevant Trust Defendant's entitlement to

---

[5] This is undisputed. *See* Luke Decl. (Dkt. 327) ¶ 5 (attesting that the Trust Defendants "hold thousands of student loans that were purchased subsequent to the loan's origination, but prior to any default of a loan"). I note, however, that only the New York City complaints (filed against K. Seaman, M. Seaman, and Tabar) appear to allege affirmatively that the Trust Defendant serving as the plaintiff in that case "IS THE ORIGINAL CREDITOR[.]" *See* Hawkins R. 23 Decl. Ex. J, at ECF p. 22; *id.* Ex. K, at ECF p. 19.

sue. *Id.* ¶ 13. "In fact, they robosign the affidavits without reviewing any such evidence," *id.*, "in order to fraudulently obtain default judgments against consumers for unprovable debts." *Id.* ¶ 12.

Moreover, defendants' pleadings and motions "were not meaningfully reviewed by an attorney prior to filing." CCAC ¶ 17. Instead, they were "created by automated systems and non-attorney support staff." *Id.* Defendant Forster, a Long Island-based debt-collection law firm, filed "hundreds, if not thousands," of lawsuits against New Yorkers allegedly indebted to one of the Trust Defendants. *Id.* ¶ 59. The pleadings and other papers filed in those lawsuits, which contained "identical assertions of fact," Hawkins R. 23 Decl. ¶¶ 19-20, were "mass-produced by non-lawyers at the push of a button, and then signed by attorneys who had done nothing to confirm the validity of the allegations and claims lodged against the consumer-defendants[.]" *Id.* ¶¶ 60-63. Forster "did not possess, and did not review, any actual documentary support" for the complaints it filed on behalf of the Trust Defendants. CCAC ¶ 61; *see also* Hawkins R. 23 Decl. ¶¶ 11-12 (noting that TSI-NCO policies expressly forbade Forster from "requesting or receiving copies of the actual documents" evidencing loan terms, assignments, or chain of title).

Similarly, the TSI-NCO employees who signed the affidavits used to procure state court judgments in favor of the Trust Defendants and against debtors – including the named plaintiffs – did not possess or review the underlying records upon which those affidavits were supposedly based. Hawkins R. 23 Decl. ¶¶ 22-27. TSI-NCO had a team of employees (the Affiants) sign those affidavits and aver before the New York State courts that they were "competent and authorized to testify" as the Trusts' witnesses against debtors in state court if called upon to do so. CCAC ¶¶ 105 (affidavit signed by James H. Cummins and filed against the Seaman plaintiffs), 139 (affidavit signed by Dudley Turner and filed against Tabar); 175 (affidavit signed by Colleen Y. Morgan

and filed against Bifulco); 207 (affidavit signed by Jonathan Boyd and filed against Butry); 236 (affidavit signed by Chandra Alphabet and filed against Frauenhofer).[6]

The Affiant team was small – consisting of roughly half a dozen members at any one time – but churned out a large number of affidavits daily, with each Affiant signing "upwards of 45 affidavits per day." Hawkins R. 23 Decl. ¶¶ 25-26. The Affiant team relied on a computerized system that began with a "pre-created" affidavit template and then "pull[ed] data in" from another system to "populate the various fields," which were "utilized to create that affidavit." *Id.* Ex. B (Luke Dep. Tr.) at 181:11-185:9. The system populated, among other things, the names of the borrower and any co-borrower, "the status of the account, balances, last payment date, amount, Trust name, fields such as those." *Id.* at 184:23-185:5.

The resulting affidavits all stated, falsely, that they were based on the Affiant's "personal knowledge" of the relevant business records "that detail the education loan records," the Trust Defendants' "record management practices," the practices and procedures required of their "loan servicers and other agents," and the "education loan records within [the Affiant's] possession as custodian of records related to this matter." *See*, *e.g.*, Cummins Aff. ¶¶ 2, 5; CCAC ¶ 108. In each affidavit, the Affiant further stated, falsely, that he or she had "reviewed the education loan records" regarding the account at issue, and on that basis attested to the amount owed. *See*, *e.g.*, Cummins Aff. ¶ 6. In reality, plaintiffs allege, the Affiants lacked the personal knowledge to which

---

[6] The affidavits were submitted by both plaintiffs and defendants. *See* Cummins Aff. (Hawkins R. 23 Decl. Ex. J, at ECF pp. 4-6; Luke Decl. Ex. 1-L, at ECF pp. 1-3); Turner Aff. (Hawkins R. 23 Decl. Ex. K, at ECF pp. 6-8; Luke Decl. Ex. 1-L, at ECF pp. 24-26); Morgan Aff. (Hawkins R. 23 Decl. Ex. G, at ECF pp.11-12; Luke Decl. Ex. 1-L, at ECF pp. 15-16); Boyd Decl. (Hawkins R. 23 Dec. Ex. H, at ECF pp. 6-8; Luke Decl. Ex. 1-L, at ECF pp. 9-11); Alphabet Aff. (Hawkins R. 23 Dec. Ex. I, at ECF pp. 8-9; Luke Decl. Ex. 1-L, at ECF pp. 18-19). The body of each affidavit is substantially identical, save for the particulars concerning the borrower and loan at issue.

they attested. *E.g.*, CCAC ¶¶ 106-109. They were "instructed to review data on a computer screen," but did not know the source of that data, how it was obtained or maintained, or whether it was accurate. *Id.* ¶ 107. TSI-NCO did not require the Affiants to review the actual documents evidencing the chain of title of the loan sued upon, or the terms of that loan. Hawkins R. 23 Decl. ¶¶ 23-24. It did not even tell the Affiants where those documents could be found in TSI-NCO's records (if at all). *Id.* ¶ 23.

In tandem with the state court proceedings, TSI-NCO reported the underlying debts to the major credit bureaus (Equifax, Experian, and TransUnion) as "valid and owed." CCAC ¶¶ 192, 221; Hawkins R. 23 Decl. ¶ 30. That reporting, in turn, negatively impacted plaintiffs' credit scores. *See* Pl. R. 23 Br. at 24 n.16 (collecting literature on the effect of credit-reporting on credit scores); Pl. R. 23 Reply Br. (Dkt. 335) at 14 n.18 (same); *see also*, *e.g.*, Pl. Bifulco Dep. Tr. (Dkt. 390-4) at 136:10-138:16 (testifying about her "[l]ow credit score" resulting from the judgment against her, which led to "higher interest rates" on her car loan and her credit cards).

### C.    Regulatory Proceedings

#### 1.    TSI

By Consent Order dated September 18, 2017, the Consumer Financial Protection Bureau (CFPB) assessed a $2.5 million civil penalty against TSI for pursuing illegal debt-collection lawsuits in violation of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565. CCAC ¶ 4. In the Consent Order, the CFPB found, among other things, that TSI personnel routinely executed affidavits in support of debt collection lawsuits, including those brought by the Trust Defendants, "that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans." Consent Order § I, *In re Transworld Sys., Inc.*,

Admin. Proc. No. 2017-CFPB-0018, 2017 WL 7520640 (Consumer Fin. Prot. Bureau Sept. 18, 2017). Plaintiffs' initial pleadings drew heavily upon the Consent Order.

In addition to the civil penalty, TSI accepted a series of restrictions on its conduct. Consent Order ¶¶ 45-51. As relevant here, TSI was enjoined from initiating any collection action unless it possessed, *inter alia*, "the documentation necessary to prove that a Trust owns the loan, including, but not limited to, the complete chain of assignment from the Debt's originator to the specific Trust claiming ownership." *Id.* ¶ 45(f)(i). It was also enjoined from executing any affidavit or providing any testimony that contains misrepresentations about the affiant's "personal knowledge" of documents relating to the chain of ownership or other documents that form the basis of the lawsuit. Consent Order ¶¶ 45(l)(i)-(v), 46(a)-(d).

TSI consented to the issuance of the Consent Order "without admitting or denying any of the findings of fact or conclusions of law," except as to jurisdiction, which it admitted. Consent Order § III.2.

### 2.    Trust Defendants

Also on September 18, 2017, the CFPB filed a proposed consent judgment against the Trust Defendants (and certain related trusts) which would have required them to pay at least $19.1 million for attempting to collect student loan debt that they could not prove they were owed, in violation of the CFPA. *See* Prop. Consent J. (Dkt. 3-1), *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr., et al.*, No. 17-CV-01323-SB (D. Del. Sept. 18, 2017) (hereafter *CFPB v. NCMSLT*). Shortly thereafter, various parties – including TSI – successfully moved to intervene in the lawsuit pursuant to Fed. R. Civ. P. 24. On March 19, 2020, following discovery, TSI moved to dismiss the action for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and various other intervenors moved to dismiss it pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dkt. 242, *CFPB v. NCMSLT* (Mar. 19, 2020). After two rounds of motion practice,

the court ruled on December 13, 2021, that "the CFPB may proceed with its enforcement suit." Order (Dkt. 381), *CFPB v. NCMSLT* (Dec. 13, 2021). Defendants and other intervenors then took an interlocutory appeal to resolve certain threshold questions (not relevant to the case before this Court) concerning the CFPB's enforcement authority and the coverage of the CFPA. *See* Notice of Appeal (Dkt. 402), *CFPB v. NCMSLT* (Apr. 29, 2022). Meanwhile, proceedings in the district court are stayed. *See* Order (Dkt. 398), *CFPB v. NCMSLT* (Feb. 11, 2022).

### 3. Forster

On May 17, 2019, the CFPB brought an enforcement lawsuit against Forster to "address its practice of filing collection lawsuits against consumers without meaningful attorney involvement" in violation of FDCPA. Compl. (Dkt. 1) ¶ 1, *Bureau of Consumer Fin. Prot. v. Forster & Garbus, LLP*, No. 19-CV-2928-JS-ARL (E.D.N.Y. May 17, 2019) (hereafter *CFBP v. Forster*). On January 18, 2023, Forster settled that action by means of a Stipulated Final Judgment and Order. Stip. Final J. (Dkt. 60), *CFBP v. Forster* (Jan. 18. 2023). The firm is enjoined from (a) "violating §§ 807(3) and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e(3), 1692e(10)," as well as various provisions of the CFPA; and from (b) initiating or threatening to initiate a collection lawsuit against a consumer, or moving for judgment in a pending collection lawsuit, without first complying with specific requirements, laid out in the stipulated judgment, including "hav[ing] in its possession" documentation of the "complete chain of assignment" of the debt from the originator to the party on whose behalf the lawsuit is brought; ensuring that any attorney whose name appears on the complaint has "reviewed the [specified] documentation"; certifying its compliance with these requirements; and tendering to the state court, in connection with any motion for judgment that it files in that court, "all the information and documentation that [Forster] is required to have in its possession under this Order." *Id.* ¶¶ 6, 7(d), 8(a), 9(a), 10. Additionally,

Forster agreed to pay a $100,000 civil money penalty to the CFPB. *Id.* ¶ 12. Forster neither admitted nor denied the CFPB's allegations, except as to jurisdiction, which it admitted. *Id.* ¶ 2.

### D.  Relevant Procedural History

#### 1.  The Pleadings

The plaintiffs in No. 18-CV-1781 (*Seaman*) filed suit on February 28, 2018, alleging violations of FDCPA, GBL, and NYJL. (Dkt. 8.) On August 23, 2018, the plaintiffs in No. 18-CV-7692 (*Bifulco*) sued defendants on the same theories of liability, alleging nearly identical facts, and on August 28, 2018, the Court accepted *Bifulco* as related to *Seaman*.

On September 14, 2018, the Seamans amended their complaint (Dkt. 60), adding plaintiff Tabar as a named plaintiff and more allegations, but preserving the same causes of action. After defendants signaled their intent to move to dismiss the then-operative complaints in both *Seaman* and *Bifulco*, the Hon. Paul G. Gardephe, United States District Judge, consolidated the cases and set coordinated briefing schedules for the motions to dismiss. (Dkts. 73-74.)

#### 2.  The Court's 2019 Decision

On October 11, 2019, Judge Gardephe granted in part and denied in part defendants' motions, made pursuant to Rule 12(b)(6), to dismiss the amended complaint in *Seaman* and the complaint in *Bifulco*. In a detailed written opinion, the Court dismissed Michelo's FDCPA claim as time-barred; dismissed portions of the Seamans' FDCPA claim as time-barred; dismissed K. Seaman's GBL § 349 claim for failure to plead "actual injury"; dismissed Butry's GBL § 349 claim on the same ground; dismissed Michelo's NYJL § 487 claim for failure to plead damages; and otherwise denied the motions to dismiss. *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668, 715 (S.D.N.Y. 2019).

As relevant here, Judge Gardephe examined each of the three central misrepresentations that defendants allegedly made in the state court debt-collection proceedings, and held that

defendants are not shielded from liability merely because the statements were made in "furtherance of a legal action." *Michelo*, 419 F. Supp. 3d at 702 (quoting *Valle v. Bendett & McHugh, P.C.*, 2015 WL 5797023, at *12 (D. Conn. Sept. 30, 2015)). The District Judge then held that the misrepresentations were both factual and material, and therefore actionable under FDCPA and GBL § 349. *Michelo*, 419 F. Supp. 3d at 705-06.[7] Judge Gardephe did not explicitly consider whether the overarching fraudulent sham lawsuit scheme now described in CCAC ¶¶ 274(a)-(b) and 280(a)-(b) could violate FDCPA and/or GBL § 349, separate and apart from the specific false or misleading statements made in individual state court pleadings and affidavits.

Judge Gardephe also considered whether certain individual plaintiffs adequately alleged "actual injury," as required by GBL § 349.[8] *Michelo*, 419 F. Supp. 3d at 706-09. At the time (prior to the Supreme Court's decision in *TransUnion*), there was a consensus among the lower courts that § 349's "actual injury" requirement was "something more than the 'injury-in-fact' required to establish constitutional standing." *Id.* at 706 (quoting *Toohey v. Portfolio Recovery Assocs., LLC*, 2016 WL 4473016, at *10 n.17 (S.D.N.Y. Aug. 22, 2016)). As relevant here, the District Judge determined that the wage garnishment alleged by Bifulco and Frauenhofer was "a pecuniary harm that satisfies the actual injury requirement," *id.* at 709, whereas K. Seaman's fear of future garnishment did not meet the standard. *Id.* at 708-09. Likewise, defendants' "improper credit reporting" satisfied the actual injury requirement as to Michelo, who specifically alleged that her credit was adversely affected, "thereby causing her economic and noneconomic harm," *id.* at 707,

---

[7] The misrepresentations, as then pleaded, were: "(1) that the Defendants were the 'original creditors' of the relevant loans; (2) that the Trust Defendants were 'authorized to proceed' with litigation in state court; and (3) that Defendants possessed and reviewed proof of indebtedness." *Michelo*, 419 F. Supp. 3d at 701. The same allegedly false or misleading statements are now described in CCAC ¶¶ 274(c)-(g), 280(c)-(g).

