UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHERINE SEAMAN, Individually and on
behalf of all others similarly situated; MARY RE
SEAMAN, Individually and on behalf of all
others similarly situated; and SANDRA TABAR,

Plaintiffs,

- against -

NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-2; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-3;
TRANSWORLD SYSTEMS, INC., In its own
right and as successor to NCO Financial Systems,
Inc.; EGS FINANCIAL CARE INC., formerly
known as NCO Financial Systems, Inc.; and
FORSTER & GARBUS LLP,

Defendants.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 1781 (PGG) (BCM)
18 Civ. 7692 (PGG) (BCM)

CHRISTINA BIFULCO, Individually and on
behalf of all others similarly situated; FRANCIS
BUTRY, Individually and on behalf of all others
similarly situated; and CORI FRAUENHOFER,
Individually and on behalf of all others similarly
situated,

Plaintiffs,

- against -

NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2004-2; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-4;
TRANSWORLD SYSTEMS, INC., In its own
right and as successor to NCO Financial Systems,
Inc.; EGS FINANCIAL CARE INC., formerly
known as NCO Financial Systems, Inc.; and
FORSTER & GARBUS LLP,

Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

In these consolidated putative class actions, Plaintiffs Katherine Seaman, Mary Re Seaman, Sandra Tabar, Christina Bifulco, Francis Butry, and Cori Frauenhofer allege that Defendants National Collegiate Student Loan Trust 2007-2 ("Trust 2007-2"), National Collegiate Student Loan Trust 2007-3 ("Trust 2007-3"), National Collegiate Student Loan Trust 2004-2 ("Trust 2004-2"), and National Collegiate Student Loan Trust 2006-4 ("Trust 2006-4") (collectively, the "Trust Defendants"); Transworld Systems, Inc. ("TSI"), in its own right and as successor to NCO Financial Systems, Inc. ("NCO"), and NCO, now known as EGS Financial Care Inc. ("EGS") (collectively, "TSI-NCO"); and Forster & Garbus LLP have orchestrated a scheme to "fraudulently obtain default judgments . . . for unprovable debts" against them in state court, and that Plaintiffs have carried out this scheme by, inter alia, filing documents containing false or deceptive information in those state proceedings.  (Consol. Cmplt. (Dkt. No. 124) ¶¶ 1, 7-13, 15-17)[1]  Plaintiffs assert claims for violations of the Fair Debt Collection Practices Act (the "FDCPA"); New York General Business Law ("GBL") Section 349; and New York Judiciary Law Section 487.  (Id. ¶¶ 266-85)

On June 3, 2021, Plaintiffs moved for class certification, pursuant to Fed. R. Civ. P. 23.  (Pltf. Mot. (Dkt. No. 312))  On April 7, 2022, Defendants moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), for lack of standing.  (Def. Mot. (Dkt. No. 371))

In a March 13, 2023 report and recommendation ("R&R"), Magistrate Judge Moses recommends granting in part and denying in part Defendants' motion to dismiss, pursuant

---

[1]  Unless otherwise specified, all docket citations are to the docket of the first-filed action, Seaman et al. v. National Collegiate Student Loan Trust 2007-2, et al., 18 Civ. 1781 (PGG) (BCM).  The original lead Plaintiff in this action was Mutinta Michelo, but on May 12, 2021, this Court so-ordered a stipulation to dismiss Michelo's claims (Dkt. No. 298), which left Katherine Seaman as the lead Plaintiff.

to Fed. R. Civ. P. 12(b)(1), and granting in part Plaintiffs' motion for class certification.  (R&R (Dkt. No. 423) at 67-68)

On April 14, 2023, both Defendants and Plaintiffs filed objections to the R&R (Def. Obj. (Dkt. No. 433); Pltf. Obj. (Dkt. No. 434)), and on April 28, 2023, Defendants and Plaintiffs filed their responses to each other's objections.  (Def. Resp. (Dkt. No. 436); Pltf. Resp. (Dkt. No. 437))

As discussed below, Judge Moses' R&R will be adopted in part.

## BACKGROUND

I.   **FACTS**[2]

A.   **The Parties**

Plaintiffs Katherine Seaman, Mary Re Seaman, and Sandra Tabar are "current or former New York City residents and holders of student loan debt."  Plaintiffs Christina Bifulco, Francis Butry, and Cori Frauenhofer are "residents of Erie County, New York, and likewise hold student loan debt."  (R&R (Dkt. No. 423) at 6 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 23-28))

> Defendants are the four Trust Defendants that sued the six named plaintiffs in state court, each alleging that it was the "original creditor" of the loan sued upon and/or "authorized to proceed with this action"[;] the Trust Defendants' servicing agent, TSI-NCO, which directed the litigation and furnished evidentiary material, including affidavits, for use in the collection actions[;] and Forster [& Garbus – a Long Island-based debt-collection law firm – ] which served as the Trust Defendants' counsel of record in each action.

---

[2]  Because the parties have not objected to Judge Moses' factual account, this Court adopts it in full.  See Silverman v. 3D Total Solutions, Inc., No. 18 Civ. 10231 (AT), 2020 WL 1285049, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the R&R's characterization of the background facts . . . , the Court adopts the R&R's 'Background' section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16 Civ. 4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them in full.").

(Id. (footnotes and citations omitted) (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 29-35, 49-50, 58-59, 89, 92, 95, 101, 104, 120, 123, 126, 132, 162, 166, 171, 174, 194, 198, 203, 206, 223, 227))

**B.    The Alleged Fraudulent Debt Collection Scheme**

Plaintiffs allege that TSI-NCO – servicing agent for the Trust Defendants, which have no employees – "causes baseless lawsuits to be filed on behalf of the Trust Defendants in state and local courts against student debt holders like [P]laintiffs."  (Id. at 7 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 2, 47)) "TSI-NCO coordinates with various law firms to sue the debt holders on the Trust Defendants' behalf, relying on Forster [& Garbus] to do so in New York State."  (Id. (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 2, 35))

Plaintiffs allege that Defendants make several misrepresentations with respect to these lawsuits.  First, "[i]n the New York collection actions, [D]efendants' boilerplate complaints falsely state that one of the Trust Defendants is the 'original creditor' of the loan at issue and/or is 'authorized to proceed' with the action."  However, the Trust Defendants did not "originate[] any of the loans sued on; rather, the Trust Defendants 'are the ultimate owners of bundles of student loan debt following a byzantine securitization process.'"  (Id. (quoting Consol. Cmplt. (Dkt. No. 124) ¶¶ 8, 10))  "Nor, according to [P]laintiffs, were any of the Trust Defendants 'authorized to proceed' in a New York court, because none of them registered with the New York Department of State and paid the tax required of 'out-of-state entities that regularly file suit in this state's courts.'"  (Id. (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 11))

With respect to the filings in these lawsuits, "[D]efendants' pleadings and motions 'were not meaningfully reviewed by an attorney prior to filing,'" but were "'created by automated systems and non-attorney support staff.'"  (Id. at 8 (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 17))  Defendant Forster & Garbus "filed 'hundreds, if not thousands,' of lawsuits against

New Yorkers allegedly indebted to one of the Trust Defendants." (Id. (citing Consol. Cmplt. (Dkt. No. 124) ¶ 59)) "The pleadings and other papers filed in those lawsuits, which contained 'identical assertions of fact,' were 'mass-produced by non-lawyers at the push of a button, and then signed by attorneys who had done nothing to confirm the validity of the allegations and claims lodged against the consumer-defendants.'" (Id. (citation omitted) (quoting Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 19-20; Consol. Cmplt. (Dkt. No. 124) ¶¶ 60-63)) "Forster [& Garbus] 'did not possess, and did not review, any actual documentary support' for the complaints it filed on behalf of the Trust Defendants." (Id. (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 61; citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 11-12))

Plaintiffs further allege that Defendants "submit[] deceptive affidavits in connection with motions for default judgments." In particular, "[t]he TSI-NCO employees who fill out and sign those affidavits falsely attest to 'personal knowledge' of key facts such as the relevant account records, the consumer's debt, and – most significantly – the chain of assignments establishing the relevant Trust Defendant's entitlement to sue." (Id. at 7-8 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 12-13)) These employees "did not possess or review the underlying records upon which those affidavits were supposedly based." (Id. at 8 (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 22-27)) "TSI-NCO had a team of employees (the Affiants) sign those affidavits and aver before the New York State courts that they were 'competent and authorized to testify' as the Trusts' witnesses against debtors in state court if called upon to do so." (Id. (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 105, 139, 175, 207, 236)) The team "consist[ed] of roughly half a dozen members at any one time [] but churned out a large number of affidavits daily, with each Affiant signing 'upwards of 45 affidavits per day.'" (Id. at 9 (quoting Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 25-26))

"The Affiant team relied on a computerized system that began with a 'pre-created' affidavit template and then 'pull[ed] data in' from another system to 'populate the various fields,' which were 'utilized to create that affidavit.'" (<u>Id.</u> (alteration in original) (quoting Hawkins R. 23 Decl., Ex. B (Dkt. No. 315-2) at 6-10))  "The system populated, among other things, the names of the borrower and any co-borrower, 'the status of the account, balances, last payment date, amount, Trust name, fields such as those.'" (<u>Id.</u> (quoting Hawkins R. 23 Decl., Ex. B (Dkt. No. 315-2) at 9-10))  Although each affidavit stated that the affiant "had 'reviewed the education loan records' regarding the account at issue, and on that basis attested to the amount owed[,] [i]n reality, [P]laintiffs allege, the Affiants lacked the personal knowledge to which they attested." (<u>Id.</u> at 9-10 (citation omitted) (quoting Hawkins R. 23 Decl., Ex. J (Dkt. No. 315-10) at 5; citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 106-09))  Rather, the Affiants were "'instructed to review data on a computer screen,' but did not know the source of that data, how it was obtained or maintained, or whether it was accurate." (<u>Id.</u> at 10 (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 107))  "TSI-NCO did not require the Affiants to review the actual documents evidencing the chain of title of the loan sued upon, or the terms of that loan.  It did not even tell the Affiants where those documents could be found in TSI-NCO's records (if at all)." (<u>Id.</u> (citation omitted) (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 23-24))

TSI-NCO also "reported the underlying debts to the major credit bureaus (Equifax, Experian, and TransUnion) as 'valid and owed.'" (<u>Id.</u> (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 192, 221; Hawkins R. 23 Decl. (Dkt. No. 315) ¶ 30))  "That reporting, in turn, negatively impacted [P]laintiffs' credit scores." (<u>Id.</u> (citing Pltf. R. 23 Br. (Dkt. No. 314) at 30 n.16; Plft. R. 23 Reply Br. (Dkt. 335) at 19 n.18; Hawkins R. 12(b)(1) Decl., Ex. 1-D ("Bifulco Dep.") (Dkt. 390-4) at 6-8))

## II.   **PROCEDURAL HISTORY**

The Complaint in <u>Seaman</u> was filed on February 27, 2018 (<u>see</u> Cmplt. (Dkt. No. 8)), and the Complaint in <u>Bifulco et al. v. National Collegiate Student Loan Trust 2004-2 et al.</u>, 18 Civ. 7692 (PGG) (BCM) was filed on August 23, 2018.  (<u>See Bifulco</u> Cmplt. (Dkt. No. 1)) On August 28, 2018, this Court accepted <u>Bifulco</u> as related to <u>Seaman</u>.  On November 29, 2018, this Court ordered that <u>Seaman</u> and <u>Bifulco</u> be consolidated.  The Court also extended the briefing schedule for the <u>Seaman</u> Defendants' motion to dismiss, and entered a briefing schedule for the <u>Bifulco</u> Defendants' motion to dismiss.  (Order (Dkt. No. 73))

On January 18, 2019, the <u>Seaman</u> Defendants moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and on January 25, 2019, the Bifulco Defendants moved to dismiss, on the same grounds.  (Def. Br. (Dkt. No. 80); <u>Bifulco</u> Def. Br. (Dkt. No. 37))

On September 30, 2019, this Court granted in part and denied in part Defendants' motions to dismiss.  (Sept. 30, 2019 Order (Dkt. No. 107); Oct. 11, 2019 Mem. Op. & Order (Dkt. No. 109))  This Court dismissed Plaintiff Michelo's FDCPA claim as time-barred.  The <u>Seaman</u> Plaintiffs' FDCPA claims were dismissed as time-barred to the extent they relied on the misrepresentation that Defendant Trust 2007-3 was the 'original creditor' of the Seamans' loan. Plaintiff Katherine Seaman's and Plaintiff Butry's GBL Section 349 claims were dismissed for failure to plead an actual injury.  And Plaintiff Michelo's Judicial Law Section 487 claim was dismissed for failure to plead damages.  Defendants' motions to dismiss were otherwise denied. (<u>Id.</u>)

In a December 3, 2019 order, this Court concluded that, "[g]iven that this Court ordered [<u>Seaman</u> and <u>Bifulco</u>] consolidated in November 2018, and that the operative complaints

are 'functionally identical,' it is appropriate for this action to proceed on the basis of a Consolidated Complaint."  (Dec. 3, 2019 Order (Dkt. No. 122) at 2 (citations omitted))

The Consolidated Class Action Complaint was filed on December 10, 2019.  (See Consol. Cmplt. (Dkt. No. 124))  It asserts violations of:  (1) the FDCPA (against Defendants TSI, NCO, EGS, and Forster & Garbus); (2) GBL Section 349 (against all Defendants); and (3) Judiciary Law Section 487 (against Forster & Garbus).  (Id. ¶¶ 266-85)  On December 20, 2019, all Defendants filed Answers to the Consolidated Class Action Complaint.  (See Dkt. Nos. 125-28; Bifulco, Dkt. No. 73)

On April 28, 2020, this Court referred these consolidated cases to Judge Moses for general pretrial supervision (Dkt. No. 144), and the cases proceeded to discovery.

