UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATHERINE SEAMAN, MARY RE SEAMAN, SANDRA TABAR, CHRISTINA BIFULCO, FRANCIS BUTRY and CORI FRAUENHOFER individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,<br><br>Defendants. | No. 18-cv-1781-PGG-BCM |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE ROGER W. SAYLOR AS AN EXPERT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

STANDARD OF REVIEW ..... 2

BACKGROUND ..... 4

ARGUMENT ..... 5

I. Saylor Does Not Qualify As An Expert Pursuant To The Court's Order ..... 5

II. Saylor's Testimony Is Useless To The Court As A Matter Of Law ..... 6

III. Saylor's Conclusions Are Not Supported By The Documents He Reviewed ..... 12

IV. Saylor's Report Is Not Based On Reliable Methodology ..... 18

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. AMTRAK*,
303 F.3d 256, 267 (2d Cir. 2002) .................... 3

*Brazier v. Hasbro, Inc.*,
No. 99-cv-11258, 2004 U.S. Dist. LEXIS 4064
(S.D.N.Y. Mar. 16, 2004) .................... 6

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993).................... 3, 11, 18

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997).................... 3

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003).................... 3

*Malone v. Spence*,
No. 21-cv-2047, 2023 U.S. Dist. LEXIS 138588
(N.D. Tex. Aug. 9, 2023).................... 11

*Mar-Can Transp. Co. v. Local 854 Pension Fund*,
722 F. Supp. 3d 355 (S.D.N.Y. 2024) .................... 12

*Pension Bank of N.Y. Mellon v. WMC Mortg., LLC*,
No. 12-cv-7096, 2015 U.S. Dist. LEXIS 108320
(S.D.N.Y. Aug. 17, 2015).................... 19

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) .................... passim

*Pogil v. KPMG L.L.P.*,
No. 21-CV-7628, 2024 U.S. Dist. LEXIS 50625
(S.D.N.Y. Mar. 21, 2024) .................... 3, 17, 21

*R.F.M.A.S., Inc. v. Mimi So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) .................... 6, 17

*SEC v. Lek Secs. Corp.*,
No. 17-cv-1789, 2019 U.S. Dist. LEXIS 60202
(S.D.N.Y. Apr. 8, 2019) ..... 11

*Trouble v. Wet Seal, Inc.*,
179 F. Supp. 2d 291 (S.D.N.Y. 2001) ..... 3

**Rules**

Fed. R. Evid. 702 ..... passim

As Plaintiffs' counsel predicted at oral argument, and Defense counsel denied, this "expert" report was not limited to the Court's order on explaining the securitization process, but was instead a charade to manufacture facts that are not in evidence justifying Defendants' lack of assignment documentation.

*First*, Defendants should be sanctioned for manufacturing Roger W. "Rusty" Saylor's report (the "Report")[1] by providing him with a wrong document on a key topic—switching out a declaration in this case with a contradictory (but more helpful to Defendant) declaration from an unrelated case. Defendants' curation of documents for his review made it impossible for him to issue an informed report. The Report also asserts that while at Citigroup, he would have relied on a servicer for the National Collegiate Student Loan Trusts (or "NCSLT") called the Pennsylvania Higher Education Assistance Agency ("PHEAA" or "AES") to determine ownership of the loans. Defendants did not provide him facts that would make him call this reliance into question, including an audit of PHEAA by a firm he had previously worked with that found numerous deficiencies, and findings by the Consumer Financial Protection Bureau ("CFPB") that Defendants did not have all chains of assignment.

*Second*, even where there are clear citations in his Report, they demonstrate that he did not read the actual documents in this case that he attached to his Report. He discusses the importance of "Program Guidelines," citing a document purportedly connected to Defendant Trust 2004-2, even though the same document is missing from counterpart document for the three other Trust Defendants here. In another instance, he insisted it was "impossible" for The First Marblehead Corporation ("FMC"), the company that conceived of and organized all the

---

[1] The Report is Exhibit 1 (or "Ex. 1") to the attorney declaration accompanying this motion and brief. That declaration contains a full list of Exhibits cited in this brief, all of which but the Report are cited herein per the format "__[name]__, Ex. __, at ____."

NCSLT securitizations, to attach a spreadsheet of loans to its securitization contracts, based on his limited industry experience working at Citigroup (or "Citi"). Yet, this was clearly FMC's practice as the documents provided to him specifically reference these attachments.

*Third*, even where he did read the documents, it's clear he didn't understand what he was reading. In his report, he insisted that certain "Opinion Letters" by attorneys involved in the NCSLT securitizations found that Defendants purchased the loans at issue. Yet, these letters clearly do not identify that particular loans are bought by a particular trust, and the authoring attorneys disclaim any investigation thereof. *Fourth*, Saylor's attempt to reframe his Citi-specific personal knowledge as generally applicable to all securitizations fails, as he testified that the securitization processes at each bank are proprietary, with no guides, treatises, standards, laws, or regulations compelling a uniform process in any way. *Fifth*, Saylor's Report improperly relies on hearsay and *ipse dixit* from other parties to inform his conclusions. Plaintiffs' motion to exclude should be granted. Further, the Court should investigate Defendants' sandbagging Saylor with the wrong (but more helpful to Defendants) declaration from an unrelated case.

