**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

KATHERINE SEAMAN, MARY RE SEAMAN, AND SANDRA TABAR, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,

Defendants.

No. 18-cv-01781-PGG

---------------------------------------------------------------------

CHRISTINA BIFULCO, FRANCIS BUTRY, and CORI FRAUENHOFER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,

Defendants.

No. 18-cv-07692-PGG

**TRUST DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>PLAINTIFFS' MOTION TO EXCLUDE ROGER W. SAYLOR AS EXPERT</u>**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 6

I. Legal Standard ..... 6

II. Mr. Saylor Is Qualified And His Opinions Reliable Because Of His Years Of Relevant Industry Experience. ..... 6

III. Mr. Saylor's Testimony Is Relevant And Useful To The Trier Of Fact. ..... 9

A. Mr. Saylor's Opinions Are Relevant. ..... 9

B. Mr. Saylor Does Not Offer Legal Conclusions About The True Sale Opinions. ..... 11

IV. Plaintiffs' Remaining Arguments Do Not Support Exclusion Of Mr. Saylor's Testimony. ..... 12

A. Mr. Saylor Was Not Required To Consider Additional Documents That Plaintiffs Believe Support Their Theory Of Liability. ..... 12

i. Jens Meyer's Declarations ..... 13

ii. Program Guidelines ..... 16

iii. Pool Supplements ..... 16

iv. BPA Audit and CFPB Proposed Stipulated Judgment ..... 18

B. The Opinions Offered In Mr. Saylor's Report Conform To The Scope Permitted By The Court. ..... 19

C. Mr. Saylor Does Not Rely On Ms. Wilbert's Declaration. ..... 21

CONCLUSION ..... 22

WORD COUNT CERTIFICATION ..... 23

CERTIFICATE OF SERVICE ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*,
No. 18-cv-06626 (ALC), 2023 WL 2529115 (S.D.N.Y. Mar. 15, 2023) ............. 15, 16, 18, 19

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*,
No. 1:23-CV-04942 (AT) (SDA), 2024 WL 4534791
(S.D.N.Y. Oct. 21, 2024) ............................................................................................. 7

*Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd.*,
929 F. Supp. 2d 159 (N.D.N.Y. 2013) .......................................................................... 7

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ............................................................................................. 6

*Clarke v. LR Sys.*,
219 F. Supp. 2d 323 (E.D.N.Y. 2002) ......................................................................... 13

*Cortland Racquet Club v. Oy Saunatec, Ltd.*,
No. 96 Civ. 1671 (GBD), 2003 WL 1108740 (S.D.N.Y. Mar. 12, 2003) ......................... 12, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................................. 6, 7

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
No. 11-cv-0564 (BMC) (PK), 2019 WL 1515231 (E.D.N.Y. Feb. 21, 2019) ....... 15, 16, 18, 19

*E.E.O.C. v. Bloomberg L.P.*,
No. 07-cv-8383(LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) .................................. 13

*Figueroa v. Boston Sci. Corp.*,
254 F. Supp. 2d 361 (S.D.N.Y. 2003) ........................................................................... 7

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
No. 12 Civ. 7372, 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ......................................... 11

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) ......................................................................... 12

*Guild v. Gen. Motors Corp.*,
53 F. Supp. 2d 363 (W.D.N.Y. 1999) ......................................................................... 13

*Hoffman v. Transworld Sys. Inc.*,
No. 2:18-cv-01132-TSZ, 2022 WL 4463419 (W.D. Wash. Sept. 26, 2022) ............ 8, 9, 16, 18

*King v. Brandtjen & Kluge, Inc.*,
No. 94-CV-411C(M), 2001 WL 1804345 (W.D.N.Y. June 20, 2001) .......... 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 7, 13

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) .......... 7

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*,
No. 2022 WL 15044626 (E.D.N.Y. Oct. 26, 2022) .......... 15, 16, 18, 19

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) .......... 7

*In re Platinum-Beechwood Litig.*,
469 F. Supp. 3d 105 (S.D.N.Y. 2020) .......... 12

*Reichmann v. Whirlpool Corp.*,
No. CV 16-5151 (AYS), 2021 WL 12102128 (E.D.N.Y. Mar. 9, 2021) .......... 6

*Schoolcraft v. City of New York*,
No. 10 Civ. 6005(RWS), 2015 WL 6444620 (S.D.N.Y. Oct. 23, 2015) .......... 6

*Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*,
No. 18CIV1781PGGBCM, 2023 WL 6290622 (S.D.N.Y. Sept. 27, 2023) .......... 3, 10

*Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*,
No. 18CV1781PGGBCM, 2023 WL 2975152 (S.D.N.Y. Mar. 13, 2023) .......... 9

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) .......... 11

*Zwillinger v. Garfield Slope Housing Corp.*,
No. CV 94-4009 (SMG), 1998 WL 623589 (E.D.N.Y. Aug. 17, 1998) .......... 7

*In re Zyprexa Prods.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) .......... 7

**Statutes and Rules**

Fed. R. Civ. P. 26(a)(2) .......... 3, 19

Fed. R. Evid. 702 .......... 1, 6, 7, 11

Fed. R. Evid. 803(6) .......... 21

Defendants National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3 (collectively, the "Defendant NCSLTs" or the "Trusts") respectfully submit this opposition to Plaintiffs' Motion to Exclude Roger W. Saylor as an Expert (ECF No. 480, the "Motion"). For the following reasons, Plaintiffs' Motion should be denied.

**PRELIMINARY STATEMENT**

Plaintiffs' arguments in their Motion to exclude Mr. Saylor's testimony are based on mischaracterizations of Mr. Saylor's testimony, of relevant caselaw, of extrinsic documents they argue Mr. Saylor should have reviewed, of the Court's orders, and even of Plaintiffs' own theory of liability in this case.