[8] The statute grants a private right of action to "any person who has been injured by reason of any violation of this section[.]" GBL § 349(h).

but not as to Butry, who alleged only that defendants falsely reported to the credit bureaus "that the debt was valid and owed." *Id.* at 709. Because Butry did not allege that the false report "actually affected [his] credit or otherwise caused [him] damage," his GBL § 349 claim was dismissed. *Id.*[9]

A plaintiff suing under NYJL § 487 must also plead "actual damages," and the defendant's deceit "must be the proximate cause of the damage incurred." *Michelo*, 419 F. Supp. 3d at 713-14 (quoting *Bryant v. Silverman*, 284 F. Supp. 3d 458, 472 (S.D.N.Y. 2018)). Here, too, the District Judge found that the plaintiffs who pleaded that their wages were garnished – M. Seaman and Tabar – adequately alleged that they suffered actual damages for purposes of § 487. *Id.* at 714 & n.29. He further held that Tabar's legal expenses, incurred in fighting the state court collection proceeding, constituted actual damages for purposes of § 487. *Id.* However the false credit-reporting alleged by Michelo was "not sufficient to sustain her Section 487 claim," because she did not allege that "Forster's misrepresentations . . . *caused* the false credit reporting, or that *Forster* [as opposed to TSI-NCO] communicated the false credit reporting to the state court or to Michelo." *Id.* at 715 (emphasis added).

---

[9] The District Judge was careful to explain that the question whether defendants' credit-reporting was "false" (and therefore actionable under FDCPA and/or GBL § 349), turned on whether they "knew they could not prove the debt was 'valid and owed,'" and whether, "in their reporting Defendants failed to state that the debt was no longer the subject of legal action," not on whether the plaintiff owed the debt. *Michelo*, 419 F. Supp. 3d at 707 & n.23. This is because, "[m]uch like the FDCPA – which is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists . . . the purpose of [GBL] Section 349 is to secure an honest market place where trust, and not deception, prevails." *Id.* at 707 n.23. Thus, plaintiffs may "suffer harm in connection with Defendants' alleged deceptive practices," including false credit-reporting, "regardless of whether or not [they] owed the loan debt in question." *Id.* (cleaned up).

### 3.    The Consolidated Class Action Complaint

On December 10, 2019, plaintiffs filed the CCAC, which remains the operative pleading for the consolidated actions. Plaintiffs assert three broad categories of misconduct alleged to violate both FDCPA and GBL § 349:

- First, that defendants filed debt collection lawsuits "without the intent or ability to prove the claims, if contested," for the sole purpose of "procuring default judgments against consumers and/or extracting settlements from them," CCAC ¶¶ 274(a)-(b), 280(a)-(b);

- Second, that in the course of carrying out that scheme, defendants routinely made certain false or misleading statements in their state court pleadings and papers, *id.* ¶¶ 274(c)-(g), 280(c)-(g);[10] and

- Third, that defendants communicated false credit information about plaintiffs' debts to the credit reporting bureaus. *Id.* ¶¶ 274(h), 280(h).

For purposes of their NYJL § 487 claim, asserted only against Forster, plaintiffs allege that the firm commenced actions "backed by an attorney's Rule 130 certification," but "without

---

[10] Specifically, plaintiffs allege, defendants:

> (c) falsely represent[ed] that a Trust Defendant was "authorized to proceed" with the state-court actions filed against Plaintiffs and the other members of the class . . . ; (d) falsely represent[ed] that a Trust Defendant was the "original creditor" in the state-court actions filed against Plaintiffs and the other members of the class . . . ; (e) fail[ed] to identify, as required by law, the true originating entity for the loan being sued upon in the state-court actions filed against Plaintiffs and the other members of the class . . . ; (f) fil[ed] complaints against Plaintiffs and the other members of the class . . . that were . . . signed by an attorney but were not, in fact, meaningfully reviewed by an attorney; [and] (g) fil[ed] default judgment affidavits against any Plaintiff or other member of the class . . . that were false or deceptive in that the affiant claimed personal knowledge of proof of indebtedness, when he or she in fact lacked such knowledge[.]

CCAC ¶¶ 274, 280.

sufficient factual basis," CCAC ¶ 284(a),[11] and that it routinely filed pleadings and papers that contained certain false or misleading statements. *Id.* ¶ 284(b)-(e).[12]

Plaintiffs seek "statutory and actual damages" on their FDCPA claim, which is asserted against TSI-NCO and Forster, and on their GBL § 349 claim, which is asserted against all defendants; damages in an amount to be determined at trial on their NYJL § 487 claim, plus treble damages "as provided by said statute"; and an injunction, under GBL § 349, "to prevent future violations of the GBL by defendants." CCAC at 57-58.

On April 28, 2020, Judge Gardephe referred this matter to me for general pretrial management. (Dkt. 144.)

### 4.    Discovery

The parties engaged in discovery throughout 2020 and 2021, including depositions of the named plaintiffs, and pre-certification class discovery "via a sampling of Defendants' documents

---

[11] Rule 130 requires that an attorney practicing before the New York State courts, in signing a paper, certify that, "to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, . . . the presentation of the paper or the contentions therein are not frivolous as defined in section 130-1.1(c) of this Subpart." N.Y. Comp. Codes R. & Regs. tit. 22, § 130-1.1a(b). Section 130-1.1(c) defines as "frivolous" conduct that either "is completely without merit in law," is "undertaken . . . to harass or maliciously injure another," or "asserts material factual statements that are false."

[12] Specifically, plaintiffs allege, Forster:

> (b) fil[ed] complaints against consumers that falsely stated that a Trust Defendant was the "original creditor" with respect to the student loan at issue in the action; (c) fil[ed] complaints against consumers that falsely stated that a Trust Defendant was "authorized to proceed with th[e] action"; (d) fil[ed] default judgment applications on behalf of a Trust Defendant without reasonable inquiry into the validity of the claims made against the consumer-defendant; and, (e) submit[ed] default judgment affidavits on behalf of a Trust Defendant where the affiant falsely attested to personal knowledge of proof of indebtedness.

CCAC ¶ 284.

concerning state-court actions," initially limited to 5% of the putative class members in New York. *See* Order dated Aug. 6, 2020 (Dkt. 204) ¶ 5.

### a)   *Plaintiffs' Depositions and Declarations*

At deposition, none of the named plaintiffs claimed to have read and relied on the allegedly false pleadings and affidavits filed in the state court collection actions against them, and several plaintiffs expressly conceded that they did not read (or could not remember reading) those documents. *See*, *e.g.*, Def. K. Seaman Dep. Tr. (Dkt. 362-1) at 170:4-20, 282:8-283:2; Def. M. Seaman Dep. Tr. (Dkt. 362-2) at 20:6-16, 121:4-16; Def. Bifulco Dep. Tr. (Dkt. 362-3) at 105:9-11, 106:3-12; Def. Frauenhofer Dep. Tr. (Dkt. 362-4) at 184:23-185:24, 187:1-11; Def. Tabar Dep. Tr. (Dkt. 362-5) at 262:8-263:15, 302:8-22. No plaintiff testified that he or she took any action, or forbore from taking any action, in reliance on any particular pleading or affidavit. *See*, *e.g.*, Def. Bifulco Dep. Tr. at 106:3-12; Def. Frauenhofer Dep. Tr. at 187:12-23.[13]

Asked about injuries or damages resulting from the entry of the default judgments against them, several plaintiffs noted (as other record evidence shows) that their wages had been garnished, or that they feared garnishment, which caused them financial harm, emotional distress, and stigma. *See*, *e.g.*, Pl. K. Seaman Dep. Tr. (Dkt. 390-1) at 302:8-303:6; Pl. M. Seaman Dep. Tr. (Dkt. 390-2) at 192:6-193:23; Pl. Bifulco Dep. Tr. at 133:1-138:16; Pl. Butry Dep. Tr. (Dkt. 390-5) at 154:4-22; Pl. Frauenhofer Dep. Tr. (Dkt. 390-6) at 120:11-25; *see also* Hawkins R. 12(b)(1) Decl. (Dkt. 390) Exs. 2-A through 2-D (income executions against M. Seaman, Bifulco, Butry, and Frauenhofer).

---

[13] Where plaintiffs and defendants separately submitted excerpts of the parties' deposition testimony, they are identified as "Pl. [name] Dep. Tr." and "Def. [name] Dep. Tr.," respectively.

One plaintiff – Tabar – ultimately succeeded in getting the default judgment against her vacated, and attested that in order to do so, she was required to miss several days of work (for court appearances and to visit the legal clinic that assisted her), for which she was not paid. Tabar Decl. (Dkt. 390-3) ¶¶ 2-10. Additionally, Tabar incurred travel and document copying expenses. *Id.* ¶¶ 7, 11. She estimates that the costs she incurred totaled just over $1,000. *Id.* ¶ 12.

Defendants acknowledge that TSI-NCO credit-reported each and every named plaintiff against whom defendants brought debt collection lawsuits, and that in each instance the "tradeline" reflected a debt owed to "National Collegiate Trust." *See* Luke Decl. ¶¶ 35, 46, 57, 72, 87.[14] However, only two of the six named plaintiffs (Bifulco and Butry) specifically allege that they were credit-reported, *see* CCAC ¶¶ 192, 221, and only one (Bifulco) testified at deposition *both* that she suffered a "low credit score" due to the National Collegiate Trust tradeline *and* that the negative information was disseminated to creditors, who charged her higher interest rates as a result. Pl. Bifulco Dep. Tr. at 136:10-138:1. Specifically, Bifulco testified that she was charged a 16% interest rate on a car loan, and that she was informed by the dealership that, absent the default judgment,f the rate would have been six to seven percent. *Id.* at 138:2-16.

### b)  *Sampling*

Defendants identified "3,914 accounts subject to state-court suits in New York where one of the four Trust Defendants was a named plaintiff," and produced files for a sample of 189 accounts (5% of the total), representing collection actions against 322 borrowers and co-borrowers. Hawkins R. 23 Decl. ¶¶ 37-38.

---

[14] "A tradeline is a term used by credit reporting agencies to describe credit accounts listed on your credit report. For each account you have, there is a separate tradeline, which includes information about the creditor and the debt." Experian, *What Are Tradelines and How Do They Affect You?* https://www.experian.com/blogs/ask-experian/what-are-tradelines/ (last visited March 13, 2023). "The information included in your tradelines is primarily used to calculate your credit scores." *Id.*

Based on their review of those files, plaintiffs report that:

- the pleadings filed against the named plaintiffs "are effectively identical to those [filed] against all other Class members," at least in New York;

- defendants obtained a default judgment in 50% of the cases in the sample;

- the debtor "settled after being sued" in 27% of the cases;

- the Trust Defendant named as plaintiff "lost, discontinued, or abandoned" the suit in 21.5% of cases, including in cases where the debtor appeared and defended; and

- the Trust Defendant named as plaintiff "prevail[ed] in state court against a Class member who appeared to defend themselves" in "only roughly 1.5%" of the cases.

*Id.* ¶ 40. Defendants do not contest these statistics.

Although plaintiffs pled this case as a nationwide class action, *see* CCAC ¶ 36, they never sought or obtained leave to expand their class discovery (via sampling) beyond New York.

### 5. Motion for Class Certification

On June 3, 2021, plaintiffs filed their motion for class certification pursuant to Rule 23, supported by the declaration of Asher Hawkins. In their moving brief, plaintiffs asked the Court to certify a single, nationwide class under Fed. R. Civ. P. 23(b)(3), including "(a) all persons sued in state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was identified as plaintiff in the complaint, (c) from February 27, 2012 through February 27, 2018," and then to "subdivide" that class, "[f]or purposes of notice and application of any statutory damages cap," such that "there is a Rule 23(b)(3) class for each Trust and each state." Pl. R. 23 Br. at 10.[15] Plaintiffs also asked the Court to certify a single, nationwide class under Fed. R. Civ. P.

---

[15] Under FDCPA, a successful plaintiff may elect to recover either the "actual damage[s] sustained" as a result of the violation, 15 U.S.C. § 1692k(a)(1), or statutory damages, which in a

23(b)(2), defined to include "(a) all persons sued in state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was the plaintiff, and (c) against whom TSI-NCO reported the alleged debt to Equifax, Experian, and/or TransUnion." *Id.* Because the purpose of the Rule 23(b)(2) class is to seek injunctive relief, rather than damages, plaintiffs argue that "[n]o subclasses are required." *Id.*

On August 12, 2021, defendants filed an opposition memorandum (Def. R. 23 Opp.) (Dkt. 323), supported by the declarations of Bradley Luke, Ralph Lyons, and James Schultz (Dkt. 331). On September 14, 2021, plaintiffs filed a reply memorandum (Pl. R. 23 Reply) (Dkt. 337), supported by the reply declaration of Asher Hawkins (Hawkins R. 23 Reply Decl.) (Dkt. 336). Thereafter, with the Court's permission (Dkt. 339), defendants filed a sur-reply (Def. R. 23 Sur-Reply) (Dkt. 338-1), and plaintiffs filed a response thereto (Dkt. 341), supported by the supplemental declaration of Asher Hawkins (Hawkins R. 23 Supp. Decl.) (Dkt. 342).

### 6.    Motion to Dismiss for Lack of Standing

On March 18, 2022 – at which point the Rule 23 motion was fully briefed but still pending and undecided – defendants filed a letter seeking "permission to file a motion under Fed. R. Civ. P. 12(b)(1) seeking dismissal of certain of Plaintiffs' claims for lack of Article III standing." Def. 3/18/22 Ltr. (Dkt. 362) at 1. The proposed motion would be based on the Supreme Court's opinion in *TransUnion*, which had been decided a few weeks after plaintiffs filed their class certification motion, and was cited in defendants' opposition papers – but only to support a narrow

---

class action are capped at $1,000 for each named plaintiff and "such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." *Id.* § 1692k(a)(2). The obvious purpose of plaintiffs' request for a separate Rule 23(b)(3) class for each Trust and each state was to overcome the $500,000 cap that would otherwise apply to a single nationwide class, and to make it possible for each class (of which there could be as many as 200, if all four Trust Defendants sued consumers in all 50 states) to seek its own $500,000 statutory damages award.

argument that any putative class member against whom a debt collection lawsuit was discontinued "prior to service of a complaint and/or any appearance in the action" would "not have standing" to pursue any of the claims asserted in the CCAC. Def. R. 23 Opp. at 10 n.15. Defendants' proposed Rule 12(b)(1) motion would argue, more broadly, for the "dismissal of certain claims" altogether on standing grounds, including all of plaintiffs' claims based on the specific false or misleading statements in defendants' state court filings and all of their claims based on defendants' false credit-reporting. Def. 3/18/22 Ltr. at 2-3.