On June 3, 2021, Plaintiffs moved for class certification, pursuant to Fed. R. Civ. P. 23 (Pltf. Mot. (Dkt. No. 312)), and on June 8, 2021, this Court referred Plaintiffs' motion to Judge Moses for an R&R.  (Dkt. No. 318)  On April 7, 2022, Defendants moved to dismiss for lack of standing, pursuant to Fed. R. Civ. P. 12(b)(1) (Def. Mot. (Dkt. No. 371)), and on April 8, 2022, this Court referred Defendants' motion to Judge Moses for an R&R.  (Dkt. No. 373)

In a March 13, 2023 report and recommendation, Magistrate Judge Moses recommends that Defendants' motion to dismiss for lack of standing be granted in part and denied in part.  She recommends dismissing (1) all claims based on "specific false statements made in state court debt-collection proceedings," whether brought under the FDCPA or GBL § 349; and (2) the claims of Plaintiffs Katherine Seaman, Mary Seaman, Tabar, Butry, and Frauenhofer based on negative credit reports, whether brought under the FDCPA or GBL § 349. She recommends that Defendants' Rule 12(b)(1) motion to dismiss otherwise be denied.  (R&R (Dkt. No. 423) at 34, 67)

Judge Moses further recommends that Plaintiffs' class certification motion, pursuant to Fed. R. Civ. P. 23, be granted in part.  She recommends certifying one class, pursuant to Rule 23(b)(3),

> comprised of all persons who have been sued in New York State court debt collection lawsuits from November 1, 2012 through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster [& Garbus] as plaintiff's counsel, and where a default judgment was obtained, but excluding any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits.

(Id. at 67-68 (emphasis omitted))

Judge Moses also recommends that the Seamans, Tabar, Butry, Bifulco, and Frauenhofer be appointed as class representatives, and that Frank LLP be appointed as class counsel.  (Id. at 68)

On April 14, 2023, both Defendants and Plaintiffs filed objections to the R&R (Def. Obj. (Dkt. No. 433); Pltf. Obj. (Dkt. No. 434)), and on April 28, 2023, Defendants and Plaintiffs filed responses to the other side's objections.  (Def. Resp. (Dkt. No. 436); Pltf. Resp. (Dkt. No. 437))

## III.   OBJECTIONS

### A.   Defendants' Objections

Defendants argue that Judge Moses makes the following errors in her R&R:

1. [f]inding that the mere existence of a collection action and a default judgment against Plaintiffs (when they failed to appear or participate) constitutes an actual injury sufficient to support Article III standing following the Supreme Court's decision in TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021);

2. [f]inding that this Court has subject matter jurisdiction to hear Plaintiffs' claims based on injuries inextricably tied to and arising out of the default judgments against Plaintiffs (such as wage garnishment or attorneys' fees), despite the Supreme Court's admonition in Exxon Mobile Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005), that the Rooker-Feldman doctrine bars federal courts from hearing claims based on alleged injuries caused by

state court judgments or seeking review and rejection of state court judgments;

3. [f]inding that Plaintiff Bifulco's self-serving deposition testimony standing alone, without any evidentiary support, is sufficient to establish a concrete injury from alleged negative credit reporting following TransUnion;

4. [f]ailing to address or recommend a ruling on Defendants' Rule 12(b)(1) Motion to Dismiss with respect to Plaintiffs' claims under Judiciary Law § 487;

5. [f]inding that Plaintiffs satisfied their obligation to demonstrate they could be adequate and typical representatives of the putative class, where Plaintiffs each assert a different combination of legal claims and Plaintiffs are subject to unique defenses – including that none of the wrongful conduct they allege actually occurred in their individual collection actions;

6. [f]inding that Plaintiffs satisfied their obligation to show questions of law or fact common to the class that can be answered with common evidence and/or that common questions would predominate over questions requiring individual assessment, where Plaintiffs have not identified any common path or common evidence to evaluate: (i) whether the wrongful conduct alleged actually occurred in the collection actions against each putative class member, (ii) whether or how each putative class member was injured, or (iii) whether and for what period of time each putative class member can take advantage of equitable tolling to resurrect time-barred claims; and

7. [f]inding that a class action is the superior method of adjudicating Plaintiffs' claims and the claims of the putative class, instead of encouraging Plaintiffs and other defendants in collection actions to challenge conduct in the collection actions themselves rather than ignoring the actions and waiting years to raise speculative claims in a separate federal lawsuit.

(Def. Obj. (Dkt. No. 433) at 7-8)

**B.    Plaintiffs' Objections**

Plaintiffs object to Judge Moses' recommendation to "deny[] Rule 23(b)(2) injunctive relief addressing [c]lass members' creditworthiness harms." (Pltf. Obj. (Dkt. No. 434) at 6 (citing R&R (Dkt. No. 423) at 64-67)) According to Plaintiffs, "[t]he R&R incorrectly presumes that older instances of negative reporting cannot entail future risk of harm. But this overlooks the reality that any negative item on a credit report permanently lowers the credit score, which impedes access to credit unless resolved." (Id. (citation omitted) (citing R&R (Dkt.

No. 423) at 64-67))  "All Plaintiffs and [c]lass members will, at some point soon, need to pay a utility bill, apply for a car loan, take out a mortgage, and so on.  They are entitled to credit-score relief, and the only basis for denying this is a misunderstanding of the role that credit scores play in daily life."  (Id.)

Plaintiffs next contend that "the R&R wrongly recommends Rule 12(b)(1) dismissal of Plaintiffs' claims concerning the false statements by Defendants' debt collection attorneys and affiants in the underlying state-court actions."  (Id. (citing R&R (Dkt. No. 423) at 34))  Plaintiffs argue that they have standing to bring these claims because "[b]oth the papers and the scheme itself meant negative legal consequences for Plaintiffs, which meet Article III's standing requirement of concrete harm."  (Id. at 7)

Plaintiffs also object to Judge Moses' "finding that any Plaintiff lacks standing to assert claims against Defendants' negative credit-reporting where there is no affirmative evidence that credit bureaus transmitted this information to potential lenders."  (Id. (citing R&R (Dkt. No. 423) at 34-38))  Plaintiffs contend that "[t]his ignores that everyone's credit score is readily available and affects myriad daily activities like how much a person pays in utility fees, car insurance, credit charges, and the like."  (Id.)

Plaintiffs further contend that "the R&R should not have recommended certifying a single Rule 23(b)(3) class, rather than four classes reflecting each of the four Trust Defendants herein," and that "[t]his approach has several flaws, including ignoring the Trusts' chosen corporate form in a manner that is outside this Court's authority."  (Id. (citing (R&R (Dkt. No. 423) at 62))

Finally, Plaintiffs assert that "[t]he R&R did not address Plaintiffs' alternative request for an amended pleading in the event any claim is dismissed for lack of standing," and

state that "[i]f this Court dismisses any of Plaintiffs' claims[,] Plaintiffs request leave to amend the complaint, as well as supplementation of the previously ordered [c]lass-sampling discovery, to incorporate Defendants' interactions with the credit bureaus about [c]lass members' tradelines."[3] (Id. at 16)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  "'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.'" Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)).  A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been

---

[3]  The R&R defines "tradeline" as follows:

> "A tradeline is a term used by credit reporting agencies to describe credit accounts listed on your credit report.  For each account you have, there is a separate tradeline, which includes information about the creditor and the debt.  The information included in your tradelines is primarily used to calculate your credit scores."

(R&R (Dkt. No. 423) at 19 n.14 (citation omitted) (quoting Experian, What Are Tradelines and How Do They Affect You?, https://www.experian.com/blogs/ask-experian/what-are-tradelines/ (last visited Sept. 25, 2023)))

committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS) (JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "To the extent . . . that the party . . . simply reiterates the original arguments, [courts] will review the Report strictly for clear error." IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343 (WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, . . . rehashing . . . the same arguments set forth in the original petition." (quotation marks and citations omitted)).

### B.   Rule 12(b)(1) Motion to Dismiss

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)." Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'" APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)); see also Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." (citing Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002))). "Under Rule 12(b)(1)[,] even 'a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient.'" Castillo v. Rice, 581 F. Supp. 2d 468, 471 (S.D.N.Y. 2008) (quoting Frisone v. Pepsico Inc., 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005)).

In considering a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). "'[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" APWU, 343 F.3d at 623 (alteration in original) (quoting Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998)).  The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but . . . may not rely on conclusory or hearsay statements contained in the affidavits." J.S., 386 F.3d at 110; see also Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010) ("In resolving a motion to dismiss for lack of subject

matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." (citing Makarova, 201 F.3d at 113)).

  "A motion to dismiss a complaint for lack of standing is properly brought pursuant to Rule 12(b)(1) . . . because it relates to the court's subject matter jurisdiction." ED Cap., LLC v. Bloomfield Inv. Res. Corp., 155 F. Supp. 3d 434, 446 (S.D.N.Y. 2016), aff'd in rel. part, 660 F. App'x 27 (2d Cir. 2016).  "'The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise.'"  United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015) (quoting Kowalski v. Tesmer, 543 U.S. 125, 128 (2004)).

> [T]he "irreducible constitutional minimum" of standing consists of three elements.  Lujan[ v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)].  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  Id. at 560-[]61 . . . ; Friends of the Earth, Inc.[ v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)].  The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements.  FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 . . . (1990).

Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016).  The "elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court."  Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

  While courts "do not require that each member of a class submit evidence of personal standing," "no class may be certified that contains members lacking Article III standing."  Denney v. Deutsche Bank AG, 443 F.3d 253, 263-64 (2d Cir. 2006).  "The class must therefore be defined in such a way that anyone within it would have standing."  Id. at 264.

C.   **Motion for Class Certification**

Fed. R. Civ. P. 23(a) sets forth the requirements for class certification and requires a potential class representative to show that:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

"If those criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 222 (2d Cir. 2008), partially abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008). A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A class may be certified under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met." In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006). "[S]uch determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement." Id. "A motion for class certification should not,

however, become a mini-trial on the merits." <u>Katz v. Image Innovations Holdings, Inc.</u>, No. 06

Civ. 3707 (JGK), 2010 WL 2926196, at *2 (S.D.N.Y. July 22, 2010).

"The dispositive question is not whether the plaintiff has stated a cause of action

or will prevail on the merits, but rather whether the requirements of Rule 23 have been met."

<u>Lewis Tree Serv., Inc. v. Lucent Techs., Inc.</u>, 211 F.R.D. 228, 231 (S.D.N.Y. 2002).  "The Rule

23 requirements must be established by at least a preponderance of the evidence," <u>Brown v.</u>

<u>Kelly</u>, 609 F.3d 467, 476 (2d Cir. 2010) (citing <u>Teamsters Loc. 445 Freight Div. Pension Fund v.</u>

<u>Bombardier Inc.</u>, 546 F.3d 196, 202 (2d Cir. 2008)), and "[a] party seeking class certification

must affirmatively demonstrate his compliance with the Rule." <u>Wal-Mart Stores, Inc. v. Dukes</u>,

564 U.S. 338, 350 (2011).

# I.   **MOTION TO DISMISS**

## A.   **The R&R**

In her R&R, Judge Moses concludes that

> none of the named [P]laintiffs has standing to pursue the FDCPA and GBL § 349
> claims outlined in [the Consolidated Class Action Complaint] – based on specific
> false statements made in state court debt-collection proceedings – because no
> plaintiff has testified that he or she ever read and detrimentally relied on any of
> those statements.

(R&R (Dkt. No. 423) at 34 (citing Def. Mot., Ex. A ("K. Seaman Dep.") (Dkt. No. 362-1) at 4-6;

Def. Mot., Ex. B ("M. Seaman Dep.") (Dkt. No. 362-2) at 4-5; Def. Mot., Ex. C ("Bifulco Dep.")

(Dkt. No. 362-3) at 3-4; Def. Mot., Ex. D ("Frauenhofer Dep.") (Dkt. No. 362-4) at 3-5; Def.

Mot., Ex. E ("Tabar Dep.") (Dkt. No. 362-5) at 5-7))  She adds that "no [P]laintiff has testified

that he or she took or forbore from any action in reliance on any of the specific statements made

in [D]efendants' pleadings or affidavits." (<u>Id.</u> (citing Bifulco Dep. (Dkt. No. 362-3) at 4;

Frauenhofer Dep. (Dkt. No. 362-4) at 5))

According to Judge Moses, "[a]bsent evidence of actual harm directly caused by one of the allegedly false statements that [D]efendants made in state court, [P]laintiffs lack standing to bring their FDCPA claims (or pendent state GBL § 349 claims) on that basis."  (Id. (citing Rosenberg v. McCarthy, Burgess & Wolff, Inc., No. 21 Civ. 2199 (MKB), 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1, 2022); Ergas v. Eastpoint Recovery Grp., Inc., No. 20 Civ. 333S, 2022 WL 1471348, at *9 (W.D.N.Y. May 10, 2022), modified on reconsideration, 2022 WL 2128029 (W.D.N.Y. June 14, 2022)))

As to the FDCPA and GBL § 349 claims based on negative credit reporting, Judge Moses concludes that "[o]nly Bifulco[] . . . testified that she had a 'low credit score' and paid a higher interest rate on a car loan and credits cards as a result of the National Collegiate Trust tradeline," and that "[t]he remaining [P]laintiffs have made no showing of either reputational or financial harm resulting from [D]efendants' negative credit-reporting, and therefore have no standing to sue [D]efendants for that conduct in this Court."  (Id. at 34-35 (citing Bifulco Dep. (Dkt. 390-4) at 6-8; Grauman v. Equifax Info. Servs., LLC, 549 F. Supp. 3d 285, 292 (E.D.N.Y. 2021)))

Judge Moses finds that Bifulco has standing to sue for these claims because she "testified that the interest rate on [her car] loan was 16%, and that she was told by the dealership that 'absent the judgment being on [her] credit report,' the rate would have been six to seven percent."  (Id. at 34 (second alteration in original) (quoting Bifulco Dep. (Dkt. 390-4) at 138)) "Her testimony thus establishes both concrete reputational harm, flowing from the 'dissemination' of the adverse credit report to the car dealership and credit card companies, and concrete financial harm, flowing from the higher interest rates that she actually paid as a direct result of [D]efendants' tradeline."  (Id. at 34-35 (emphasis omitted) (citation omitted) (citing

<u>Krausz v. Equifax Info. Servs., LLC</u>, No. 21 Civ. 7427 (KMK), 2023 WL 1993886, at *10

(S.D.N.Y. Feb. 14, 2023); <u>Grauman</u>, 549 F. Supp. 3d at 292))

Judge Moses finds that "[a]lthough [P]laintiffs argue in broad terms that the

tradelines resulting from [D]efendants' negative credit-reporting 'were included in credit reports

on Plaintiffs that the bureaus disseminated during the [c]lass period,' the record simply does not

substantiate that claim for any [P]laintiff other than Bifulco." (<u>Id.</u> at 38 (citations omitted)

(citing Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 15 & n.16; Aug. 26, 2022 Pltf. Ltr. (Dkt. 420) at

2))

> Since only Bifulco has demonstrated the necessary "concrete harm" to sue
> [D]efendants in federal court for reputational or financial injuries caused by their
> negative credit-reporting, only Bifulco has standing to sue for that harm. The
> remaining [P]laintiffs have demonstrated only "an inaccuracy in an internal credit
> file," which, "if it is not disclosed to a third party, causes no concrete harm."