## STANDARD OF REVIEW

Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (A) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (B) the testimony is based on sufficient facts or data;
> (C) the testimony is the product of reliable principles and methods; and
> (D) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony must show its admissibility by a preponderance of the evidence. *Pogil v. KPMG L.L.P.*, No. 21-CV-7628, 2024 U.S. Dist. LEXIS 50625, at *25 (S.D.N.Y. Mar. 21, 2024) (Moses, Mag. J.); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 700 n.6 (S.D.N.Y. 2003) (Chin, J.).

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, explaining that the Rules of Evidence—and Rule 702 in particular—"assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) (Marrero, J.) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").

Under *Daubert*, the trial court considers the following factors to determine whether the expert's methodology is valid:

1. Whether the technique or theory in question can be, and has been tested;
2. Whether it has been subjected to publication and peer review;
3. Its known or potential error rate;
4. The existence and maintenance of standards controlling its operation; and
5. Whether it has attracted widespread acceptance within a relevant scientific community.

An expert's analysis must be "reliable at every step," meaning that "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos v. AMTRAK*, 303 F.3d 256, 267 (2d Cir. 2002) (quote omitted). The Court must not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Daubert*).

## BACKGROUND

For the first six years of this case, Defendants insisted that discovery would eventually show they had proof of chain of assignment for each alleged loan dating back to the securitization of each NCSLT trust. They said this would come in the form of documents called "Schedules," which were supposed to be attached to contract documents formalizing the securitization of each NCSLT trust. But, after years of discovery, Defendants could not come up with the proof they promised. In certifying the Rule 23 Class here, this Court explained:

> According to [the corporate designee for Defendant] TSI[, the servicer for NCSLT trust collections], the loans at issue were all originally assigned, by the banks that made them, to National Collegiate Funding, Inc. (NCF), by means of a series of nearly identical Pool Supplements (one from each originating bank), which NCO received on various dates in 2012 from First Marblehead Corporation (FMC), the company that arranged the securitization. Each Pool Supplement, in turn, recites that the loans being assigned to NCF (which later assigned them to one of the Trust Defendants) are listed on an attached Schedule, but no such Schedule is attached to any of the Pool Supplements in TSI-NCO's possession. [TSI] attests that the Schedules exist in "digital Excel file format," and that these files were received from FMC on November 14, 2012, "separately" from the Pool Supplements. Plaintiffs counter that the Pool Supplements and (unattached) Excel files are not adequate to establish ownership of the loans listed in the Excel files, arguing (among other things) that defendants have lost or misplaced the "loan roster CD" containing the Schedules as transmitted by FMC; that the Excel files contain a variety of apparent errors; and that their metadata does not match the dates on which they were supposed to have been created.

*Seaman v. Nat'l Coll. Student Loan Trust 2007-2*, No. 18-cv-1781, 2023 U.S. Dist. LEXIS 43041, at *76 n.32 (S.D.N.Y. Mar. 13, 2023) (Moses, Mag. J.) (record cites omitted).

After Defendants lost their appeal to the Second Circuit concerning the certification ruling in Plaintiffs' favor, Defendants decided to shift tactics. In July 2024, more than three years after close of discovery, Defendants suddenly announced they needed to propose an expert witness. *See* ECF No. 450 [July 25, 2024] (letter to Court in which Defendants first state intent to introduce experts). According to Defendants, they essentially seek to show the Schedules are

not necessary to determining which NCSLT trust owns which specific loan. *See* Dec. 17, 2024 Ct. Conf. Tr. (ECF No. 474), at 34:13–25.

## ARGUMENT

### I. Saylor Does Not Qualify As An Expert Pursuant To The Court's Order

Saylor has effectively admitted that he is not "qualified by knowledge, skill, experience, training, or education" to provide the expert testimony that this Court allowed Defendants to proposed. Fed. R. Evid. 702 (preamble). The Court's order allowing Saylor's Report permitted him to make assertions "regarding the student loan securitization process and the structure and related documentation of student loan securitizations." *See* Ord. of Jan. 6, 2025, at 4 & ¶ 1 (ECF No. 477) (the "Order"). Practically all of his testimony is outside the scope of the Order, as discussed further below. However, Saylor is not even qualified to offer expert testimony within the confines of the Order's instruction.

At deposition, Saylor admitted that he:

- Has never taken any coursework on securitization of any kind.
- Has never written any articles about any kind of securitization.
- Has no professional certifications relevant to securitization.

Dep. Tr., Ex. 2, at 18:17–19:12.

Further, Saylor did not provide any evidence of a standardized securitization process across the industry. He testified that the securitization processes at each bank are proprietary with no external guides, whatsoever. Saylor believes that "there are no specific laws or regulations related to securitization" in the United States. *Id.*, at 62:20–63:2. He's unaware of any manuals describing securitizations for workers in that industry—he believes the leading

authority is "one little book"—whose title he could not recall—that was "written by Steve Schwarzman." *Id.*, at 20:5–25.[2]

Saylor's limited credentials warrant rejecting him as an expert per the Order. It does not matter to the Court's analysis here whether Saylor had work experience that involved student loan securitization—he lacks the credentials that would "give[] him specialized knowledge" into all the fine points of securitization of student loans. *R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010) (Marrero, J.) (emphasis added); *see Brazier v. Hasbro, Inc.*, No. 99-cv-11258, 2004 U.S. Dist. LEXIS 4064, at *23–24 (S.D.N.Y. Mar. 16, 2004) (Mukasey, J.) (toy design engineer's testimony on child's motivations for putting a toy into mouth inadmissible as he wasn't qualified to opine on this subject matter; even if he were, testimony lacked factual basis).