Plaintiffs first argue that Mr. Saylor is unqualified and his opinions are unreliable because he has no education or certifications specific to "securitization," and has not published any articles relating to the industry. But, Plaintiffs ignore that Mr. Saylor's expertise is based on his 20-year career leading private student loan securitizations for some of the largest financial institutions in the world. He knows and testified, based on this experience, that those securitizations worked in a virtually identical way to the Trusts. He also spent years working with many of the same parties involved with the Trusts' securitizations, including First Marblehead Corporation ("First Marblehead") and its affiliates, and The Pennsylvania Higher Education Assistance Agency ("PHEAA"). He testified that in the course of his work, he reviewed the documents relevant to the Trusts' securitizations. This is exactly the type of "knowledge" and "experience" that Rule of Evidence 702 requires of an expert.

Plaintiffs next argue that Mr. Saylor's opinion that "industry participants" would understand that each Trust owned the relevant student loans after securitization is not relevant. This argument is based entirely on Plaintiff's mischaracterization of their remaining theory of

liability related to loan ownership. Plaintiffs' theory is not that each Trust did not own the loans on which it attempted to collect. Instead, as the Court has now repeatedly explained, Plaintiffs' remaining theory is the "sham lawsuit" theory: that Defendants brought meritless lawsuits without the "intent" or "ability" to prove that the Trusts owned the relevant loans. Mr. Saylor's opinions are directly relevant to whether Defendants reasonably believed that the Trusts owned the loans.

In addition, Plaintiffs spend the majority of their Motion arguing that Mr. Saylor failed to consider certain documents that Plaintiffs believe support their case. Plaintiffs mischaracterize each of these documents; contrary to Plaintiffs' assertions otherwise, the documents do not undermine or contradict Mr. Saylor's opinions. In fact, in some instances, the cited materials actually *confirm* them. More fundamentally, even if Plaintiffs were correct that these documents contradict Mr. Saylor's testimony (which they do not), that bears only on the weight of Mr. Saylor's testimony, not its admissibility. Plaintiffs were free to cross-examine Mr. Saylor about these purported contradictions at his deposition, and Plaintiffs are free to cross-examine him about them at trial. He should still be permitted to offer his opinions, however.

Finally, Plaintiffs are simply wrong that Mr. Saylor's Report goes beyond the scope permitted by the Court or that Mr. Saylor's opinions should be excluded because they "rely on" purported hearsay. For these reasons, and as explained in greater detail below, Plaintiffs' Motion should be denied.

## BACKGROUND

On September 27, 2023, Judge Gardephe adopted in part Magistrate Judge Moses' Report and Recommendation dismissing certain of Plaintiffs' claims and certifying a single class comprised of:

> [A]ll persons who have been sued in New York State court debt collection lawsuits from November 1, 2012 through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-

> NCO acting as servicing agent and Forster [& Garbus] as plaintiff's counsel, and where a default judgment was obtained, but excluding any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits.

*Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18-cv-1781-PGG-BCM, 2023 WL 6290622, at *20 (S.D.N.Y. Sept. 27, 2023).

Based on the claims dismissed and the limited class certified, the Court recognized that Plaintiffs' sole remaining theory of liability concerning ownership of their loans is the "sham lawsuit" theory: "that Defendants filed lawsuits without the intent or ability to prove their claims, and for the sole purpose of procuring default judgments against or extracting settlements from Plaintiffs." *Id.*, at *18, *31 (rejecting Plaintiffs' other "claims 'based on specific false statements made in state court debt-collection proceedings [ ] because no [P]laintiff has testified that he or she ever read and detrimentally relied on any of those statements,' and 'no [P]laintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in [D]efendants' pleadings or affidavits.'").

After the Court's decision, Defendants raised—first to Plaintiffs, then to the Court—their intention to disclose an expert witness pursuant to Rule 26(a)(2). Defendants requested that the Court set a schedule for expert discovery. *See* ECF No. 464. In response, the Court held a conference on December 17, 2024 to discuss Defendants' request. At the conference, and in a subsequent order memorializing the discussion at the conference, the Court permitted Defendants to disclose a single expert to testify "regarding the student loan securitization process and the structure and related documentation of student loan securitizations," and "how the trusts believe that they own" the class members' loans. ECF No. 477, p. 4; ECF No. 471 at 36:10–11.

In accordance with the Court's order, the Trusts then disclosed and served the Expert Report of Roger W. Saylor (the "Saylor Report"). *See* ECF No. 481-1. Mr. Saylor has more than 20 years'

experience in education finance, including serving as the Managing Director of the Education Finance group within the Citigroup Global Securitized Markets business from 2001 to 2009 and serving as Managing Director of Structured Products for PNC Capital Markets from 1997 through 2001, where he was responsible for all education finance-related transactions. Saylor Report ¶ 1. During his time at Citigroup, Mr. Saylor led the group serving as Joint Book-Runner for several of the National Collegiate Student Loan Trust ("NCSLT") securitizations (but not the Defendant NCSLTs). *Id.* ¶ 2. This required him to "review and become familiar with all the relevant agreements, Prospectuses, Prospectus Supplements, and other documents related to and governing the NCSLT securitizations prior to their closings." *Id.* Mr. Saylor also "undertook at least annual on-site due diligence meetings with each of the major United States Department of Education ('DOE') eligible student loan servicers," including the servicer of all the loans in all the NCSLTs, PHEAA. *Id.* ¶ 4. Mr. Saylor also performed "detailed reviews" of PHEAA's "loan servicing operations." *Id.*

Mr. Saylor stated that his mandate was to: (a) provide an overview of the typical process by which student loan securitizations are structured, (b) opine as to whether the Defendant NCSLTs followed this standard process resulting in a standard securitization structure, and (c) if they did, opine as to the effects of this structure and its implication on the loans securitized into the Trusts, including whether industry participants would understand that the Defendant NCSLTs are the owners of the securitized student loans following closing of the securitization. *Id.* ¶ 6.