Plaintiffs objected, arguing, that having invoked *TransUnion* for a limited purpose in their class certification papers, "Defendants are now estopped from suddenly urging that Plaintiffs be held to a different, novel theory of standing." Pl. 05/23/22 Ltr. (Dkt. 363) at 1. However, mindful of the rule that lack of subject matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation," *In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 101 (2d Cir. 2015), and recognizing that defendants' standing challenge, if it had merit, could affect the outcome of the class certification motion, I set a briefing schedule for the Rule 12(b)(1) motion. (Dkt. 364.)

Thereafter, on April 7, 2022, defendants filed their Rule 12(b)(1) motion. As promised in their pre-motion letter, defendants sought the dismissal of some but not all of plaintiffs' claims, namely, those based on "allegedly false statements made in court filings in other actions and allegedly inaccurate credit reporting." Def. R. 12(b)(1) Br. (Dkt. 372) at 1. The false statements did not cause any "injury in fact," defendants argued, because plaintiffs were not "confused or misled" by them and did not take or refrain from taking any action because of them. *Id.* at 5-7. The false credit-reporting did not cause any injury-in-fact, in defendants' view, because no plaintiff *alleged* that any inaccurate report was disseminated "to third parties from the credit bureaus." *Id.*

22

at 8. Defendants assured the Court that plaintiffs' claims would remain alive to the extent they were based on the harms alleged in CCAC ¶¶ 274(a)-(b) and 280(a)-(b), which alleged that defendants filed debt collection lawsuits *en masse*, "without the intent or ability to prove the claims, if contested," for the sole purpose of "procuring default judgments against consumers and/or extracting settlements from them." *See* Def. R. 12(b)(1) Br. App'x A (Dkt. 372 at ECF pp. 13-14), at 1 n.1.

On April 22, 2022, plaintiffs filed their opposition brief (Pl. R. 12(b)(1) Opp.) (Dkt. 389), accompanied by another Hawkins declaration (Hawkins R. 12(b)(1) Decl.), and on April 29, 2022, defendants filed their reply brief, which again asked the Court to dismiss "the subset of Plaintiffs' claims" identified in Appendix A to their opening brief. Def. R. 12(b)(1) Reply (Dkt. 397) at 5. On April 8, 2022, Judge Gardephe referred both the Rule 23 motion and the Rule 12(b)(1) motion to me for report and recommendation. (Dkt. 373.)

### 7.    Oral Argument

The Court heard oral argument on both motions on May 5, 2022. Defendants took this occasion to expand their argument yet again, arguing – for the first time – that *TransUnion* requires dismissal of this consolidated action in its entirety. *See* Tr. of May 5, 2022 Hearing (Hr'g Tr.) (Dkt. 402), at 29:3-34:23 (defendants' counsel, explaining that the more aggressive argument dawned on him "as [they] were preparing [for oral argument] last night"). Plaintiffs, for their part – after fielding a series of questions from the bench concerning the certifiability of a nationwide class, as well as the inclusion, in the class definition, of consumers against whom no default judgments were entered – asked for an opportunity to "modify the proposed class definition[s] in accordance with the Court's concerns[.]" *Id.* at 110:17-20. Consequently, at the conclusion of the hearing, I directed the parties to file supplemental briefs with respect to both motions. (Dkt. 399.)

### 8.   Supplemental Briefing

On May 26, 2022, defendants filed their supplemental memorandum in support of their expanded Rule 12(b)(1) motion (Def. R. 12(b)(1) Supp. Br.), and plaintiffs filed their supplemental memorandum setting out the modified proposed class definitions summarized above. (Pl. R. 23 Supp. Br.) Plaintiffs also filed a supplemental memorandum concerning the categories of damages they seek on a classwide basis. (Pl. Damages Supp. Br.) On June 9, 2022, defendants responded to plaintiffs' supplemental briefs (Def. R. 23 Supp. Opp.) (Dkt. 414); Def. Damages Supp. Opp. (Dkt. 415)), and plaintiffs responded to defendants' supplemental brief (Pl. R. 12(b)(1) Supp. Opp.) (Dkt. 416). Thereafter, the parties periodically submitted letters and notices discussing new decisions of interest. (Dkts. 419-22.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standing

The question at the heart of every dispute over constitutional standing is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotations omitted). Because that question is rooted in Article III of the Constitution, which limits the subject matter jurisdiction of the federal courts to actual "cases" and "controversies," U.S. Const. art. III § 2, standing is properly challenged pursuant to Rule 12(b)(1), and is "the threshold question in every federal case." *Warth*, 422 U.S. at 498. Standing may be raised "at any stage in the litigation," *In Touch Concepts*, 788 F.3d at 101, including class certification. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).

"To meet the Article III standing requirement, a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Denney*, 443 F.3d at 263 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The first element, "injury in fact," requires that plaintiff allege an injury that is both "concrete *and* particularized," as well as "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-41 (2016) (emphasis in original) (in bringing an action for violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.*, plaintiff could not merely "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement"); *see also* *TransUnion*, 141 S. Ct. at 2205 ("Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue[.]"). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 578 U.S. at 338. Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 141 S. Ct. at 2208.

Not only must each named plaintiff in a class action have standing to sue; "no class may be certified that contains members lacking Article III standing." *Denney*, 443 F.3d at 264; *see also* *Petrosino v. Stearn's Prods., Inc.*, 2018 WL 1614349, at *4-5 (S.D.N.Y. Mar. 30, 2018) (explaining that "[s]tanding in the class action context requires a bifurcated inquiry" in which the court first ensures that the named plaintiffs have plausibly alleged an "injury-in-fact" sufficient to confer Article III standing on them, and then determines whether the conduct that caused that injury "implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants"). At the class certification stage, the courts

"do not require that each member of a class submit evidence of personal standing." *Denney*, 443 F.3d at 263. Instead, "the class must . . . be defined in such a way that anyone within it would have standing." *Id.* at 264.

If the standing challenge is based upon the pleadings, the court must "accept as true all material allegations of the complaint." *Denney*, 443 F.3d at 263 (quoting *Warth*, 422 U.S. at 501). But if "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999)). Where, as here, the motion is made after full fact discovery, the Court appropriately looks to the relevant portions of the discovery record in determining the motion. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

### 2.   Class Certification

Rule 23 requires the party seeking certification to establish that:

(1)    the class is so numerous that joinder of all members is impracticable;
(2)    there are questions of law or fact common to the class;
(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, "[s]ome courts have read into Rule 23 an implied requirement that the class be ascertainable." *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 138 (S.D.N.Y. 2014) (internal quotations omitted). "An identifiable class exists if its members can be ascertained by reference to objective criteria." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002) (citation omitted).

Beyond that, "the movant must show that the action is one of three types described in section (b)." *Ciaramella v. Zucker*, 2019 WL 4805553, at *12 (S.D.N.Y. Sept. 30, 2019) (quoting

26

*Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014)). In this case, plaintiffs seek class certification under Rules 23(b)(2) and 23(b)(3).

Under Rule 23(b)(2), ordinarily used to obtain classwide declaratory or injunctive relief, a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Additionally, certification of a Rule 23(b)(2) class requires a showing that defendants caused harms "that apply generally to the class," such that the conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 294 (S.D.N.Y. 2012) (*Sykes II*) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (certifying separate classes under Rules 23(b)(2) and 23(b)(3))).

Under Rule 23(b)(3), which permits plaintiffs to seek classwide damages, they must demonstrate that questions of law or fact common to the members of the proposed class "predominate over any questions affecting only individual members," and that a class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 221, 224 (2d Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(3)). "To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, . . . must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence." *Rodriguez*, 300 F.R.D. at 132. "If both Rule 23(a) and Rule 23(b) are satisfied, the Court may, in its discretion, certify the class." *Id.*

### B.       Plaintiffs Have Standing to Sue

#### 1.       Defendants' Argument

As noted above, defendants' (most recent) position is that *TransUnion* precludes *all* of the named plaintiffs' claims, requiring dismissal of this action *in toto* for lack of standing. In defendants' view, *TransUnion* made the "injury in fact" inquiry under Article III of the Constitution equivalent to the "actual injury" requirement for GBL § 349 claims. Def. R. 12(b)(1) Supp. Br. at 3, 6. Thus, they conclude, to the extent Judge Gardephe held in 2019 that a particular named plaintiff failed to adequately plead an "actual injury" for purposes of GBL § 349 on one of the two bases he considered (wage garnishment and improper credit-reporting), that plaintiff is also precluded, on standing grounds, from asserting any of the FDCPA claims alleged in the Consolidated Class Action Complaint.[16] *Id.* Moreover, defendants argue, wage garnishment cannot constitute the required "concrete injury" (even though Judge Gardephe determined that it could, *see Michelo*, 419 F. Supp. 3d at 709), because that species of harm is not "redressable" in federal court pursuant to the *Rooker-Feldman* doctrine. Def. R. 12(b)(1) Supp. Br. at 3, 8-10.

Defendants go on to consider – and reject as a basis for standing – three additional species of harm, which were not expressly considered by Judge Gardephe. First, defendants say, plaintiffs cannot show that they were harmed by detrimentally relying on defendants' false statements (*see* CCAC ¶¶ 274(c)-(g), 280(c)-(g)), because they cannot show any such reliance. Def. R. 12(b)(1)

---

[16] This portion of defendants' argument focuses solely upon the pleadings when they are sparse, ignoring the discovery record. For example, defendants argue that plaintiff Bifulco has not adequately *alleged* an actual injury based on defendants' credit-reporting, because she pleads only that the improper credit-reporting occurred – not that it "actually affected her credit or otherwise caused her damage." Def. R. 12(b)(1) Supp. Br. at 7 (quoting *Michelo*, 419 F. Supp. 3d at 709). However, as discussed in Part I.D.4(a), *supra*, Bifulco clearly testified at deposition that she was negatively credit-reported *and* that she suffered higher interest rates on an auto loan and credit cards as a result. *See* Pl. Bifulco Dep. Tr. at 136:10-138:1.

Supp. Br. at 5. Second, according to defendants, plaintiffs cannot show that they suffered reputational harm caused by the fraudulent lawsuits filed against them or the resulting default judgments (*see* CCAC ¶¶ 274(a)-(b), 280(a)-(b)), because under the Second Circuit's post-*TransUnion* decision in *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58 (2d Cir. 2021) (*Maddox II*), plaintiffs are required to establish that a third party "viewed the record (causing a reputational harm)," which they cannot. Def. R. 12(b)(1) Supp. Br. at 5-6. Third, defendants argue, plaintiff Tabar cannot point to the costs incurred in successfully moving to vacate the default judgment against her (even though Judge Gardephe held that those costs satisfied the "damages element" of her NYJL § 487 claim, *see Michelo*, 419 F. Supp. 3d at 714 & n.29), because "costs to vacate a default do not confer standing." Def. R. 12(b)(1) Supp. Br. at 6 n.5.

### 2.     The *TransUnion* Decision

Given that defendants' Rule 12(b)(1) motion turns on *TransUnion*, it bears briefly summarizing what the Supreme Court did in that case. The class comprised 8,185 individuals who alleged that TransUnion, one of the major credit reporting agencies, violated the FCRA by failing to use reasonable procedures to ensure the accuracy of its credit files. 141 S. Ct. at 2200. TransUnion had placed an internal alert on each class member's credit file to indicate that his or her name was a "potential match" to a name on a list of "specially designated nationals" (SDNs) kept by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) – an ignominious designation reserved for "terrorists, drug traffickers, or other serious criminals." *Id.* at 2201. The named plaintiff, Ramirez, "learned the hard way" that the list contained many "false positives" when an automobile dealer refused to sell him a car because his name was on a "terrorist list." *Id.*

After the class was certified, the parties stipulated that "only 1,853 members of the class (including Ramirez) had their credit reports disseminated by TransUnion to potential creditors"

during the relevant period. 141 S. Ct. at 2202. Nonetheless, the district court ruled that all 8,185 had Article III standing, the case went to trial, and the jury returned a verdict for the class. *Id.* The Ninth Circuit affirmed, but Supreme Court reversed and remanded, holding that only the 1,853 class members whose misleading credit reports were disseminated to third-party businesses "demonstrated concrete reputational harm and thus have Article III standing to sue." *Id.* at 2200.

Writing for the Court, Justice Kavanaugh observed that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider," and that "with respect to the concrete-harm requirement in particular . . . courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341). The test "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury," but "does not require an exact duplicate in American history and tradition." *Id.* Among the harms that satisfy Article III, are "physical harms," "monetary harms," and "[v]arious intangible harms," including "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.*

Applying these principles, the Court found that the 1,853 class members whose credit reports – including the inaccurate SDN alert – were disseminated to third-party businesses "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation," and therefore suffered "a concrete harm that qualifies as an injury in fact." *TransUnion*, 141 S. Ct. at 2209.[17] However, the remaining class members, whose credit files were inaccurate but were not disseminated beyond TransUnion, lacked standing, because:

---

[17] The Court did *not* require those 1,853 class members to show that they were unable to purchase an automobile (like Ramirez) or suffered another *tangible* harm. 141 S. Ct. at 2204. Rather, the

> The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm. In cases such as these where allegedly inaccurate or misleading information sits in a company database, the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer. *A letter that is not sent does not harm anyone, no matter how insulting the letter is.* So too here.

*Id.* at 2210 (emphasis added).