(<u>Id.</u> (quoting <u>TransUnion</u>, 141 S. Ct. at 2210))

Judge Moses further concludes that "the named [P]laintiffs and the proposed class

members have standing to sue with respect to the sham lawsuit scheme" alleged in the

Consolidated Class Action Complaint. (<u>Id.</u> at 48) Judge Moses finds that

> [g]iven the broad reach of the [FDCPA], district courts in [this] Circuit have
> repeatedly recognized that the type of conduct described in [the Consolidated
> Class Action Complaint] – filing deficient debt-collection lawsuits in bulk,
> without the intent or ability to prove their claims, in hopes of obtaining default
> judgments or extracting settlements from borrowers ill-equipped to defend
> themselves – violates [the] FDCPA as well as GBL § 349.

(<u>Id.</u> at 38-39) "'[T]here can be no doubt that false, deceptive, or misleading representations

made by debt collectors to state courts with the power to enter judgments adverse to consumers

have the ability to cause consumers severe harm.'" (<u>Id.</u> at 40 (quoting <u>Toohey v. Portfolio</u>

<u>Recovery Assocs., LLC</u>, No. 15 Civ. 8098 (GBD), 2016 WL 4473016, at *8 (S.D.N.Y. Aug. 22,

2016)))

> Those harms include:  being subjected to a lawsuit that should never have been brought; suffering the entry of an adverse default judgment in such a lawsuit, followed in many cases by wage garnishment; and, for those consumers who fought back, incurring significant costs, both in time and money, to vacate improperly-obtained judgments.

(Id. (citing Pltf. Supp. Damages Br. (Dkt. No. 410) at 2))  Judge Moses finds that "[t]hese are all 'distinct and palpable' injuries in fact, 'fairly traceable' to the challenged action, and redressable in this forum," and that "these harms bear 'a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.'"  (Id. at 41-42 (citation omitted) (quoting Denney, 443 F.3d at 263; TransUnion, 141 S. Ct. at 2204))  These traditionally recognized harms are "common-law 'unjustifiable litigation' torts such as civil malicious prosecution, abuse of process, and wrongful use of civil proceedings."  (Id. at 42)

Judge Moses rejects Defendants' argument that "[P]laintiffs cannot bring these claims in federal court because they cannot 'establish a redressable concrete injury as required, especially in light of the Rooker-Feldman doctrine.'"  (Id. at 40 (quoting Def. R. 12(b)(1) Supp. Br. (Dkt. No. 408) at 2))  In so concluding, Judge Moses notes that "the question whether Rooker-Feldman bars [P]laintiffs from relying on the garnishments for standing has already been decided by [this Court]."  (Id. at 44-45)  Judge Moses quotes from this Court's opinion granting in part and denying in part Defendants' earlier motion to dismiss:  "'The Court concludes that the Rooker-Feldman doctrine presents no obstacle to the claims of the Seaman Plaintiffs and the Bifulco Plaintiffs. . . . 'Wage garnishment is a pecuniary harm that satisfies the actual injury requirement.'"  (Id. at 45 (quoting Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2, 419 F. Supp. 3d 668, 686-88, 709 (S.D.N.Y. 2019)))  Given that there has been no change in the law regarding this issue, Judge Moses concludes that "there is no reason to reconsider [this Court]'s Rooker-Feldman analysis, which is . . . law of the case."  (Id. at 45)

In any event, Judge Moses finds that this Court's analysis of the <u>Rooker-Feldman</u> issue "remains sound." (<u>Id.</u>) She notes that Plaintiffs "do not invite this Court to review or reject the state court default judgments against them." (<u>Id.</u> (citing Pltf. Supp. Damages Br. (Dkt. No. 410) at 2-3)) Rather, "they bring 'claims sounding under the FDCPA . . . and state law [that] speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that [D]efendants pursued in obtaining such judgments.'" (<u>Id.</u> (alteration and omission in original) (quoting <u>Michelo</u>, 419 F. Supp. 3d at 687))

Judge Moses also rejects Defendants' argument that Plaintiff Tabar lacks standing because costs incurred in vacating a default judgement do not confer standing or suffice as actual damages. (<u>Id.</u> at 47) She reasons that "[w]here, as here, the [D]efendant[s'] actionable misconduct included bringing an improper lawsuit against the current [P]laintiff, that [P]laintiff's legal fees and related costs incurred in the prior action can constitute both a concrete injury that confers standing and (in most jurisdictions) a measure of the [P]laintiff's compensatory damages." (<u>Id.</u> (citing Restatement (Second) of Torts § 681))

### 1. **Defendants' Objections**

In their objections, Defendants contend that the R&R's finding that injuries related to the "sham lawsuit scheme" can provide a basis for standing "is inconsistent with the requirements of Article III injury following <u>TransUnion</u> and the boundaries of federal jurisdiction established by the <u>Rooker-Feldman</u> doctrine." (R&R (Dkt. No. 423) at 38; Def. Obj. (Dkt. No. 433) at 20) According to Defendants, (1) "the R&R erred in finding that the mere existence of a collection action against Plaintiffs, without more, could establish Article III standing following <u>TransUnion</u>"; (2) "the Court does not have jurisdiction to hear any claim for which the default judgments themselves are the only alleged injury"; and (3) "this Court lacks

subject matter jurisdiction to hear Plaintiffs' claims based on any alleged 'sham lawsuit scheme,' and must dismiss." (Def. Obj. (Dkt. No. 433) at 22, 25)

In support of their lack of subject matter jurisdiction claim, Defendants rehash their argument that the Rooker-Feldman doctrine bars this Court from exercising jurisdiction over Plaintiffs' claims to the extent they are based on default judgments. (Compare Def. Supp. R. 12(b)(1) Br. (Dkt. No. 408) at 9 ("Here, because Plaintiffs' only injuries are based on garnishments relating to alleged improper default judgments, this Court cannot redress Plaintiffs' injuries because, in order to do so, this Court would have to reverse or modify the state court judgments that authorized the garnishments. Said another way, the Court would need to conclude the default judgments were improper to remedy any alleged improper garnishments, something this Court clearly cannot do under Rooker-Feldman.") with Def. Obj. (Dkt. No. 433) at 24-25 ("The only alleged concrete injuries [P]laintiffs complain of are, or arise from, the default judgments. These alleged injuries are dependent on Plaintiffs' (unproven) contention that the default judgments are invalid or were wrongfully procured. However, Rooker-Feldman prohibits this Court from hearing claims that would require the Court to review, reject, and invalidate the default judgments. Plaintiffs fail to identify any concrete injury sufficient to satisfy Article III that is [redressable] by this Court." (footnote omitted)); and id. at 22 ("It is not difficult to see that a default judgment cannot be an injury unless it is invalid or flawed, and such injury cannot be redressed without review, rejection, and invalidation of the judgment. The Second Circuit has made clear Rooker-Feldman bars any claim where the judgment is the injury.")) Accordingly, the portions of the R&R addressing this argument will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211. To the extent that Defendants object to the

R&R's finding that the state court lawsuits themselves constitute an injury for standing purposes, the R&R will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Defendants also object to the R&R's finding that Plaintiff Bifulco has standing based on negative credit reporting. (Def. Obj. (Dkt. No. 433) at 25) Defendants argue that "the negative credit reporting complained of was based on 'the judgment being on [Plaintiff Bifulco's] credit report,'" and "to find harm flowing from the judgment necessitates finding the judgment invalid, which Rooker-Feldman prohibits." (Id. (alteration in original) (quoting Bifulco Dep. (Dkt. 390-4) at 8)) Defendants further argue that "there are no documents in the record to support Plaintiff Bifulco's self-serving testimony." (Id.) This objection will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Finally, Defendants complain that "the R&R only proceeded to analyze and recommend a resolution of Defendants' motion to dismiss as to the FDCPA and GBL claims," and that "[t]here is no reason to decline to resolve Defendants' motion to dismiss Plaintiffs' claims under Judiciary Law § 487." (Def. Obj. (Dkt. No. 433) at 26) According to Defendants, "Plaintiffs lack standing to assert a Judiciary Law § 487 claim based on specific false or misleading statements for the same reasons the R&R recommends dismissal of the FDCPA and GBL claims based on specific false or misleading statements." (Id. (citing R&R (Dkt. No. 423) at 34)) "The Court should also dismiss all Plaintiffs' Judiciary Law § 487 claims for lack of Article III standing to the extent they are based on a 'sham lawsuit scheme.'" (Id.) This objection will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

### 2.    Plaintiffs' Objections[4]

Plaintiffs object to Judge Moses' recommendation that "Plaintiffs' claims concerning the false statements by Defendants' debt collection attorneys and affiants in the underlying state-court actions" be dismissed.  (Pltf. Obj. (Dkt. No. 434) at 10 (citing R&R (Dkt. No. 423) at 34))  They first argue that Judge Moses errs in analogizing their false statement claims "to those in 'letter cases,' in which FDCPA plaintiffs press claims based on a collection letter."  Judge Moses "overlooks the distinguishing fact that courts have dismissed letter cases for lack of standing because the plaintiffs there never suffered legal consequences – such as a state-court collection action, as with Plaintiffs here."  (Id. at 11 (emphasis omitted))  In this objection, Plaintiffs merely repeat the argument they made in their opposition papers that "Defendants inaptly rely on post-TransUnion letter cases, in which FDCPA plaintiffs who never got sued were denied standing."  (See Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 8 (emphasis omitted))

Plaintiffs next argue that "the R&R focuses solely on the absence of the first type of harm discussed by Rosenberg [v. McCarthy, Burgess & Wolff, Inc., No. 21 Civ. 2199 (MKB), 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1, 2022)] (actual reliance by the plaintiff) but ignores the existence of the second type (legal consequences)."  (Pltf. Obj. (Dkt. No. 434) at 11 (citing

---

[4] Defendants contend that Plaintiffs' objections are untimely and should not be considered. (Def. Resp. (Dkt. No. 436) at 6-7)  According to Defendants, the R&R was issued on March 13, 2023, and objections were thus due on March 27, 2023 absent an extension of time.  (See id. at 6; R&R (Dkt. No. 423) at 68)  On March 20, 2023, Defendants requested an extension until April 14, 2023 "for [D]efendants to file [o]bjections" to the R&R.  (Mar. 20, 2023 Def. Ltr. (Dkt. No. 425))  This Court granted that application on March 21, 2023.  (Mar. 21, 2023 Order (Dkt. No. 426))  Plaintiffs filed their objections on April 14, 2023, without requesting a similar extension of time.  (See Pltf. Obj. (Dkt. No. 434))  Defendants request that this Court "apply a clear error standard to its review of the portions of the R&R challenged in Plaintiffs' untimely [o]bjection[s]."  (Def. Resp. (Dkt. No. 436) at 7)  This Court has considered Plaintiffs' objections as though they were timely filed.  As discussed below, however, even when reviewed de novo, Plaintiffs' objections fail.

R&R (Dkt. No. 423) at 34))  They argue that "[b]ecause Defendants' various false statements in state court meant negative legal consequences for Plaintiffs, the R&R should not have recommended dismissing Plaintiffs' claims for lack of meaningful attorney review, false affidavits, or false complaints."  (Id.)  According to Plaintiffs, "[c]ourts in analogous cases have held that individuals like Plaintiffs suffer Article III injury where the defendant has filed a debt-collection lawsuit in state court, but its attorneys prosecuted the action without taking the time to review the claims and the papers submitted in state court."  (Id. (citing McCrobie v. Palisades Acquistion XVI, LLC, No. 1:15 Civ. 00018 (LJV) (MJR), 2022 WL 1657226, at *8 n.10, 13 (W.D.N.Y. Mar. 4, 2022), report and recommendation adopted sub nom. McCrobie v. Palisades Acquisition XVI, LLC, 2023 WL 5317844 (W.D.N.Y. Aug. 18, 2023))  "[T]he R&R should have found that Defendants' false default-judgment affidavits are subject to claims for which Plaintiffs have standing," because "these affidavits trigger the negative 'legal' consequence of default judgment for individuals like Plaintiffs."  (Id. at 12 (citing Rosenberg, 2022 WL 3030390, at *5; McCrobie, 2022 WL 1657226, at *13))  "The R&R's comparison of the[] [three] falsities" that Defendants' state-court complaints relied on – that "(1) [e]ach Trust is an 'original creditor,' when really it was an assignee; (2) [e]ach Trust must be paid the debt alleged, despite not first identifying which lender may have originated the underlying loan; [and] (3) [e]ach Trust is 'authorized to proceed' in state court, when really none is, for failure to register with the state" – "to the falsities in the letter cases, ignores the aggregate impact of Defendants' state-court filings."  (Id. at 13 (citing R&R (Dkt. No. 423) at 34))

Because this objection repeats several arguments Plaintiffs made in their motion papers, including that alleged debtors suffer injuries when attorneys prosecuting a case do not review the claims and papers submitted (see Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 9-10

("[T]he injury is even greater when the claims of indebtedness were pursued in state court without review of proof, as were Defendants' here.")), and that "Defendants' falsities furthered the actions that caused Plaintiffs the various harms clearly demonstrated by the evidence here."[5] (Id. at 14)

Accordingly, the portions of the R&R addressing these arguments will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211. The portions of the R&R addressing Plaintiffs' remaining argument – involving the "negative legal consequences" that Plaintiffs argue provide a basis for standing – will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Plaintiffs next object to the R&R's finding that "TransUnion and subsequent cases foreclose Plaintiffs' asserting credit-related harms, where there is no confirmative evidence that Defendants' negative reporting to credit bureaus was in turn passed to Plaintiffs' potential creditors." (Pltf. Obj. (Dkt. No. 434) at 14) They argue that the R&R "mistakenly relies on cases that did not involve debt collections, FDCPA or GBL claims, or violations connected to state-court actions." According to Plaintiffs, "[e]ach case cited by the R&R is distinguishable, as each involved claims against credit bureaus and/or original creditors for violations of the FCRA," and that "[t]he R&R's reliance on FCRA cases is inapt because the FDCPA uniquely extends special protections to victims of fraudulent debt collections, which Congress specifically identified as a problem necessitating heightened standards for the collections industry." (Id. (citing R&R (Dkt. No. 432) at 32-38)) Plaintiffs claim that Judge Moses erred in "refusing to

---

[5]  In connection with several of their objections, Plaintiffs repeat verbatim arguments they made in their opposition brief. (See, e.g., Pltf. Obj. (Dkt. No. 434) at 12 ("The Article III injury resulting from no-review collections suits was actionable before TransUnion and remains so today."); Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 10 (same); Pltf. Obj. (Dkt. No. 434) at 13 ("No court before or after TransUnion has condoned practices like Defendants'."); Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 13 (same))

credit the leading case on standing for FDCPA claims over negative credit-reporting in the debt-collection context" – Ewing v. MED-1 Solutions, LLC, 24 F.4th 1146 (7th Cir. 2022) – and "in rejecting the significance of the in-Circuit case In re Anderson, 641 B.R. 1 (Bankr. S.D.N.Y. 2022)." (Id. at 15)  The portions of the R&R addressing these arguments will be reviewed de novo.  See 28 U.S.C. § 636(b)(1)(C).