## II. Saylor's Testimony Is Useless To The Court As A Matter Of Law

Defendants are required to show, by a preponderance of the evidence, that it is more likely than not that Saylor's testimony will "help" the Court to understand the evidence or determine a fact in issue. Fed. R. Evid. 702(A) (emphasis added).

### A. Saylor's Report Is Not Based On The Evidence In This Case

When providing Saylor with a universe of documents upon which to write his report, Defendants' counsel replaced key pieces of evidence in this case with contradicting documents outside the factual record. Specifically, Defendants' counsel had Saylor ignore a declaration by a witness in this case from January 2021 and instead directed him to review a contradictory declaration by the same witness but from September 2022 and in a different case.

---

[2] Saylor apparently cannot differentiate between Steve Schwarcz, a Duke University professor of securities law, and Steve Schwarzman, a very different individual who leads private equity firm Blackstone Group (and does not author specialized texts like the one Saylor claims to have read). *See id.*

Saylor's Report relies on a declaration by a person named Jens Meyer. Meyer was employed by FMC, the company that acted as structuring advisor for the NCSLT trust securitizations. *See* Report, at ¶¶ 8(q)-(r) & 24–25. Saylor cites the September 19, 2022 declaration by Meyer in a case in the Middle District of Pennsylvania captioned *Gosse v. Transworld Systems, Inc. et al.*, No. 20-cv-1446. *See Gosse*-Meyer Decl., Ex. 3 (hereinafter the "*Gosse*-Meyer Declaration."). During Saylor's deposition, he testified that in preparing his Report, he assumed the truth of the *Gosse*-Meyer Declaration.[3] Among the paragraphs from the *Gosse*-Meyer Declaration whose truth Saylor assumed were the following, the underlined text of which does not appear in the declaration in this case:

> 5. Cognition is not an existing custodian for the Trust, and therefore is currently under no obligation, contractual or otherwise, to maintain any documents or data on behalf of the Trust. Nonetheless, Cognition maintains an MS Access Database it utilized while structuring the Trust's transactions and acting as Structuring Advisor to the Trust. The MS Access Database holds data for each loan owned by each of the Trust, and the data has remained unchanged from the date the data was entered into the database.
>
> 6. The MS Access Database data reflects the loan data as of the completion of the securitization reconciliation process for the Trust; and the data entered for each loan owned by the Trust has remained unchanged from the completion of the securitization reconciliation process.
>
> 7. The loan data contained in the MS Access Database is derived directly from loan tapes received in connection with the origination and initial servicing of the Trust's loans, which Cognition received as part of the student loan securitization transactions through which student loans reflected on the loan tapes were sold to the Trust.
>
> *Gosse*-Meyer Decl., Ex. 3 (emphasis added); *see also* Dep. Tr., Ex. 2, at 214:19–217:8.

These paragraphs from the *Gosse*-Meyer Declaration provide a reason why the metadata from the Schedules—i.e., the list of loans for each securitized pool—would show a date after the date of the securitization. *See id.* Saylor, in his Report here, relies on Meyer's excuse that a

[3] All but a few words about a minor point that Saylor attributed to essentially a typographical error by Meyer. *See* Dep. Tr., Ex. 2, at 214:19–217:8.

"reconciliation" prevents there from being a list of loans current as of the date of securitization. *See* Report, at ¶¶ 50–52 (pointing to "period of reconciliation" which "may take 30 days or more").

This is a fabrication manipulated by Defense counsel. Saylor's Report does not consider that Meyer's declaration in this action contradicts the *Gosse*-Meyer Declaration, upon which Saylor relied, because he was not provided with it by Defense counsel. On January 4, 2021, Meyer filed a declaration in this case (the "Seaman-Meyer Declaration"), which contains paragraphs generally matching those above from—except for Paragraph 5:

> 3. Cognition is not an existing custodian for National Collegiate Student Loan Trust 2004-2, 2006-4, 2007-2, and 2007-3 (the "Trusts"), and therefore is under no obligation, contractual or otherwise, to maintain any documents or data for the Trusts.
>
> 4. Nonetheless, Cognition currently maintains an MS Access Database which holds data for each loan owned by the Trusts, which has remained unchanged from the dates it was entered into database.
>
> 5. The data for the loans owned by each of the Trusts was entered on the following dates: National Collegiate Student Loan Trust 2004-2 (September 30, 2004); National Collegiate Student Loan Trust 2006-4 (November 30, 2006); National Collegiate Student Loan Trust 2007-2. (November 30, 2006); and National Collegiate Student Loan Trust 2007-3 (August 31, 2007).
>
> 6. The source of the data contained in the MS Access Database is derived from loan tapes received in connection with the origination and servicing of the Trusts' loans.
>
> *Seaman*-Meyer Decl. (ECF No. 338-6) (underlines added).