To prepare his Report, Mr. Saylor considered numerous documents, including: (i) the Loan Request/Credit Agreements for each named Plaintiff; (ii) the relevant Note or Loan Purchase Agreements; (iii) the relevant Pool Supplements; (iv) the relevant Deposit and Sale Agreements; (v) the relevant Prospectuses and Prospectus Supplements; (vi) the relevant True Sale Opinions,

and (vii) the PHEAA Servicing Agreement. *Id.* ¶ 8. Mr. Saylor also considered testimony from certain fact witnesses in *Gosse v. Transworld Sys. Inc.*, No. 3:20-cv-01446-RDM (M.D. Pa.), a case involving similar claims in which the Court recently granted summary judgment in favor of Defendants. *See* Declaration of Gregory T. Casamento in Opposition to Plaintiffs' Motion dated March 21, 2025, Ex. 1 (*Gosse v. Transworld Sys. Inc.*, No. 3:20-cv-01446-RDM (M.D. Pa. Feb. 7, 2025), ECF No. 223 (Order)).

Based on his experience and the documents he reviewed, Mr. Saylor concluded that "the securitizations for all the Defendant NCSLTs worked very similar to each other and to billions of dollars' worth of other Student Loan Asset Backed Securities ('SLABS') and other consumer Asset Backed Securities ('ABS') structured between 1995 and 2009." Saylor Report ¶ 9. *See also id.* ¶ 23. Mr. Saylor also concluded that after "the 'two-step' sale—from the originators to the Depositor and then from the Depositor to the respective Defendant NCSLT—of the student loan assets takes place, parties to the securitization would treat the respective Defendant NCSLT as the owner of the respective student loan assets." *Id.* ¶ 54. And, that if "PHEAA's system of record shows that the NCSLT owns the loan, then industry participants know that PHEAA changed the Legend to reflect the applicable NCSLT as the owner at the time of sale (or shortly thereafter), and that the Legend has remained as such since because the NCSLT has remained the owner of the loan." *Id.* ¶ 72.

Plaintiffs deposed Mr. Saylor on February 28, 2025. *See* Casamento Decl., Ex. 2 (Saylor Dep. Tr.). On March 7, 2025, they filed the present Motion seeking to exclude him from testifying in this action.

# ARGUMENT

## I. Legal Standard

A court evaluating expert admissibility focuses on whether: (1) the witness is qualified; (2) the proffered opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will assist the trier of fact. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). *See also* Fed. R. Evid. 702. "The Second Circuit has endorsed an especially broad standard for the admissibility of expert testimony." *Reichmann v. Whirlpool Corp.*, No. CV 16-5151 (AYS), 2021 WL 12102128, at *2 (E.D.N.Y. Mar. 9, 2021) (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). "[A]fter Daubert . . . rejection of expert testimony is the exception rather than the rule." *Schoolcraft v. City of New York*, No. 10 Civ. 6005(RWS), 2015 WL 6444620, at *1 (S.D.N.Y. Oct. 23, 2015) (citing omitted).

## II. Mr. Saylor Is Qualified And His Opinions Reliable Because Of His Years Of Relevant Industry Experience.

Plaintiffs argue that Mr. Saylor is not qualified because he "[h]as never taken any coursework on securitization …," "[h]as never written any articles about any kind of securitization," and "[h]as no professional certifications relevant to securitization." Motion, p. 5 (citing Saylor Dep. Tr. at 18:17–19:12). First, Plaintiffs simply assume without any basis that such coursework, publishing, and professional certifications related to "securitization" exist. Even if they did, Plaintiffs fail to recognize that Mr. Saylor's expertise is derived from the knowledge gained during his 20-year career leading private student loan securitizations for some of the largest financial institutions in the world.

An expert may be qualified by "knowledge, skill, experience, training, *or* education …." Fed. R. Evid. 702 (emphasis added). The Second Circuit "construe[s] expert qualification requirements liberally." *Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94-4009 (SMG),

1998 WL 623589, at *9 (E.D.N.Y. Aug. 17, 1998) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)). The "classic" *Daubert* factors of academic training and "publish[ing] articles in peer-reviewed journals" are "not the *sine qua non* of admissibility under Rule 702." *Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd.*, 929 F. Supp. 2d 159, 175 (N.D.N.Y. 2013). In fact, often, they are "simply unhelpful." *King v. Brandtjen & Kluge, Inc.*, No. 94-CV-411C(M), 2001 WL 1804345, at *4 (W.D.N.Y. June 20, 2001).

Instead, an expert's "considerable training and experience" can qualify him under Rule 702. *Id.*, at *6; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). *See also, e.g.*, *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, No. 1:23-CV-04942 (AT) (SDA), 2024 WL 4534791, at *5 (S.D.N.Y. Oct. 21, 2024) (because an expert had "experience of over 30 years in the insurance industry and related experience involving insurance coverage as a trial attorney, he has 'experiential qualifications in a general field closely related to the subject matter in question,'" and is therefore qualified) (quoting *In re Zyprexa Prods.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 474 (S.D.N.Y. 2010) (expert's "experience as a hedge fund administrator provides a sufficient basis for him to testify about the customs and practices of hedge fund administrators"); *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003).