### 3.   The Legal Landscape Following *TransUnion*

Since *TransUnion*, many lower courts have relied on it to dismiss consumer claims that were not previously thought vulnerable to a standing challenge. *See*, *e.g.*, *Ciccone v. Cavalry Portfolio Servs., LLC*, 2021 WL 5591725, at *3, *5 (E.D.N.Y. Nov. 29, 2021) (dismissing FDCPA claims for lack of standing and observing that *TransUnion* "'substantially and materially' changed a district court's analysis of Article III standing in statutory consumer law cases"). In particular, courts within our Circuit have dismissed numerous cases that fall into one of two broad categories:

*False Statement/No Reliance Cases.* Where the gravamen of the claim is that a debt collector made false or misleading statements in dunning letters, but the plaintiff did not actually read or rely on those letters (or show any specific pecuniary or reputational harm flowing from them), the case will be dismissed. *See*, *e.g.*, *Rosenberg v. McCarthy, Burgess & Wolff, Inc.*, 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1, 2022) (no standing in FDCPA case where plaintiff "did not allege that the [creditor's] letter caused her to take or refrain from taking any action or that she suffered any financial, legal, or other harm beyond the alleged statutory violations"); *Ergas v.*

---

*intangible* reputational harm supplied the necessary "injury in fact." *Id. See also Martinez v. Avantus, LLC*, 2023 WL 112807, at *6 (D. Conn. Jan. 5, 2023) (noting that "[t]he reputational harm stemming from the dissemination of a statement of this kind is a concrete harm on its own, regardless of any detrimental reliance on the statement," and holding that plaintiff Martinez "clearly suffered an injury in fact as a result of Avantus publishing his credit report bearing the misleading OFAC alert," notwithstanding that plaintiff's mortgage broker "never believed" that plaintiff was a terrorist and ultimately was able to find him a lender).

*Eastpoint Recovery Grp., Inc.*, 2022 WL 1471348, at *9 (W.D.N.Y. May 10, 2022) (no standing in FDCPA case where plaintiff "took no action upon receipt of the dunning letter with the unfamiliar creditor" and did "not claim he refused to act because of . . . the letter to his later detriment"), *modified on recon.*, 2022 WL 2128029, at *3 (W.D.N.Y. June 14, 2022) (preserving prior reasoning and specifying that the basis of the decision was lack of standing).

     *Negative Credit-Reporting/No Downstream Dissemination Cases.* Where the gravamen of the claim is that the defendant improperly reported negative information about the plaintiff to a credit bureau, but the plaintiff cannot show that the information was further disseminated to potential creditors, the case will ordinarily be dismissed. *See, e.g., Charles v. TransUnion, LLC*, 2022 WL 4539693, at *2 (E.D.N.Y. Sept. 28, 2022) (dismissing case where, "[a]lthough Plaintiff states he suffered harm to his reputation, the [credit reporting] agencies never issued a consumer report to a third party reporting Plaintiff's [disputed] Verizon account"); *Spira v. Trans Union, LLC*, 2022 WL 2819469, at *5-6 (S.D.N.Y. July 19, 2022) (dismissing case where plaintiff alleged that an inaccurate report allegedly went to the credit bureaus, but did not allege any "concrete injury" resulting from further dissemination of that report to actual creditors); *Swainson v. Lendingclub Corp.*, 2022 WL 2704629, at *8 (S.D.N.Y. June 24, 2022) ("[A]bsent dissemination, an inaccuracy in a credit report, standing alone, does not give a consumer standing to bring a FCRA claim."), *report and recommendation adopted*, 2022 WL 2704486 (S.D.N.Y. July 12, 2022); *Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 291-92 (E.D.N.Y. 2021) (dismissing case where plaintiff failed to allege "that his credit report was disseminated to third parties" during the period when it contained inaccurate information).[18]

---

[18] The rule is not entirely inflexible. In *In re Anderson*, 641 B.R. 1 (Bankr. S.D.N.Y. 2022), the court held that a debtor who was previously granted a discharge in bankruptcy, had constitutional

These cases do not, for the most part, require that the plaintiff show a specific *financial* injury (such as being denied a loan or charged a higher interest rate) in order to establish Article III standing.[19] But in the wake of *Maddox II*, they do require (except in unusual circumstances) that the plaintiff show some further dissemination of the credit report containing the negative tradeline to a potential creditor that is in a position to evaluate that plaintiff's creditworthiness. *See Krausz*, 2023 WL 1993886, at *9 (it is enough that "Defendant's credit reports were sent to third party creditors with the alleged inaccurate information").

To the extent the case at bar falls into one of these two categories, defendants' motion should be granted. But, as shown below, that will not dispose of the entire case. In accordance with *TransUnion*, 141 S. Ct. at 2208, I separately consider "each claim" that plaintiffs press.

---

standing to bring a "discharge enforcement action," *id.* at 16 n.5, to redress a creditor's "systematic refusal after the discharge of an unsecured debt upon which it was a reporting entity to notify credit reporting agencies of the debt's changed status from 'charged off' to being subject to the bankruptcy discharge," without regard to further publication of the resulting credit report. *Id.* at 14. The court explained the defamatory significance of the "charged off" notation as to a pre-bankruptcy debt: "[F]ailing to report the discharge while reflecting a bankruptcy on a credit report would reasonably be understood by a former debtor to state to the world that he had been in bankruptcy but had not received a discharge," and thus that "he was guilty of a bad act for which he did not deserve a discharge." *Id.* at 50. The court then held that Anderson (and others similarly situated) were concretely injured by "Credit One's systematic policy of refusing to correct its tradelines," because the purpose and effect of that misconduct was "to pressure Anderson and the putative class members to pay their discharged debts" in order to clean up their credit reports. *Id.* at 55.

[19] As Judge Karas recently explained in *Krausz v. Equifax Info. Servs.*, 2023 WL 1993886 (S.D.N.Y. Feb. 14, 2023), a concrete *reputational* injury can confer Article III standing (as it did for the class of 1,853 in *TransUnion*), and such an injury, which is "caused by dissemination," "is not tied to actual credit denial or related harms." *Id.* at *10 (holding that plaintiff adequately pled standing by alleging in non-conclusory terms that his negative credit report was further disseminated by the credit bureaus to third parties, even though those third parties made only "soft" inquiries, and no actual pecuniary harm resulted).

4.      **Plaintiffs Do Not Have Standing to Bring Claims Based on Specific False or Misleading Statements (CCAC ¶¶ 274(c)-(g), 280(c)-(g))**

Defendants are correct that none of the named plaintiffs has standing to pursue the FDCPA and GBL § 349 claims outlined in CCAC ¶¶ 274(c)-(g) and 280(c)-(g) – based on specific false statements made in state court debt-collection proceedings – because no plaintiff has testified that he or she ever read and detrimentally relied on any of those statements. *See* Def. K. Seaman Dep. Tr. at 170:4-20, 282:8-283:2; Def. M. Seaman Dep. Tr. at 20:6-16, 121:4-16; Def. Bifulco Dep. Tr. at 105:9-11, 106:3-12; Def. Frauenhofer Dep. Tr. at 184:23-185:24, 187:1-11; Def. Tabar Dep. Tr. at 262:8-263:15, 302:8-22. Similarly, no plaintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in defendants' pleadings or affidavits. *See, e.g.*, Def. Bifulco Dep. Tr. at 106:3-12; Def. Frauenhofer Dep. Tr. 187:12-23. Absent evidence of actual harm directly caused by one of the allegedly false statements that defendants made in state court, plaintiffs lack standing to bring their FDCPA claims (or pendent state GBL § 349 claims) on that basis. *See Rosenberg*, 2022 WL 3030390, at *5; *Ergas*, 2022 WL 1471348, at *9.

5.      **Only Bifulco Has Standing Based on Negative Credit-Reporting (CCAC ¶¶ 274(h), 280(h))**

TSI-NCO concedes that it did in fact credit-report each plaintiff (although it claims to have done so "properly and accurately"), and that the resulting tradelines reflected debts to National Collegiate Trust. Luke Decl. ¶¶ 35, 46, 57, 72, 87. Only Bifulco, however, testified that she had a "low credit score" and paid a higher interest rate on a car loan and credits cards as a result of the National Collegiate Trust tradeline. Pl. Bifulco Dep. Tr. at 136:10-138:1. With regard to the car loan, Bifulco testified that the interest rate on the loan was 16%, and that she was told by the dealership that "absent the judgment being on [her] credit report," the rate would have been six to seven percent. *Id.* at 138:2-16. Her testimony thus establishes both concrete *reputational* harm,

flowing from the "dissemination" of the adverse credit report to the car dealership and credit card companies, *see Krausz*, 2023 WL 1993886, at *10, and concrete *financial* harm, flowing from the higher interest rates that she actually paid as a direct result of defendants' tradeline. *Cf. Grauman*, 549 F. Supp. 3d at 292 (plaintiff failed to plead concrete financial injury because he made "no claim that he tried or was imminently planning to try to use his credit report to procure credit").

The remaining plaintiffs have made no showing of either reputational or financial harm resulting from defendants' negative credit-reporting, and therefore have no standing to sue defendants for that conduct in this Court. *See Grauman*, 549. Supp. 3d at 292 (the "lack of dissemination of Grauman's credit report" rendered him unable to plead either concrete reputational harm or concrete financial harm, as required for standing).

In an effort to save these claims from dismissal, plaintiffs cite *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146 (7th Cir. 2022), which held that a consumer suffers a concrete reputational injury, sufficient for Article III standing, when a debt collector "disseminates" negative information about that consumer *to* a debt collection agency such as TransUnion. *See* Pl. R. 12(b)(1) Opp. at 10-12. Thus, according to plaintiffs, it is enough for them to show that defendants "credit-report[ed] dubious information [about them] to the bureaus." *Id.* at 11 (citing *Ewing*, 24 F.4th at 1153-54).

Plaintiffs have correctly read *Ewing*. In that case, brought under FDCPA, the defendant debt collectors reported certain debts to the credit reporting agencies without also reporting – as required – that the debts were disputed. *Ewing*, 24 F.4th at 1149. On appeal from a dismissal on other grounds, the Seventh Circuit considered whether, under *TransUnion*, plaintiffs "suffered a concrete injury when the Debt Collectors communicated false information (i.e., reports of debts not being disputed) about them to a credit reporting agency," *id.* at 1152, even though there was "no evidence that TransUnion sent the Consumers' credit reports to potential creditors." *Id.* The

Seventh Circuit answered that question in the affirmative, holding that transmission of the negative information *by* the debt collectors *to* the credit reporting agencies constituted sufficient "publication" to satisfy *TransUnion*, since the credit reporting agencies did not "merely process[]" the negative information in the debt collectors' reports; they "understood" the reports' "defamatory significance" and took them into account in assessing plaintiffs' creditworthiness. *Id.* at 1154. Thus, in the Seventh Circuit's view:

> The [plaintiffs] suffered an intangible, reputational injury that is sufficiently concrete for purposes of Article III standing. Specifically, they have shown that their injury is related closely to the harm caused by defamation. Reputational harm of this sort is a real-world injury; being portrayed as a deadbeat who does not pay her debts has real-world consequences.

*Ewing*, 24 F.4th at 1154.

This Court, however, is bound by the Second Circuit's opinion in *Maddox II*. In that case, two sisters (the Maddoxes) sued their bank under New York's mortgage-satisfaction-recording statutes, seeking statutory damages for the bank's failure timely to record the satisfaction of their mortgage as required by statute. *Maddox II*, 19 F.4th at 59-60.[20] Ruling on the pleadings, the district court held that the Maddoxes had constitutional standing to sue, but "identified the question as a close one" and certified it for interlocutory appeal. *Id.* at 61. The Second Circuit initially answered that question in the affirmative, *see Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 997 F.3d 436 (2d Cir. 2021), but – in light of *TransUnion* – granted the bank's petition for rehearing, re-analyzed the question, and held that plaintiffs had *not* suffered concrete harm sufficient to grant them standing. *See Maddox II*, 19 F.4th at 60-65.

---

[20] The relevant statutes require banks to record a "certificate of discharge," showing that a borrower has paid off a mortgage, within 30 days of the payoff, and prescribe statutory penalties for delay. The Maddoxes paid off their $50,000 mortgage in October 2014, when they sold their house, but the bank failed to record the certificate of discharge until September 2015, nearly one year later. *Maddox II*, 19 F.4th at 60.

The *Maddox* court examined four potential species of harm, two of which are relevant here: reputational harm and financial harm. The court acknowledged that reputational harm, which is "well established as actionable at common law" and thus potentially sufficient for Article III standing, could flow from the delayed recording of a satisfaction of a mortgage, which "creat[es] the false appearance that the borrower has not paid [off] the underlying debt[.]" 19 F.4th at 65. However, the Maddoxes never alleged any reputational harm. *Id.* Further, while the misleading record was, in theory, publicly available, insofar as the record disclosed "it was read by no one." *Id.* The court contrasted these facts with *TransUnion*, where (as to the successful class) "[t]here could be no doubt that the third-party businesses viewed those credit reports, which they had specifically requested and paid for." *Id.* Thus, the court explained, the Maddoxes had shown at best "a nebulous risk of future harm during the period of delayed recordation," but "that risk, which was not alleged to have materialized, cannot not form the basis of Article III standing." *Id.* Similarly, the court held, since the Maddoxes did not apply for any type of financing during the period of delayed recordation, they failed to identify any concrete financial harm *Id.*

Since *Maddox II*, the district courts in our Circuit have uniformly held (outside of the bankruptcy context) that it is insufficient, for standing purposes, for a plaintiff to allege that a debt collector communicated adverse information about that plaintiff to a credit reporting agency. *See* Part II.B.3, *supra*. In order to demonstrate the necessary reputational or financial harm, the plaintiff must plead (initially) or make an evidentiary showing (at later stages of the case) that the adverse information was *further disseminated*, for example, to a potential creditor. *See*, *e.g.*, *Krausz*, 2023 WL 1993886, at *8 ("*TransUnion* held that, for standing under the FCRA, a plaintiff's credit report must have been actually disseminated to a third-party entity, and without actual dissemination, there is no concrete harm and thus no standing") (cleaned up).

In this case, only one plaintiff has met the Second Circuit's test. Although plaintiffs argue in broad terms that the tradelines resulting from defendants' negative credit-reporting "were included in credit reports on Plaintiffs that the bureaus disseminated during the Class period," Pl. R. 12(b)(1) Opp. at 11; *see also id.* at 11 n.16; Pl. Resp. to Def. Notice (Dkt. 420) at 2 ("evidence already has demonstrated that Defendants' negative statements to the bureaus became 'tradelines' which were disseminated to third parties, with corresponding harms including loss of credit opportunity"), the record simply does not substantiate that claim for any plaintiff other than Bifulco. Since only Bifulco has demonstrated the necessary "concrete harm" to sue defendants in federal court for reputational or financial injuries caused by their negative credit-reporting, only Bifulco has standing to sue for that harm. The remaining plaintiffs have demonstrated only "an inaccuracy in an internal credit file," which, "if it is not disclosed to a third party, causes no concrete harm." *TransUnion*, 141 S. Ct. at 2210.