Finally, Plaintiffs assert that "[t]he R&R did not address Plaintiffs' alternative request for an amended pleading in the event any claim is dismissed for lack of standing." Plaintiffs request leave to amend as to any dismissed claim, "as well as supplementation of the previously ordered [c]lass-sampling discovery, to incorporate Defendants' interactions with the credit bureaus about [c]lass members' tradelines."  (Pltf. Obj. (Dkt. No. 434) at 16)  Although Plaintiffs' objection repeats this argument in their opposition papers (see Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 18), the R&R did not address this argument.  Accordingly, it will be considered de novo.  See 28 U.S.C. § 636(b)(1)(C).

*          *          *          *

Those portions of the R&R addressing standing to which Defendants and Plaintiffs have not objected will be reviewed only for clear error.  See Gilmore, 2011 WL 611826, at *1.

**B.     Analysis**

**1.     Defendants' Objections**

According to Defendants, Judge Moses erred in finding that injuries related to the "sham lawsuit scheme" provide a basis for standing.  Defendants contend that this finding "is inconsistent with the requirements of Article III injury following TransUnion and the boundaries

of federal jurisdiction established by the Rooker-Feldman doctrine." (Def. Obj. (Dkt. No. 433) at 20) Defendants' arguments are not persuasive.

Defendants contend that "the mere existence of a collection action against Plaintiffs, without more, [cannot] establish Article III standing following TransUnion." (Id. at 22) But in making this argument, Defendants misconstrue the R&R's findings.

The R&R finds that the alleged harm suffered by Plaintiffs includes

> being subjected to a lawsuit that should never have been brought; suffering the entry of an adverse default judgment in such a lawsuit, followed in many cases by wage garnishment; and, for those consumers who fought back, incurring significant costs, both in time and money, to vacate improperly-obtained judgments.

(R&R (Dkt. No. 423) at 40) Judge Moses concludes that "[e]ach of the named [P]laintiffs was subjected to a wrongful lawsuit in which an adverse default judgment was entered." (Id.)

In sum, Judge Moses does not find that "the mere existence of a collection action against Plaintiffs, without more," establishes standing. Instead, Judge Moses concludes that because every named Plaintiff "was subjected to a wrongful lawsuit in which an adverse default judgment was entered," each has alleged a harm that gives rise to standing. This finding is consistent with applicable case law. See, e.g., Toohey, 2016 WL 4473016, at *4 n.5 ("[Plaintiff]'s allegation that the default judgment obtained against her was obtained improperly sufficiently alleges an 'injury-in-fact' so as to establish constitutional standing.").

Defendants further contend that, under Rooker-Feldman, "the Court does not have jurisdiction to hear any claim for which the default judgments themselves are the only alleged injury," and that "this Court lacks subject matter jurisdiction to hear Plaintiffs' claims based on any alleged 'sham lawsuit scheme.'" (Def. Obj. (Dkt. No. 433) at 22-25) The R&R correctly concludes, however, that "[w]]hile TransUnion required the lower federal courts to rethink the

'concrete-harm requirement' of standing, it did not alter the 'redressability' analysis, and said

nothing at all about <u>Rooker-Feldman</u>."  (R&R (Dkt. No. 423) at 45 (citation omitted) (citing

<u>TransUnion</u>, 141 S. Ct. at 2204))  "Consequently, there is no reason [for this Court] to reconsider

[its] <u>Rooker-Feldman</u> analysis [as set forth in the October 11, 2019 memorandum opinion and

order], which is . . . law of the case."  (<u>Id.</u>)  In the October 11, 2019 memorandum opinion and

order, this Court concluded that "the <u>Rooker-Feldman</u> doctrine presents no obstacle to the claims

of the <u>Seaman</u> Plaintiffs and the <u>Bifulco</u> Plaintiffs" because – as in analogous cases –

"'[P]laintiffs assert claims independent of the state-court judgments and do not seek to overturn

them.'"  (Oct. 11, 2019 Mem. Op. & Order (Dkt. No. 109) at 17-18 (quoting <u>Sykes v. Mel S.</u>

<u>Harris & Assocs. LLC</u>, 780 F.3d 70, 94 (2d Cir. 2015) ("<u>Sykes III</u>"); citing <u>Toohey</u>, 2016 WL

4473016, at *4))

  Judge Moses finds that this Court's "analysis remains sound."  (R&R (Dkt. No.

423) at 45)  "Plaintiffs here do not invite this Court to review or reject the state court default

judgments against them," and "they bring 'claims sounding under the FDCPA . . . and state law

[that] speak not to the propriety of the state court judgments, but to the fraudulent course of

conduct that [D]efendants pursued in obtaining such judgments.'"  (<u>Id.</u> at 45 (omission and first

alteration in original) (quoting <u>Michelo</u>, 419 F. Supp. 3d at 687))  This Court finds no error in

Judge Moses' analysis.  Accordingly, Defendants objections are overruled.

  As to Judge Moses' finding that Plaintiff Bifulco has standing with respect to

negative credit reporting, Defendants argue that "the negative credit reporting complained of was

based on 'the judgment being on [Plaintiff Bifulco's] credit report,'" and "to find harm flowing

from the judgment necessitates finding the judgment invalid, which <u>Rooker-Feldman</u> prohibits."

(Def. Obj. (Dkt. No. 433) at 25 (quoting Bifulco Dep. (Dkt. 390-4) at 8))  For the reasons stated above, however, Defendants' invocation of the <u>Rooker-Feldman</u> doctrine is unavailing.

As to Defendants' complaint that "there are no documents in the record to support Plaintiff Bifulco's self-serving testimony" (<u>id.</u>), the short answer is that Bifulco's testimony is sufficient at this stage to show reputational and financial harm.[6]  Bifulco testified that, as a result of Defendants' dissemination of negative credit information concerning her, she suffered a "[l]ow credit score," which resulted in "[h]igher interest rates" on her credit cards and on a car loan.  She was charged 16% interest on her car loan; the dealership told her that – but for the judgment on her credit report – she would have been charged 6-7%.  (<u>See</u> Bifulco Dep. (Dkt. 390-4) at 6-8)  In sum, Bifulco adequately pleads financial and reputational harm resulting from the negative credit report.  Defendants' objection is overruled.

Defendants also complain that Judge Moses did not "resolve [their] motion to dismiss Plaintiffs' claims under Judiciary Law § 487."  (Def. Obj. (Dkt. No. 433) at 26)  Plaintiffs respond that "[t]he R&R did properly analyze these claims," and assert that "[t]his Court should confirm standing for . . . these claims."  (Pltf. Resp. (Dkt. No. 437) at 30)

---

[6]  In arguing that Bifulco's "self-serving" testimony should be ignored, Defendants rely on <u>Deebs v. Alstom Transportation, Inc.</u>, 346 F. App'x 654 (2d Cir. 2009) (summary order) (<u>see</u> Def. Obj. (Dkt. No. 433) at 25), in which the Second Circuit – in affirming summary judgment – notes that defendant "correctly asserts that 'the only "evidence" cited in plaintiffs' brief is their own self-serving testimony' and that the plaintiffs have 'made no attempt . . . to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery.'" <u>Deebs</u>, 346 F. App'x at 656 (omission in original).  Setting aside the fact that <u>Deebs</u> is a summary order, which has no precedential value, the case is not on point.  Unlike in <u>Deebs</u>, Defendants have not set forth "hard evidence adduced during discovery" that rebuts Bifulco's testimony.  Accordingly, "this is not an instance in which plaintiff's testimony contradicts uncontroverted documentary evidence, such that it should be deemed 'self-serving' and disregarded." <u>Frost v. Lentex Co., LLC</u>, No. 20 Civ. 5313 (VB), 2022 WL 17968058, at *6 (S.D.N.Y. Dec. 27, 2022), <u>reconsideration denied</u>, 2023 WL 373242 (S.D.N.Y. Jan. 24, 2023).

In their moving papers, Defendants do not separately address Plaintiffs' Judiciary Law claims. Instead, in arguing that Plaintiffs lack standing, Defendants group Plaintiffs' Judiciary Law claims with their FDCPA and GBL claims. Having said that, Defendants clearly request that the Court dismiss "Plaintiffs' Section 487 claims in their entirety for failure to adequately establish Article III standing." (Def. R. 12(b)(1) Br. (Dkt. No. 372) at 11; see also id. at 7 (arguing that Plaintiffs lack Article III standing to pursue their claims based on allegedly false information in state court filings, and citing Plaintiffs' Judiciary Law claims))

The R&R states that "[a]ll of [P]laintiffs' claims based [on specific false statements made in state court debt-collection proceedings, under both the FDCPA and GBL § 349], should be dismissed, along with the claims of [P]laintiffs K. Seaman, M. Seaman, Tabar, Butry, and Frauenhofer based on [negative credit reporting, under both the FDCPA and GBL § 349]. The motion to dismiss should otherwise be denied." (R&R (Dkt. No. 423) at 67 (emphasis omitted)) Read in context, it is thus clear that Judge Moses recommends that Defendants' motion to dismiss Plaintiffs' Judiciary Law claims be denied.

As to Judge Moses' reasoning, the R&R states that "this Court has already held that the costs incurred by Tabar in vacating the default judgment against her are compensable as damages for purposes of her [Judiciary Law] § 487 claim against Forster [& Garbus]. It would be an odd result indeed if that same injury failed even to provide her with standing to sue the remaining [D]efendants." (See id. at 48 (citation omitted) (citing Michelo, 419 F. Supp. 3d at 714 n.29))

Section 487 of the Judiciary Law provides that:

An attorney or counselor who:

1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,

2.   Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Jud. Law § 487.  "Section 487 thus permits a civil action to be maintained by any party who is injured by an attorney's intentional deceit or collusion in New York on a court or on any party to litigation, and it provides for treble damages." Amalfitano v. Rosenberg, 533 F.3d 117, 123 (2d Cir. 2008), certified question accepted, 11 N.Y.3d 728 (2008), certified question answered, 12 N.Y.3d 8 (2009).  "The act of deceit need not occur during a physical appearance in court; the statute applies to any oral or written statement related to a proceeding and communicated to a court or party with the intent to deceive." Id.

As Defendants acknowledge, "Plaintiffs' claims under Judiciary Law § 487 are based on nearly identical allegations and the same theories of injury as their FDCPA and GBL claims." (Def. Obj. (Dkt. No. 433) at 26 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 274, 280, 284))  Plaintiffs allege that "Forster [& Garbus] violated New York Judiciary Law § 487 by engaging in a chronic, persistent pattern of conduct with the intent to deceive consumer-defendants and multiple New York courts." (Consol. Cmplt. (Dkt. No. 124) ¶ 284)  Plaintiffs further allege that Forster & Garbus' violations "include but are not limited to":

a. commencing actions against consumers on behalf of a Trust Defendant without sufficient factual basis, yet backed by an attorney's Rule 130 certifications falsely stating that, to the best of his or her knowledge, and after an inquiry "reasonable under the circumstances," the complaint and the contentions therein were not frivolous;

b. filing complaints against consumers that falsely stated that a Trust Defendant was the "original creditor" with respect to the student loan at issue in the action;

c. filing complaints against consumers that falsely stated that a Trust Defendant was "authorized to proceed with th[e] action";

d. filing default judgment applications on behalf of a Trust Defendant without reasonable inquiry into the validity of the claims made against the consumer-defendant; and,

e. submitting default judgment affidavits on behalf of a Trust Defendant where the affiant falsely attested to personal knowledge of proof of indebtedness.

(Id. (alteration in original))  Because Plaintiffs' Judiciary Law claims are premised on the same conduct as Plaintiffs' FDCPA and GBL § 349 claims based on (1) specific false statements made in state court debt-collection proceedings, and (2) the alleged sham lawsuit scheme, this Court finds that the same analysis applies to Plaintiffs' FDCPA, GBL § 349, and Judiciary Law claims. This Court further concludes that (1) Plaintiffs lack standing to assert Judiciary Law claims based on specific false or misleading statements for the same reasons that Plaintiffs lack standing to assert FDCPA and GBL claims based on these statements; and (2) Plaintiffs have standing to assert their Judiciary Law claims based on the alleged sham lawsuit scheme for the same reasons Plaintiffs have standing to assert FDCPA and GBL claims based on this alleged scheme.  (See R&R (Dkt. No. 423) at 34, 38-48)  Accordingly, Defendants' motion to dismiss Plaintiffs' Judiciary Law claims will be granted in part and denied in part.