The dates in Paragraph 5 of the *Seaman*-Meyer Declaration in this case are all dates that precede the dates of securitization for each NCSLT trust referenced in that Paragraph 5.[4] This

[4] After Meyer submitted his *Seaman*-Meyer Declaration, he filed a subsequent sworn statement amending Paragraph 5 such that the date in parentheses after "Trust 2007-2" read "May 31, 2007" instead of "November 30, 2006." *See* ECF No. 338-6 (corrected version declaration) [dated Sept. 23, 2021; filed Oct. 13, 2021]. Other than that one change to that one date, Meyer did not otherwise amend the specific dates that he identifies in Paragraph 5. *Id.*

proves that any spreadsheet with metadata not matching the date of securitization, cannot be the authentic Schedule required by the NCSLT trusts' own foundational documents.[5]

Contradictorily, Paragraph 6 of the *Gosse*-Meyer Declaration indicates that the Schedules were finalized weeks after the date of securitization. *Gosse*-Meyer Decl., Ex. 3, at ¶ 6. This Court must exclude Saylor's testimony because Defense counsel gave him the wrong declaration from a non-related case from the same source on the same topic. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 481 (S.D.N.Y. 2010) (Scheindlin, J.). This also supports the proposition that there is no "industry standard" with respect to the securitizations involved, and therefore no such thing as an "expert" in them. Defendants should be sanctioned for attempting to manipulate the evidence in this way.

**B. Saylor's Report Does Not Conform To The Court's Order**

The Court's Order allowing Saylor's Report was clear: he could only make assertions "regarding the student loan securitization process and the structure and related documentation of student loan securitizations." *See* Ord. of Jan. 6, 2025, at 4 & ¶ 1 (ECF No. 477). Following oral argument, the Court ordered this limitation after Plaintiffs' counsel expressed concerns that Saylor would be attempting to create new facts without personal knowledge, not simply explain how the securitization process works. Nevertheless, Saylor's Report contained not just what the Court authorized but a broadened mandate, apparently directed by Defense counsel, to justify NCSLT's broken securitization process by adding new facts. *Compare id.*, *with* Report, at ¶¶ 6(a) & (b)–(c).[6]

---

[5] *See* Part III, *infra* (discussing NCSLT trusts' underlying purchase agreements and pool supplement documents).

[6] Saylor's Report's Subparagraph 6(a), which matches the Order of January 6's language, states he was asked to "provide an overview of the typical process by which student loan

The Court here made plain to Defendants that it did not want Saylor's Report to amount to fact evidence masquerading as expert testimony—especially given that Defendants were asking for permission to submit the Report years after the close of discovery. See Dec. 17, 2024 Tr. (ECF No. 474), at 35:9–21 ("THE COURT: And your expert can [offer his opinions] without introducing new percipient witness or, quote, 'fact,' unquote, evidence? MR.DeROSE [DEFENSE COUNSEL]: Yes.").[7]

**C. Saylor's Conclusions Are Irrelevant To This Case**

Saylor's essential opinion has no connection to this case's liability issue. As this Court explained upon certifying the Class, liability against Defendants concerns "whether defendants possessed admissible chain-of-title evidence—and therefore were capable of proving to a state court that they owned the loans on which they sued." *Seaman*, 2023 U.S. Dist. LEXIS 43041, at *76 (S.D.N.Y. Mar 13, 2023) (Moses, Mag. J.), *adopted*, 2023 U.S. Dist. LEXIS 173057 (S.D.N.Y., Sept. 27, 2023) (Gardephe, J.).

Saylor's Report, meanwhile, is based around an unrelated opinion: that "parties to the securitization would recognize that the respective Defendant NCSLT acquired the respective loans." Report, at ¶¶ 54–72 (emphasis added). What parties to the securitization did or did not think is irrelevant—even if Saylor's assertions were true, which they are not. Defendants give

---

securitizations are structured, documented, placed, and managed pre- and post-closing." Meanwhile, Subparagraphs 6(b) and (c) additionally lists his mandate as "opin[ing] as to whether the Defendant NCSLTs followed this standard process resulting in a standard securitization structure; and [i]f the Defendant NCSLTs, followed this process and have this structure," and "as to the effects of this structure and its implication on the loans securitized into the Trust, including whether industry participants would understand that the Defendant NCSLTs are the owners of the securitized student loans following the closing of the securitization."

[7] Saylor stated at his deposition that he had not seen the Court's Order of Jan. 6, 2025 setting forth the allowed scope of the Report, until he reviewed it at his deposition after Plaintiffs' counsel provided him a copy. *See* Dep. Tr., Ex. 2, at 108:5–114:4.

no explanation why Saylor's Report will actually assist the trier of fact in their Rule 26 disclosure that accompanies Saylor's Report. *See* Ex. 1, at Defs.' R.26 Disclosure Cover Sheet. Where, as here, a proposed expert's evidence would be "[ir]relevant" to the claims at bar the resulting "deficiency is so extreme that it may not be addressed solely through cross-examination" at trial, and the "report must be excluded" under "*Daubert* and Rule 702." *SEC v. Lek Secs. Corp.*, No. 17-cv-1789, 2019 U.S. Dist. LEXIS 60202, at *12–14 (S.D.N.Y. Apr. 8, 2019) (Cote, J.) (granting plaintiff's motion to exclude evidence from defense's proposed expert witness); *see also Malone v. Spence*, 21-cv-2047, 2023 U.S. Dist. LEXIS 138588, at *21–22 (N.D. Tex. Aug. 9, 2023) (striking proposed expert report for irrelevance

### D. Saylor's Report Is Premised On Impermissible Legal Conclusions

The Report should also be struck because Saylor premises it on legal conclusions that he is not qualified to make and that are instead within the exclusive purview of this Court to make. Saylor misinterprets two forms of Opinion Letter from attorneys involved in the NCSLT securitizations to insist that a particular trust must have owned particular assets. In fact, the Opinion Letters merely stated that (1) A bankruptcy court would find that the NCSLT trusts' "pass-through" entity for each securitization—National Collegiate Funding LLC ("NCF")—no longer holds any interest in any student loan purportedly included, with thousands of others, in one of the NCSLT securitization pools; and (2) no such loan would be recoverable by the Federal Deposit Insurance Commission in the event of an insolvency of a bank that purportedly originated the loan. *See* Report, at ¶¶ 8(n)–(o), & 32–8; *see also* Opinion Letters, Exs. 4–11. At his deposition, Saylor concluded that the NCSLT trust assets were therefore "bankruptcy remote," which to him means that "the trust owns the assets." Dep. Tr., Ex. 2, at 156:14–160:8; *accord* Report, at ¶¶ 32–38.