Mr. Saylor's "impressive"[1] experience of more than 20 years in education finance at global financial institutions during the time when each of the loans in the Trusts were originated and each

[1] *See* Saylor Dep. Tr. at 16:9–13 (Under examination by Plaintiffs' counsel, Mr. G. Frank: "Q: And Exhibit A is your very impressive resume, is that fair? A: It's a normal resume. I'm not sure it's 'impressive.' Q: Impressive to me.").

of the Trusts securitized qualifies him as an expert to offer the opinions in his Report. Saylor Report ¶ 1; Saylor Dep. Tr. at 13:17–22. Through his work, Mr. Saylor was required to "review and become familiar with all the relevant agreements, Prospectuses, Prospectus Supplements, and other documents related to and governing" the NCSLT securitizations. Saylor Report ¶ 2. He also became familiar with First Marblehead's "standard" securitization process, including its guidelines for originating and servicing loans. Saylor Report ¶¶ 9, 14, 24–30; Saylor Dep. Tr. at 129:6–8; 132:20–133:4. In addition, Mr. Saylor worked closely with and performed annual diligence of PHEAA and other major eligible servicers. Saylor Report ¶ 4; Saylor Dep. Tr. at 46:17–50:23. Certainly, this experience makes Mr. Saylor qualified to provide reliable expert testimony about the industry-standard asset-backed securitization process for private student loans, as well as industry participants' understanding about the ownership of those loans.

In fact, the court in *Hoffman v. Transworld Sys. Inc.*, No. 2:18-cv-01132-TSZ (W.D. Wash.), said as much when considering a substantially similar report from Mr. Saylor and the same argument by Plaintiffs in that case. In *Hoffman*, Mr. Saylor submitted a report that "provide[d] an overview of the process by which the NSCLTs were structured and acquired student loans." 2022 WL 4463419, at *4 (W.D. Wash. Sept. 26, 2022). Plaintiffs moved to exclude Mr. Saylor as unqualified and unreliable because his opinions were "based primarily on knowledge from his experience in the private student loan industry …." *Id.*[2] The court rejected this argument and denied Plaintiffs' motion, saying that an "expert can testify based on his or her professional experience."

---

[2] Specifically, Plaintiffs argued—as Plaintiffs do here—that Mr. Saylor was not qualified as an expert because his opinions were "primarily based on his knowledge from his experience in the private student loan industry," and "there are no studies, research materials, or other peer reviewed articles about student loan securitizations upon which Mr. Saylor bases his opinions." Casamento Decl., Ex. 3 (*Hoffman v. Transworld Sys. Inc.*, No. 2:18-cv-01132-TSZ (W.D. Wash. July 21, 2022), ECF No. 333, p. 8).

*Hoffman*, 2022 WL 4463419, at *4. The Court held that Mr. Saylor had sufficient experience to qualify as an expert and offer reliable testimony. *Id.*, at *4–5.[3] The Court should reach the same conclusion here.

**III. Mr. Saylor's Testimony Is Relevant And Useful To The Trier Of Fact.**

**A. Mr. Saylor's Opinions Are Relevant.**

Plaintiffs also argue that Mr. Saylor's "essential opinion" is irrelevant and therefore his testimony should be excluded. Motion, p. 10. They say that Mr. Saylor's "unrelated" opinion is that "parties to the securitization would recognize that the respective Defendant NCSLT acquired the respective loans." *Id.* (citing Saylor Report ¶¶ 54–72). They argue that what "parties to the securitization did or did not think is irrelevant …." *Id.* They say that this case really concerns whether Defendants "were capable of proving to a state court that they owned the loans on which they sued." This argument is fundamentally flawed, however, because it ignores the only remaining theory of liability tied to loan ownership in this case.

Despite their characterization otherwise, Plaintiffs' "overarching" theory of liability is the "sham lawsuit" theory: that "defendants filed debt collection lawsuits 'without the intent or ability to prove the claims, if contested,' for the sole purpose of 'procuring default judgments against consumers and/or extracting settlements from them.'" *Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18-cv-1781-PGG-BCM, 2023 WL 2975152, at *6—7 (S.D.N.Y. Mar. 13, 2023), adopted in part, rejected in part, No. 18-cv-1781-PGG-BCM, 2023 WL 6290622 (S.D.N.Y. Sept. 27, 2023) (quoting ECF No. 124 (CCAC) ¶¶ 274(a)–(b), 280(a)–(b)); *see also* ECF No. 471 (Dec.

[3] The Court specifically acknowledged Mr. Saylor's experience serving "as the Managing Director of the Education Finance group within the Citigroup Global Securitized Markets business," and how that experience led him to "review and become familiar with all the relevant agreements, Prospectuses and Supplements governing the securitization prior to the closing of the securitization." *Hoffman*, 2022 WL 4463419, at *4.

17, 2024 Conf.) at 27:20–28:9 ("[Plaintiffs'] argument, one of the legs still remaining on their stool, is that if push came to shove, you couldn't prove which trust owned which loan … and you knew you couldn't do it when you filed the default motions, and, therefore, these were sham motions."). In other words, Plaintiffs' case is not about whether the Trusts actually owned Plaintiffs' loans, but whether Defendants intentionally sued on loans they knew the Trusts did not own.[4] Mr. Saylor's testimony is undoubtedly relevant to this question.

Mr. Saylor opines that after the "two-step sale" effectuated by the relevant agreements, "parties to the securitization would treat the respective Defendant NCSLT as the owner of the respective student loan assets." Saylor Report ¶ 54. This would include the investment banks serving as Placement Agents and Book-Runners (*id.* ¶¶ 58–59), investors in the Trusts (Saylor Dep. Tr. at 127:22–128:4, 159:4–13), the rating agencies rating the tranches of certificates sold to investors (*id.* at 184:3–7), servicers, including PHEAA (Saylor Report ¶¶ 61, 64–72), and last, but not least, the Defendant NCSLTs.