### 6.      All Plaintiffs Have Standing to Bring Claims Based on Defendants' Sham Lawsuit Scheme (CCAC ¶¶ 274(a)-(b), 280(a)-(b))

FDCPA makes it unlawful for a debt collector to use "any false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, or use "unfair or unconscionable means to collect or attempt to collect any debt." *Id.* § 1692f. The "false, deceptive, or misleading" representation need not be solely made directed to, or solely relied on by, the borrower, and the "unfair or unconscionable means" need not be practiced solely on the borrower. *See Toohey*, 2016 WL 4473016, at *8 ("Notably, the text does not expressly limit the class of persons to whom the false representation must be made in order to be actionable.").

Given the broad reach of the statute, district courts in our Circuit have repeatedly recognized that the type of conduct described in CCAC ¶¶ 274(a)-(b) and 280(a)-(b) – filing deficient debt-collection lawsuits in bulk, without the intent or ability to prove their claims, in

hopes of obtaining default judgments or extracting settlements from borrowers ill-equipped to defend themselves – violates FDCPA as well as GBL § 349. *See*, *e.g.*, *Toohey*, 2016 WL 4473016, at *1 (denying motion to dismiss FDCPA claim alleging that defendants "orchestrated a scheme to fraudulently obtain and enforce consumer debt judgments . . . in state courts," by bringing lawsuits "without having sufficient evidence to prove the claimed debts" and filing "false, deceptive and misleading affidavits of merit . . . to obtain default judgments"); *Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 474 (S.D.N.Y. 2013) (noting, in *dicta*, that "[t]he mass filing of form affidavits and other submissions containing false or deceptive representations about the status and character of a debt may, under certain circumstances, give rise to an actionable FDCPA claim."); *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) (*Sykes I*) (denying, for the most part, defendants' motions to dismiss FDCPA and GBL § 349 claims alleging that defendants "engaged in a 'massive scheme' to fraudulently obtain default judgments" in state court by engaging in "sewer service," failing to serve summonses and complaints, filing false affidavits of service, and then obtaining default judgments when the debtors failed to appear in court). Similarly, numerous district court decisions have upheld FDCPA claims based on the "meritless" nature of the claims asserted in a single debt collection action or the unfair means used in that case.[21]

---

[21] *See*, *e.g.*, *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 138 (2d Cir. 2017) (holding that plaintiff Arias stated a claim under 15 U.S.C. § 1692f based on allegations of bad-faith litigation conduct by the defendant, which "required Arias to prepare needlessly for a hearing that GMBS knew was frivolous and that was intended primarily to harass Arias, frustrate his exemption claim, and erect procedural and substantive challenges that Arias, *pro se*, was ill-equipped to handle"); *Brake v. Slochowsky & Slochowsky, LLP*, 504 F. Supp. 3d 103, 109 (E.D.N.Y. 2020) (denying motion to dismiss FDCPA claims based on "Slochowsky's pursuit of meritless litigation" against plaintiff in housing court); *Guzman v. Mel S. Harris & Assocs., LLC*, 2018 WL 1665252, at *11-12 (S.D.N.Y. Mar. 22, 2018) (plaintiff raised triable issues of fact, so as to survive summary judgment, on FDCPA and GBL § 349 claims alleging that defendants filed

Defendants do not argue that the "theories of liability" set forth in CCAC ¶ 274(a)-(b) fall outside of the reach of FDCPA or are improperly pleaded. Instead, in their supplemental briefing, they contend that plaintiffs cannot bring these claims in federal court because they cannot "establish a redressable concrete injury as required, especially in light of the *Rooker-Feldman* doctrine." Def. R. 12(b)(1) Supp. Br. at 2. Defendants are mistaken.

As Judge Daniels recognized in *Toohey*, "[t]here can be no doubt that false, deceptive, or misleading representations made by debt collectors to state courts with the power to enter judgments adverse to consumers have the ability to cause consumers severe harm." *Toohey*, 2016 WL 4473016, at *8. Those harms include: being subjected to a lawsuit that should never have been brought; suffering the entry of an adverse default judgment in such a lawsuit, followed in many cases by wage garnishment; and, for those consumers who fought back, incurring significant costs, both in time and money, to vacate improperly-obtained judgments. *See* Pl. Damages Supp. Br. at 1 (confirming that, in addition to statutory damages, plaintiffs propose to seek actual damages for the sums garnished from plaintiffs' wages and, where relevant, "any costs in responding to state-court actions").[22] Each of the named plaintiffs was subjected to a wrongful lawsuit in which an adverse default judgment was entered. Additionally, four of the named plaintiffs (M. Seaman, Bifulco, Butry, and Frauenhofer) had their wages garnished to collect that judgment, *see* Hawkins R. 12(b)(1) Decl. Exs. 2-A through 2-D, and one (Tabar) incurred over $1,000 in lost wages and

---

a collection lawsuit based on a false affidavit of service and a false affidavit of merit); *Cameron v. LR Credit 22, LLC*, 998 F. Supp. 2d 293, 300 (S.D.N.Y. 2014) (holding that the filing of a time-barred complaint in a state court debt-collection action violated FDCPA, and collecting cases).

[22] They also propose to seek damages for settlement payments made in state court. Pl. Damages Supp. Br. at 1. But since none of the named plaintiffs settled, and since the proposed damages classes are limited to persons against whom a default judgment was entered in state court, *see* Pl. R. 23 Supp. Br. at 5, the propriety of that form of relief is irrelevant to the motions now before the Court.

out-of-pocket expenses to vacate the improperly-obtained judgment against her (after which the debt collection case was dismissed). Tabar Decl. ¶ 12.

These are all "distinct and palpable" injuries in fact, "fairly traceable" to the challenged action, and redressable in this forum. *Denney*, 443 F.3d at 263. *See Viernes v. DNF Assocs., LLC*, 582 F. Supp. 3d 738, 752-53 (D. Haw. 2022) ("being subjected to an unlawful lawsuit is a concrete harm" sufficient to confer constitutional standing on the wrongly-sued individual, who sought redress under FDCPA); *Robinson v. New York City Transit Auth.*, 2020 WL 5884055, at *9 (S.D.N.Y. Aug. 31, 2020) ("the entry of an adverse default judgment is a 'concrete' and 'particularized' injury sufficient to establish the injury-in-fact required for Article III standing"), *report and recommendation adopted*, 2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020);[23] *Toohey*, 2016 WL 4473016, at *4 n.5 ("Toohey's allegation that the default judgment obtained against her was obtained improperly sufficiently alleges an 'injury-in-fact' so as to establish constitutional standing."); *Michelo*, 419 F. Supp. 3d at 709 ("Wage garnishment is a pecuniary harm that satisfies the actual injury requirement."); *McCrobie v. Palisades Acquisition XVI, LLC*, 2022 WL 1657226, at *13 (W.D.N.Y. Mar. 4, 2022) (wage garnishment constitutes an "actual, concrete injury" resulting from defendants' violations of FDCPA and NY GBL § 349); *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 382 (S.D.N.Y.) (attorneys' fees and expenses incurred

---

[23] In *Robinson*, plaintiffs alleged that the New York City Transit Authority (NYCTA) obtained and enforced state court default judgments against individuals cited for violating its rules without giving them constitutionally adequate notice. 2020 WL 5884055, at *1. Accepting the recommendation of the undersigned magistrate judge, Judge Torres certified a class consisting of "all people against whom the NYCTA 'has obtained or will obtain a default judgment in a New York State court,' excluding those who paid their default judgments voluntarily or whose claims were time-barred." 2020 WL 5814189, at *2. Before reaching the Rule 23 analysis, Judge Torres considered the standing issue and agreed that the issuance of a default judgment "constitutes a concrete and particularized injury," that "this injury is fairly traceable to the NYCTA's allegedly unconstitutional practices," and consequently that "the proposed class members have standing." *Id.* at *3.

to contest an allegedly "fraudulent Chapter 7 petition" were "sufficient to confer standing" for certain of plaintiffs' RICO claims), *on reconsideration*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002), *aff'd sub nom. First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).[24]

Moreover, these harms bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," *TransUnion*, 141 S. Ct. at 2204, specifically, common-law "unjustifiable litigation" torts such as civil malicious prosecution, abuse of process, and wrongful use of civil proceedings.[25] Several district courts, both within and without our Circuit, have looked to the harms redressable in unjustifiable-litigation cases to analyze standing in FDCPA cases arising out of alleged litigation misconduct. *See Makhnevich v. Bougopoulos*, 2022 WL 939409, at *5 n.7 (E.D.N.Y. Mar. 29, 2022) (analogizing to "common-law unjustifiable-litigation torts" to find that FDCPA plaintiff had standing to sue for defendants' "alleged misconduct during the Civil Court [debt collection] action"); *Benjamin v. Rosenberg & Assocs., LLC*, 2021 WL 3784320, at *6 (D.D.C. Aug. 26, 2021) (plaintiff had Article III standing with respect to her FDCPA claims, which arose largely out of defendant's alleged litigation misconduct

---

[24] *See also In re Anderson*, 641 B.R. at 13-14, 55 (holding, in an action to redress Credit One's "systematic refusal" to correct its tradelines to show that plaintiff's debt was discharged in bankruptcy, that plaintiff had constitutional standing to press the claim because he was injured by (i) Credit One conduct (which violated the Bankruptcy Court's discharge injunction), and (ii) the "substantial fees and expenses" that Anderson incurred to enforce the injunction, constituting "a second concrete harm" fairly traceable to the discharge injunction violation and redressable in Bankruptcy Court).

[25] *See* Restatement (Second) of Torts § 674 (1977) ("One who takes an active part in the initiation, continuation or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if (a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought."). The successful plaintiff in such a lawsuit may recover compensation for "the harm to his reputation" caused by the improperly-filed proceeding, the "expense that he has reasonably incurred in defending himself" against it, any "specific pecuniary loss" resulting from those proceedings, and any resulting emotional distress. *Id.* § 681.

in prior foreclosure proceeding, because 15 U.S.C. § 1692e "seeks to remedy a harm closely related to one recognized at common-law (*i.e.*, wrongful-litigation torts)" and plaintiff's asserted injuries – mental distress, interest, fees, and costs – "are sufficiently concrete to pass Article III scrutiny"); *Viernes*, 582 F. Supp. 3d at 749 ("being subjected to an unlawful lawsuit bears a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts," namely, "the tort of 'wrongful use of civil proceedings'").[26]

As the *Viernes* court explained, being sued over a debt "is a serious matter with potentially serious negative consequences," including "the obvious monetary harms associated with a litigation defense" and the "reputational harms incurred by having one's 'dirty laundry' aired in public." 582 F. Supp. 3d at 752-53. Defendants do not deny that (as the Seventh Circuit put it) "being portrayed as a deadbeat who does not pay her debts has real-world consequences," *Ewing*, 24 F.4th at 1154, and that those consequences include "stigma." *See* Pl. Bifulco Dep. Tr. at 134:1. Instead, they argue that plaintiffs cannot rely on the reputational harms associated with a wrongful civil lawsuit and resulting default judgment, for standing purposes, because that theory of harm is foreclosed by *Maddox II.* Def. R. 12(b)(1) Supp. Br. at 5-6. In that case, however, the "misleading record" was both significantly less damaging and significantly less public than the lawsuits and defaults judgments at issue here.

The Maddoxes were never accused of being deadbeats, much less so adjudicated. Instead, by failing to file the mortgage satisfaction promptly after the Maddoxes sold their house, the defendant bank created the impression (to anyone researching the property at the county clerk's

---

[26] In *Viernes*, the "unlawful lawsuit" was brought by DNF to collect a debt that plaintiff concededly owed, but that "DNF had no legal authority to collect" because it failed to register as a debt collector under Hawaii law. 582 F. Supp. 3d at 743-44. The court certified (and then denied a post-*TransUnion* motion to decertify) a class consisting of all "Hawaii residents subjected to debt-collection lawsuits filed by DNF within a year preceding the filing of the Complaint." *Id.* at 745.

office) that they still had a mortgage; that is, that they still "owe[d] a debt secured by [the] property." *Maddox II*, 19 F.4th at 65. While this could have "adversely affected their credit," *id.*, in the event they sought a new loan during the period of delayed recordation, it was not inherently stigmatizing; that is, it did not announce to the world that they were either unable or unwilling to honor their financial obligations. A debt collection lawsuit and resulting judgment, by contrast, carries precisely that message. Moreover, state court complaints and judgments are effectively in "open view," easily accessible to the public (including online), and protected by none of the restrictions applicable to credit reports. *See* 15 U.S.C. § 1681b (credit reports may only be furnished for enumerated "[p]ermissible purposes"); *id.* § 1681g(a)(3)(A) (consumer reporting agencies must provide the consumer, on request, with the identity of "each person" who "procured" the consumer's credit report). Consequently, this case is less like *Maddox II* and more like a post-*Maddox II* case, *Panebianco v. Selip & Stylianou, LLP*, 2022 WL 392229 (E.D.N.Y. Feb. 9, 2022), in which the plaintiff alleged that the defendant served him with a debt collection summons and complaint by "posting it to plaintiff's apartment door without enclosing [it in] an envelope or otherwise concealing it," thus leaving it in "open view of other residents." *Id.* at *1. On these facts, the court held that the plaintiff demonstrated the necessary "concrete injury" to establish constitutional standing. *Id.* at *2. So too here.

Defendants next argue that wage garnishment, while indisputably "concrete" and unquestionably "traceable" to the misconduct alleged in CCAC §§ 274(a)-(b) and 280(a)-(b), is not "redressable" in this Court because, "in order to find the garnishments are 'actual damages' incurred by Plaintiffs, this Court would have to find the state-court judgments are invalid, which *Rooker-Feldman* clearly prohibits." Def. Damages Supp. Opp. at 4. Defendants' reliance on *Rooker-Feldman* is misplaced. First, the question whether *Rooker-Feldman* bars plaintiffs from

relying on the garnishments for standing has already been decided by the District Judge. *Michelo*, 419 F. Supp. 3d at 686-88 ("The Court concludes that the *Rooker-Feldman* doctrine presents no obstacle to the claims of the *Seaman* Plaintiffs and the *Bifulco* Plaintiffs."); *id.* at 709 ("Wage garnishment is a pecuniary harm that satisfies the actual injury requirement."). While *TransUnion* required the lower federal courts to rethink the "concrete-harm requirement" of standing, *see* 141 S. Ct. at 2204 ("The question in this case focuses on the Article III requirement that the plaintiff's injury in fact be 'concrete'[.]") (quoting *Spokeo*, 578 U. S. at 340), it did not alter the "redressability" analysis, and said nothing at all about *Rooker-Feldman*. Consequently, there is no reason to reconsider Judge Gardephe's *Rooker-Feldman* analysis, which is the law of the case.