## 2.  **Plaintiffs' Objections**

As to Plaintiffs' standing to bring FDCPA and GBL § 349 claims based on Defendants' allegedly false statements made in state court proceedings, Judge Moses finds that "none of the named [P]laintiffs has standing[,] . . . because no [P]laintiff has testified that he or she ever read and detrimentally relied on any of those statements," and "no [P]laintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in [D]efendants' pleadings or affidavits."  (R&R (Dkt. No. 423) at 34)

Plaintiffs object, arguing that "[b]ecause Defendants' various false statements in state court meant negative legal consequences for Plaintiffs, the R&R should not have

33

recommended dismissing Plaintiffs' claims for lack of meaningful attorney review, false

affidavits, or false complaints." (Pltf. Obj. (Dkt. No. 434) at 11)  In objecting, however,

Plaintiffs misstate the standard for establishing standing.  A plaintiff does not establish standing

merely by alleging that he or she has suffered a legal consequence from a defendant's actions.[7]

"[U]nder Article III, an injury in law is not an injury in fact," and "[o]nly those plaintiffs who

have been <u>concretely</u> <u>harmed</u> by a defendant's statutory violation may sue that private defendant

over that violation in federal court." <u>TransUnion</u>, 141 S. Ct. at 2205 (emphasis in original); <u>see</u>

<u>also</u> <u>Maddox v. Bank of New York Mellon Tr. Co., N.A.</u>, 19 F.4th 58, 64 ("<u>Maddox II</u>") (2d Cir.

2021) ("<u>TransUnion</u> established that in suits for damages plaintiffs cannot establish Article III

---

[7]  Plaintiffs argue that, "[i]n <u>Rosenberg [v. McCarthy, Burgess & Wolff, Inc.</u>, No. 21 Civ. 2199
(MKB), 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1 , 2022)], . . . the court emphasized that an
FDCPA plaintiff would have standing in either of two instances:  (1) the plaintiff saw the false
statements and in response took or refrained to take certain actions; or, (2) the plaintiff suffered
'legal[] or other harm' following the false statement." (Pltf. Obj. (Dkt. No. 434) at 11 (emphasis
omitted) (second alteration in original))  According to Plaintiffs, Judge Moses "focuses solely on
the absence of the first type of harm discussed by <u>Rosenberg</u> (actual reliance by the plaintiff) but
ignores the existence of the second type (legal consequences)." (<u>Id.</u>)  But <u>Rosenberg</u> does not
hold that standing in FDCPA cases may be premised on either actual reliance or "legal or other
harm," as Plaintiffs contend.  The portion of <u>Rosenberg</u> that Plaintiffs quote in their objections is
in turn a quotation from an Eleventh Circuit case, in which that court found that a

> plaintiff "ha[d] not alleged an injury-in-fact sufficient to confer standing" where
> she merely alleged that debt collection letters violated the FDCPA and left her
> confused about her statutory rights[,] [noting] that . . . plaintiff did not allege that
> the letter caused her to take or refrain from taking any action or that she suffered
> any financial, legal, or other harm beyond the alleged statutory violations.

<u>Rosenberg</u>, 2022 WL 3030390, at *5 (first alteration in original) (quoting <u>Cooper v. Atl. Credit
& Fin. Inc</u>, 822 F. App'x 951, 954-55 (11th Cir. 2020)).  <u>Rosenberg</u> quotes <u>Cooper</u> in support of
its conclusion that "[p]laintiff did not suffer – and has not alleged – an economic harm arising
from a possessory interest in seized property.  Rather, [p]laintiff's only alleged harm is an
informational injury, which courts have found insufficient to confer standing in the FDCPA
context." <u>Id.</u>  In sum, <u>Rosenberg</u> does not stand for the proposition that "an FDCPA plaintiff
would have standing [if] the plaintiff suffered 'legal[] or other harm.'" (Pltf. Obj. (Dkt. No. 434)
at 11 (emphasis omitted) (second alteration in original))

standing by relying entirely on a statutory violation or risk of future harm: 'No concrete harm; no standing.'" (quoting TransUnion, 141 S. Ct. at 2214)).

Plaintiffs argue, however, that the legal consequences they have alleged suffice to establish standing. With respect to "[t]he [alleged] Article III injury resulting from no-review collection suits," Plaintiffs contend that "[t]he concreteness of the violations is especially profound in New York, where state law requires that attorneys like Defendant Forster [& Garbus] certify meaningful review in prosecuting suits like those against Plaintiffs." (Pltf. Obj. (Dkt. No. 434) at 12 (citing 22 N.Y. C.R.R. § 130-1.1)) Plaintiffs further contend that "[f]or largely the same reasons, Plaintiffs also have standing to pursue their claims concerning the false default-judgment affidavits signed by TSI-employed affiants." (Id.) "Under state law, such affidavits are a prerequisite for default judgment – and require the affiant to attest to personal knowledge and review of the facts of the debt alleged. . . . [T]hese affidavits [thus] trigger the negative 'legal' consequence of default judgment for individuals like Plaintiffs." (Id. (citing N.Y. C.P.L.R. § 3215; Rosenberg, 2022 WL 3030390, at *5))

These arguments do not demonstrate that Plaintiffs have suffered the type of concrete injury necessary to establish standing. Plaintiffs describe statutory violations, without alleging concrete harm that occurred as a result of the statutory violation. The R&R correctly concludes that Plaintiffs lack standing to bring claims "based on specific false statements made in state court debt-collection proceedings [] because no [P]laintiff has testified that he or she ever read and detrimentally relied on any of those statements," and "no [P]laintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in [D]efendants' pleadings or affidavits." (R&R (Dkt. No. 423) at 34)

While Plaintiffs argue that default judgments are the concrete injury they suffered, this Court is now addressing claims premised merely on Forster & Garbus' failure to review collection suits and on TSI's filing of false affidavits.  The alleged failure to review and the mere filing of the alleged false affidavits did not cause concrete harm to Plaintiffs.  And to the extent that Plaintiffs argue that the default judgments constitute the concrete harm, this Court has accepted Judge Moses' recommendation that those claims should proceed pursuant to Plaintiffs' sham lawsuit theory.  (See id. at 48 ("[W]hile none of the [P]laintiffs has standing to sue with respect to the specific false representations . . . , and only Bifulco has standing to sue with respect to the negative credit-reporting . . . , each named [P]laintiff – and, by definition, each member of the proposed classes – has been subjected to a lawsuit that should never have been brought, in which a default judgment was entered. . . . [T]he named [P]laintiffs and the proposed class members have standing to sue with respect to the sham lawsuits alleged in [the Consolidated Class Action Complaint]."))

Plaintiffs also contend that "[e]ven if any of the falsities [in the state court complaints] were acceptable on its own – which none is – this wouldn't excuse the illegality of using them in combination."  (Pltf. Obj. (Dkt. No. 434) at 13)  According to Plaintiffs, "[d]ebt-collection schemes like Defendants' enjoy a kind of positive feedback loop:  more falsities about entitlement to judgment, in more suits, mean more judgments, and more money, continuing and growing the cycle.  Such schemes can be nearly as harmful to local court systems as to consumers alone."  (Id. at 13-14)

Plaintiffs again ignore the applicable legal standard.  The Article III standing analysis does not consider harm "to local court systems" or "to consumers" that are not involved in the case.  As discussed above, Plaintiffs must show – but have not shown – that they suffered

concrete harm merely as a result of false statements they allege were made by Defendants in state court proceedings.

Accordingly, this Court overrules Plaintiffs' objection to the R&R's recommendation that Plaintiffs' claims concerning the false statements in the underlying state court actions be dismissed.

Plaintiffs next object to the R&R's finding that "TransUnion and subsequent cases foreclose Plaintiffs' asserting credit-related harms[] where there is no confirmative evidence that Defendants' negative reporting to credit bureaus was in turn passed to Plaintiffs' potential creditors." (Pltf. Obj. (Dkt. No. 434) at 14 (citing R&R (Dkt. No. 423) at 32-38))

Plaintiffs have not pled facts demonstrating that negative credit information was disseminated to a third party, other than as to Bifulco in connection with her car loan. Although Plaintiffs argue that "Defendants' liability attached the moment Defendants disseminated the [negative credit] information to a third party," and that the "tradelines" resulting from the negative credit reporting "were included in credit reports on Plaintiffs that the bureaus disseminated during the [c]lass period" (Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 15), "the distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor[] . . . does not constitute or cause concrete injury for standing purposes." Campbell v. Portfolio Recovery Assocs., LLC, 21 Civ. 1322 (PKC) (RML), 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022); see also Grauman, 549 F. Supp. 3d at 292 ("[T]he lack of dissemination of [Plaintiff's] credit report renders him unable to adequately allege a concrete injury."). As in Maddox II, although Plaintiffs other than Bifulco "may have suffered a nebulous risk of future harm" by having negative credit information included in their credit reports, "that

risk, which was not alleged to have materialized, cannot not form the basis of Article III

standing." 19 F.4th at 65.  Accordingly, Plaintiffs' objection is overruled.[8]

Finally, Plaintiffs complain that Judge Moses "did not address Plaintiffs'

alternative request for an amended pleading in the event any claim is dismissed for lack of

standing."  Plaintiffs seek leave to amend as to any dismissed claim, "as well as supplementation

of the previously ordered [c]lass-sampling discovery, to incorporate Defendants' interactions

with the credit bureaus about [c]lass members' tradelines."  (Pltf. Obj. (Dkt. No. 434) at 16)

---

[8]  As noted above, in challenging Judge Moses' recommendation concerning Plaintiffs' negative credit reporting claims, Plaintiffs complain that she "mistakenly" relied on FCRA cases.  (See Pltf. Obj. (Dkt. No. 434) at 14)  The FCRA and the FDCPA are "analogous statute[s]," however. Sputz v. Alltran Fin., LP, No. 21 Civ. 4663 (CS), 2021 WL 5772033, at *6 (S.D.N.Y. Dec. 5, 2021).  And "cases in the Second Circuit brought in the context of financial credit – including claims specifically brought pursuant to both the FDCPA and the FCRA . . . – have uniformly held that, absent specific evidence of reputational or monetary harm, plaintiffs lack standing under TransUnion."  Adler v. Penn Credit Corp., No. 19 Civ. 7084 (KMK), 2022 WL 744031, at *8 (S.D.N.Y. Mar. 11, 2022).  Accordingly, Judge Moses did not err in citing FCRA cases.

And to the extent Plaintiffs complain that Judge Moses erred in refusing to rely on Ewing v. MED-1 Solutions, LLC, 24 F.4th 1146 (7th Cir. 2022) and In re Anderson, 641 B.R. 1 (Bankr. S.D.N.Y. 2022) (Pltf. Obj. (Dkt. No. 434) at 15), this Court finds no such error.  Neither case is binding on this Court, and the reasoning of these cases is not persuasive here.

Ewing runs contrary to Second Circuit law, which holds that dissemination, without more, does not establish Article III standing.  See Maddox II 19 F.4th at 65 (finding that "[t]he public nature of the record is not analogous to the dissemination of the credit reports in TransUnion [where class members' credit reports were disseminated to third-party businesses]," and although plaintiffs "may have suffered a nebulous risk of future harm during the period of delayed recordation [of the satisfaction of mortgage] – i.e., a risk that someone (a creditor, in all likelihood) might access the record and act upon it – but that risk, which was not alleged to have materialized, cannot not form the basis of Article III standing").

In Anderson, "[t]he injury was [defendant]'s violation of the discharge injunction by [defendant]'s systematic policy of refusing to correct its tradelines to pressure [plaintiff] and the putative class members to pay their discharged debts."  In re Anderson, 641 B.R. at 55.  Here, Plaintiffs do not allege any such practice, or that any Plaintiff requested that her tradeline be corrected.  Plaintiffs instead allege that their injury is negative credit reporting alone.

This objection is overruled, and the request for leave to amend and discovery will be denied.  Even if Plaintiffs showed that Defendants disseminated Plaintiffs' tradelines to credit bureaus, "the distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor[] . . . does not constitute or cause concrete injury for standing purposes." Campbell, 2022 WL 657225, at *2.  Given that Plaintiffs have not offered evidence that the credit bureaus disseminated the negative credit information to potential creditors, Plaintiffs' requested amendment would be futile.  See O'Shea v. P.C. Richard & Son, LLC, No. 15 Civ. 9069 (KPF), 2017 WL 3327602, at *8 (S.D.N.Y. Aug. 3, 2017) ("Because Plaintiff['s] . . . proposed amendments would be insufficient to confer Article III standing, they are futile and Plaintiff['s] . . . request to amend is denied.").[9]

## II.   MOTION FOR CLASS CERTIFICATION

### A.   The R&R

In her R&R, Judge Moses recommends that this Court

> certify one class, pursuant to Rule 23(b)(3), comprised of all persons who have been sued in New York State court debt collection lawsuits from November 1, 2012 through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster [& Garbus] as plaintiff's counsel, and where a default judgment was obtained, but excluding any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits.

---

[9]  Although Plaintiffs cite Faehner v. Webcollex, LLC, No. 21-1734-CV, 2022 WL 500454, at *1 (2d Cir. Feb. 18, 2022) (summary order) in support of their application for leave to amend and for discovery (Pltf. Obj. (Dkt. No. 434) at 16), that case provides no support for Plaintiffs' application.  While the Second Circuit remanded in that case "to allow plaintiff an opportunity to replead her claims to comport with the pleading standards set out in TransUnion, and to give the district court an opportunity to address any standing questions in the first instance," in Faehner the Supreme Court's TransUnion decision was issued three days after the district court's order dismissing the amended complaint.  Id.  Here, Plaintiffs have had ample time to address TransUnion and to construct their arguments as to why leave to amend and discovery should be granted.