These assertions impermissibly "consist of legal opinions or conclusions regarding how to interpret [a] statue's plain language and analysis of the relevant caselaw." *Mar-Can Transp. Co. v. Local 854 Pension Fund*, 722 F. Supp. 3d 355, 363 (S.D.N.Y. 2024) (Seibel, J.). It "is [this Court's job" to determine whether (1) the Opinion Letters are correct about the limited bankruptcy and insolvency issues they consider; and, even if correct, (2) whether those facts prove ownership of specific loans by specific NCSLT trusts. *Id.* "[T]hus the [Saylor Report is] neither necessary nor helpful in the Court's consideration" of the issues in this case. *Id.*

**III. Saylor's Conclusions Are Unsupported By The Documents That Saylor Reviewed**

Saylor's analysis includes numerous errors, any one of which is fatal to his conclusions, and together mandating exclusion outright. The law requires Defendants to show, by a preponderance of the evidence, that it is more likely than not that Saylor's testimony is based on sufficient facts or data. Fed. R. Evid. 702(B). They cannot meet this standard, because Saylor appears to have not read the documents provided to him. On numerous occasions, Saylor failed to consider that documents he cites are incomplete versions of the genuine originals, often missing pages that the documents specifically reference. These glaring oversights undermine his trustworthiness as an "expert."

**A. Saylor Fails To Consider Missing Program Guidelines**

Again showing he did not actually read the documents provided to him, Saylor's Report recognizes that each trust must have "Program Guidelines" in order to determining NCSLT trust ownership, while failing to notice the missing Program Guidelines related to three of the four securitizations he supposedly reviewed. *See* Report, at ¶¶ 24–27; *see also Pension Comm. of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 481 (excluding proposed expert's testimony for failure to account for such differences between supposedly similar documents).

Each bank that originated loans that were supposed to be included in an NCSLT securitization had one or more "Program[s]" with specific criteria for what kinds of borrowers could be given loans and on what terms. *See* Report, at ¶¶ 24–27. These Program Guidelines were supposed to be incorporated into each contract between originating banks and FMC (known as a "Purchase Agreement") wherein an individual bank and FMC would anticipate that future pools of loans originated by the bank would be sold one day to then-unspecified NCSLT trusts. There are four separate documents that are listed as attachments to Saylor's report and that he labels Purchase Agreements. *Id.*

Saylor did not notice that Program Guidelines were not attached to Purchase Agreements for three of the four Trust Defendants in this case.[8] The Program Guidelines Saylor cites to is comprised of 110 pages of dense, small-type text with countless figures and data points, as well as specific references to the specific originating bank (National City). *See* Purchase Agreement-National City, Ex. 12, at Bates No. NCSLT__000323-433. It's hard to imagine how he didn't notice these guidelines were missing from the other Trust Defendants' documents. These gaps in Saylor's analysis demand that he be rejected as an expert here. *See Pension Comm. of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 481 (excluding proposed expert's testimony for failure to account for such differences between supposedly similar documents).

---

[8] The Report discusses Program Guidelines in the context of a single Purchase Agreement: a document named "Referral Program Note Purchase Agreement TERI-Guaranteed National City Referral Loan Program", produced in this litigation at Bates No. NCSLT_000209-000439. *See id.*; *see generally* Purchase Agreement-National City, Ex. 12. However, Saylor glosses over the fact that none of the three other Purchase Agreement documents he reviewed here contain Program Guidelines.

**B. Saylor Fails To Consider Conflicts In The Pool Supplement Documents**

Saylor fails to consider a series of inconsistencies and documentary absences pertaining to the Pool Supplements. Pool Supplements are the contract documents that were signed on the date of securitization for each NCSLT trust, and by which pools of loans from individual banks purportedly were assigned from NCF over to a specific trust. The documents specifically reference attached Schedules listing individual loans, but discovery here showed the Schedules are missing if they ever existed.

Based on Saylor's limited experience only working at Citi he contends that it would be "impossible" for FMC to attach schedules identifying the loans to the contracts signed on the date of securitization. Even a cursory reading of the Purchase Agreements shows that this is exactly what FMC did.

First, Saylor failed to notice the numerous instances in which the Purchase Agreement documents expressly dictate that future participants in the contemplated NCSLT securitizations <u>must</u> sign Pool Supplements with Schedules attached <u>on the date</u> of the securitization, not later. *See, e.g.*, Purchase Agreement-National City, Ex. 12, at Bates No. NCSLT_ 000221–222 (PDF Page 13–14 of 231), Bates No. NCSLT_000226 (PDF Page 18 of 231), and Bates No. NCSLT_000252 (PDF Page 44 of 231).