Mr. Saylor also opines that, based on this understanding, PHEAA—the servicer of the loans in each Trust—would update its records upon closing of the "two-step sale" to reflect that the relevant Defendant NCSLT was now the owner of each of the relevant loans. Saylor Report ¶¶ 54, 67, 71–73. Certainly, these opinions "will help the trier of fact to understand" whether Defendants believed—or, at the very least, would have been justified in believing—that the Trusts owned the loans on which they attempted to collect. Fed. R. Evid. 702. *See also Fin. Guar. Ins. Co. v. Putnam*

[4] This distinction forms the basis for the Court rejecting Defendants' argument that *Rooker-Feldman* precludes them from bringing claims based on the "sham lawsuit" theory. *Seaman*, 2023 WL 6290622, at *15 ("Plaintiffs here do not invite this Court to review or reject the state court default judgments against them," and "they bring 'claims sounding under the FDCPA ... and state law [that] speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that [D]efendants pursued in obtaining such judgments.'") (citation omitted).

*Advisory Co., LLC*, No. 12 Civ. 7372, 2020 WL 4251229, at *4 (S.D.N.Y. Feb. 19, 2020) (denying the motion to exclude expert because testimony "will likely prove helpful in allowing the trier of fact to understand the evidence better and providing the trier of fact with the necessary tools to make an ultimate determination" on the matter); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.").

**B. Mr. Saylor Does Not Offer Legal Conclusions About The True Sale Opinions.**

Plaintiffs also argue that Mr. Saylor's Report should be excluded because he "premises it on legal conclusions" about the effect of the True Sale Opinions. Plaintiffs misinterpret Mr. Saylor's proffered opinions. Mr. Saylor is not offering his opinion on the legal implications of the True Sale Opinions, or even stating whether the True Sale Opinions are correct that the loans were sold. Instead, he is explaining what he understood the True Sale Opinions to mean to the parties to a securitization and how he relied on them as a "very experienced securitization banker." Saylor Dep. Tr. at 159:23–160:8 ("I'm not a lawyer …. All I can do is represent to you as a very experienced securitization banker, for a very long time, this is accepted in the market from a highly reputable law firm in its totality as a True Sale Opinion that tells investors, the trust owns these assets, you are entitled to the cash flows from these assets and they are bankruptcy remote.").

Mr. Saylor states in his Report:

> The True Sale Opinions state that, ***in counsel's opinion***, the student loans were legally sold from the originators to the Depositor and then ultimately from the Depositor to the purchasing NCSLT …. ***In my experience*** as a Joint Book-Runner for billions of dollars' worth of SLABS, ***I relied on True Sale Opinions***, like the ones I reviewed here, for assurance that the loans were owned by the purchasing Trust.

Saylor Report ¶¶ 34–38 (emphasis added). Mr. Saylor is simply explaining how industry participants like himself would have understood and treated the True Sale Opinions. This is

permissible and helpful expert testimony. *See, e.g.*, *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 117 (S.D.N.Y. 2020) ("These statements are not … legal conclusions. Instead, they seek to contextualize the evidence so that the jury may understand the standards under which Platinum Management and its managers were operating with respect to management of PPVA's assets, as well as standard industry practices by investment managers to meet such standards.") (internal citations and quotations omitted). *See also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 537 (E.D.N.Y. 2012) ("Testimony as to the content of banking industry standards and practices—and the Bank's compliance with such standards and practices—will be valuable to a jury likely to be unfamiliar with such topics.").[5]

## IV. Plaintiffs' Remaining Arguments Do Not Support Exclusion Of Mr. Saylor's Testimony.

### A. Mr. Saylor Was Not Required To Consider Additional Documents That Plaintiffs Believe Support Their Theory Of Liability.

The majority of Plaintiffs' Motion argues that Mr. Saylor "failed to consider" certain documents that Plaintiffs believe undermine or contradict Mr. Saylor's opinions. Motion, pp. 6–9, 12–18. As a preliminary matter, the portions of these documents that Plaintiffs highlight do not directly bear on Mr. Saylor's opinions; rather, Plaintiffs have cherry-picked and mischaracterized

[5] Plaintiffs also argue that Mr. Saylor failed to consider the "disclaimers" in the True Sale Opinions and therefore his opinion about their meaning is incorrect. However, this argument is only applicable if Mr. Saylor were offering a legal interpretation as to the meaning of the True Sale Opinions, which he is not. Again, he is only explaining how he and others in the industry would have understood and relied upon the True Sale Opinions. To the extent Plaintiffs believe Mr. Saylor and other industry experts misinterpreted the True Sale Opinions, they are free to make that legal argument at summary judgment and/or trial. *See, e.g.*, *Cortland Racquet Club v. Oy Saunatec, Ltd.*, No. 96 Civ. 1671 (GBD), 2003 WL 1108740, at *4 (S.D.N.Y. Mar. 12, 2003) ("[I]t is not for this Court to preclude expert testimony simply because there is additional contradictory testimony that will be available to the jury.").

portions of often-irrelevant materials and argue that, had Mr. Saylor considered them, it would have changed his opinions. Plaintiffs are incorrect.

Even if Plaintiffs were right (they are not) that Mr. Saylor failed to consider facts he should have, such a failure does not support excluding Mr. Saylor's testimony. "Disputes about … faults in an expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion 'go to the weight, not the admissibility of his testimony.'" *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 333 (E.D.N.Y. 2002). "If an expert's testimony lies within 'the range where experts might reasonably differ,' the jury, and not the trial court, should 'decide among the conflicting views ….'" *E.E.O.C. v. Bloomberg L.P.*, No. 07-cv-8383(LAP), 2010 WL 3466370, at *6 (S.D.N.Y. Aug. 31, 2010) (quoting *Kumho Tire Co.*, 526 U.S. at 156). *See also Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369 (W.D.N.Y. 1999) ("[T]he mere fact that a difference of opinion exists does not make [an] expert[']s conclusions inherently unreliable. Such differences of opinion and alleged weaknesses in the expert[']s methodologies will go to the weight to be given the expert testimony, not its admissibility."). Moreover, none of the documents that Plaintiffs assert Mr. Saylor *should* have considered would have done anything to call into question or change his opinions.