Second, that analysis remains sound. Under *Rooker-Feldman*,[27] federal district courts "lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). There are "four requirements for the application of *Rooker-Feldman*," including that "the plaintiff must 'invit[e] district court review and rejection" of a state court judgment. *Id.* at 85 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). Plaintiffs here do not invite this Court to review or reject the state court default judgments against them. *See* Pl. Damages Supp. Br. at 1-2 (confirming that plaintiffs do not seek either to set aside the state court default judgments or for damages in the amount of those judgments). Instead, like the plaintiffs in *Sykes*, they bring "claims sounding under the FDCPA . . . and state law [that] speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments." *Michelo*,

---

[27] *See Rooker v. Fid. Tr.Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

419 F. Supp. 3d at 687 (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 94-95 (2d Cir. 2015) (*Sykes III*)).

In *Sykes III*, which arose from a large-scale "default judgment mill," the Second Circuit expressly held (in the course of affirming the district court's certification of a damages class and an injunctive-relief class) that *Rooker-Feldman* was not a bar to plaintiffs' FDCPA claims, even though plaintiffs there sought "'remittance' damages," *i.e.*, "the return of the money extracted from them as a result of [the] fraudulent judgments." 780 F.3d at 75, 88, 95.[28] *See also Toohey*, 2016 WL 4473016, at *4 (holding, in a similar "default judgment mill" case, that *Rooker-Feldman* did not bar Toohey's FDCPA claims because he "does not seek to undo the state court judgment through this federal action, but merely seeks damages based on Defendants' alleged independent wrongful conduct"); *Cameron*, 998 F. Supp. 2d at 297 (*Rooker-Feldman* was "inapplicable" to FDCPA case based on the wrongful filing of a time-barred collection action ending in a default judgment, because "plaintiff[] assert[s] claims independent of the state-court judgment[] and do[es] not seek to overturn [it].") (quoting *Sykes I*, 757 F. Supp. 2d at 429) (alteration in original). Most recently, in *Hansen v. Miller*, 52 F.4th 96 (2d Cir. 2022), the Second Circuit confirmed that *Rooker-Feldman* "generally does not affect a federal court's jurisdiction over claims for damages against third parties for alleged misconduct occurring in the course of a state court proceeding,

---

[28] The Second Circuit did not determine whether *Rooker-Feldman* would bar the *Sykes* plaintiffs from *recovering* those remittance damages. Instead, drawing a distinction between the injury (which must be identified for standing purposes) and a specific form of redress for that injury (which could run afoul of *Rooker-Feldman*, even if other forms of redress for the same injury do not), the *Sykes III* court declined to exclude from the class certification order, a "category of damages that [defendant] believes is not cognizable under *Rooker-Feldman*[.]" 780 F.3d at 95. Similarly, Judge Gardephe did not hold in 2019 – and this Report and Recommendation does not suggest – that the plaintiffs whose wages were garnished can *recover* the garnished funds as actual damages. The only question now before the Court is whether those plaintiffs can point to that garnishment to show that they were concretely injured by the conduct of which they complain.

because the adjudication of such claims would 'not require the federal court to sit in review of the state court judgment.'" *Id.* at 100 (quoting *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014)).

Finally, defendants argue that plaintiff Tabar, who incurred concrete and tangible costs in order to vacate the default judgment against her, nonetheless lacks standing because "costs to vacate a default do not confer standing, much less suffice as actual damages." Def. Damages Supp. Opp. at 3 n.1. That is not an accurate statement of the law applicable to unjustifiable litigation torts.[29]

Where, as here, the defendant's actionable misconduct included bringing an improper lawsuit against the current plaintiff, that plaintiff's legal fees and related costs incurred in the prior action can constitute both a concrete injury that confers standing and (in most jurisdictions) a measure of the plaintiff's compensatory damages. Restatement (Second) of Torts § 681; *see also*, *e.g.*, *Brickellbush*, 218 F. Supp. 2d at 382; *Benjamin*, 2021 WL 3784320, at *6 (FDCPA plaintiff who alleged misconduct in connection with a prior foreclosure action properly relied, for standing

---

[29] Neither of the out-of-Circuit cases cited by defendants on this point considered standing through the lens of unjustifiable litigation torts. In *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067 (7th Cir. 2020), the plaintiff's argument was that she was injured by (i) a confusing dunning letter that violated FDCPA, and (ii) her costs incurred in retaining a lawyer. *Id.* at 1068. The Seventh Circuit held (i) that plaintiff's confusion did not give her standing to sue, and (ii) that her decision to hire a lawyer did "not change the evaluation" of whether she could show a concrete injury. *Id.* at 1069. In other words, consulting a lawyer cannot bootstrap a non-concrete injury into a concrete one. Tabar, by contrast, incurred costs (not legal fees) to remedy a concrete injury, namely, the entry of a default judgment against her. In *Milisavljevic v. Midland Credit Mgmt., LLC*, 581 F. Supp. 3d 1020 (N.D. Ill. 2022), the district court relied on *Brunett* to rule that legal fees that plaintiff incurred in challenging a default judgment did not give him standing to sue for the allegedly misleading communications that caused him to default in the first place. *Id.* at 1026-28. I note that other district courts within the same Circuit have reached the opposite result on similar facts. *See*, *e.g.*, *Lako v. Portfolio Recovery Assocs.*, 2021 WL 3403632, at *4 (W.D. Wis. Aug. 4, 2021) ("the court concludes that the costs, time, and energy incurred by plaintiff in defending against the [debt collection] suit brought against him amounts to a concrete injury in fact").

purposes, on a number of tangible and intangible injuries, including "legal fees defending the illegal foreclosure"); *Amalfitano v. Rosenberg*, 428 F. Supp. 2d 196, 198, 211 (S.D.N.Y. 2006) (attorney who had "brought suit against plaintiffs despite knowing that it was entirely baseless" was liable to plaintiffs in damages for their costs incurred "in defending themselves against an action which was founded upon [a] deceitful premise"), *aff'd*, 572 F.3d 91 (2d Cir. 2009); *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 577 (D.C. Cir. 2003) ("many states permit the recovery of attorney's fees *qua* damages in malicious prosecution suits – and, to our knowledge, not a single state forbids the practice"). Moreover, this Court has already held that the costs incurred by Tabar in vacating the default judgment against her are compensable as damages for purposes of her NYJL § 487 claim against Forster. *Michelo*, 419 F. Supp. 3d at 714 n.29. It would be an odd result indeed if that same injury failed even to provide her with standing to sue the remaining defendants.

In short, while none of the plaintiffs has standing to sue with respect to the specific false representations alleged in CCAC ¶¶ 274(c)-(g) and 280(c)-(g), and only Bifulco has standing to sue with respect to the negative credit-reporting alleged in CCAC ¶¶ 274(h) and 280(h), each named plaintiff – and, by definition, each member of the proposed classes – has been subjected to a lawsuit that should never have been brought, in which a default judgment was entered. In addition, some of the named plaintiffs (and, likely, many of the proposed class members) have had their wages garnished and/or have spent time and money to vacate the default judgments against them. Therefore, the named plaintiffs and the proposed class members have standing to sue with respect to the sham lawsuit scheme alleged in CCAC ¶¶ 274(a)-(b) and 280(a)-(b).

## C.  The Court Should Certify One Rule 23(b)(3) Class

In their class certification motion – as narrowed after oral argument – plaintiffs ask the Court to certify four Rule 12(b)(3) classes, seeking damages, and four Rule 12(b)(2) classes,

seeking injunctive relief. *See* Pl. R. 23 Supp. Br. at 5-6. Each class would be limited to persons who, since 2012, have been (or, for Rule 23(b)(2) purposes, "will be") (i) sued in a New York state-court debt-collection lawsuit in which (ii) one of the Trust Defendants was the plaintiff, (iii) TSI-NCO was its servicing agent, and (iv) Forster appeared as the plaintiff's counsel. *Id.* The Rule 23(b)(3) classes would be further limited to persons against whom a default judgment was obtained in state court. *Id.* at 5. The damages class would assert claims under FDCPA (against TSI-NCO and Forster), GBL § 349 (against all defendants), and NYJL § 487 (against Forster). *Id.* at 5. The Rule 23(b)(2) class would assert claims against all defendants under GBL § 349. *Id.* at 6.

Plaintiffs explain that their narrowed class definitions track the definitions used in *Sykes* – which, like this action, charged a debt collector and its counsel with running a "default judgment mill." *Sykes III*, 780 F.3d at 75.[30] Their argument, in a nutshell, is that this Court should follow *Sykes*, except that instead of one damages class and one injunctive-relief class, it should certify *four* damages classes and *four* injunctive-relief classes because "[t]his case involves four separate Delaware statutory trusts, each corporately distinct, and holding its own set [of] alleged debt accounts" as to which the "chain of title" documents may vary. Pl. R. 23 Supp. Br. at 1-2. In response, defendants argue: (1) that no injunctive class should be certified, because an injunction will not help those who have already been sued by defendants, while those who have yet to be sued lack Article III standing, *see* Def. R. 23 Supp. Opp. at 2-4; (2) that there is no reason to

---

[30] In *Sykes*, Judge Chin (then sitting in the district court) certified two classes, and the Second Circuit affirmed as to both. The Rule 23(b)(3) class comprised "all persons who have been sued by the Mel Harris defendants as counsel for the Leucadia defendants in . . . New York City Civil Court and where a default judgment has been obtained." *Sykes III*, 780 F.3d at 75 (alteration in original). That class asserted claims under FDCPA, GBL § 349, NYJL § 487, and the Racketeer Influenced and Corrupt Organizations Act (RICO), which is not at issue here. *Id.* The Rule 23(b)(2) class comprised "all persons who have been or will be sued by the Mel Harris defendants as counsel for the Leucadia defendants," and asserted claims under RICO, GBL § 349, and NYJL § 487. *Id.*

subdivide any otherwise-certifiable class into "Trust-specific subclasses," which would serve no purpose other than to multiply the potential statutory damages award, *see id.* at 4-6; and (3) that this case is different from *Sykes* because it is weak on the merits, *id.* at 6-10, in that the evidence adduced during discovery shows that the Trust Defendants properly "brought lawsuits based on loans that they believe that they own" and "submitted evidence which they were advised was sufficient at the outset of a litigation to demonstrate their ownership." *Id.* at 8.

Defendants are correct that no Rule 23(b)(2) class should be certified in this action, and that there is no need to certify separate Rule 23(b)(3) classes on a trust-by-trust basis. Plaintiffs are, however, entitled to certification of a single, statewide damages class.

### 1.    Rule 23(a)

#### a)    *Numerosity*

The first Rule 23(a) requirement is "numerosity." The class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "the numerosity requirement is presumed once plaintiffs number 40." *Taylor v. Zucker*, 2015 WL 4560739, at *7 (S.D.N.Y. July 27, 2015). "Precise quantification" is not necessary; rather, the Court can "make common sense assumptions regarding numerosity." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

During discovery, defendants identified "3,914 accounts subject to state-court suits in New York where one of the four Trust Defendants was named plaintiff." Hawkins R. 23 Decl. ¶ 37. Many of the suits were brought against two individuals: a "primary borrower" and a "co-borrower." *Id.* Thus, in their original motion papers, plaintiffs estimated that the "New York Class" consisted of roughly 6,365 members. *Id.* ¶ 38. In approximately 50% of the state-court suits, a default judgment was entered. *Id.* ¶ 40. Thus, even as narrowed (for Rule 23(b)(3) purposes) to those who

had default judgments entered against them, the proposed class consists of roughly 3,183 members (50% of 6,365). Numerosity has been adequately established.

### b)    Commonality

The parties seeking class certification must also show that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Members of the class must have claims that "depend upon a common contention" that "is capable of classwide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

"Importantly, Rule 23(a)(2) does not require that the claims of the lead plaintiffs 'be identical to those of all other plaintiffs.'" *Sykes II*, 285 F.R.D. at 286-87 (quoting *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008)). Moreover, "factual differences in the claims of the class do not preclude a finding of commonality," *Id.* at 287 (quoting *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 73 (S.D.N.Y. 2006)), so long as "the plaintiffs' alleged injuries 'derive from a unitary course of conduct by a single system.'" *Id.* (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)). Thus, in *Sykes*, Judge Chin found the requisite commonality despite the fact that the alleged scheme had more than one component:

> [Plaintiffs'] overarching claim is that defendants systematically filed false affidvits of merit and, in many instances, false affidvits of service to fraudulently procure default judgments in New York City Civil Court. Whether a false affidavit of merit or a false affidavit of service or both were employed in a particular instance, the fact remains that plaintiffs' injuries derive from defendants' alleged 'unitary course of conduct,' *see Marisol A.*, 126 F.3d at 377, that is, fraudulently procuring default judgments.

*Sykes II*, 285 F.R.D. at 290. The Second Circuit agreed, noting that "the common injury in this case, which was the same for all plaintiffs, is a fraudulently procured default judgment." *Sykes III*, 780 F.3d at 84.