(R&R (Dkt. No. 423) at 67-68 (emphasis omitted))  Judge Moses further recommends that "[P]laintiffs K. Seaman, M. Seaman, Tabar, Butry, Bifulco, and Frauenhofer be appointed [c]lass [r]epresentatives (although [P]laintiffs neglected to ask for this relief), and that Frank LLP be appointed [c]lass [c]ounsel."  (Id. at 68)

Judge Moses finds that the requirements of Fed. R. Civ. P. 23(a) are satisfied here.  As to numerosity, Judge Moses finds that, when "narrowed (for Rule 23(b)(3) purposes) to those who had default judgments entered against them, the proposed class consists of roughly 3,183 members," and that accordingly "[n]umerosity has been adequately established."  (Id. at 50-51)

As to commonality, Judge Moses finds that

> in this case, all members of the proposed classes were named in sham lawsuits, which were filed and litigated in accordance with a unified playbook authored (literally) by NCI-TCO and carried out by its Affiants and by Forster [& Garbus]. Additionally, all of the members of the proposed Rule 23(b)(3) class were injured by the resulting, wrongfully-procured default judgments.  Although the alleged scheme had several interrelated components – including boilerplate complaints, never meaningfully reviewed by the attorneys who signed them, that falsely alleged that the Trust Defendant named as plaintiff was the "original creditor" on the loan and was "authorized to proceed" in state court, and deceptive affidavits, signed by Affiants who routinely attested to "personal knowledge" of chain-of-title documents they had not actually reviewed – [P]laintiffs have shown that [D]efendants engaged in a "unitary course of conduct" leading to the injuries alleged.

(Id. at 52)  Judge Moses further finds that "[P]laintiffs have demonstrated a 'unitary course of conduct,' applicable to all class members, which presents common questions of fact, subject to common proof, which will generate common answers and are thus 'capable of classwide resolution.'"  (Id. at 53 (citation omitted) (quoting Sykes III, 780 F.3d at 84; Wal-Mart Stores, Inc., 564 U.S. at 350))  For the same reasons, Judge Moses "conclude[s] that typicality has also adequately been established."  (Id. at 57)

As to adequacy, Judge Moses finds that "all of the named [P]laintiffs have standing – and thus have 'live' claims – with respect to the sham lawsuit scheme alleged in [the Consolidated Class Action Complaint]." (Id. at 58)  According to Judge Moses, "[t]hese claims are also suitable for litigation on a class basis, as they can be pursued against the Trust Defendants under GBL § 349; against TSI-NCO under [the] FDCPA and GBL § 349; and against Forster [& Garbus] under [the] FDCPA, GBL § 349, and [Judiciary Law] § 487," and "all putative class members would qualify for statutory damages under [the] FDCPA and GBL § 349." (Id.)  Although "only one plaintiff – Bifulco – has a 'live' claim with respect to [D]efendants' negative credit-reporting, as to which she could, in theory, seek damages not available to the other named [P]laintiffs or the class," Judge Moses "do[es] not view that as a disabling conflict, because it does not render Bifulco's interests 'antagonistic' to those of other [P]laintiffs." (Id. at 58 n.33)  "Further, it is by now well-settled that liability under [the] FDCPA can be established 'irrespective of whether the presumed debtor owes the debt in question.'" (Id. at 58 (quoting Sykes III, 780 F.3d at 83))  Accordingly, "[D]efendants' contention that some of the named [P]laintiffs 'owed the debts' – and indeed acknowledged them when they filed for personal bankruptcy – does not give rise to a defense, much less a unique defense, to their FDCPA claims." (Id. at 59 (citations omitted) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 28, 30-32))  And "Defendants do not raise, and [Judge Moses] has not identified, any basis upon which to question the qualification and experience of [P]laintiffs' counsel." (Id.)

Finally, Judge Moses finds that "ascertainability is not a barrier to certification of the proposed classes here," because

> Plaintiffs' class discovery, based on a sampling of 5% of the putative class members sued in New York, shows that [P]laintiffs can easily identify which individuals fall within the proposed . . . class definitions, i.e., which persons have

been sued by [D]efendants in a New York State court and have had default
judgments entered against them in those suits.

(Id. (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 38-39))

As to Fed. R. Civ. P. 23(b), Judge Moses finds that "Rule 23(b)(3)'s
predominance requirement is met because the key issues – indeed, virtually all of the liability
issues – are susceptible of generalized proof applicable to all putative class members, and there is
little chance 'that individual issues will overwhelm the common questions.'"  (Id. at 60 (quoting
In re NASDAQ Market-Makers Antitr. Litig., 169 F.R.D. 493, 517 (S.D.N.Y. 1996)))  "Nor are
[P]laintiffs required to propose, prior to certification, 'a common method for determining . . . to
what degree any individual Plaintiff or putative class member was damaged by the alleged
misconduct.'"  (Id. (omission in original) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 37))  Judge
Moses explains that "[i]n a consumer debt case, where statutory damages are available under
both federal and state law, '[a]ll that is required at class certification is that the plaintiffs must be
able to show that their damages stemmed from the defendant's actions that created the legal
liability.'"  (Id. (second alteration in original) (citations omitted) (citing 15 U.S.C. §
1692k(a)(2)(A)-(B); GBL § 349(h); quoting Sykes III, 780 F.3d at 88))

As to superiority, Judge Moses finds that "a class action 'is, without question,
more efficient than requiring thousands of debtors to sue individually,' whether in state or in
federal court."  (Id. at 62 (quoting Sykes v. Mel Harris & Assocs., LLC, 285 F.R.D. 279, 294
(S.D.N.Y. 2012) ("Sykes II"), aff'd sub nom. Sykes III, 780 F.3d 70 (2d Cir. 2015)))  She further
finds that "[c]ertifying a class is . . . consistent with the remedial purpose of [the] FDCPA, which
requires the courts to construe its terms 'in liberal fashion if the underlying Congressional
purpose is to be effectuated.'"  (Id. at 62 (quoting Hart v. FCI Lender Servs., Inc., 797 F.3d 219,
225 (2d Cir. 2015)))  She adds that "[i]f, as [D]efendants contend, they 'can show they

unequivocally had the proper documentation in their possession' when they defaulted the class

members, they can – and no doubt will – make that showing on a classwide basis in this Court."

(Id. (citation omitted) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 43))

Judge Moses finds, however, that "[P]laintiffs' request that the Court certify four

Rule 23(b)(3) classes, on a per-Trust basis, appears to be motivated simply by [P]laintiffs' desire

to circumvent the $500,000-per-class statutory damages cap under [the] FDCPA."  (Id.

(emphasis omitted) (citing 15 U.S.C. § 1692k(a)(2)(B)))  "As a matter of logic, it cannot be the

case that common questions of fact and law predominate here to the degree required to justify

class certification – except that 'each Trust is its own legal entity, with its own distinct facts,'

necessitating the multiplication of classes," as Plaintiffs contend.  (Id. at 63 (citation omitted)

(quoting Pltf. R. 23 Supp. Br. (Dkt. No. 409) at 10))  To the contrary, "Plaintiffs have shown

(and [D]efendants have largely conceded) that TSI-NCO litigated on behalf of all four Trust

Defendants in exactly the same way, using the same Affiants, the same outside counsel, and the

same training and instruction materials (the Procedure and the [Standard Operating Procedure

manual]) across New York State," and "[P]laintiffs do not point to any actual variation in the

alleged scheme, or the evidence needed to prove it, between one Trust Defendant and another."

(Id.)  Although "each class member can recover damages against only one Trust Defendant – the

one that sued that member, . . . it is sufficient, for certification purposes, that 'for every named

[d]efendant there . . . be at least one named plaintiff who can assert a claim directly against that

defendant.'"  (Id. (second omission in original) (quoting NECA-IBEW Health & Welfare Fund

v. Goldman Sachs & Co., 693 F.3d 145, 159 (2d Cir. 2012)))  "Beyond that, the necessary

computations (to ensure that each [P]laintiff's damage award is assessed against the correct Trust

Defendant) can easily be performed within the confines of a single class."  Accordingly, Judge

Moses finds that Plaintiffs are entitled to certification of one class under Rule 23(b)(3).  (Id.)

As to certification under Rule 23(b)(2), Judge Moses finds that "[P]laintiffs'

efforts to certify a Rule 23(b)(2) class founder on the issue of standing."  (Id. at 65)  "The

proposed class seeks relief only pursuant to GBL § 349, and only with respect to [D]efendants'

negative credit-reporting."  (Id.)

> It thus appears that [P]laintiffs seek both a prohibitory injunction (preventing
> [D]efendants from credit-reporting debts "without possession or review of proof
> thereof") and a mandatory injunction (requiring [D]efendants to "instruct" the
> credit bureaus and FICO to remove the tradelines relating to the student loan
> debts they attempted to collect), both targeted narrowly to the harm allegedly
> caused by [D]efendants' negative credit-reporting.

(Id. at 65-66)  "[O]nly one of the named [P]laintiffs – Bifulco – has standing to seek damages

related to [D]efendants' negative credit-reporting," however, and "[e]ven Bifulco[] . . . lacks

standing to seek prospective relief on her credit-reporting claim, because the risk of future harm

from this species of misconduct is neither imminent nor substantial."  (Id. at 66 (emphasis

omitted))

Although "Plaintiffs point out that there is no confirmation in the record that

[D]efendants have 'requested tradeline removals' for the entire class, . . . this does not help them

get a Rule 23(b)(2) class certified."  (Id. (quoting Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 17))

According to Judge Moses,

> [P]laintiffs have shown – at best – that some members of the proposed class might
> still have default judgments or negative tradelines affecting their credit scores as a
> result of [D]efendants' allegedly unlawful debt collection efforts, which puts them
> at risk of future harm should that information be disseminated to potential
> creditors.  This is not sufficient.

(Id. at 67 (emphasis omitted))  "Nor may [P]laintiffs rely for standing on the risk that

[D]efendants will initiate new debt-collection lawsuits against them, or other members of the

putative class, 'without possession or review' of the necessary proof of indebtedness," because
"[b]oth TSI-NCO and Forster [& Garbus] are now enjoined from engaging in that conduct."
(Id.)  For all of these reasons, Judge Moses concludes that "[P]laintiffs cannot show that they
face an 'imminent and substantial' risk of harm, either from the lingering effects of
[D]efendants' past conduct or from any future repetition of that conduct."  (Id. (quoting
TransUnion, 141 S. Ct. at 2210))

      1.    **Plaintiffs' Objections**

      According to Plaintiffs, Judge Moses "erred in recommending denying Plaintiffs
injunctive relief under Rule 23(b)(2) for the harm caused by Defendants' improper credit-
reporting lowering Plaintiffs' credit scores," because "[c]redit scores are used constantly
throughout daily life," "Plaintiffs will always need necessities like cars, housing, credit cards,
and other goods and services that require a credit score check," and "[l]ower credit scores cause
actual or imminent harms that are not hypothetical or conjectural and automatically translate into
permanently higher interest rates and other burdens."  (Pltf. Obj. (Dkt. No. 434) at 8 (emphasis
omitted) (citing R&R (Dkt. No. 423) at 64-67))  "The R&R mistakenly assumes that past
negative credit-reporting eventually ceases to cause harm to an individual's reputation for
creditworthiness," "fails to address the permanent harm to Plaintiffs' credit scores," and
"compounds this mistake by focusing on the now years-old vintage of Plaintiff Bifulco's
evidence concerning inability to obtain a loan for an automobile on favorable terms due to
Defendants' negative reporting."  (Id. at 8-9 (citing R&R (Dkt. No. 423) at 64-67))

      Plaintiffs contend that

> [t]he fact [that Bifulco's loan experience] happened years ago is irrelevant – what
> [matters] is that every [c]lass member eventually will have their credit score
> assessed when they purchase a car or home, rent an apartment, sign up for a

utility, apply for a credit card, and so on.  When that happens, each will be relying
on a credit score that would have been higher but for Defendants' violations.

(Id. at 9 (emphasis omitted))  Plaintiffs go on to assert that they "have alleged a continuing harm

in the form of forever lowered credit scores that are used extensively, unavoidably, in everyone's

daily life."  (Id. at 10)

Plaintiffs also complain that Judge Moses erred in rejecting their request for "four

Rule 23(b)(3) classes or subclasses, one for each of the four Trust defendants."  (Id. at 16 (citing

(R&R (Dkt. No. 423) at 62-63))  "[T]he R&R overlooks the text of the FDCPA, which, unlike

other statutes, does not prohibit multiple classes," and "mistakenly relies on precedent from

securities litigation, where there is no basis [for certifying] multiple classes."  (Id. (citing R&R

(Dkt. No. 423) at 63))

These objections will be reviewed de novo.  See 28 U.S.C. § 636(b)(1)(C).

## 2. **Defendants' Objections**

Defendants contend that Plaintiffs' claims are not susceptible to common proof.

(Def. Obj. (Dkt. No. 433) at 27)  In this regard, Defendants maintain that "[t]he R&R focused on

. . . technical disputes" – "such as whether the Trust Defendants were required to register to do

business in New York in order to be 'authorized to proceed' on collection of Plaintiffs' unpaid

debts and whether certain Pool Supplements and Schedules are legally sufficient to establish

chain of title"[10] – "and found that many of them were 'well-suited to classwide resolution.'"  (Id.

---

[10]  As to chain of title issues, Judge Moses explains that

[a]ccording to Bradley Luke, TSI's Director of Operations, the loans at issue were all
originally assigned, by the banks that made them, to National Collegiate Funding, Inc.
(NCF), by means of a series of nearly identical Pool Supplements (one from each
originating bank), which NCO received on various dates in 2012 from First
Marblehead Corporation (FMC), the company that arranged the securitization.
[(Luke Decl. (Dkt. No. 330) ¶¶ 5, 14(a); id., Ex. 1-A (Dkt. No. 330-1))]  Each Pool
Supplement, in turn, recites that the loans being assigned to NCF (which later

at 27-28 (citing R&R (Dkt. No. 423) at 55))  But "[t]hese types of technical issues . . . cannot

form the basis for class certification because the R&R dismissed Plaintiffs' claims based on false

or misleading statements."  (Id. at 28)

   In connection with their common proof arguments, Defendants next contend that,

"[t]o succeed on their claims, Plaintiffs and each member of the class must demonstrate that the

problems they contend were rampant in collection actions brought by Defendants actually

occurred in the specific collection actions brought against Plaintiffs."  (Id. (emphasis omitted))

Although "Plaintiffs and the R&R suggest this question can be determined with common

evidence, pointing to 'written training and instructional materials,'" Defendants argue that

"written training and instructional materials would not establish what an affiant actually looked

at before signing an affidavit in each individual Plaintiff's collection proceedings."  Rather,

"[t]hat would require an individualized, case-specific inquiry."  (Id. (quoting R&R (Dkt. No.