Second, Saylor ignores documentary proof showing that participants in the NCSLT securitizations <u>did in fact</u> attach Schedules to Pool Supplements <u>on the date</u> of the securitization. Thus, the Pool Supplement involving Bank One National Association and Trust 2004-2 contains a first page stating that the Schedule listing loans is "attached" and a final page directing readers to "See supplemental loan roster CD" to view that Schedule. *See* Pool Supplement-Bank One/Trust 2004-2, Ex. 16, at Bates No. NCSLT_ 000102 & 000108 (PDF Page 1 and 7 of 7). The other Pool Supplement documents that he claims to have reviewed either state that the

Schedule is "On file with FMC," or entirely lack any page identifying the location of the Schedule. Saylor does not mention any of this in his Report. At deposition, he contradicted all these very documents, testifying that it's impossible to create such a list of student loans for securitizations like these, and that the only repository for that information is the "servicer," i.e., PHEAA. *See* Dep. Tr., Ex. 2, at 193:16–199:78.

Third, Saylor fails to consider contradictions between the Pool Supplement documents that Defendants have produced in this case, and the ones that were actually filed with the SEC. Saylor does note in his Report that the Securities and Exchange Commission ("SEC") maintains a database of securities filings called "EDGAR," which he utilized here. *See* Report, at ¶ 58. However, he failed to check EDGAR in reviewing the Pool Supplements—and so ignores key conflicts. Per EDGAR, the SEC's copy of the Pool Supplement involving Bank One National Association and Trust 2004-2 contains a final page telling readers that the Schedule's location is "On file with the Indenture Trustee"[9]—in contrast to the copy Saylor reviewed, which says "See supplemental loan roster CD" to view that Schedule. *Compare* SEC Copy of Pool Supplement-Bank One/Trust 2004-2,[10] *with* Ex 16., at Bates No. NCSLT_ 000108 (PDF Page 7 of 7).

Fourth, he fails to consider the absence from EDGAR of filed copies of three of the four Pool Supplement documents he claims to have reviewed.

**C. Saylor Fails To Consider The Opinion Letters' Disclaimers**

Saylor fails to consider that the Opinion Letters he relies on do not actually say what he says they do. The Opinion Letters state that the authoring attorneys did not investigate any underlying documents, that they had assumed the accuracy of statements made by those

---

[9] The indenture trustee for the NCSLT trusts has been U.S. Bank.

[10] The SEC copy for this document is available on EDGAR at the following URL: https://www.sec.gov/Archives/edgar/data/1305287/000088237704002294/d277098.txt.

organizing the NCSLT securitizations, and that they limited their fact-gathering or inflated their assumptions in other ways. *See* Opinion Letters, Exs. 4–11.[11]

**D. Saylor Fails To Consider More Recent Analyses By Experts With Better Data**

Defendants did not provide to Saylor relevant evidence that would have undermined his assumption to blindly rely on PHEAA.[12] Saylor was not able to consider that, in late 2015, a company called Boston Portfolio Advisors, Inc. ("BPA")[13] conducted an audit of PHEAA, at the instruction of the NCSLT trusts' owners, and made the following conclusions:

- Assignments were not present in any of the collateral files provided and PHEAA did not indicate if an Assignment existed elsewhere. Based on representations made by PHEAA, it is likely that the Assignments do not exist. Without appropriately issued Assignments, collection efforts are more challenging and costly to defend in Court.

- PHEAA is not aware of the criteria FMC used for assigning a batch of loans to any given trust except the general knowledge that FMC was able to package loans to appeal to investors. PHEAA would change the owner on its system upon notification from FMC. Loans were not bundled by disbursement year or period (i.e. the 2007 trust does not contain all loans originated in the 2006-2007 academic year) and the

[11] The Opinion Letters all contain language identical or analogous to the following:

"We have not examined any documents evidencing the Student Loans. . . . This opinion letter is based upon our review of the documents referred to herein. We have conducted no independent investigation with respect to the facts contained in such documents and relied upon in rendering this opinion letter. . . ." NCSLT 2004-2 - Opinion Letter/Bank, Ex. 4, at PDF Page 3–4 of 66;

"In rendering this opinion letter, except for the matters that are specifically addressed in the opinions expressed below, we have made no inquiry, have conducted no investigation and assume no responsibility with respect to (a) the accuracy of and compliance by the parties thereto with the representations, warranties and covenants as to factual matters contained in any document or (b) the conformity of the underlying assets and related documents to the requirements of any agreement to which this opinion letter relates. . . . This opinion letter is based upon our review of the documents referred to herein. We have conducted no independent investigation with respect to the facts contained in such documents and relied upon in rendering this opinion letter. . . . ." NCSLT 2004-2 - Opinion Letter/Depositor, Ex. 5, at PDF Page 4 of 24.

[12] Report, at ¶¶ 54–72 ("parties to the securitization would recognize that the respective Defendant NCSLT acquired the respective loans," because of PHEAA) (emphasis added).

[13] Saylor testified that he knows BPA and has been involved in at least one project in which BPA was also involved—and he "didn't have any qualms with" their fundamental conclusions based on the data they observed during the project. Dep. Tr., Ex. 2, at 220:24–222:18.

> criteria that FMC used to formulate the trusts was never disclosed to PHEAA. The first trust (National Collegiate Master Student Loan Trust) was replenished with 6 independent securitizations from 2001 to 2006, while the other 14 trusts were one and done transactions. . . . . .