**i. Jens Meyer's Declarations**

Plaintiffs argue that Mr. Saylor failed to consider that Jens Meyer's declaration "<u>in this action</u> contradicts the *Gosse*-Meyer Declaration, upon which Saylor relied …"[6] Motion p. 8 (emphasis in original). The supposed contradiction Plaintiffs believe they have uncovered is, in reality, nothing more than imprecision by Mr. Meyer. In his declaration in this case, Mr. Meyer

[6] Plaintiffs make this argument in an exaggerated fashion that has unfortunately become their *modus operandi*. Their assertion that the Defendant NCSLTs should be sanctioned or "investigated" because their expert witness considered one declaration over another is ridiculous.

states that the "data for the loans owned by each of the Trusts" has remained unchanged since it was entered into Cognition's (f/k/a First Marblehead) database. Motion p. 8 (quoting ECF No. 338-6). In the *Gosse*-Meyer Declaration, Mr. Meyer states—virtually identically—that the data "for each loan owned by each of the Trust[s]," has "remained unchanged from the date the data was entered into the database." ECF No. 481-3 ¶ 5. Mr. Meyer then states—which Plaintiffs latch onto, ignoring the previous statement—that the data has "remained unchanged from the completion of the securitization reconciliation process." *Id.* ¶ 6. These statements are consistent and consistent with Mr. Saylor's testimony; Mr. Meyer is explaining that, while the individual data for *each loan* remains unchanged after it is first entered, the overall data "sets" comprised of individual loans may change until they are finalized during the reconciliation process, and then remain unchanged after reconciliation. *See* Saylor Report ¶ 49 (the Prospectus Supplement allows for 30 days "to permit the anticipated reconciliation of the *pool* of loans into the Trust.") (emphasis added).

It should also be noted that, in his deposition testimony, Mr. Meyer repeatedly confirms one of Mr. Saylor's ultimate conclusions: that PHEAA's system would be the ultimate source for industry participants to determine ownership of the loans. *See* Casamento Decl., Ex. 4 (*Gosse v. Transworld Sys. Inc.*, No. 3:20-cv-01446-RDM (M.D. Pa. Apr. 14, 2023), ECF No. 176-3, at 38:8–14 ("Q: Would anything else be consulted to determine the ownership issue? A: We would be able to go into the loan servicing system and look up an individual loan, to see what ownership is being assigned to the loan, in the system of record."), 40:12–21 ("And you could have one step further and you could go to a system of records and ask for data extract from the system of records at the loan level to create a loan roster of loans that were sold into the Trust. Q: And when you say system

of records, what does that mean? A: That would be the loan servicing system.”)). *Compare with* Saylor Report ¶¶ 71–72.

Finally, to the extent Plaintiffs believe a “contradiction” relevant to Mr. Saylor’s opinions still exists (which it does not), again, it bears only on the weight of Mr. Saylor’s testimony, not the admissibility. *See, e.g.*, *Cortland Racquet Club v. Oy Saunatec, Ltd.*, No. 96 Civ. 1671 (GBD), 2003 WL 1108740, at *4 (S.D.N.Y. Mar. 12, 2003) (“[I]t is not for this Court to preclude expert testimony simply because there is additional contradictory testimony that will be available to the jury.”). Plaintiffs are free to cross-examine Mr. Saylor—or Mr. Meyer—at trial about this supposed contradiction. *See, e.g.*, *Actava TV, Inc. v. Joint Stock Co. “Channel One Russia Worldwide”*, No. 18-cv-06626 (ALC), 2023 WL 2529115, at *6 (S.D.N.Y. Mar. 15, 2023) (concerns about the expert’s methodology in forming an opinion “goes to the weight of the expert’s testimony, not to its admissibility” and “can be addressed during cross-examination.”); *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, No. 2022 WL 15044626, at *45 n.15 (E.D.N.Y. Oct. 26, 2022) (the fact that the expert did not address “contradictory evidence in his report is a possible ground for cross-examination” not a ground for exclusion); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-cv-0564 (BMC) (PK), 2019 WL 1515231, at *10 (E.D.N.Y. Feb. 21, 2019) (consideration of alternative “variables” and “factors” is “properly addressed by thorough cross-examination and the presentation of contradictory evidence, not exclusion.”).[7]

[7] Plaintiffs’ counsel did not show Mr. Saylor *any* of these documents or ask him any questions about these supposed contradictions at his deposition. It appears Plaintiffs were more interested in trying to manufacture supposed defects in Mr. Saylor’s testimony to try to exclude him, than eliciting his testimony and clarifying the opinions with which they now take issue.

### ii. Program Guidelines

Plaintiffs argue that Mr. Saylor failed to consider the TERI Program Guidelines for three of the loan programs under which Plaintiffs' loans were originated. Motion, pp. 12–13. But, Plaintiffs fail to explain how this supposed failure calls into question Mr. Saylor's opinions. According to Mr. Saylor, the Program Guidelines set forth "criteria for the borrowers and loans … that would ultimately be securitized into an NCSLT …." Saylor Report ¶ 26. The Program Guidelines do not effectuate the sale of the loans from the originating banks to First Marblehead; the operative Note or Loan Purchase Agreements and Pool Supplements—each of which Mr. Saylor reviewed—do that. Saylor Report ¶¶ 28, 30. Plaintiffs do not and cannot assert—because it is not true—that differences in the Program Guidelines would impact the sale of a loan originated in accordance with the Program Guidelines.

Moreover, Mr. Saylor testified that based on his experience, he knows that "the securitizations for all the Defendant NCSLTs worked very similarly to each other," and that the "agreements and related documents governing each Defendant NCSLT are consistent …." Saylor Report ¶ 9. *See also* Saylor Dep. Tr. at 103:19–22 ("Q: And you stated that the document packs from deal to deal are, you used the phrase, 'nearly identical'? A: Yes."). As the court in *Hoffman* concluded when faced with the same argument regarding certain transaction documents, "[t]o the extent Plaintiffs contend that the [Program Guidelines] are not virtually identical, they can address this criticism in cross-examination." 2022 WL 4463419, at *4. *See also Actava TV, Inc.*, 2023 WL 2529115, at *6; *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, 2022 WL 15044626, at *45 n.15; *DPWN Holdings (USA), Inc.*, 2019 WL 1515231, at *10.