Similarly, in this case, all members of the proposed classes were named in sham lawsuits, which were filed and litigated in accordance with a unified playbook authored (literally) by NCI-TCO and carried out by its Affiants and by Forster. Additionally, all of the members of the proposed Rule 23(b)(3) class were injured by the resulting, wrongfully-procured default judgments. Although the alleged scheme had several interrelated components – including boilerplate complaints, never meaningfully reviewed by the attorneys who signed them, that falsely alleged that the Trust Defendant named as plaintiff was the "original creditor" on the loan and was "authorized to proceed" in state court, and deceptive affidavits, signed by Affiants who routinely attested to "personal knowledge" of chain-of-title documents they had not actually reviewed – plaintiffs have shown that defendants engaged in a "unitary course of conduct" leading to the injuries alleged.[31]

In short, because plaintiffs are "challenging a practice of defendants," not merely defendants' "conduct with respect to the individual plaintiff[s]," the commonality requirement is met. *Ray M v. Bd. of Educ.*, 884 F. Supp. 696, 699 (E.D.N.Y. 1995); *see also, e.g., Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 293 (S.D.N.Y. 2019) (commonality met where class of people with mobility limitations sought to challenge a long list of alleged architectural barriers on the SUNY Purchase campus, because "the core issue presented is whether Defendants engaged in a general course of conduct of not providing

---

[31] Defendants argued in opposition to plaintiff's original Rule 23 motion that virtually every fact question raised by plaintiffs (including questions concerning conduct mandated by TSI-NCO's policies) would require "[i]ndividualized inquiry." *See* Def. R. 23 Opp. at 26. However, they take a different approach in their post-argument brief, which argues that there is no need for four separate subclasses because "the issue – the alleged inability to prove ownership [of the debt] created by the alleged lack of documentation and how it was dealt with by [TSI-NCO] and Forster – is *the same in each instance for each Trust and manifests itself through the same entities*." Def. R. 23 Supp. Opp. at 5 (emphasis added).

accessible paths of travel throughout the Campus, thereby denying people with mobility disabilities meaningful access" and "[t]he answer to this question will resolve all of the class claims."); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 419 (S.D.N.Y. 2012) (commonality met even though New York City's emergency preparedness plan was flawed in four different ways, with no one flaw affecting all class members, because the alleged failure of the City-wide policy "to take into account the needs of disabled citizens" was "common to the proposed class," which "challenges 'acts and omission of the [City] that are not specific to any particular Plaintiff'") (citation omitted); *Finch v. N.Y. State Office of Child. & Fam. Servs.*, 252 F.R.D. 192, 201 (S.D.N.Y. 2008) (commonality met because "any variation in the reasons for each person's [harm] does not negate the common questions of fact and law surrounding [defendant's injurious] policies).

Here too, plaintiffs have demonstrated a "unitary course of conduct," *Sykes III*, 780 F.3d at 84, applicable to all class members, which presents common questions of fact, subject to common proof, which will generate common answers and are thus "capable of classwide resolution." *Wal-Mart Stores*, 564 U.S. at 350. For example, the question whether the Trust Defendants serving as the plaintiffs in state court were the "original owners" of the debt sued upon has been conceded, on a classwide basis. *See* Luke Decl. ¶ 5 (the student loans held by the Trust Defendants were "purchased subsequent to the loan's origination"). Similarly, the question whether the Trust Defendants were "authorized to proceed" with the litigation turns on the undisputed fact that none of them ever registered to do business in New York, *see* Hawkins R. 23 Decl. ¶ 4, which according to plaintiffs means they were not in fact "authorized to proceed." CCAC ¶ 11; *see also Viernes*, 582 F. Supp. 3d at 744 (defendant violated FDCPA by seeking to collect debts that it "had no legal authority to collect" because it had not registered as a debt-collector in Hawaii).

Whether the TSI-NCO Affiants routinely signed affidavits attesting to personal knowledge that they did not actually have, concerning chain-of-title documents (and other proof of indebtedness) that they had not actually seen, can be also be resolved by means of classwide proof, including TSI-NCO's "training programs and standard operating procedures," known as the "Procedure," *see* Luke Decl. ¶ 23 & Ex. 1-K (NCO "Affidavit Verification Procedure" handbook), and the testimony of the Affiants concerning the procedures to which they were required to adhere. *See* Hawkins R. 23 Decl. ¶¶ 22-27; Hawkins R. 23 Reply Decl. ¶ 35 & Exs. K, H, M. Similarly, whether the Forster attorneys routinely signed pleadings without meaningful review can also be shown through common proof, including – for example – TSI-NCO's "Standard Operating Procedure" manual (SOP), which instructed its attorneys, including Forster, not to request copies of "bill of sale/assignment" documents or "chain of title" documents when litigating on behalf of the Trust Defendants. Hawkins R. 23 Decl. ¶ 11 & Ex. E, at ECF p. 4. Finally, the question whether defendants *possessed* admissible chain-of-title evidence – and therefore were *capable* of proving to a state court that they owned the loans on which they sued – will necessarily be resolved based on the bulk assignment documents to which defendants now point as adequate for this purpose.[32]

---

[32] According to Bradley Luke, TSI's Director of Operations, the loans at issue were all originally assigned, by the banks that made them, to National Collegiate Funding, Inc. (NCF), by means of a series of nearly identical Pool Supplements (one from each originating bank), which NCO received on various dates in 2012 from First Marblehead Corporation (FMC), the company that arranged the securitization. Luke Decl. ¶¶ 5, 14(a) & Ex. 1-A. Each Pool Supplement, in turn, recites that the loans being assigned to NCF (which later assigned them to one of the Trust Defendants) are listed on an attached Schedule, but no such Schedule is attached to any of the Pool Supplements in TSI-NCO's possession. *See id.* Ex. 1-A. Luke attests that the Schedules exist in "digital Excel file format," *id.* ¶ 14(c)-(e), and that these files were received from FMC on November 14, 2012, "separately" from the Pool Supplements. *Id.* ¶ 14(a), (c). Plaintiffs counter that the Pool Supplements and (unattached) Excel files are not adequate to establish ownership of the loans listed in the Excel files, arguing (among other things) that defendants have lost or misplaced the "loan roster CD" containing the Schedules as transmitted by FMC; that the Excel files contain a variety of apparent errors; and that their metadata does not match the dates on which

Plaintiffs are correct that these issues are similar to the common issues in *Sykes*, where defendants allegedly obtained thousands of default judgments by submitting affidavits of merit in which defendant Fabacher falsely attested that he was "'personally familiar with, and [has] personal knowledge of, the facts and proceedings relating to' the default judgment action," when in fact "Fabacher has not reviewed, nor do defendants actually possess, documents relevant to the underlying debt." *Sykes III*, 780 F.3d at 85. At the Rule 23 stage, the Second Circuit agreed with Judge Chin that "a fraudulently obtained state court judgment that depended on the filing of a false affidavit of merit could serve as a common issue satisfying Rule 23(a)" *and* that this issue could be resolved on a classwide basis. *Id.* at 85, 88.

Defendants argue that this case is different from *Sykes* because "the Trusts can prove they own the loans they hold," and can also prove that "each affidavit was independently reviewed, verified and signed consistent with TSI policy." Def. R. 23 Supp. Opp. at 6. Plaintiffs, of course, disagree. But this debate largely misses the point. At the class certification stage, the question is not whether plaintiffs or defendants will prevail on the merits; it is whether the prevailing party will be able to do so on a classwide basis, in reliance on common evidence. *Wal-Mart Stores*, 564 U.S. at 350; *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.").

Here, the key questions are well-suited to classwide resolution. For example, the Pool Supplements and Schedules are either sufficient or insufficient to establish the necessary chain of title for *all* of the loans on the Schedules (that is, the Excel files), not just for one or two. Similarly, TSI-NCO's standardized policies, most of them memorialized in its written training and

---

they were supposed to have been created. Hawkins R. 23 Reply Decl. ¶¶ 6-34; Hawkins R. 23 Supp. Decl. ¶¶ 13-28.

instructional materials, are either roadmaps for deception (in plaintiffs' and, apparently, the CFPB's view) or models of responsible collections litigation (in defendants' view).

I am aware that a district court in Washington recently came to a different conclusion in a similar case. In *Hoffman v. Transworld Sys. Inc.*, 2023 WL 421113 (W.D. Wash. Jan. 26, 2023), the district court denied plaintiffs' class certification motion on commonality grounds, reasoning that "[i]ndividual inquiry" would be required "to determine whether TSI or the [trusts] can present sufficient documentation to support ownership of each class member's loan," and that "[s]uch an inquiry will likely require review of the origination records for class members' loans and other documents supporting the chain of assignment, and must be completed for every loan at issue in this action on an individual basis." *Id.* at *8. On the record in this case, I cannot agree. Plaintiffs here do not claim that individual "origination records" (that is, the original loan documents signed by each borrower) are missing or inadequate. Nor, in this case, is there any reason to believe that there are any contested "documents supporting the chain of assignment" – *apart from* the Pool Supplements and Schedules upon which both sides rely. Because those documents reflect bulk transfers, they will either support or undermine plaintiffs' claim in bulk.

The *Hoffman* court also concluded that "whether the affidavits and declarations of TSI employees are false, deceptive, and/or misleading [will] require[] inquiry concerning the individual affiants," because plaintiffs will not be able to "show by a preponderance of the evidence that the documents Defendants used in every debt collection action suffered from the same alleged deficiencies (*i.e.*, that all TSI affiants lacked the training or knowledge necessary to execute accurate affidavits)." 2023 WL 421113, at *8. In the case at bar, however, the claim is not that some of the Affiants lacked the requisite training or knowledge to produce accurate affidavits. Quite the contrary: the claim is that TSI-NCO's training and instructions *prevented* the Affiants

from reviewing the records required to make their affidavits accurate. *See*, *e.g.*, Pl. R. 23 Supp. Br. at 2 ("For each of the Trust Defendants, TSI-NCO's uniform written policies prohibited the Trust's Attorneys (including Forster) and Affiants (employed by TSI-NCO) from requesting and/or reviewing proof of the debt alleged in each suit."). Because the claimed deficiencies are a feature, not a bug, if plaintiffs prevail on this theory, they will prevail on a classwide basis. I therefore conclude that, as in *Sykes*, the proposed classes satisfy the commonality requirement.

### c)       *Typicality*

Rule 23(a)(3) requires that the class representatives have claims typical of those shared by class members. This requirement is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability . . . irrespective of minor variations in the fact patterns underlying the individual claims." *Reynolds v. Giuliani*, 118 F. Supp. 2d 352, 389 (S.D.N.Y. 2001) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)). Thus, the typicality requirement tends to "merge" with the commonality requirement, "and similar considerations guide both analyses." *Mayhew v. KAS Direct, LLC*, 2018 WL 3122059, at \*5 (S.D.N.Y. June 26, 2018).

"Where, as here, the alleged injuries derive from a unitary course of conduct by a single system, typicality is generally found." *Brooklyn Ctr. for Indep.*, 290 F.R.D. at 419 (internal citations and quotation marks omitted). Given the discussion of commonality above, I conclude that typicality has also adequately been established.

### d)       *Adequacy*

Before a class may be certified, the representative parties must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The rule is satisfied where class counsel is "qualified, experienced and generally able to conduct litigation," *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992), and where "there is no

conflict of interest between the named plaintiffs and other members of the plaintiff class."
*Marisol A.*, 126 F.3d at 378. Even if a conflict is revealed, it does not "necessarily defeat class
certification – the conflict must be 'fundamental.'" *Denney*, 443 F.3d at 268 (quoting *In re Visa
Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)).

Defendants argue that there are conflicts of interest *among* the named plaintiffs, following
Judge Gardephe's Rule 12(b)(6) decision, because some of them have "live" individual claims
under both FDCPA and GBL § 349, while others do not. Def. R. 23 Opp. at 17-18. They further
argue that the named plaintiffs are "subject to unique defenses – namely, that they did indeed owe
the amounts claimed in their collection actions." *Id.* at 19. Neither argument has merit.

As shown in Part II.B.6, *supra*, all of the named plaintiffs have standing – and thus have
"live" claims – with respect to the sham lawsuit scheme alleged in CCAC ¶¶ 274(a)-(b) and 280(a)-
(b). These claims are also suitable for litigation on a class basis, as they can be pursued against the
Trust Defendants under GBL § 349; against TSI-NCO under FDCPA and GBL § 349; and against
Forster under FDCPA, GBL § 349, and NYJL § 487. *See* Pl. R. 23 Supp. Br. at 5. Moreover, as
plaintiffs point out, all putative class members would qualify for statutory damages under FDCPA
and GBL § 349. Pl. Damages Supp. Br. at 2 n.4.[33]

Further, it is by now well-settled that liability under FDCPA can be established
"irrespective of whether the presumed debtor owes the debt in question." *Sykes III*, 780 F.3d at 83
(quoting *Sykes II*, 285 F.R.D. at 292); *accord Villalba v. Houslanger & Assocs., PLLC*, 2022 WL

---

[33] As discussed in Part II.B.5, *supra*, only one plaintiff – Bifulco – has a "live" claim with respect
to defendants' negative credit-reporting, as to which she could, in theory, seek damages not
available to the other named plaintiffs or the class. I do not view that as a disabling conflict,
because it does not render Bifulco's interests "antagonistic" to those of other plaintiffs. *See In re
Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764-65 (2d Cir. 2020) (summary order) (lead
plaintiffs were not inadequate by reason of the fact that they held claims under the Exchange Act
and Delaware law, whereas many class members had Exchange Act claims only).

900538, at *4 (E.D.N.Y. Mar. 28, 2022). Thus, defendants' contention that some of the named plaintiffs "owed the debts," Def. R. 23 Opp. at 19 – and indeed acknowledged them when they filed for personal bankruptcy, *id.* at 21-23 – does not give rise to a defense, much less a unique defense, to their FDCPA claims.

Defendants do not raise, and the Court has not identified, any basis upon which to question the qualification and experience of plaintiffs' counsel. Rule 23(a)(4) is therefore satisfied.

### e)   *Ascertainability*

Plaintiffs' class discovery, based on a sampling of 5% of the putative class members sued in New York, shows that plaintiffs can easily identify which individuals fall within the proposed Rule 12(b)(3) class definitions, *i.e.*, which persons have been sued by defendants in a New York State court and have had default judgments entered against them in those suits. *See* Hawkins R. 23 Decl. ¶¶ 38-39; *see also Sykes II*, 285 F.R.D. at 292-93. Consequently, ascertainability is not a barrier to certification of the proposed classes here.

### 2.   Rule 23(b)(3)

Rule 23(b) "imposes two additional burdens on plaintiffs attempting to proceed by class action, namely, predominance and superiority." *Sykes III*, 780 F.3d at 81.

### a)   *Common Issues of Fact and Law Predominate*

The predominance requirement under Rule 23(b)(3) is "more demanding" than the commonality requirement under Rule 23(a)(2). *Sykes III*, 780 F.3d at 81. However, the rule "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (citations omitted) (alteration in original). All that is required is that a class plaintiff show that "common questions 'predominate.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). As the Second Circuit explained *in Sykes III*, "[i]ndividual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual

questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." 780 F.3d at 81 (quoting *Messner v. Northshore Uni. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). Thus, for example, the fact that an affirmative defense may arise that affects different class members differently "does not compel a finding that individual issues predominate over common ones." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d at 225 (citation and internal quotation marks omitted). The same is true with respect to damages. *Sykes III*, 780 F.3d at 81.