423) at 55-56))

   Defendants further contend that "the R&R's assumption that it would be possible

to determine the necessary chain of title 'for all of the loans . . . , not just for one or two' from

---

assigned them to one of the Trust Defendants) are listed on an attached Schedule, but
no such Schedule is attached to any of the Pool Supplements in TSI-NCO's
possession.  [(See Luke Decl., Ex. 1-A (Dkt. No. 330-1))]  Luke attests that the
Schedules exist in "digital Excel file format[]" [(Luke Decl. (Dkt. No. 330) ¶ 14(c)-
(e))], and that these files were received from FMC on November 14, 2012,
"separately" from the Pool Supplements.  [(Id. ¶ 14(a), (c))]  Plaintiffs counter that
the Pool Supplements and (unattached) Excel files are not adequate to establish
ownership of the loans listed in the Excel files, arguing (among other things) that
[D]efendants have lost or misplaced the "loan roster CD" containing the Schedules as
transmitted by FMC; that the Excel files contain a variety of apparent errors; and that
their metadata does not match the dates on which they were supposed to have been
created.  [(Hawkins R. 23 Reply Decl. (Dkt. No. 336) ¶¶ 6-34; Hawkins R. 23 Supp.
Decl. (Dkt. No. 342) ¶¶ 13-28]

(R&R (Dkt. No. 423) at 54-55 n.32)

common evidence in the form of Pool Supplements and Schedules is factually incorrect."  (Id. at

29 (omission in original) (citation omitted) (quoting R&R (Dkt. No. 423) at 55))  According to

Defendants, "[e]ach Trust Defendant acquired pools of loans from multiple originating lenders

through multiple different Pool Supplements and Schedules," which means that "subsets of

putative class members will need to rely on different documentation to substantiate claims

against the same Trust Defendant."  (Id.)  "Thus, contrary to the R&R's suggestion, there is no

common evidence that could generate common answers to the question of whether the

appropriate Trust Defendant had authority to collect on each putative class member's loan."

(Id.)[11]

        Defendants' objections with respect to common proof will be reviewed de novo.

See 28 U.S.C. § 636(b)(1)(C).

        Defendants further argue that individual issues will predominate:  "For the same

reasons that Plaintiffs' claims are not susceptible to common proof, the individual issues

associated with determining whether the alleged patterns of wrongful conduct were actually at

play in any class member's collection proceedings will predominate over any common proof of

the alleged patterns of wrongful conduct themselves."  (Def. Obj. (Dkt. No. 433) at 32 (citation

omitted))  According to Defendants, "individual mini-trials will be necessary to determine

---

[11]  Defendants further argue that

    [a]fter TransUnion and Maddox II, the Court lacks subject matter jurisdiction to
    consider claims where the alleged injury is a state court judgment itself or an injury
    allegedly caused by the state court judgment.  From this it follows that federal courts
    should not certify class actions where the only purportedly common issues involve
    whether a state court judgment was wrongfully procured.  Simply put, the type of
    class blessed in Sykes[ III] is not sustainable post-TransUnion.

(Def. Obj. (Dkt. No. 433) at 30)  Given that this Court concluded that it has subject matter
jurisdiction over the claims in this case, Defendants' objection on this point is overruled.

whether any allegedly wrongful collection conduct actually occurred in each putative class member's case, as well as whether and how each putative class member was injured," and "[t]hese individualized inquiries will predominate over any alleged patterns susceptible to common proof." (Id. at 32-33)  Defendants also assert that "equitable tolling issues [require] a highly individualized inquiry focused on each Plaintiff's diligence, and what they knew, when," and that "for nearly all class members, the Court will need to conduct individual mini-trials to determine whether and to what extent equitable tolling applies to their claims." (Id. at 33)[12]

Defendants' arguments regarding the equitable tolling issues echo their arguments in their opposition papers. (See, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 44 ("Here, Plaintiffs cannot establish entitlement to equitable tolling on a class-wide basis given the individualized inquiry necessary to determine due diligence or whether a class member was aware of his or her potential claims before the limitations. These individualized inquiries will require numerous mini-trials on each putative class members' subjective state of mind and knowledge of their student loan, rendering the case unmanageable as a class action.")) Accordingly, the portions of the R&R addressing Defendants' equitable tolling arguments will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211. The portions of the R&R addressing Defendants' remaining predominance arguments will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Defendants next argue that Plaintiffs are not adequate class representatives. (Def. Obj. (Dkt. No. 433) at 30) According to Defendants, the surviving claims "have different elements, allow for different types of damages, and are available against different Defendants," rendering the named Plaintiffs inadequate representatives of a class. (Id.) "Plaintiffs are also not

---

[12]  Defendants add that "all of the common issues identified in the R&R require an assessment of whether the default judgments were wrongfully procured – a topic this Court lacks subject matter jurisdiction to consider under Rooker-Feldman." (Def. Obj. (Dkt. No. 433) at 33) As discussed above, the Rooker-Feldman doctrine does not apply to Plaintiffs' claims.

adequate class representatives because their claims are subject to unique defenses."  In particular, "[t]he evidence shows that the Trust Defendants can establish that Plaintiffs absolutely owed the debts that were the subject of their collection actions and that the debts were in fact owned by the Trust Defendants."  And although the R&R "find[s] that ownership of a debt is not a defense to an FDCPA claim," it "does not explain how these facts do not create serious adequacy problems under the other claims brought by Plaintiffs (under GBL § 349 and Judiciary Law § 487)."  (Id. at 31)  Because in this objection Defendants repeat arguments made in their opposition brief (see, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 27 ("Plaintiffs are not adequate class representatives because each of them has an interest in pursuing different combinations of the three causes of action brought in the Complaint, which creates insurmountable conflicts of interest."); id. at 28 ("Plaintiffs are also inadequate class representatives because they are subject to unique defenses – namely, that they did indeed owe the amounts claimed in their collection actions.")), the portion of the R&R addressing adequacy will be reviewed only for clear error.  See Phillips, 955 F. Supp. 2d at 211.

Defendants also contend that Plaintiffs' claims are not typical of the claims of the proposed class.  (Def. Obj. (Dkt. No. 433) at 31)  According to Defendants, "Plaintiffs cannot demonstrate that their claims and defenses are typical of those of the proposed class for the same reasons they cannot establish their adequacy as class representatives."  (Id.)  "The R&R does not address this question head-on, stating only that 'typicality has . . . been adequately established' '[g]iven the discussion of commonality.'"  (Id. at 32 (alteration and omission in original) (quoting R&R (Dkt. No. 423) at 57))  "But Plaintiffs are not and cannot be typical representatives of the purported class alleging fraudulent collection actions where the evidence shows that each Plaintiff owed the debt, the correct entity initiated the collection actions, and the

affiant(s) adequately reviewed all appropriate documentation." (Id.)  In making this objection, Defendants rehash arguments made in their opposition brief.  (See, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 33 ("Plaintiffs have not and cannot demonstrate that their claims and defenses are typical of those of the proposed class for the same reasons that they cannot establish their adequacy as class representatives.")) Accordingly, the portion of the R&R addressing typicality will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211.

Finally, Defendants object on the ground that a class action is not a superior method for adjudicating Plaintiffs' claims.  (Def. Obj. (Dkt. No. 433) at 33)  According to Defendants, Judge Moses "find[s] that the superiority requirement is met here, based on her conclusion that many issues in this case can be resolved by common proof."  (Id. at 33-34 (citing R&R (Dkt. No. 423) at 61))  But "common proof can only go so far in this case; for Plaintiffs and any class members to succeed on their claims, many issues will need to be determined on an individualized basis, via individualized proof.  A class action is not the superior method of adjudication for these kinds of claims."  (Id. at 34)  Defendants add that Judge Moses "misunderstands" the public policy arguments they made in their opposition papers, which they restate as follows:

> if debtors want to challenge the veracity or provenance of information or documents filed in collection actions against them, debtors should appear in those actions and address their concerns before a default judgment is entered instead of ignoring those proceedings and then raising speculative claims years later in a separate federal lawsuit.  Resolving disputes about whether an affiant years ago looked at the documents he said he looked at is not an efficient use of the Court's time or resources.

(Id. at 34 (citation omitted) (citing R&R (Dkt. No. 423) at 34))

Because these objections rehash arguments Defendants made in their opposition brief (see, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 42 ("Here, each Plaintiff would need to demonstrate that Defendants did not possess and/or review sufficient documentation of their debt

before initiating collection actions against them, and that any misrepresentations regarding possession or review of loan documentation caused Plaintiffs to suffer some injury, and finally the nature and amount of any such injury. The court would have to conduct a mini-trial for each Plaintiff and class member."); id. at 43 ("Where Plaintiffs have technical complaints about whether civil procedures were properly followed in actions against them – such as Plaintiffs' complaints here, which center on whether documents were reviewed by the correct people at the right time – Plaintiffs should be encouraged to raise those issues in their individual collection actions instead of declining to participate in the collection action and allowing default judgment to be entered against them, only to ask the courts to take up the technical procedural complaints years later en masse.")), those portions of the R&R addressing superiority will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211.

*          *          *          *

Those portions of the R&R addressing class certification to which Defendants and Plaintiffs have not objected will be reviewed only for clear error. See Gilmore, 2011 WL 611826, at *1.

B.    **Analysis**

1.    **Plaintiffs' Objections**

Plaintiffs contend that they are entitled to "injunctive relief under Rule 23(b)(2) for the harm caused by Defendants' improper credit-reporting lowering Plaintiffs' credit scores," because "[c]redit scores are used constantly throughout daily life," "Plaintiffs will always need necessities like cars, housing, credit cards, and other goods and services that require a credit score check," and "[l]ower credit scores cause actual or imminent harms that are not hypothetical or conjectural and automatically translate into permanently higher interest rates and other

burdens." (Pltf. Obj. (Dkt. No. 434) at 8 (emphasis omitted) (citing R&R (Dkt. No. 423) at 64-67))

Plaintiffs' general assertions that "every [c]lass member eventually will have their credit score assessed when they purchase a car or home, rent an apartment, sign up for a utility, apply for a credit card, and so on," and that "[w]hen that happens, each will be relying on a credit score that would have been higher but for Defendants' violations" (id. at 9 (emphasis omitted)), are entirely speculative. Plaintiffs have not pled facts demonstrating that they face "a 'real or immediate threat' of injury" such that injunctive relief would be appropriate. See Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111-12 (1983)). Plaintiffs' unsupported assertion that they "eventually will have their credit score[s] assessed when they purchase a car or home, rent an apartment, sign up for a utility, apply for a credit card, and so on" (Pltf. Obj. (Dkt. No. 434) at 9 (emphasis omitted)), is insufficient absent a non-conclusory showing that Plaintiffs are at risk of imminent injury. Accordingly, this objection is overruled.

Plaintiffs also object to Judge Moses' finding that one class – rather than four subclasses, one "for each of the four Trust [D]efendants" – is appropriate. Plaintiffs complain that Judge Moses (1) should not have been concerned that certifying four subclasses would "expose[] Defendants to potentially hundreds of classes nationally," because the R&R "properly limits the [c]lass to individuals sued in New York"; and (2) "overlooks the text of the FDCPA, which, unlike other statutes, does not prohibit multiple classes," and "mistakenly relies on precedent from securities litigation, where there is no basis [for certifying] multiple classes." (Pltf. Obj. (Dkt. No. 434) at 16 (citing (R&R (Dkt. No. 423) at 20 n.15, 62 n.35, 62-63))

As to Judge Moses' alleged concern about exposing Defendants to massive litigation nationally, Judge Moses explains the ramifications of subclasses as follows:

> [u]nder [the] FDCPA, a successful plaintiff may elect to recover either the "actual damage[s] sustained" as a result of the violation, 15 U.S.C. § 1692k(a)(1), or statutory damages, which in a class action are capped at $1,000 for each named plaintiff and "such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." Id. § 1692k(a)(2). The obvious purpose of [P]laintiffs' request for a separate Rule 23(b)(3) class for each Trust and each state was to overcome the $500,000 cap that would otherwise apply to a single nationwide class, and to make it possible for each class (of which there could be as many as 200, if all four Trust Defendants sued consumers in all 50 states) to seek its own $500,000 statutory damages award.

(R&R (Dkt. No. 423) at 20-21 n.15 (third alteration in original); see also id. at 62 ("[P]laintiffs' request that the Court certify four Rule 23(b)(3) classes, on a per-Trust basis, appears to be motivated simply by [P]laintiffs' desire to circumvent the $500,000-per-class statutory damages cap under [the] FDCPA." (emphasis omitted)); id. at 62-63 n.35 ("[S]plitting their Rule 23(b)(3) class into four classes would let [Plaintiffs] seek up to $500,000 per class under [the] FDCPA from the remaining [D]efendants, TSI-NCO and Forster [& Garbus]. Statutory damages under the GBL are limited to $50 per plaintiff, or 'an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section,' plus attorneys' fees. GBL § 349(h). There is no separate class action cap under the GBL."))

In any event, Judge Moses goes on to find that, "[a]s a matter of logic, it cannot be the case that common questions of fact and law predominate here to the degree required to justify class certification," yet also require a separate class for each Trust Defendant. (Id. at 63) Although Plaintiffs are correct that the FDCPA does not prohibit separate classes, see 15 U.S.C. § 1692k(a)(2)(B), separate classes are not appropriate here, where Plaintiffs assert that TSI-

NCO, as servicing agent for all four Trust Defendants, engaged in the same alleged sham lawsuit scheme on behalf of all four Trust Defendants.  (See Consol. Cmplt. (Dkt. No. 124) ¶¶ 47-49, 274, 280)  Accordingly, this objection is overruled.