BPA-PHEAA Audit, Ex. 20, at 7, 17

Where, as here, testimony by a proposed expert fails to consider salient facts of which he should have been aware, his testimony must be precluded. *Pogil v. KPMG L.L.P.*, No. 21-CV-7628, 2024 U.S. Dist. LEXIS 50625, at *35 (S.D.N.Y. Mar. 21, 2024) (Moses, Mag. J.).[14]

Next, Saylor's Report fails to consider that, just days before he issued the Report, the CFPB confirmed the existence of a "Master List" of instances wherein individuals like Plaintiffs and the Class members undisputably were sued in state court by NCSLT trusts despite the absence of proof of assignment. *See* Stip. Final J. & Ord., at ¶¶ 5(a), (d), (f) & (j), *CFPB v. Nat'l Coll. Master Student Loan Trust et al.*, No. 17-cv-1323 (D. Del. Jan. 16, 2025) (Dkt. No. 458-1).

Saylor's failure to consider these recent events and documents requires his Report be excluded. *Pogil*, 2024 U.S. Dist. LEXIS 50625, at *35. Saylor cannot rely on the accuracy of PHEAA's records, where BPA so decisively showed these inaccurate. An expert would, at the very least, consider and address facts that could undermine his assertions; the failure to do this is by itself grounds for rejecting a proposed expert. *See R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 270 (S.D.N.Y. 2010) (Marrero, J.) (rejecting proposed experts' testimony for failure to consider "alternative" explanations contradicting their own view of the evidence). Similarly, Saylor cannot rely on the Opinion Letters as authoritative on the issue of NCSLT trust

---

[14] Due to the BPA audit of PHEAA, the NCSLT trusts' owners filed a Delaware Chancery Court case against TSI and other agents, alleging they failed to safeguard assignment documents for the NCSLT trusts, making it impossible to prove the right to collect under state law—a sine qua non for any creditor. *See* Am. Compl. ¶¶ 70–79, *Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*, No. 2018-0167 (Del. Ch. June 15, 2018). Saylor's testimony fails to take into account this fact in any way.

ownership, when attorneys as good as (if not better than) the Opinion Letters' authors, and with better access to salient data, recently have contradicted (1) the contents of the Opinion Letters and (2) Saylor's understanding of what the Opinion Letters mean. *See id*.

**IV. Saylor's Report Must Be Precluded As It Is Not Based On Reliable Methodology**

The law requires Defendants to show that Saylor's "testimony is the product of reliable principles and methods." Fed. R. Evid. 702(C). They fail this standard."

**A. Saylor's Report Cannot Meet *Daubert*'s Standards**

In *Daubert*, the Supreme Court listed five factors for assessing reliability per Rule 702(C)—and Saylor satisfies zero out of five. First, the methodology he uses—exalting and relying on PHEAA—"has been tested," but found failing, as the BPA audit and the CFPB action disproved PHEAA's reliability and showed the lack of chain of title concerning NCSLT collections.

Second, Saylor's methodology has not been "subjected to publication or peer review" as *Daubert* requires. *See* Report, at Exhibit A (Saylor's curriculum vitae shows neither). Third, his methodology's "known or potential error rate" is high, because, again, other experts with better data access (whom he ignores) have contradicted his opinions about PHEAA's reliability and NCSLT trust ownership. Fourth, Saylor's methodology involved no "standards controlling its operation": he repeatedly failed to consider, account for, or address numerous passages of text, in the very documents he claimed to have reviewed, that contradict his assertions. Fifth and finally, there's no suggestion here that Saylor's methodology "has attracted widespread acceptance within a relevant scientific community." *See* Report, at Exhibit A.

**B. Saylor's Report Tries To Disguise Hearsay As Methodology**

Saylor's Report must be rejected because it relies on multiple layers of hearsay. *Pension Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096, 2015 U.S. Dist. LEXIS 108320, at

*21–28 (S.D.N.Y. Aug. 17, 2015) (Cote, J.) (rejecting proposed expert's testimony as hearsay). Saylor's reliance on PHEAA's integrity is based on hearsay comments from people he met in the student loans industry, and from statements made to him by PHEAA employees.[15]

Saylor also impermissibly relies on multiple layers of *ipse dixit*, relying on authority rather than concrete facts. *Comm. of the Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 458 & 481 n.211 (rejecting proposed expert's testimony as *ipse dixit*). For example, Saylor relies on the declaration in the *Gosse* case by PHEAA employee Jennifer Wilbert (the "*Gosse*-Wilbert Declaration"; Ex. 21 to this motion) concluding that a particular loan was owned by Trust 2007-3. *See* Report, at ¶¶ 8(g), 39, 42–43, 54, 66–69 (relying on the Gosse-Wilbert Declaration). Wilbert relied on a screenshot of PHEAA account notes that she attached to her declaration. *Gosse*-Wilbert Declaration, Ex. 21, at PDF Page 6–7 of 94 (Paragraphs 25–26 of the body of the declaration). Relying only on Wilbert's authority, Saylor never bothered to check the actual account notes that were attached, which identifies a different owner ("OWNER") as "122962QT – NCT." *See id.*, Ex. 21, at PDF Page 82 of 94. Neither Wilbert nor Saylor discusses this discrepancy.[16]

---

15 *See* Dep. Tr., Ex. 2, at 49:13–21 ("[T]he bulk of it was we went out to a nice dinner, and we talked about how PHEAA serviced their loans . . . .").

16 Wilbert's declaration points to text in the account notes that reads "NCT20073". *Gosse*-Wilbert Declaration, Ex. 21, at PDF Page 6–7 of 94 (Paragraphs 25–26 of declaration). However, the full text of this line from the account notes reads "BOND ISSUE: NCT20073". Wilbert does not account for the fact that FMC's first "National Collegiate" securitization was for a trust called National Collegiate Master Student Loan Trust, which issued bonds based on six independent securitizations from 2001 to 2006 ("NCMSLT"). As BPA found in auditing PHEAA, the existence of the NCSLMT securitizations caused confusion for PHEAA staff trying to keep track of loan pools. *See* BPA-PHEAA Audit, Ex. 20. Likewise, when Plaintiffs took discovery here, the corporate designee for the servicer Defendant (TSI) testified at deposition that the existence of the NCSLMT securitizations caused TSI to use a coding system for NCSLT trusts that didn't match the alphanumeric of official trust names like "Trust 2007-3," and so is unintelligible to outsiders. *See* TSI Rule 30(b)(6) Dep. Tr., Ex. 22.

Saylor simply cannot present as expert testimony statements in which he says that he knows something, because Wilbert says that she knows. That's *ipse dixit* and must be rejected. *Pension Comm. of the Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 458 & 481 n.211 (rejecting *ipse dixit*). In addition, Saylor's blind reliance on the *Gosse*-Wilbert Declaration causes him to miss a key fact that he should have considered, but failed to: the securitization date for Trust 2007-3—September 20, 2007— was the same as the securitization date for a separate NCSLT trust, Trust 2007-4. Saylor should know this, because Trust 2007-4 was one of the defendants in the only other federal case for which he has proposed expert testimony. Saylor's failure to consider this fact highlights what the BPA audit of PHEAA illustrated: there is no way for an NCSLT servicer to be sure which loan went to which NCSLT trust. *See* BPA-PHEAA Audit, Ex. 20.[17]

**C. There's No Reliability To The Application Of Saylor's Principles**

In addition to not having any methodology recognized by the law, Saylor fails to apply reliably any principles he claims to follow. *See* Fed. R. Evid. 702(D). His failings in this regard are illustrated by a number of assumptions so unrealistic they warrant exclusion.

First, Saylor unrealistically assumes that only items of documentation that an agent of an NCSLT trust would "need" to collect against an alleged borrower would be "the promissory note and the disclosure statement"—and nothing else, i.e., no chain of title is necessary. *See* Dep. Tr.,

---

[17] It matters that Trust 2007-3 and 2007-4 have the same securitization date: According to documents filed with the SEC, both these Trusts were to be populated by KeyBank loans pursuant to a pool supplement agreement dated that same day (September 20, 2007). *Compare* Deposit and Sale Agreement for Trust 2007-3, Ex. 23, *with* SEC Copy of Deposit and Sale Agreement for Trust 2007-4 (which is available on EDGAR at the following URL: https://www.sec.gov/Archives/edgar/data/1223029/000088237707002305/d719503.htm). If these two Trusts were securitized on the same day, and populated with loans from the same bank on that same day, there's no way to tell which loans went to which Trust <u>without</u> a Schedule attached.

Ex. 2, at 95:9–18. This is simply not the law. Courts in similar cases have found that the presence of such "unrealistic assumptions" in a proposed expert's testimony warrants excluding it. *Pogil*, 2024 U.S. Dist. LEXIS 50625, at *32–39.

Next, Saylor unrealistically assumes that none of the NCSLT trusts can be a "party" to any event or proceeding, such as a contract or a lawsuit. *See* Dep. Tr., Ex. 2, at 173:15–177:23. During the relevant colloquy at deposition, he stated that he "do[es]n't believe that the trust is the appropriate place for someone to seek recompense for an activity." *See id.* at 177:8–11. If his view were applied in the real world, he would be prohibited from seeking payment for his time in this matter if the Court were to find his testimony nonexpert and he couldn't collect from Plaintiffs. *See* Report, at ¶ 7 (asking for $500 per hour). His "trusts aren't parties" theory is nonsense and indicative of fundamental flaws his thinking.

Last, Saylor unrealistically assumes that anyone who took out a private student loan from a long list of banks during the 2000s <u>must</u> owe money to <u>at least one</u> of the NCSLT trusts. But that's an overly simplistic view of the structure of the NCSLT securitizations—even according to the few underlying documents that Saylor was given. Moreover, most of the hypothetical documents that would confirm this viewpoint have gone missing, if they ever existed. In the real world, it's not realistic for a creditor to think they can tell a consumer, or their attorney, or a state court: "Well, we've narrowed the actual creditor down to a list of fifteen trusts. We can't say for sure which one should actually be paid, but any one will do." The real world doesn't work that way. In any event, this Court already has deemed irrelevant, as a matter of law, the argument that Saylor makes in this regard. *See* Dec. 17, 2024 Tr. (ECF No. 474), at 35:24–36:8.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion to exclude must be granted.

Dated: New York, New York
March 7, 2025

Respectfully submitted,

**FRANK LLP**

By: *_/s/ Gregory A. Frank___*

Gregory A. Frank (GF0531)
Marvin L. Frank (MF1436)
Asher Hawkins (AH2333)
305 Broadway, Suite 700
New York, New York 10007
Tel: (212) 682-1853
Fax: (212) 682-1892
gfrank@frankllp.com
mfrank@frankllp.com
ahawkins@frankllp.com