### iii. Pool Supplements

Plaintiffs next argue that Mr. Saylor failed to consider "a series of inconsistencies and documentary absences pertaining to the Pool Supplements." Motion, p. 14. First, Plaintiffs claim

that Mr. Saylor testified that there would not be "Schedules" attached to the Pool Supplements, when the Pool Supplements reference that Schedules are attached or on-file. *Id*. This argument is based on a mischaracterization of Mr. Saylor's testimony.

Mr. Saylor did not consider and does not discuss the loan "Schedules" in his Report. At his deposition, Mr. Saylor was asked: "So, none of the documents at the time of sale actually identify the specific loans that are being sold?" Saylor Dep. Tr. at 191:22–24. He responded that "there's a roster of loans. So, Bifulco - - Bifulco's loans would have been in that roster that was provided by the servicer to the administrator related to whatever trust …." *Id*. at 192:2–7. Mr. Saylor was later asked if, when he worked at Citi, did he "identify the loans being sold … on a schedule attached to the loan sale agreement." *Id*. at 193:16–19. He answered: "No … [T]he record of the loans is at the servicer. You don't take - - you don't take 50,000 loans and run a - - a schedule and attach them to the document." *Id*. at 193:24–194:4.

Contrary to Plaintiffs' mischaracterization, Mr. Saylor did not testify that it would be "impossible" to attach a schedule to the Pool Supplement. Instead, he testifies that he would not have used such a schedule when he was at Citi. He then offers additional explanation in response to Plaintiffs' insistence that there must be a physical, "static" schedule on the closing date that is the be-all and end-all way to identify loans in a particular Trust. Mr. Saylor explains that using such a physical, static schedule would have been impractical and unnecessary. As Mr. Saylor stated in his Report and at his deposition, PHEAA's system of record would reflect the most up-to-date data about each loan, including the owner of the loan. Saylor Report ¶ 72; Saylor Dep. Tr. 194:5–12. Therefore, regardless of whether he used a schedule attached to one of the Pool Supplements (and regardless of whether such a schedule even existed), he and other industry participants knew that they could rely on PHEAA's data to determine ownership. *Id*.

Plaintiffs also argue that Saylor "fails to consider contradictions between the Pool Supplement documents that Defendants have produced in this case, and the ones that were actually filed with the SEC." Motion, p. 15. Again, Plaintiffs fail to explain how the minor difference they purportedly identified would impact Mr. Saylor's opinions. And, again, "[t]o the extent Plaintiffs contend that the [Pool Supplements] are not virtually identical, they can address this criticism in cross-examination." *Hoffman*, 2022 WL 4463419, at *4. *See also Actava TV, Inc.*, 2023 WL 2529115, at *6; *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, 2022 WL 15044626, at *45 n.15; *DPWN Holdings (USA), Inc.*, 2019 WL 1515231, at *10.

**iv. BPA Audit and CFPB Proposed Stipulated Judgment**

Finally, Plaintiffs fault Mr. Saylor for not considering an audit conducted by Boston Portfolio Advisors, Inc. ("BPA") of PHEAA in 2015 (the "BPA Audit") that purportedly "would have undermined his assumption to blindly rely on PHEAA," as well as a proposed Stipulated Final Judgment and Order between the Consumer Financial Protection Bureau ("CFPB") and the 15 NCSLTs ("Stipulated Proposed CFPB Judgment"). Motion, pp. 14–15.

With respect to BPA's Audit, Mr. Saylor does not "blindly rely" on PHEAA; in fact, he does not rely on PHEAA at all. None of Mr. Saylor's opinions are based on data provided by PHEAA. Rather, they are based on his observations about PHEAA during his "impressive" 20-year career. As for the BPA Audit itself, the Audit's main "finding" that "100% of the accounts did not contain an Assignment" was based on several unsupported assumptions, including an incorrect assumption that individual assignments were even required (they were not). ECF No. 481-20, p. 18.[8]

[8] Mr. Saylor had testified at his deposition that he had one prior experience with BPA on another student loan-related matter and expressed doubts about the reliability of its work. Saylor Dep. Tr.

Moreover, the excerpts Plaintiffs include in their Motion are actually consistent with Mr. Saylor's observations in his Report. For instance, the BPA Audit observes that "PHEAA would change the owner on its system upon notification from [First Marblehead]" of the sale of loans to an NCSLT. *Id*. Mr. Saylor made the very same observation. Saylor Report ¶ 45 ("PHEAA simply took a list of loans sold to the purchasing Trust and updated its systems by amending the Legend to reflect the new owner ….").[9]

Regarding the Stipulated Proposed CFPB Judgment, Plaintiffs here too fail to explain how Mr. Saylor considering the Judgment would have impacted his opinions. Moreover, and yet again, to the extent the Stipulated Proposed CFPB Judgment is relevant, it bears only on the weight of Mr. Saylor's opinions, not their admissibility. *See Actava TV, Inc.*, 2023 WL 2529115, at *6; *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, 2022 WL 15044626, at *45 n.15; *DPWN Holdings (USA), Inc.*, 2019 WL 1515231, at *10.

**B. The Opinions Offered In Mr. Saylor's Report Conform To The Scope Permitted By The Court.**

Plaintiffs also argue that Mr. Saylor's opinions go beyond the scope described in the Court's January 6, 2025 Order, which permitted Defendants to "serve **one** expert report pursuant to Fed. R. Civ. P. 26(a)(2)(A) and (B), regarding the student loan securitization process and the structure and related documentation of student loan securitizations." ECF No. 477, p. 4 (emphasis in

---

218:9–13 ("[BPA's] data analysis on what I looked at in ITT I thought was simplistic and didn't turn out to be near correct. So - - so, I don't have a great opinion of their analysis in student loans.").

[9] Additionally, it is curious that Plaintiffs have highlighted the BPA Audit's observation that without loan assignments, "collection efforts are more challenging and costly to defend in Court." Motion, p. 16. Mr. Saylor never discusses loan assignments in his report; he instead discusses other methods that parties may use to determine and prove ownership of loans. In fact, BPA's conclusion that lack of loan assignments may make proving ownership more "challenging"—but not impossible—seems to support Defendants' position in this case that there is no single piece of evidence—like assignments (or loan Schedules)—that is strictly necessary to prove ownership.

original). Yet again, Plaintiffs base their argument on misrepresentations. The January 6, 2025 Order modified the Court's December 17, 2024 Order, which sought to memorialize the Court's decision at the December 17, 2024 conference. *See* ECF No. 470 (Dec. 17, 2024 Order), p. 1 ("For the reasons discussed during today's conference, it is hereby ORDERED as follows ….").

At the conference, it was clear that Defendants intended to offer, and the Court intended to allow, opinions by Mr. Saylor beyond just generalized opinions about securitization process and structure:

> MR. DeROSE: We're looking to get in an expert to discuss how securitizations work, what they are, how they operate. One of the incorrect ideas about a securitization, and it was expressed already today by opposing counsel, is that the schedules are the only indicia of ownership that a trust has or owns the loans that it holds …. All the documentation that sets forth how the structures work are before the Court; they've been disclosed in discovery, and now it's time for, I mean the documents can't get up and testify for themselves ….
>
> THE COURT: ***Well, so you need an expert to connect the dots***.
>
> MR. DeROSE: Yes.
>
> THE COURT: You think that there is such an expert out there who can, in effect, say, look, jury, or, look, court, on summary judgment, it's true that these schedules weren't attached to these other documents, ***but if you wanted to know which trust owns Mrs. Jones's loan, here's how you would do it***.
>
> …
>
> THE COURT: [Plaintiffs'] argument, one of the legs still remaining on their stool, is that if push came to shove, you couldn't prove which trust owned which loan, and, therefore, and you knew you couldn't do it when you filed the default motions, and, therefore, these were sham motions.
>
> MR. DeROSE: Your Honor, each trust is an individual entity, right, the corpus of loans that they hold is individualized to each one. And, yeah, I mean it will demonstrate which loans are, ***and how the trusts believe that they own those loans*** ….

ECF No. 471 at 34:13–35:14 (emphasis added). The Court then stated: "I am going to exercise my discretion in the interest of ensuring that the record is full and complete to permit the defendants to serve one, count them, one, merits oriented expert report ***going to the issue just described by defendants' counsel***." *Id*. at 49:19–23 (emphasis added).

Plaintiffs' counsel's and the Court's real concern at the conference was Defendants introducing a "percipient" witness, disguised as an expert witness, who would testify regarding the Schedules. *Id*. at 17–18, 36-45. Mr. Saylor does not offer any opinions about the Schedules in his Report. To the extent he offered any testimony at his deposition about the Schedules, it was only in response to questions by Plaintiffs' counsel. Accordingly, Mr. Saylor's Report is within the bounds set by the Court and no portion of it should be excluded.

**C. Mr. Saylor Does Not Rely On Ms. Wilbert's Declaration.**

Finally, Plaintiffs argue that Mr. Saylor "relies on" the *Gosse*-Wilbert Declaration and that his testimony is therefore inadmissible hearsay. Motion, pp. 18–20. Here too, Plaintiffs overstate. Mr. Saylor does not "rely" on Ms. Wilbert's testimony (which is itself not hearsay because it falls under Rule 803(6)'s exception for business records); rather, he states numerous times that Ms. Wilbert's testimony simply confirms his independent recollection based on his extensive experience. *See, e.g.*, Saylor Report ¶ 39 ("I have reviewed the *Gosse* Wilbert Declaration and the statements by Ms. Wilbert, PHEAA's Director Client Relations since 2002, confirms my recollection of this."); ¶ 43 ("Ms. Wilbert's declaration that I reviewed confirms this."); ¶ 66 ("Ms. Wilbert's declaration that I reviewed reflects this."). Accordingly, his testimony is admissible.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Exclude Roger W. Saylor as an Expert should be denied in its entirety.

Dated: New York, New York
March 21, 2025

TROUTMAN PEPPER LOCKE LLP

*/s/ Gregory T. Casamento*
Gregory T. Casamento
R. James DeRose, III
Brookfield Place, 20th Floor
200 Vesey Street
New York, New York 10281
(212) 415-8600
greg.casamento@troutman.com
rj.derose@troutman.com

J. Matthew Goodin
111 South Wacker Drive, Suite 4100
Chicago, Illinois 60606
(312) 443-0700
matt.goodin@troutman.com

*Attorneys for Defendants National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3*

## WORD COUNT CERTIFICATION

I hereby certify pursuant to Local Rule 7.1(c) that the total number of words in the foregoing *Memorandum of Law in Opposition to Plaintiffs' Motion to Exclude Roger W. Saylor as Expert*, exclusive of the caption, table of contents, table of authorities, and signature is 6,989, and is in compliance with the word count limit.

Dated: New York, New York
March 21, 2025

*/s/ Gregory T. Casamento*
Gregory T. Casamento

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of March 2025, I caused a true and correct copy of the foregoing *Memorandum of Law in Opposition to Plaintiffs' Motion to Exclude Roger W. Saylor as Expert* to be served via CM/ECF upon all parties entitled to notice.

*/s/ Gregory T. Casamento*
Gregory T. Casamento