In this case, Rule 23(b)(3)'s predominance requirement is met because the key issues – indeed, virtually all of the liability issues – are susceptible of generalized proof applicable to all putative class members, and there is little chance "that individual issues will overwhelm the common questions." *In re NASDAQ Market-Makers Antitr. Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996). Nor are plaintiffs required to propose, prior to certification, "a common method for determining . . . to what degree any individual Plaintiff or putative class member was damaged by the alleged misconduct." Def. R. 23 Opp. at 28. In a consumer debt case, where statutory damages are available under both federal and state law, *see* 15 U.S.C. § 1692k(a)(2)(A)-(B); GBL § 349(h), "[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes III*, 780 F.3d at 88 (internal quotation marks and citation omitted).[34]

---

[34] In their post-argument damages brief, plaintiffs also assert the right to seek classwide actual damages under FDCPA, GBL § 349, and NYJL § 487 for the money garnished from plaintiffs' wages after default; the costs incurred by plaintiffs "in responding to state court actions," and costs incurred to seek resolution of (*i.e.*, settle) such actions. Pl. Damages Supp. Br. at 1. As plaintiffs point out, the amount of money garnished from each plaintiff's paychecks can be ascertained from defendants' records. *Id.* at 3 (citing *Sykes III*, 780 F.3d at 76.) This is presumably also true for the money recovered through settlements after default (if there were any). Moreover, while the second category (defense costs) would likely require individualized determinations, defendants have

Relying on Third Circuit authority, defendants argue that the issue of equitable tolling (which plaintiffs will necessarily rely upon to overcome what would otherwise be a limitations bar for many class members) will require thousands of mini-trials. Def. R. 23 Opp. at 34-35 (citing *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 294 (3d Cir.), *as amended* (Oct. 20, 2010)). In the quoted portion of *Cmty. Bank of N. Virginia*, however, the court merely noted that defendants "may . . . challenge the predominance requirement in light of the 'presence of idiosyncratic statute-of-limitations issues' among the laws of various states in a nationwide class action." 622 F.3d at 294. This is not a nationwide class action, and there is no reason to believe that equitable tolling issues cannot be resolved efficiently in a class format.

### b)       *A Class Action Is Superior to All Other Methods of Resolution*

Reprising their commonality and predominance arguments, defendants contend that a class action is not a superior method for adjudicating plaintiffs' damages claims because:

> each Plaintiff would need to demonstrate that Defendants did not possess and/or review sufficient documentation of their debt before initiating collection actions against them, and that any misrepresentations regarding possession or review of loan documentation caused Plaintiffs to suffer some injury, and finally the nature and amount of any such injury. The court would have to conduct a mini-trial for each Plaintiff and class member.

Def. R. 23 Opp. at 33. As shown above, defendants' claimed fears are groundless.

Defendants' "public policy" argument (that plaintiffs "should be encouraged to raise [their complaints] in their individual collection actions," Def. R. 23 Opp. at 34) falls flat as well. A strikingly similar argument was rejected in *Sykes III*, where defendants urged the court to deny class certification so as to encourage the debtors to return to New York Civil Court to adjudicate,

---

presented no information as to the number of putative class members who sought vacatur of the default judgments against them, and have made no showing that calculating the actual damages incurred by these individuals would "predominate" over the common issues.

on an individual basis, the adequacy of the certificates of merit filed in their collection cases. 780 F.3d at 92. The court made short work of that contention, noting that it amounted to nothing more than a "preference that their alleged widespread fraudulent behavior be dealt with in a piecemeal fashion." *Id.* So too here.

In this case, as in *Sykes*, a class action "is, without question, more efficient than requiring thousands of debtors to sue individually," whether in state or in federal court. *Sykes II*, 285 F.R.D. at 294 (confirming superiority of class resolution where defendants filed state-court collection suits *en masse* via fraudulent allegations of debts owed). Certifying a class is also consistent with the remedial purpose of FDCPA, which requires the courts to construe its terms "in liberal fashion if the underlying Congressional purpose is to be effectuated." *Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 225 (2d Cir. 2015) (quoting *Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013)). If, as defendants contend, they "can show they unequivocally had the proper documentation in their possession" when they defaulted the class members, Def. R. 23 Opp. at 34, they can – and no doubt will – make that showing on a classwide basis in this Court. Accordingly, I conclude that the superiority requirement has been met.

### c)      There is No Need for Trust-Specific Classes or Subclasses

Defendants are correct, however, that plaintiffs' request that the Court certify *four* Rule 23(b)(3) classes, on a per-Trust basis, appears to be motivated simply by plaintiffs' desire to circumvent the $500,000-per-class statutory damages cap under FDCPA. *See* 15 U.S.C. § 1692k(a)(2)(B); Def. R. 23 Supp. Opp. at 2, 5.[35]

---

[35] Plaintiffs do not assert any FDCPA claims against the Trust Defendants, presumably because they are not "debt collectors" as that term is defined in 15 U.S.C. § 1692a(6). However, splitting their Rule 23(b)(3) class into four classes would let them seek up to $500,000 per class under FDCPA from the remaining defendants, TSI-NCO and Forster. Statutory damages under the GBL are limited to $50 per plaintiff, or "an amount not to exceed three times the actual damages up to

As a matter of logic, it cannot be the case that common questions of fact and law predominate here to the degree required to justify class certification – except that "each Trust is its own legal entity, with its own distinct facts," Pl. R. 23 Supp. Br. at 9, necessitating the multiplication of classes. Plaintiffs have shown (and defendants have largely conceded) that TSI-NCO litigated on behalf of all four Trust Defendants in exactly the same way, using the same Affiants, the same outside counsel, and the same training and instruction materials (the Procedure and the SOP) across New York State. Indeed, it is that uniformity of conduct that permits plaintiff to meet the commonality and superiority prongs of the test. Moreover, plaintiffs do not point to any actual variation in the alleged scheme, or the evidence needed to prove it, between one Trust Defendant and another.

It is true that each class member can recover damages against only one Trust Defendant – the one that sued that member. But it is sufficient, for certification purposes, that "for every named defendant there . . . be at least one named plaintiff who can assert a claim directly against that defendant[.]" *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012). Beyond that, the necessary computations (to ensure that each plaintiff's damage award is assessed against the correct Trust Defendant) can easily be performed within the confines of a single class. Thus, while plaintiffs are entitled to certification under Rule 23(b)(3), they are only entitled to certification of one such class, comprised of:

> All persons who have been sued in New York State court debt collection lawsuits where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster as plaintiff's counsel, and where a default judgment was obtained, from November 1, 2012 through February 27, 2018.

---

one thousand dollars, if the court finds the defendant willfully or knowingly violated this section," plus attorneys' fees. GBL § 349(h). There is no separate class action cap under the GBL.

From this class should be excluded any individual who (i) appeared and litigated in state court after entry of the default judgment, (ii) succeeded in setting aside the default, but (iii) thereafter had judgment entered against him or her after dispositive motion practice or trial.

### 3. Rule 23(b)(2)

A Rule 23(b)(2) class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Thus, the plaintiff must show that the conduct sought to be enjoined applies "generally to the class," such that it "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Sykes II*, 285 F.R.D. at 289. Additionally, as with any class, a Rule 23(b)(2) class cannot be certified unless the named plaintiffs have standing to assert the underlying claims for injunctive relief, and the class is defined in such a way that all members similarly having standing. *Denney*, 443 F.3d at 263-64.

A plaintiff must "demonstrate standing separately for each form of relief sought." *TransUnion*, 41 S. Ct. at 2210 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016). In *TransUnion*, the Supreme Court confirmed that a risk of future harm may provide a plaintiff with standing to seek "forward-looking, injunctive relief," but the risk must be both "imminent and substantial." 141 S. Ct. at 2210. If it is not, the district courts do not hesitate to dismiss injunctive relief claims (or refuse to certify them under Rule 23) for lack of standing. *See*, *e.g.*, *Nicosia*, 834 F.3d at 239 (plaintiff who purchased a diet product containing a banned substance through Amazon.com lacked constitutional standing to sue

for injunctive relief because "Amazon has ceased selling *1 Day Diet* on its website, and Nicosia has failed to allege that he intends to use Amazon in the future to buy *any* products"); *Aponte v. Ne. Radiology, P.C.*, 2022 WL 1556043, at *5 (S.D.N.Y. May 16, 2022) (dismissing data-breach claim because "plaintiffs do not allege that they have suffered, or will imminently suffer, an injury-in-fact"), *appeal dismissed*, No. 22-1284, 2022 WL 4125739 (2d Cir. Aug. 9, 2022).

In this case, plaintiffs' efforts to certify a Rule 23(b)(2) class founder on the issue of standing. The proposed class seeks relief only pursuant to GBL § 349, and only with respect to defendants' negative credit-reporting. Plaintiffs describe the relief they seek as follows:

> [A]n injunction must be entered to stop the ongoing harms caused by Defendants' reporting Class members' alleged debts to credit bureaus without possession or review of proof thereof. Defendants have computer systems that constantly interface with corresponding systems at the major credit bureaus (Equifax, Experian, and Trans Union). Since Defendants' policy is to credit-report each alleged debt contemporaneously with suing over it in state court, the equitable-relief Class is as ascertainable as the Rule 23(b)(3) one. . . .
>
> To ensure replete equitable relief here, in addition to instructing credit reports be updated, Defendants also must instruct the credit bureaus and Fair Isaac Corp. ("FICO") to remove the alleged debts as data points visible to the proprietary algorithms they use to generate credit scores.

Pl. R. 23 Br. at 24 (record citations omitted). *See also* Pl. R. 12(b)(1) Opp. at 13 ("Plaintiffs demand that Defendants be enjoined to contact the bureaus and FICO to ensure Plaintiffs' credit scores are recalculated such that the impact of Defendants' wrongful reporting is negated."). It thus appears that plaintiffs seek both a prohibitory injunction (preventing defendants from credit-reporting debts "without possession or review of proof thereof") and a mandatory injunction (requiring defendants to "instruct" the credit bureaus and FICO to remove the tradelines relating to the student loan debts

they attempted to collect), both targeted narrowly to the harm allegedly caused by defendants' negative credit-reporting.[36]

As discussed in Part II.B.5, *supra*, only one of the named plaintiffs – Bifulco – has standing to seek damages related to defendants' negative credit-reporting. Even Bifulco, however, lacks standing to seek *prospective* relief on her credit-reporting claim, because the risk of *future* harm from this species of misconduct is neither imminent nor substantial. The default judgment against her was issued on March 25, 2014, and the associated lien was recorded on September 15, 2015. CCAC ¶¶ 188-89; Luke Decl. ¶ 45. TSI-NCO last credit-reported her account on February 8, 2015, when a "tradeline removal request" was made. Luke Decl. ¶ 46. Similar removal requests were made, with respect to all of the other named plaintiffs, by February 8, 2015, at the latest. *Id.* ¶¶ 35, 57, 72, 87.[37]

Plaintiffs point out that there is no confirmation in the record that defendants have "requested tradeline removals" for the entire class. Pl. R. 12(b)(1) Opp. at 13. True enough. But this does not help them get a Rule 23(b)(2) class certified, because they must first show that that

---

[36] This is quite different from the injunctive relief requested in *Sykes*, where plaintiffs sought:

> first, a direction that defendants "cease engaging in debt collection practices that violate the FDCPA, RICO, N.Y. GBL § 349, and N.Y. Jud. Law § 487;" second, a direction that defendants locate and notify class members that a default judgment has been entered against them and that "they have the right to file a motion with the court to re-open their case;" third, a direction that defendants "serve process in compliance with the law in any and all future actions;" and fourth, a direction that defendants' affidavits of merit in future actions reflect their personal knowledge of the facts.

*Sykes III*, 780 F.3d at 97 (citation omitted).

[37] By law, the default judgments themselves dropped off the plaintiffs' credit reports seven years after they were issued. *See* 15 U.S.C. § 1681c(a)(2) (generally prohibiting the credit bureaus from reporting any "[c]ivil suits" or "civil judgments" that "antedate the report by more than seven years").

least one named plaintiff has standing to seek the requested injunction – which they cannot do. And even if they cleared this hurdle, they could not clear the next, which requires them to show that the class has been "defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264. Here, plaintiffs have shown – at best – that *some* members of the proposed class *might* still have default judgments or negative tradelines affecting their credit scores as a result of defendants' allegedly unlawful debt collection efforts, which puts them at risk of future harm should that information be disseminated to potential creditors. This is not sufficient.

Nor may plaintiffs rely for standing on the risk that defendants will initiate new debt-collection lawsuits against them, or other members of the putative class, "without possession or review" of the necessary proof of indebtedness. Both TSI-NCO and Forster are now enjoined from engaging in that conduct. *See* Consent Order ¶¶ 45-51 (TSI); Stip. Final J. ¶¶ 6-9 (Forster). For this reason as well, plaintiffs cannot show that they face an "imminent and substantial" risk of harm, either from the lingering effects of defendants' past conduct or from any future repetition of that conduct. *TransUnion*, 141 S. Ct. at 2210.

## III.   CONCLUSION

For the reasons set forth above, I recommend, respectfully, that defendants' Rule 12(b)(1) motion to dismiss this action for lack of standing be GRANTED IN PART. All of plaintiffs' claims based on CCAC ¶¶ 274(c)-(g) and 280(c)-(g), should be dismissed, along with the claims of plaintiffs K. Seaman, M. Seaman, Tabar, Butry, and Frauenhofer based on CCAC ¶¶ 274(h) and 280(h). The motion to dismiss should otherwise be DENIED.

I further recommend that plaintiffs' Rule 23 class certification motion be GRANTED IN PART. The Court should certify one class, pursuant to Rule 23(b)(3), comprised of all persons who have been sued in New York State court debt collection lawsuits from November 1, 2012

through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster as plaintiff's counsel, and where a default judgment was obtained, but *excluding* any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits.

I further recommend that plaintiffs K. Seaman, M. Seaman, Tabar, Butry, Bifulco, and Frauenhofer be appointed Class Representatives (although plaintiffs neglected to ask for this relief), and that Frank LLP be appointed Class Counsel.

Dated: New York, New York
       March 13, 2023

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Paul G. Gardephe at 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned Magistrate Judge. Any request for an extension of time to file objections must be directed to Judge Gardephe. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 Fed. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).