### 2.      Defendants' Objections

As to commonality, Defendants argue that the "technical disputes" that the R&R "focused on" – "such as whether the Trust Defendants were required to register to do business in New York in order to be 'authorized to proceed' on collection of Plaintiffs' unpaid debts and whether certain Pool Supplements and Schedules are legally sufficient to establish chain of title" – "cannot form the basis for class certification because the R&R dismissed Plaintiffs' claims based on false or misleading statements."  (Def. Obj. (Dkt. No. 433) at 27-28 (citing R&R (Dkt. No. 423) at 55))

While the R&R recommends dismissing Plaintiffs' claims based on false and misleading statements under both the FDCPA and the GBL, the R&R does not recommend dismissing Plaintiffs' FDCPA and GBL claims based on the alleged sham lawsuit scheme (see R&R (Dkt. No. 423) at 67), and what Defendants euphemistically refer to as "technical disputes" are part of the alleged sham lawsuit scheme.  Whether the Trust Defendants were required to register to do business in New York is relevant to whether they were authorized to file lawsuits against Plaintiffs to collect Plaintiffs' unpaid debts.  (See Consol. Cmplt. (Dkt. No. 124) ¶¶ 274(a)-(b), 280(a)-(b))  And whether the Pool Supplements and Schedules establish chain of title with respect to the loans on which Defendants filed lawsuits is relevant to whether Defendants would be able to prove, in those lawsuits, that they owned the loans and thus could prevail on their claims.  (See id. ¶¶ 274(a), 280(a))

Defendants argue, however, that "written training and instructional materials would not establish what an affiant actually looked at before signing an affidavit in each individual Plaintiff's collection proceedings," and that this "would require an individualized, case-specific inquiry." (Def. Obj. (Dkt. No. 433) at 28)  However, "[a]ll that must be proven, at this stage, is that 'there are in fact sufficiently . . . common questions of law or fact,'" Sykes III, 780 F.3d at 86 (emphasis omitted) (omission in original) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350), and "[c]ommonality may be found where the plaintiffs' alleged injuries 'derive from a unitary course of conduct by a single system,'" Sykes II, 285 F.R.D. at 287 (quoting Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997)), which here is the alleged sham lawsuit scheme.

Plaintiffs contend that "[f]or each of the Trust Defendants, TSI-NCO's uniform written policies prohibited the Trust's Attorneys (including Forster [& Garbus]) and Affiants (employed by TSI-NCO) from requesting and/or reviewing proof of the debt alleged in each suit'" (Pltf. R. 23 Supp. Br. (Dkt. No. 409) at 3 (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 11, 23-24; Hawkins R. 23 Reply Decl. (Dkt. No. 336) ¶¶ 35-37)), while Defendants maintain that "each affidavit was independently reviewed, verified and signed consistent with TSI policy." (Def. R. 23 Supp. Opp. (Dkt. No. 414) at 7)  Acknowledging the factual dispute, Plaintiffs need not show – at class certification – that they will ultimately prevail on the merits of their claims. See Lewis Tree Serv., Inc., 211 F.R.D. at 231.  Instead, "what matters is 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" Sykes II, 285 F.R.D. at 286 (emphasis omitted) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350). Where, as here, Plaintiffs' claim is that "TSI-NCO's uniform written policies prohibited" its Affiants from reviewing records, it is possible that this issue could be resolved on the basis of the

written policies, rendering unnecessary any individualized inquiry into what each Affiant "actually looked at before signing an affidavit in each individual Plaintiff's collection proceedings," as Defendants contend.  (See Def. Obj. (Dkt. No. 433) at 28)

Defendants further argue that "there is no common evidence that could generate common answers to the question of whether the appropriate Trust Defendant had authority to collect on each putative class member's loan," because "[e]ach Trust Defendant acquired pools of loans from multiple originating lenders through multiple different Pool Supplements and Schedules," which means that "subsets of putative class members will need to rely on different documentation to substantiate claims against the same Trust Defendant."  (Def. Obj. (Dkt. No. 433) at 29)  Again, however, "what matters is 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'"  Sykes II, 285 F.R.D. at 286 (emphasis omitted) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350).  And where, as here, the parties dispute whether the Pool Supplements and Schedules – which allegedly show the named Plaintiffs' alleged loans that the banks assigned to the Trust Defendants (see Luke Decl. (Dkt. No. 330) ¶¶ 5, 14(a); id., Ex. 1-A (Dkt. No. 330-1)) – are sufficient to establish the necessary chain of title for the loans (compare Pltf. R. 23 Supp. Br. (Dkt. No. 409) at 3 ("The record shows each Trust lacks chain of title, as well as terms and conditions, for any of the purported loans that Defendants claim the Trusts own.") with Def. R. 23 Supp. Opp. (Dkt. No. 414) at 9 ("The Trusts came to hold those loan documents, which were attached to four of the five Affidavits at issue, as part of the transfer of ownership of the loans to the Trust under the Pool Supplement Agreements and Deposit and Sale Agreements.")), this dispute can be resolved by a review of the Pool Supplements and Schedules.  Accordingly, Defendants' objections on the basis of commonality are overruled.

As to predominance, Defendants assert, "[f]or the same reasons that Plaintiffs' claims are not susceptible to common proof, [that] the individual issues associated with determining whether the alleged patterns of wrongful conduct were actually at play in any class member's collection proceedings will predominate over any common proof of the alleged patterns of wrongful conduct themselves."  (Def. Obj. (Dkt. No. 433) at 32 (citation omitted)) For the same reasons that Defendants' objections as to common proof are overruled, Defendants' objections as to predominance are likewise overruled.

Judge Moses correctly concludes that "Rule 23(b)(3)'s predominance requirement is met because the key issues – indeed, virtually all of the liability issues – are susceptible of generalized proof applicable to all putative class members, and there is little chance 'that individual issues will overwhelm the common questions.'"  (R&R (Dkt. No. 423) at 60 (quoting In re NASDAQ Market-Makers Antitr. Litig., 169 F.R.D. at 517))  "Nor are [P]laintiffs required to propose, prior to certification, 'a common method for determining . . . to what degree any individual Plaintiff or putative class member was damaged by the alleged misconduct.'"  (Id. (omission in original) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 37))  The R&R correctly explains that "[i]n a consumer debt case, where statutory damages are available under both federal and state law, '[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'"  (Id. (second alteration in original) (citations omitted) (citing 15 U.S.C. § 1692k(a)(2)(A)-(B); GBL § 349(h); quoting Sykes III, 780 F.3d at 88))

As to Defendants' argument that "equitable tolling issues [will require] a highly individualized inquiry focused on each Plaintiff's diligence, and what they knew, when," and that "for nearly all class members, the Court will need to conduct individual mini-trials to

determine whether and to what extent equitable tolling applies to their claims" (Def. Obj. (Dkt. No. 433) at 33), the R&R properly concludes that "[t]his is not a nationwide class action, and there is no reason to believe that equitable tolling issues cannot be resolved efficiently in a class format." (R&R (Dkt. No. 423) at 61)

As to adequacy, the R&R correctly concludes that "all of the named [P]laintiffs have standing – and thus have 'live' claims – with respect to the sham lawsuit scheme alleged in [the Consolidated Class Action Complaint]." (Id. at 58) "These claims are also suitable for litigation on a class basis, as they can be pursued against the Trust Defendants under GBL § 349; against TSI-NCO under [the] FDCPA and GBL § 349; and against Forster [& Garbus] under [the] FDCPA, GBL § 349, and [Judiciary Law] § 487." Judge Moses further notes that "all putative class members would qualify for statutory damages under [the] FDCPA and GBL § 349." (Id.)

While Judge Moses acknowledges that Bifulco "has a 'live' claim with respect to [D]efendants' negative credit-reporting, as to which she could, in theory, seek damages not available to the other named [P]laintiffs or the class," she correctly determines that this circumstance does not constitute "a disabling conflict, because it does not render Bifulco's interests 'antagonistic' to those of other [P]laintiffs." (Id. at 58 n.33) "Under Rule 23(a)(4) of the Federal Rules of Civil Procedure, adequacy is satisfied unless a 'plaintiff's interests are antagonistic to the interest of other members of the class.'" Sykes III, 780 F.3d at 90 (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)). Moreover, "[t]he fact that some class members may advance . . . GBL[] and Judiciary Law claims . . . does not mean the interests of these class members are antagonistic to those other members of the class that also advance FDCPA claims." Id. Accordingly, Defendants' objection on the basis

that the surviving claims "have different elements, allow for different types of damages, and are available against different Defendants" – rendering the named Plaintiffs inadequate representatives of a class (Def. Obj. (Dkt. No. 433) at 30) – is overruled.

        Defendants object to Judge Moses' finding that – although some of the named Plaintiffs admit that they "owed the debts," and indeed acknowledged the debts when they filed for personal bankruptcy – these circumstances do "not give rise to a defense, much less a unique defense, to their FDCPA claims." (R&R (Dkt. No. 423) at 59 (quoting Def. R. 23 Opp. (Dkt. No. 323) at 28, 30-32; Def. Obj. (Dkt. No. 433) at 31) Judge Moses explains that "it is by now well-settled that liability under [the] FDCPA can be established 'irrespective of whether the presumed debtor owes the debt in question.'" (Id. at 58 (quoting Sykes III, 780 F.3d at 83))

        Defendants complain that although the R&R "find[s] that ownership of a debt is not a defense to an FDCPA claim," it "does not explain how these facts do not create serious adequacy problems under the other claims brought by Plaintiffs (under GBL § 349 and Judiciary Law § 487)." (Def. Obj. (Dkt. No. 433) at 31) Even if some class members owed the debts and some did not, however, any conflict on this basis is not "fundamental," because Plaintiffs' remaining claims – under the FDCPA, the GBL, and the Judiciary Law – are based on the alleged sham lawsuit scheme. See Denney, 443 F.3d at 268 ("A conflict or potential conflict alone will not . . . necessarily defeat class certification – the conflict must be 'fundamental.'"). The alleged sham lawsuit scheme is, in turn, based on allegations that Defendants filed lawsuits without the intent or ability to prove their claims, and for the sole purpose of procuring default judgments against or extracting settlements from Plaintiffs. (See Consol. Cmplt. (Dkt. No. 124) ¶¶ 274(a)-(b), 280 (a)-(b), 284(a)) Accordingly, Defendants' adequacy objections are overruled.

The R&R also correctly concludes that, "[g]iven the discussion of commonality . . . [,] typicality has also adequately been established." (R&R (Dkt. No. 423) at 57) Defendants contend, however, that "Plaintiffs are not and cannot be typical representatives of the purported class alleging fraudulent collection actions where the evidence shows that each Plaintiff owed the debt, the correct entity initiated the collection actions, and the affiant(s) adequately reviewed all appropriate documentation." (Def. Obj. (Dkt. No. 433) at 32) But the R&R notes that Plaintiffs have alleged that

> all members of the proposed classes were named in sham lawsuits, which were filed and litigated in accordance with a unified playbook authored (literally) by NCI-TCO and carried out by its Affiants and by Forster [& Garbus]. Additionally, all of the members of the proposed Rule 23(b)(3) class were injured by the resulting, wrongfully-procured default judgments. Although the alleged scheme had several interrelated components – including boilerplate complaints, never meaningfully reviewed by the attorneys who signed them, that falsely alleged that the Trust Defendant named as plaintiff was the "original creditor" on the loan and was "authorized to proceed" in state court, and deceptive affidavits, signed by Affiants who routinely attested to "personal knowledge" of chain-of-title documents they had not actually reviewed – [P]laintiffs have shown that [D]efendants engaged in a "unitary course of conduct" leading to the injuries alleged.

(R&R (Dkt. No. 423) at 52) In sum, as discussed above, "[P]laintiffs' alleged injuries 'derive from a unitary course of conduct by a single system,'" Sykes II, 285 F.R.D. at 287 (quoting Marisol A., 126 F.3d at 377), and "Rule 23(a)(2) does not require that the claims of the lead plaintiffs 'be identical to those of all other plaintiffs.' Indeed, 'factual differences in the claims of the class do not preclude a finding of commonality.'" Id. at 286-87 (citations omitted) (quoting Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 176 (S.D.N.Y. 2008); Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 73 (S.D.N.Y. 2006)). Accordingly, Defendants' typicality objection is overruled.

As to superiority, the R&R correctly concludes that "a class action 'is, without question, more efficient than requiring thousands of debtors to sue individually,' whether in state

or in federal court," and that "[c]ertifying a class is also consistent with the remedial purpose of [the] FDCPA, which requires the courts to construe its terms 'in [a] liberal fashion if the underlying Congressional purpose is to be effectuated.'"  (R&R (Dkt. No. 423) at 62 (quoting Sykes II, 285 F.R.D. at 294; Hart, 797 F.3d at 225))  In their objections, Defendants contend that "common proof can only go so far in this case."  For "Plaintiffs and any class members to succeed on their claims, many issues will need to be determined on an individualized basis, via individualized proof."  According to Defendants, "[a] class action is not the superior method of adjudication for these kinds of claims."  (Def. Obj. (Dkt. No. 433) at 34)  Judge Moses notes, however, that "[i]f, as [D]efendants contend, they 'can show they unequivocally had the proper documentation in their possession' when they defaulted the class members, they can – and no doubt will – make that showing on a classwide basis in this Court."  (R&R (Dkt. No. 423) at 62 (citations omitted) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 43))

Finally, Judge Moses did not "misunderstand" Defendants' policy argument that "debtors should appear in [collection] actions and address their concerns before a default judgment is entered instead of ignoring those proceedings and then raising speculative claims years later in a separate federal lawsuit."  (Def. Obj. (Dkt. No. 433) at 34)  She rejects Defendants' argument, which the Second Circuit likewise rejected in Sykes III, finding that it "amount[s] to nothing more than a 'preference that their widespread fraudulent behavior be dealt with in a piecemeal fashion.'"  (R&R (Dkt. No. 423) at 61-62 (quoting Skyes III, 780 F.3d at 92))  Accordingly, Defendants' superiority objection is overruled.

## **CONCLUSION**

Judge Moses' R&R is adopted in part as set forth above.  Defendants' motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), is granted in part and denied in part, and Plaintiffs' motion for class certification is granted in part.

The Clerk of Court is directed to terminate the motions at (Dkt. Nos. 312, 371) in Seaman, 18 Civ. 1781, and at (Dkt. No. 300) in Bifulco, 18 Civ. 7692.

The Clerk of Court is further directed to close the member case Bifulco, 18 Civ. 7692.

Dated:  New York, New York
            September 27, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge