**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KATHERINE SEAMAN, MARY RE SEAMAN, SANDRA TABAR, CHRISTINA BIFULCO, FRANCIS BUTRY, and CORI FRAUENHOFER individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,

Defendants.

Case No.: 18-cv-1781-PGG-BCM

**JOINT MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

ARGUMENT ..... 2

I. Legal Standard For Summary Judgment ..... 2

II. Plaintiffs' Claims ..... 3

III. The Defendants Did Not Bring "Sham Lawsuits." ..... 4

1. The Sham Lawsuit Test. ..... 5

2. There Is No Evidence That The Lawsuits Were Objectively Baseless. ..... 8

a. Plaintiffs' Loan Ownership Theory Does Not Support Their "Sham Litigation" Claims ..... 8

i. The Evidence Shows The Trusts Own The Loans. ..... 9

a. Plaintiffs' Loans Were Originated To Be Securitized. ..... 9

b. Plaintiffs Loans Were Sold To The Trusts ..... 10

c. Records Show Which Trust Owns Which Loan. ..... 13

d. Defendants Had [And Have] The Necessary Records. ..... 16

ii. Plaintiffs Have No Evidence To Support Their Assertions That The Trusts Do Not Own Their Loans. ..... 17

iii. A Reasonable Litigant Would Believe They Owned The Loans. ..... 19

b. Plaintiffs' Registration Claims Do Not Amount To "Sham Litigation" Because The Trusts Are Not Required To Be Registered In New York ..... 21

3. Plaintiffs Cannot Demonstrate That The Trusts Intended To Cause Harm With Any Lawsuit. ..... 24

IV. Defendants Are Entitled To Summary Judgment For Additional Reasons. ..... 25

A. Plaintiffs Cannot Prove All Elements Of Their GBL § 349 Claim. ..... 25

B. Plaintiffs Cannot Prove Their FDCPA Claim. ..... 25

C. The Plaintiffs Cannot Prove Their Judiciary Claim. ..... 27

CONCLUSION ..... 29

WORD COUNT CERTIFICATION ..... 30

CERTIFICATE OF SERVICE ..... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Actava TV Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*,
No. 18-cv-06626, 2024 WL 1156614 (S.D.N.Y. Mar. 18, 2024)....2

*Airline Exch., Inc. v. Bag*,
266 A.D.2d 414 (2d Dep't 1999)....21

*Anderson v. Liberty Lobby, Inc.*,
447 U.S. 242 (1986)....2, 3

*Arias v. Gutman, Mintz, Baker, & Sonnenfeldt, LLP*,
875 F.3d 128 (2d Cir. 2017)....25

*Azuma N.V. v. Sinks*,
646 F.Supp. 122 (S.D.N.Y. 1986)....22

*Baram v. Doe*,
No. 23-CV-1758 (ER), 2024 WL 232319 (S.D.N.Y. Jan. 22, 2024),
*appeal dismissed*, No. 24-599 (2d Cir. June 12, 2024)....28

*BE&K Constr. Co. v. N.L.R.B.*,
536 U.S. 516 (2002)....4

*Bill Birds, Inc. v. Stein Law Firm, P.C.*,
35 N.Y.3d 173 (2020)....26, 27

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988)....3

*Burke v. Jacoby*,
981 F.2d 1372 (2d Cir. 1992)....8

*Carvalho v. Mel S. Harris & Assocs., L.L.C.*,
No. 04-CV-0425(JBW), 2004 WL 1555193 (E.D.N.Y. July 13, 2004)....21, 22, 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....3, 4

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013)....3

*In re Elysium Health-Chromadex Litig.*,
354 F. Supp. 3d 330 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019).... *passim*

*Fed. Trade Comm'n v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020)..........6

*Fieland v. Chase Manhattan Mortg. & Realty Tr.*,
67 A.D.2d 888 (1st Dep't 1979)..........23

*Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*,
No. 01-17-00253-CV, 2018 WL 1095760 (Tex. App. Mar. 1, 2018)..........7

*Gosse v. Transworld Sys. Inc.*,
No. 3:20-CV-1446, 2023 WL 7926828 (M.D. Pa. Sept. 29, 2023)..........7

*Gov't Emps. Ins. Co. v. Hazel*, No. 11-CV-00410 CBA VMS,
2014 WL 4628655, at *17 (E.D.N.Y. Aug. 11, 2014),
*report and recommendation adopted*, No. 11-CV-0410 CBA VMS,
2014 WL 4628661 (E.D.N.Y. Sept. 15, 2014)..........6

*Gwiazda v. LVNV Funding, LLC*,
No. 22-3295, 2023 WL 8595402 (3d Cir. Dec. 12, 2023)..........8, 25

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015)..........4

*Hirschfeld v. Spanakos*,
104 F.3d 16 (2d Cir. 1997)..........4

*Hongtai Trading Inc. v. Yan*,
No. 12–CV–3683 (DLI)(VMS), 2014 WL 1277172 (E.D.N.Y. Mar. 27, 2014)..........21

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
791 F.2d 288 (4th Cir. 1986)..........4

*Int'l Fuel & Iron Corp. v. Donner Steel Co.*,
242 N.Y. 224 (1926)..........21

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
863 F.3d 1178 (9th Cir. 2017)..........5

*Interline Furniture, Inc. v. Hodor Indus., Corp.*,
140 A.D.2d 307 (2d Dep't 1988)..........21

*Koch v. Acker, Merrall & Condit Co.*,
18 N.Y.3d 940 (2012)..........24

*La. Health Serv. & Indem. Corp. v. Celgene Corp.*,
No. 23-cv-7871 (ER), 2025 WL 1056668 (S.D.N.Y. Apr. 8, 2025)..........4, 5

*Matsushita Elecs. Corp. v. Loral Corp.*,
974 F. Supp. 345 (S.D.N.Y. 1997) ....................................................................4, 5, 6

*Mock v. Nat'l Collegiate Student Loan Tr.2007-4*,
No. 01-17-00216-CV, 2018 WL 3352913 (Tex. App. July 10, 2018) ....................................7

*Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*,
701 F. Supp. 2d 568 (S.D.N.Y. 2010)..........................................................................4

*Movers & Warehousemen's Ass'n of Greater N.Y. v. Long Island Moving & Storage Ass'n*,
No. 98 Civ. 5373(SJ), 1999 WL 1243054 (E.D.N.Y. Dec. 16, 1999).....................................6

*Nat'l Collegiate Student Loan Tr. 2005-3 v. Dunlap*,
115 N.E.3d 689, 700 (Ohio Ct. App. 2018)....................................................................7

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*,
19 N.W.3d 287(Table) (Wis. Ct. App. June 2, 2022).......................................................17

*Nat'l Collegiate Student Loan Tr. 2007-3 v. Burnett*,
No. 6035/2014 (N.Y. Sup. Ct. Nassau Cnty. 2016)...........................................................6

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*,
No. 21-cv-192 (Wis. Cir. Ct. Dane Cnty. June 14, 2024),
*aff'd*, 2025 WI App. 15 (Jan. 30, 2025) .........................................................................8

*New York by James v. Red Rose Rescue*,
No. 23-CV-4832 (KMK), 2025 WL 887722 (S.D.N.Y. Mar. 20, 2025)...........................2, 3, 8

*Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*,
885 F. Supp. 522 (S.D.N.Y. 1995) .............................................................................25

*NTL Collegiate Student Loan Tr.-1 v. Payne*,
No. 18AP-973, 2020 WL 3545732 (Ohio Ct. App. June 30, 2020) ........................................7

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015).......................................................................................24

*Page v. Forster & Garbus, LLP*,
No. 18CV3611SJFARL, 2019 WL 5696108 (E.D.N.Y. June 17, 2019).....................21, 22, 23

*Pick v. Kay*,
No. 20-55804, 2022 WL 193197 (9th Cir. Jan. 21, 2022)..............................................5, 23

*PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*,
21 F. Supp. 2d 350 (S.D.N.Y. 1998), *rev'd*, 219 F.3d 92 (2d Cir. 2000) .................................5

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)............................................................................................ *passim*

*Ray v. Balestriere Fariello*,
No. 23-274-cv, 2024 WL 390293 (2d Cir. Feb. 2, 2024) ....................26, 27

*Ray v. Watnick*,
182 F. Supp. 3d 23 (S.D.N.Y. Apr. 26, 2016) ....................26

*Remler v. Cona Elder L., PLLC*,
No. 21CV5176ARRLB, 2022 WL 4586243 (E.D.N.Y. Sept. 29, 2022)....................28

*Savoy v. Nat'l Collegiate Student Loan Tr. 2005-3*, 557 S.W.3d 825 (Tex. App. 2018) ....................7

*Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*,
No. 18-cv-1781-PGG-BCM, 2023 WL 2975152 (S.D.N.Y. Mar. 13, 2023),
*adopted in part, rejected in part*, No. 18-cv-1781-PGG-BCM,
2023 WL 6290622 (S.D.N.Y. Sept. 27, 2023)....................1, 3, 6

*Shetiwy v. Midland Credit Mgmt.*,
980 F. Supp. 2d 461 (S.D.N.Y. 2013)....................5, 6, 24

*Smith v. Barnesandnoble.com, LLC*,
839 F.3d 163 (2d Cir. 2016)....................2

*Smith v. Nat'l Collegiate Student Loan Tr.*,
153 N.E.3d 222 (Ind. Ct. App. 2020)....................7

*Snarr v. Transworld Sys., Inc.*,
No. 2:21-CV-3, 2022 WL 2475688 (D. Utah July 6, 2022) ....................7

*Sykes v. Mel Harris & Assocs., LLC*,
757 F. Supp. 2d 413 (S.D.N.Y. 2010)....................25

*T.F.T.F. Cap. Corp.*,
312 F.3d 90 (2d Cir. 2002)....................5, 9

*Taylor v. Nat'l Collegiate Student Loan Tr. 2007-1*, No. 2:19-CV-00120-BSJ, 2021 WL 673458 (D. Utah Feb. 22, 2021),
*aff'd*, No. 21-4049, 2023 WL 2147332 (10th Cir. Feb. 22, 2023)....................7, 23

*Tchrs. Ins. & Annnuity Ass'n of Am. v. Simons*,
No. 21-CV-03712-ALC, 2023 WL 6386955 (S.D.N.Y. Sept. 29, 2023) ....................2

*Town of Islip v. Datre*,
No. 16-CV-2156(MKB), 2022 WL 445680 (E.D.N.Y. Feb. 14, 2022)....................9

*Urias v. Daniel P. Buttafuoco & Assocs., PLLC*,
41 N.Y.3d 560 (2024) ....................26

*WAKA LLC v. DC Kickball*,
517 F. Supp. 2d 245 (D.D.C. 2007) ........................................................................5

**Statutes and Rules**

Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ............................................ *passim*

N.Y. Gen. Ass'ns L. § 18 ..........................................................................20, 21, 22, 23

N.Y. Gen. Bus. L. § 349 ..........................................................................................1, 24

N.Y. Jud. L. § 487 ..............................................................................................1, 26, 27, 28

Fed. R. Civ. P. 12 ...................................................................................................7

Fed. R. Civ. P. 56 ...................................................................................................3

Utah Code Ann. § 16-10a-1501 (2024) ...........................................................................23

Defendants National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3 (collectively, "Defendant Trusts" or "Trusts"), Transworld Systems, Inc. ("TSI"), EGS Financial Care, Inc. f/k/a NCO Financial Systems, Inc. ("NCO"),[1] and Forster & Garbus, LLP ("F&G") (collectively "Defendants"), respectfully submit this joint memorandum in support of their motion for summary judgment. For the following reasons, Defendants' Motion should be granted.

## INTRODUCTION

This case is about state court lawsuits.

Specifically, it is about Plaintiffs' assertion that "defendants filed debt collection lawsuits 'without the intent or ability to prove the claims, if contested,' for the sole purpose of 'procuring default judgments against consumers and/or extracting settlements from them.'" *Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18-cv-1781-PGG-BCM, 2023 WL 2975152, at *6–7 (S.D.N.Y. Mar. 13, 2023), *adopted in part, rejected in part*, No. 18-cv-1781-PGG-BCM, 2023 WL 6290622, at *31 (S.D.N.Y. Sept. 27, 2023). These so-called "sham lawsuits" are claimed to be the misleading conduct that underpins each of Plaintiffs' claims against the Defendants: a New York General Business Law ("GBL") § 349 claim against all Defendants; a Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, claim against TSI, NCO and F&G; and a New York Judiciary Law § 487 claim against F&G. *See Seaman*, 2023 WL 6290622, at *31.

But, Plaintiffs carry a heavy burden to prove that a lawsuit was a "sham lawsuit," such that the Defendants who brought them would not be protected by the First Amendment and immune from liability for exercising their right to petition. Plaintiffs need to show that the "sham lawsuits"

[1] TSI became the successor and assign of NCO with respect default servicing in 2014.

were objectively baseless and intended to cause harm solely through the use of governmental process. There is nothing in the record that will allow Plaintiffs to make this showing.

Because Plaintiffs cannot prove the essential element of their claims, that Defendants brought "sham litigation," summary judgment should be granted to Defendants on all claims.

## FACTUAL BACKGROUND

The relevant facts are set forth in the Joint Statement of Material Facts (ECF No. 487), cited as (J.S.F.¶__), and Defendants' Statement of Material Facts, filed concurrently with this memorandum, cited as (D.S.F.¶__).

## ARGUMENT

### I. Legal Standard For Summary Judgment.

Defendants are entitled to summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact." *See Actava TV Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, No. 18-cv-06626, 2024 WL 1156614, at *6 (S.D.N.Y. Mar. 18, 2024); *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247–48 (1986).

The movant bears the initial burden of demonstrating that no genuine issue of material fact exists. *Smith v. Barnesandnoble.com, LLC,* 839 F.3d 163, 166 (2d Cir. 2016). This is informed by "the underlying standards and burdens of proof ... because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Tchrs. Ins. & Annnuity Ass'n of Am. v. Simons*, No. 21-CV-03712-ALC, 2023 WL 6386955, at *10 (S.D.N.Y. Sept. 29, 2023) (citations omitted). Thus, when the non-moving party bears the burden of proof at trial it "is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim." *New York by James v. Red Rose Rescue,* No. 23-CV-4832 (KMK), 2025 WL 887722, at *6–7 (S.D.N.Y. Mar. 20, 2025)

(quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (cleaned up); *see also Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988). In fact, the plain language of Rule 56(c), "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party opposing summary judgment under these circumstances must present some "significantly probative" evidence indicating the necessity of a trial to resolve a material factual dispute. *Anderson*, 477 U.S. at 256; *Red Rose Rescue*, 2025 WL 887722, at *6–7. If the non-moving party fails to make this showing summary judgment is warranted. *See Celotex*, 477 U.S. at 323.

**II. Plaintiffs' Claims.**

Based on the decisions in this case to date, it is clear that "Plaintiffs' … claims – under the FDCPA, the GBL, and the Judiciary Law – are based on the alleged sham lawsuit scheme." *Seaman*, 2023 WL 2975152, at *18; *Seaman*, 2023 WL 6290622, at *31. Thus, the essential element underpinning each of Plaintiffs' three claims is their "sham lawsuit" theory: that "defendants filed debt collection lawsuits 'without the intent or ability to prove the claims, if contested,' for the sole purpose of 'procuring default judgments against consumers and/or extracting settlements from them.'" *Seaman*, 2023 WL 2975152, at *6–7; *Seaman* 2023 WL 6290622, at *31.[2]

[2] The Court specifically rejected Plaintiffs' "claims 'based on specific false statements made in state court debt-collection proceedings.'" *Seaman*, 2023 WL 2975152, at *31.

The essential question in this case is: did Defendants bring "sham lawsuits" by suing on loans they knew they could not prove they owned, in a forum they knew they were not permitted to sue? They did not, and Plaintiffs have no contrary evidence.

## III. The Defendants Did Not Bring "Sham Lawsuits."

Normally, under the *Noerr–Pennington* doctrine, a party who brings a civil suit is immunized from liability for bringing that suit. *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 355 (S.D.N.Y. 1997) (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993); *Hirschfeld v. Spanakos*, 104 F.3d 16, 18 (2d Cir. 1997). This immunity is rooted in the First Amendment right to petition. *La. Health Serv. & Indem. Corp. v. Celgene Corp.*, No. 23-cv-7871 (ER), 2025 WL 1056668, at *25 (S.D.N.Y. Apr. 8, 2025) (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 56; *BE&K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 532 (2002)). But, there is an exception: if the litigation is a "sham" it is not protected. *Matsushita Elecs. Corp.*, 974 F. Supp. at 355 (citing *Pro. Real Est. Invs.*, 508 U.S. at 60–61); *Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 701 F. Supp. 2d 568, 597 (S.D.N.Y. 2010). This is the exception Plaintiffs are trying to invoke here.

Plaintiffs bear a heavy burden to prove that Defendants' lawsuits fall within the narrow "sham" exception. *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 336 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019) (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 60; *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 791 F.2d 288, 292–93 (4th Cir. 1986); *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) ("[*Pro. Real Est. Invs., Inc.*]'s exacting two-step test properly places a heavy thumb on the scale in favor of the defendant.")). Plaintiffs cannot carry that burden and summary judgment should be granted in Defendants' favor for this reason. *Celotex Corp.*, 477 U.S. at 322.

### 1. The Sham Lawsuit Test.

Courts use a two-part test to determine if a lawsuit is "sham litigation." *See Pro. Real Est. Invs., Inc.*, 508 U.S. at 60–61; *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d at 336; *PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*, 21 F. Supp. 2d 350, 359 (S.D.N.Y. 1998), *rev'd*, 219 F.3d 92 (2d Cir. 2000).[3] The challenged suit must be objectively baseless *and* intended to cause harm to the defendant "through the use [of] governmental process–as opposed to the outcome of that process." *Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 475–76 (S.D.N.Y. 2013) (citations and emphasis omitted); *T.F.T.F. Cap. Corp.*, 312 F.3d 90, 93 (2d Cir. 2002).

A lawsuit is not objectively baseless when it is "arguably warranted by existing law" or "based on an objectively good faith argument." *Pick v. Kay*, No. 20-55804, 2022 WL 193197, at *2 (9th Cir. Jan. 21, 2022) (citing *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1188 (9th Cir. 2017) (quoting *Pro. Real Est. Invs., Inc.*, 508 U.S. at 65)). It is objectively baseless *only* if no reasonable litigant could realistically expect success on the merits. *See Matsushita Elecs. Corp.*, 974 F. Supp. at 356; *see also WAKA LLC v. DC Kickball*, 517 F. Supp. 2d 245, 251 (D.D.C. 2007) (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 60–61).

---

[3] The two-step inquiry applies to determine "whether a single action constitutes sham petitioning." *Primetime 24 Joint Venture*, 219 F.3d at 101 (citation omitted). In the instant case, though there are numerous Plaintiffs, each Plaintiff was subject to a single action, and this is the appropriate test. *See, e.g., La. Health Serv. & Indem. Co.*, 2025 WL 1056668, at *2 (applying single action test to claim based on "a series of sham patent lawsuits against generic competitors").

In cases in which "the defendant is accused of bringing a whole series of legal proceedings," the test is: "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Primetime 24 Joint Venture*, 219 F.3d at 101. Were the legal challenges "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* For this analysis to apply, the series of legal proceedings must be directed at a single target, *i.e.*, the market rival.

This means Plaintiffs must prove that Defendants' lawsuits against them were objectively baseless, *i.e.*, not legally viable, and – additionally – that the litigant's subjective motivation in bringing suit was to cause harm through the process of the litigation. *Pro. Real Est. Invs., Inc.*, 508 U.S. at 60–61; *Matsushita Elecs. Corp.*, 974 F. Supp. at 355; *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d at 336.

The required test is problematic for Plaintiffs. They claim that Defendants brought suits "for the sole purpose of procuring default judgments against or extracting settlements from Plaintiffs." *Seaman*, 2023 WL 6290622, at *31. But, this speaks to the results of the litigation process, not Defendants' use of the process itself to harm Plaintiffs.[4] *Shetiwy*, 980 F. Supp. 2d at 475-76; *see also Movers & Warehousemen's Ass'n of Greater N.Y. v. Long Island Moving & Storage Ass'n*, No. 98 Civ. 5373(SJ), 1999 WL 1243054, at *6 (E.D.N.Y. Dec. 16, 1999) (stating that "resolution [by settlement] does not lend itself well to the label objectively baseless"); *Gov't Emps. Ins. Co. v. Hazel*, No. 11-CV-00410 CBA VMS, 2014 WL 4628655, at *17 (E.D.N.Y. Aug. 11, 2014), *report and recommendation adopted*, No. 11-CV-0410 CBA VMS, 2014 WL 4628661 (E.D.N.Y. Sept. 15, 2014).

Here, none of the named Plaintiffs allege they did not incur the loans and were sued anyway; or that they repaid or otherwise satisfied their loans; or were pursued by an entity other than the Defendant Trusts which claimed ownership of the loans. Put another way, none of the Plaintiffs allege the Defendant Trusts filed lawsuits on loans not owed or for which other entities claim ownership.

---

[4] The "classic example [of sham litigation] is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 368 (3d Cir. 2020) (citation omitted).

Moreover, there are numerous instances where a borrower contested a National Collegiate Student Loan Trust's loan ownership and the Trust prevailed on the merits. This includes New York State cases where the Defendant Trusts prevailed on the merits, which were carved out of the class and this case. *See, Seaman*, 2023 WL 2975152, at * 34; *Nat'l Collegiate Student Loan Tr. 2007-3 v. Burnett*, No. 6035/2014 (N.Y. Sup. Ct. Nassau Cnty. 2016) (Minutes of Decision of Bench Trial dated Feb. 22, 2016 rendering decision in Trust's favor after bench trial; Judgment dated Nov. 9, 2016)[5]; *see also, e.g., Nat'l Collegiate Student Loan Tr. 2005-3 v. Dunlap*, 115 N.E.3d 689, 700 (Ohio Ct. App. 2018); *Savoy v. Nat'l Collegiate Student Loan Tr. 2005-3*, 557 S.W.3d 825, 838 (Tex. App. 2018); *Mock v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00216-CV, 2018 WL 3352913, at *7 (Tex. App. July 10, 2018); *Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at *10 (Tex. App. Mar. 1, 2018); *Smith v. Nat'l Collegiate Student Loan Tr.*, 153 N.E.3d 222, 228 (Ind. Ct. App. 2020); *NTL Collegiate Student Loan Tr.-1 v. Payne*, No. 18AP-973, 2020 WL 3545732, at *10 (Ohio Ct. App. June 30, 2020); *Taylor v. Nat'l Collegiate Student Loan Tr. 2007-1*, No. 2:19-CV-00120-BSJ, 2021 WL 673458, at *5 (D. Utah Feb. 22, 2021), *aff'd*, No. 21-4049, 2023 WL 2147332 (10th Cir. Feb. 22, 2023); *Snarr v. Transworld Sys., Inc.*, No. 2:21-CV-3, 2022 WL 2475688, at *3 (D. Utah July 6, 2022); *Gosse v. Transworld Sys. Inc.*, No. 3:20-CV-1446, 2023 WL 7926828, at *11 (M.D. Pa. Sept. 29, 2023). A reasonable litigant would expect success on the merits and that their suits were warranted by existing law, given this record of results. Plaintiffs have nothing that demonstrates otherwise.

---

[5] A true and correct copy of the Minutes of Decision of Bench Trial dated February 22, 2016, and the Judgment dated November 9, 2016 from *Burnett*, are attached as Exhibit 73 to the Declaration of Chris Fontenelli in Support of Defendants' Rule 56.1 Statement of Material Facts as to which There Is No Genuine Issue to Be Tried ("Fontenelli Declaration").

### 2. There Is No Evidence That The Lawsuits Were Objectively Baseless.

Plaintiffs have another problem. They claim the Trust: 1) cannot prove ownership of their loans; and 2) were not permitted to bring suit in New York State Courts. Plaintiffs cannot prove either of these essential assertions.

#### a. Plaintiffs' Loan Ownership Theory Does Not Support Their "Sham Litigation" Claims.

Plaintiffs' "sham litigation" claims depend on *their* ability to prove that the Trusts *cannot* prove they own their loans. Simply asserting that "sham litigation" took place and implicitly putting the burden on the Defendants to prove otherwise may have worked to survive Rule 12, but at summary judgment there must be *evidence* to support that assertion. *See Red Rose Rescue*, 2025 WL 887722, at *6–7; *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d at 336.

Recently, a Wisconsin state court called-out the impropriety of Plaintiffs' burden shifting. While considering claims nearly identical to those here, the court noted:

> it flips the burden of proof onto the Trust. [Debtor] substitutes her *defense* to the Trust's claims as *affirmative proof* that the Trust did something wrong in moving forward on its collection action. It might be the case that [Debtor] can raise issues about whether the Trust is the assignee; however, this is quite different than coming forward with proof that the Trust proceeded knowing it could not prevail. Put differently, [Debtor] may be able to defeat the Trust's claims based on evidentiary objections. But this is very different than *proving* the Trust did not have an assignment (and knew it) ….

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*, No. 21-cv-192 (Wis. Cir. Ct. Dane Cnty. June 14, 2024), Decision & Order, ECF No. 380 at 7–8, *aff'd*, 2025 WI App. 15 (Jan. 30, 2025) (emphasis in the original)[6]; *see also, Gwiazda v. LVNV Funding, LLC,* No. 22-3295, 2023 WL 8595402, at *2 (3d Cir. Dec. 12, 2023) (affirming dismissal of FDCPA claim because failure to

[6] A true and correct copy of the Decision and Order dated June 14, 2024 from *Seldal*, is attached as Exhibit 72 to the Fontenelli Declaration.

prove chain of title in state court action did not mean creditor made false or deceptive statements).

It is a basic tenet of American law that a plaintiff must prove his or her case. *See, e.g.*, *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992) (upholding district court's decision to grant summary judgment for defendant because plaintiff could not establish an element of her claim). As laid out above, that particular burden is elevated because Plaintiffs bear the heavy burden of proving that the Trusts' lawsuits were "sham litigation" to strip away *Noerr-Pennington* immunity. *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d at 336 (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 60).

Since Plaintiffs depend on the assertion that the Trusts cannot prove they own their loans, Plaintiffs must prove the Trusts cannot prove they own their loans. Plaintiffs cannot. They have no evidence that shows the Trusts do not own the loans, or that a reasonable litigant in the Trusts' position could not conclude that their lawsuits were "arguably warranted by existing law" or that there was no reasonable chance of success on the merits. *See Town of Islip v. Datre*, No. 16-CV-2156(MKB), 2022 WL 445680, at *7 (E.D.N.Y. Feb. 14, 2022) (summary judgment because no evidence that lawsuit was objectively baseless) (citing *T.F.T.F. Cap. Corp.*, 312 F.3d at 93).

#### i. The Evidence Shows The Trusts Own The Loans.

To be clear, Defendants need not prove the Trusts' ownership to prevail. The burden is Plaintiffs' to prove Defendants' lawsuits were objectively baseless—that the Trusts cannot prove they own their loans. Nonetheless, the Trusts can prove they own their loans, and certainly that it was objectively reasonable to believe they did.

##### a. Plaintiffs' Loans Were Originated To Be Securitized.

Nothing is accidental in the way the Trusts came into being. Each Trust was structured by The First Marblehead Corporation ("First Marblehead") which was involved in every step of each

securitization. That involvement began before the origination of the loans the Trusts hold. Each loan securitized into each Trust was made as part of specific loan programs structured by First Marblehead and The Education Resources Institute ("TERI"). (J.S.F.¶¶ 13, 16, 36, 39, 59, 62, 83, 86). Only certain lenders, known as Program Lenders, participated in these programs. (D.S.F.¶¶ 64–66). Each Program Lender followed specific Program Guidelines set forth by First Marblehead and TERI, which dictated the parameters of the loans made under the Program. (D.S.F.¶ 67).

A loan being part of one of the Programs has significance. The agreements between First Marblehead and the Program Lenders mandated that *all of the loans* originated by a Program Lender pursuant to the Program Guidelines, *must* be sold to First Marblehead or a trust created by First Marblehead (or one of its affiliates). (D.S.F.¶¶ 69–71). For instance, the Loan Purchase Agreement that sold Plaintiff Seaman's loan from KeyBank to NCF stated that "[o]n each Purchase Date … Program Lender *shall* sell … and [First Marblehead] … *shall* purchase, *every Seasoned [i.e., fully-disbursed] Loan owned by Program Lender on the Purchase Date*." (D.S.F.¶ 69 (emphasis added). Put simply: Program loans were originated to be securitized by First Marblehead into a National Collegiate Student Loan Trust. Each of Plaintiffs' loans were Program loans, originated pursuant to a First Marblehead/TERI Program. (D.S.F.¶¶ 4, 17, 28, 42, 54).

**b. Plaintiffs Loans Were Sold To The Trusts.**

The Program Lenders sold their Program loans to National Collegiate Funding, LLC ("NCF"), a wholly owned subsidiary of First Marblehead (J.S.F.¶¶ 12, 35, 58, 82); these sales were documented by Note Purchase Agreements (or Loan Purchase Agreements) between the Program Lenders and First Marblehead. (D.S.F.¶¶ 5, 18, 29, 43, 55, 105). NCF pooled the loans it purchased and then sold each pool into a particular National Collegiate Student Loan Trust; the sales into the Trusts were documented by Pool Supplements and Deposit and Sale Agreements. (D.S.F.¶ 105(a)–(d)). The sales to NCF and then from NCF to a Trust took place nearly simultaneously as part of a

"two-step process." (D.S.F.¶¶ 72–74; 106–08). Each National Collegiate Student Loan Trust is independent of the other and each has its own set of agreements.

These sales of loans did not take place haphazardly. The parties to the transactions knew what was being bought and sold. The Deposit and Sale Agreements stated that "[t]he Seller [defined as NCF] hereby sells and the Purchaser [defined as the purchasing Trust] hereby purchases the Transferred Student Loans." (D.S.F.¶ 74). This was the sale that transferred ownership of specific loans to a specific Trust. (D.S.F.¶¶ 108–110). The "Transferred Student Loans" were defined as "the student loans listed" on Schedule 1 or Schedule 2 "to each of the Pool Supplements" pooling the loans to be purchased by the purchasing Trust. (D.S.F.¶ 74).

Unsurprisingly, there were entities cataloguing and administering the Program loans as they made their way from the Program Lenders into the securitizations that ultimately own them. First Marblehead, in its role as Structuring Agent, did this. (J.S.F. ¶ 3). First Marblehead also selected the Philadelphia Higher Education Assistance Agency ("PHEAA") to be the servicer for all of the loans originating under the Programs, beginning from the funding of those loans.[7] (D.S.F.¶ 76–77). Notably, PHEAA continued to service these loans through securitization and then on behalf of the Trusts after the securitizations were complete. (D.S.F.¶ 96). PHEAA still services the loans today, until they are repaid in full or transferred to the Trusts' default servicer upon a sufficient default. (J.S.F.¶ 101; D.S.F.¶¶ 96, 103). PHEAA's records reflect who owns each loan. (D.S.F.¶¶ 89–98).

[7] PHEAA's servicing obligations began in 2001, when PHEAA and First Marblehead entered into an Alternative Servicing Agreement. (D.S.F.¶ 76). On September 28, 2006, PHEAA and First Marblehead entered into an Amended and Restated Private Student Loan Servicing Agreement. (D.S.F.¶ 80).

Moreover, PHEAA was charged with holding the original Credit Agreements signed by borrowers on behalf of a loan's owner (*i.e.*, the specific Trust that owns a particular loan). (D.S.F.¶ 84). PHEAA received "the fully executed signature page to the credit agreement and note disclosure statement" for each Plaintiff. (D.S.F.¶ 83).

That PHEAA's servicing obligations ran through the securitization (and beyond) and its data had a role in the securitization was part of the design from the outset. (D.S.F.¶¶ 96–97). First Marblehead chose one servicer to handle the loans through their entire life span because it simplified the securitization of the loans, since they remained on one recordkeeping system throughout. (D.S.F.¶¶ 88–89, 97). To that end, the Amended and Restated Private Student Loan Servicing Agreement stated that "[t]he parties contemplate that: (a) pools of Committed Student Loans will be sold by the Program Lender to SPEs in Securitization Transactions sponsored by [First Marblehead] from time to time, and Permitted Assignees will receive a collateral assignment of the Committed Student Loan in each Securitization Transaction." (D.S.F.¶ 82). And, PHEAA was required to provide the following to "[First Marblehead] and/or all Owners":

a. "A report of all Committed Student Loans[8] on Servicer's system that are fully disbursed, including (at least): Unique loan identifier, Current principal balance, Current interest balance, and Fully disbursed indicator, delivered to [First Marblehead] ten (10) business days prior to a scheduled Securitization Transaction[;]" and

b. "The same report as set forth in Item 1 above, updated through the closing date, delivered to [First Marblehead] within five (5) days after the closing date of a Securitization Transaction scheduled under Section 13.04 of the Agreement[.]"

(D.S.F.¶ 80).

[8] "Committed Student Loans" is defined as "all the Private Student Loans which [First Marblehead] is obligated to or has the right to purchase under third-party agreements with Program Lender and which, upon the occurrence of such purchase, will become Student Loans." (D.S.F.¶ 80).

PHEAA was required to record data and generate reports pre- and post- securitization for First Marblehead and the Trusts reflecting all of the loans that were included in each securitization. (D.S.F.¶¶ 88–92). PHEAA's role was both borrower facing and owner facing. (D.S.F.¶ 85).

**c. Records Show Which Trust Owns Which Loan.**

As part of its duties, PHEAA maintains an electronic servicing platform–called "COMPASS"–that allows it to keep track of the loans it services and various datapoints associated with each loan.[9] (D.S.F.¶ 88). On that platform, PHEAA maintains a "Legend" that identifies the current owner (as well as the originating lender) of each loan it services. (D.S.F.¶ 92).

When a pool of Loans was sold into one of the Trusts, PHEAA received data from First Marblehead–the entity that structured each securitization–identifying all of the Loans being sold (which were all serviced by PHEAA) and the Trust that was purchasing them. (D.S.F.¶ 90). Upon closing of the sale to the purchasing Trust, PHEAA "took [the] list of loans sold to the purchasing Trust and updated its [COMPASS] systems by amending the Legend to reflect the new owner …." (D.S.F. 92). The data PHEAA received corresponded to the "Transferred Loans" subject to the Pool Supplements for that transaction, *i.e.*, what was in the Schedules. (D.S.F.¶¶ 91–93).

Because PHEAA serviced each loan from origination through securitization and beyond, PHEAA was able to provide "consistent servicing of the loan from one owner to the next." (D.S.F.¶ 97). And, because PHEAA documented the change in ownership on its COMPASS system to

---

[9] PHEAA's system was critical to each securitization. The Amended and Restated Private Student Loan Servicing Agreement provides that "[a]ll sums received by [PHEAA] with respect to any Student Loans … shall be received in trust for the benefit of the Owner." (D.S.F.¶ 81). "Owner" is defined as "with respect to a Student Loan, [the] Program Lender prior to a Securitization Transaction and then [First Marblehead] or any Permitted Assignee that purchases such Student Loans …." (D.S.F.¶ 81). This means that PHEAA was required to keep track of all monies received on each loan it serviced to make sure that a particular loan's owner received the payments it was entitled to.

indicate that a specific Trust was the new owner of the loan, "industry participants understood that PHEAA's record of ownership of the loan is up-to-date and accurate." (D.S.F.¶ 97).

First Marblehead kept a copy of the loan data it provided PHEAA, including which loan was securitized into which Trust. (D.S.F.¶ 90). Jens Meyer, the Senior Vice President of Cognition Financial, formerly First Marblehead, confirmed that First Marblehead maintained this data, specifically "an MS Access Database which holds data for each loan owned by the Trusts, which has remained unchanged from the dates it was entered into the database." (D.S.F.¶ 74). The "source of the data contained in the MS Access Database is derived from loan tapes received in connection with the origination and servicing of the Trusts' loans." (D.S.F.¶ 74). The "data for the loans owned by each of the Trusts was entered on the following dates: [NCSLT] 2004-2 (September 30, 2004); [NCSLT] 2006-4 (November 30, 2006); [NCSLT] 2007-2 (May 31, 2007); and [NCSLT] 2007-3 (August 31, 2007)." (D.S.F.¶ 74). These dates are shortly before the effective dates of each of the Pool Supplements: NCSLT 2004-2 (October 28, 2004); NCSLT 2006-4 (December 7, 2006); NCSLT 2007-2 (June 14, 2007); and NCSLT 2007-3 (September 20, 2007). (D.S.F.¶ 87). In other words, even if "Schedules" were not physically attached to the Pool Supplements, electronic rosters with details of each loan owned by each Trust—including the fact that the loan was owned by the Trust—existed shortly prior to the closing of the securitization and the execution of the Pool Supplements.

Cognition produced, and Defendants provided to Plaintiffs' counsel, "copies of 61 lender-specific excel spreadsheets, which include the loans sold by those lenders to [NCF], which it subsequently sold to the Trusts." (D.S.F.¶ 105(a)–(d)). Cognition also produced "extracted data from the MS Access Database for all of the loans owned by the Trusts and produced it in the form of four Trust-specific excel spreadsheets, which the Trusts produced …." (D.S.F.¶ 105(a)–(d)).

These correspond to the four Defendant Trusts. (D.S.F.¶ 105(a)–(d)). The "data in those spreadsheets is the same as maintained in the MS Access Database," which was not changed since it was originally entered before the Pool Supplements were executed. (D.S.F.¶ 105(a)–(d)). Both sets of these spreadsheets list the named Plaintiffs' loans.

PHEAA's COMPASS system reflects that each of Plaintiffs' loans were sold by the respective originating bank to the respective purchasing Trust.[10] Specifically:

- **The Seaman Loan** was sold to the 2007-3 Trust as part of a pool of KeyBank loans on September 20, 2007. PHEAA's COMPASS servicing system includes a loan activity entry dated September 20, 2007, which shows the pre-sale balance of the Seaman Loan (identified by K. Seaman's Social Security number) as held by KeyBank, and the corresponding post-sale balance of the Seamans Loan as held by the 2007-3 Trust following the transfer. PHEAA received notice of the sale of the Seaman Loan and recorded the sale as described above in its COMPASS servicing system on September 20, 2007. (D.S.F.¶ 5).

- **The Tabar Loan** was sold to the 2007-2 Trust as part of a pool of National City loans on June 14, 2007. PHEAA's COMPASS servicing system includes a loan activity entry dated June 14, 2007, which shows the pre-sale balance of the Tabar Loan (identified by Tabar's co-borrower's Social Security number) as held by National City, and the corresponding post-sale balance of the Tabar Loan as held by the 2007-2 Trust following the transfer. PHEAA received notice of the sale of the Tabar Loan and recorded the sale as described above in its COMPASS servicing system on September 20, 2007. (D.S.F.¶ 18).

- **The Bifulco Loan** was sold to the 2004-2 Trust as part of a pool of Bank One loans on October 28, 2004. PHEAA's COMPASS servicing system includes a loan activity entry dated October 28, 2004, which shows the pre-sale balance of the Bifulco Loan (identified by Bifulco's co-borrower's Social Security number) as held by Bank One, and the corresponding post-sale balance of the Bifulco Loan as held by the 2004-2 Trust following the transfer. PHEAA received notice of the sale of the Bifulco Loan and recorded the sale as described above in its COMPASS servicing system on October 28, 2004. (D.S.F.¶ 29).

---

[10] Once the loans were transferred, PHEAA also sent a letter to the borrower(s) associated with each loan, to notify the borrower(s) of the sale and change of ownership of the loan. (D.S.F.¶ 94). PHEAA's COMPASS system shows that these transfer letters were sent to each of the Plaintiffs shortly after the sale of their loans to the respective Trust. (D.S.F.¶¶ 6, 19, 30, 44, 56).

- **The Butry Loan** was sold to the 2004-2 Trust as part of a pool of Bank One loans on October 28, 2004. PHEAA's COMPASS servicing system includes a loan activity entry dated October 28, 2004, which shows the pre-sale balance of the Bifulco Loan (identified by Butry's Social Security number) as held by Bank One, and the corresponding post-sale balance of the Bifulco Loan as held by the 2004-2 Trust following the transfer. PHEAA received notice of the sale of the Butry Loan and recorded the sale as described above in its COMPASS servicing system on October 28, 2004. (D.S.F.¶ 43).

- **The Frauenhofer Loan** was sold to the 2006-4 Trust as part of a pool of M&T loans on December 7, 2006. PHEAA's COMPASS servicing system includes a loan activity entry dated December 7, 2006, which shows the pre-sale balance of the Frauenhofer Loan (identified by Frauenhofer's Social Security number) as held by M&T, and the corresponding post-sale balance of the Frauenhofer Loan as held by the 2006-4 Trust following the transfer. PHEAA received notice of the sale of the Frauenhofer Loan and recorded the sale as described above in its COMPASS servicing system on December 7, 2006. (D.S.F.¶ 55).

#### d. Defendants Had [And Have] The Necessary Records.

If a loan was determined to be in default, PHEAA transferred the loan to a default servicer to service the Loan. (D.S.F.¶ 98). In 2008, First Marblehead Education Resources ("FMER"), a subsidiary of First Marblehead, acted as the Trusts' default servicer. (D.S.F.¶ 99). When a Loan went into default, PHEAA was required to transfer it to FMER. (D.S.F.¶ 100). In 2012, NCO took over FMER's role as the Trusts' default servicer and continued until 2014, when TSI assumed that role as successor and assign of NCO. (J.S.F.¶ 102; D.S.F.¶ 101).

Upon taking over default servicing, NCO received Excel files setting forth the loans corresponding to each of the Pool Supplements relating to each of the Defendant Trusts. (D.S.F.¶¶ 116–17). NCO received these from a First Marblehead entity. (D.S.F.¶ 118). NCO passed those files on to TSI when TSI assumed NCO's default servicing duties. (D.S.F.¶ 119). The default servicer also received (and continues to have) view only access to PHEAA's COMPASS system, including the ownership information described above. (J.S.F.¶ 103; D.S.F.¶ 116).

When PHEAA transfers a loan to the default servicer, PHEAA identifies the owner Trust and sends the default servicer several documents and other information that PHEAA maintains (including copies of the signature pages to the credit agreement and note disclosure statement) in order for the default servicer to service the loan. (D.S.F.¶ 102). Thus, when TSI received a defaulted loan to begin collections on, it had extensive data about the loan, including which Trust owned it. (D.S.F.¶ 102).

Accordingly, when a defaulted loan is transferred to the default servicer to begin the process of collection that might end up with a collection lawsuit, information has been provided identifying the Trust that owns the loan and documents sufficient to prove ownership of the loans.

**ii. Plaintiffs Have No Evidence To Support Their Assertions That The Trusts Do Not Own Their Loans.**

The ultimate nub of Plaintiffs case has to do with the "Schedules" to the Pool Supplements. Plaintiffs posit that because they were not physically attached to the Pool Supplements that were produced by Defendants in discovery the Trusts could not ever prove that they own any loan. As demonstrated above, that is not true. Plaintiffs have nothing that contradicts Defendants' evidence on this point.

Plaintiffs' corollary to their ownership claim is that because the "Schedules" were not submitted in the underlying state court actions, those litigations somehow became improper. Plaintiffs seek to elevate an evidentiary quibble-—which should have been raised in the state court proceedings-—into something much more nefarious. But, they run into the issue recognized by the Wisconsin appellate court that affirmed the *Seldal* decision quoted above:

> At a trial on her class claims, [plaintiff] would bear the burden to prove that the loans were not actually assigned to the Trust, which requires more than pointing out problems with the admissibility of any evidence that the Trust might offer on that issue. *See Wisconsin Auto Title Loans, Inc. v. Jones,* 2006 WI 53, ¶30, 290 Wis. 2d 514,

> 714 N.W.2d 155 (the burden of proving that a contract is invalid rests with the party making the claim).
>
> To illustrate this point, consider a hypothetical that focuses exclusively on [plaintiff's] loan, and that highlights the distinction between the Trust's burden of proof in its collections action and [plaintiff's] burden to prove the counterclaims she raises against the Trust. For the sake of this hypothetical, assume that [plaintiff] took out a loan from PNC, PNC entered into a written contract assigning the loan to NCF, and NCF entered into a written contract assigning it to the Trust. However, after the loan was properly assigned to the Trust, the assignment contracts were destroyed in a fire. Under those circumstances, the Trust would not succeed in a collection action against [plaintiff] if it lacked other admissible proof of the assignments. Yet, the Trust's inability to produce the assignment contracts would not, in and of itself, mean that [plaintiff] is entitled to a declaration that her loan was not assigned to the Trust. Nor would it mean that [plaintiff] would be entitled to damages if the Trust attempted to collect on the loan.

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*, 19 N.W.3d 287(Table), at *7 (Wis. Ct. App. June 2, 2022).

Plaintiffs cannot point to anything that supports their assertion that the Schedules never existed. In fact, the evidence shows otherwise. First, Defendants produced the Schedules in this case, as did non-party Cognition (formerly First Marblehead). Second, Defendants' experienced industry expert Roger Saylor testified that he would not have expected to receive or review a schedule attached to the loan sale agreement. (D.S.F.¶ 80(b)). Specifically, he stated "there's a roster of loans," containing the information about each loan "that was provided by the servicer to the administrator related to whatever trust …." (D.S.F.¶ 80(b)). "[T]he record of the loans is at the servicer. You don't take - - you don't take 50,000 loans and run a - - a schedule and attach them to the document." (D.S.F.¶ 80(b)). Nothing in the record contradicts Mr. Saylor's testimony in any way.[11]

[11] As a brief aside, Mr. Saylor "undertook at least annual on-site due diligence meetings with each of the major United States Department of Education ('DOE') eligible student loan servicers,"

As demonstrated above, rosters of the loans sold to a particular Trust existed at the time they were sold. The data that comprised those rosters is held by PHEAA and the default servicer (including NCO and TSI), and remains in the legacy First Marblehead database. These rosters, containing the information about Plaintiffs' loans and the specific Trusts that purchased each one, were produced to Plaintiffs during discovery. In response to Defendants' mountain of evidence, Plaintiffs have nothing.

**iii. A Reasonable Litigant Would Believe They Owned The Loans.**

Given the marketplace and the structure of the Trusts, a reasonable litigant in the Trusts' positions would believe it owned the loans.

All of the participants to the securitizations—including parties to the agreements governing the Trust, investment banks selling certificates in the Trusts, sophisticated investors in the Trusts, rating agencies rating the tranches of certificates, and servicers of the loans in the Trusts—would have understood that, at closing, each Trust owned the student loans that had been sold to it. (J.S.F. ¶¶ 20, 43, 66, 90; D.S.F.¶ 92–93). In fact, the entire structure of the securitizations of the NCSLTs was premised on this understanding. ((J.S.F. ¶¶ 8–100).

As described above, all of the agreements governing the Trusts contemplate that the Trusts would ultimately own the underlying student loans. (*See* § III.2.a.c., supra). For each Trust, "True Sale Opinions" were issued by law firms advising on the effect of the sale of the student loans (D.S.F.¶ 106). The True Sale Opinions stated, among other opinions, that the loans were legally sold from the originating banks to NCF and then from NCF to the Trust. (D.S.F.¶ 108). For instance, the True Sale Opinion regarding the sale from the originators to NCF for the 2007-3 Trust

---

including the servicer of all the loans in all the NCSLTs, PHEAA. (D.S.F.¶ 80(b)). He also performed "detailed reviews" of PHEAA's "loan servicing operations." (D.S.F.¶ 80(b)).

states that "[p]ursuant to its respective Bank Sale Agreements, each Bank sold its Transferred Assets[12] to the Depositor for consideration … consisting only of cash proceeds …." (D.S.F.¶ 109).[13]

Mr. Saylor testified that during his career, "as a Joint Book-Runner for billions of dollars' worth of [student loan asset backed securitizations]," he relied on the True Sale Opinions to be sure that the loans being securitized were owned by the purchasing Trust. (D.S.F.¶ 106). As a Book-Runner, Mr. Saylor was responsible for knowing "that the student loan assets were actually owned by and held in the trust, as would be stated in the Prospectus and Prospectus Supplement on any given securitization."(D.S.F.¶ 106).

Securitization "industry participants" would understand that the Trusts would own the underlying loans upon closing. (D.S.F.¶ 97). These participants included the originating banks, the sophisticated law firms authoring the True Sale Opinions, and the global financial institutions serving as Placement Agents and Book Runners. It would also include the financial institutions—for the Trusts at issue, Citigroup Global Markets, Deutsche Bank Securities, Goldman Sachs, and UBS Securities—that authored the Prospectuses and Prospectus Supplements, as well as the investors that relied on the Prospectuses and Prospectus Supplements. (D.S.F.¶ 111). ("Following the purchase of the trust student loans, the assets of the trust will include: The trust student loans themselves ….”). (D.S.F.¶ 63). And, it would include the servicers that contracted to service the loans in the Trusts. (D.S.F.¶ 63).

---

[12] Transferred Assets is defined as "all of any right, title, and other ownership interest of the transferor in and to its respective Student Loans." (D.S.F.¶ 109).

[13] True Sale Opinions for the 2004-2, 2006-4, and 2007-3 Trusts were issued by Thacher Proffit & Wood. The two True Sale Opinions for the 2007-2 Trust were issued by Stroock Stroock & Lavan and contain substantially similar language. (D.S.F.¶¶ 107–08).

This demonstrates that there can be no serious question that it was reasonable for the Trusts-–-and those acting on their behalf-—to share this understanding. In addition, as explained above, PHEAA's system of record confirms that each Trust owns their respective loans. Again, Plaintiff has nothing that demonstrates otherwise.

#### b. Plaintiffs' Registration Claims Do Not Amount To "Sham Litigation" Because The Trusts Are Not Required To Be Registered In New York.

Plaintiffs' claims based on the Trusts' purported failure to register pursuant to New York General Associations Law § 18 fair no better. The apparent logic behind this claim is that the Defendants' lawsuits were "sham litigation" because the suing Trusts were not registered in New York and were therefore barred from "maintain[ing] any action … in this state." *See* N.Y. Gen. Ass'ns Law § 18(4) (McKinney 2024). But, there is nothing in the record that demonstrates the Trusts do business in New York so as to be subject to Section 18.

A foreign entity is only required to register under Section 18 if it is "doing business" in New York. Specifically,

> 2. Every association *doing business within this state* shall file in the department of state a certificate in its associate name …
>
> …
>
> 4. Any association *doing business within this state* without having filed the certificate of designation prescribed by this section shall not maintain any action or special proceeding in this state ….

N.Y. Gen. Ass'ns Law §§ 18(2), (4) (McKinney 2024) (emphasis added).

If the Trusts' purported failure to register is why Defendants' lawsuits where "sham litigation," Plaintiffs bear the burden of proving that the Trusts do business in New York so as to be subject to the registration requirement. *See, e.g., In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d at 336; *see also Interline Furniture, Inc. v. Hodor Indus., Corp.,* 140 A.D.2d 307, 308

(2d Dep't 1988) (a party relying upon a statutory barrier to bringing suit in New York "bears the burden of proving that 'the corporation's business activities in New York were not just casual or occasional.'") (citations omitted).[14]

In order to survive summary judgment, Plaintiffs must establish that the Trusts are doing business in New York with evidence of continuous, systematic and regular activity in the state. *See Carvalho v. Mel S. Harris & Assocs., L.L.C.*, No. 04-CV-0425(JBW), 2004 WL 1555193, at *1 (E.D.N.Y. July 13, 2004) (citing *Int'l Fuel & Iron Corp. v. Donner Steel Co.*, 242 N.Y. 224, 229 (1926); *Interline Furniture, Inc.*, 140 A.D.2d at 308). "[I]solated … activities which are merely incidental to the corporation's business in interstate or international commerce do not constitute doing business for such purpose." *Carvalho*, 2004 WL 1555193, at *1 (citations omitted). Absent proof establishing that a foreign entity is doing business in New York, it is presumed that the entity is doing business in its state of incorporation and not in New York. *Carvalho*, 2004 WL 1555193, at *1 (citing *Airline Exch., Inc. v. Bag*, 266 A.D.2d 414, 415 (2d Dep't 1999).

Bringing collection lawsuits in New York is not enough. *See, e.g.*, *Page v. Forster & Garbus, LLP*, No. 18CV3611SJFARL, 2019 WL 5696108, at *2 (E.D.N.Y. June 17, 2019). Retaining a law firm to sue in the state is the type of incidental activity that does not constitute doing business in New York. *Carvalho*, 2004 WL 1555193, at *1 (citing *Azuma N.V. v. Sinks*, 646 F.Supp. 122, 125 (S.D.N.Y. 1986) (allegation that defendant brought hundreds of collection actions in New York not sufficient to demonstrate that defendant was doing business in New York)).

---

[14] Section 18 of the General Associations Law is a "door-closing" statute. *See Hongtai Trading Inc. v. Yan*, No. 12–CV–3683 (DLI)(VMS), 2014 WL 1277172, at *3 (E.D.N.Y. Mar. 27, 2014); *see also Page v. Forster & Garbus, LLP,* No. 18CV3611SJFARL, 2019 WL 5696108 (E.D.N.Y. June 17, 2019) (equating the door-closing provision of GBL § 1312 to General Assn's Law § 18). Courts have warned these provisions should not be used "to enable defendants to avoid contractual obligations." *Hongtai Trading Inc.*, 2014 WL 1277172, at *3.

The *Page* decision is instructive. There a plaintiff brought suit against a securitized, student loan trust alleging that the trust had directed numerous lawsuits be filed in New York even though it was not registered under the General Associations Law. *See Page*, 2019 WL 5696108, at *1. The court, looking to *Carvalho*, dismissed plaintiff's claims to the extent they were based upon a failure to file a certificate. *Id.*, at *8–9. The court explained that:

> In *Carvalho*, Judge Weinstein found that the plaintiff had failed to overcome the presumption that the defendant was doing business in its state of incorporation based upon an allegation that defendant had filed hundreds of lawsuits in New York seeking to collect outstanding debts. Just as here, the plaintiff had failed to allege that the defendant "owns any real or personal property in New York, has entered into any contracts in this state, has any offices or employees here, or that its New York collection activities represent a disproportionate share of its business. The retention of a law firm and the maintenance of legal action in New York do not constitute the type of regular, systematic and continuous activity required …."

*Id.*, at *2.

Just like in *Carvalho* and *Page*, Plaintiffs have nothing that demonstrates that the Trusts are doing business in New York.[15] In fact, the evidence shows that the Trusts are Delaware statutory trusts. (J.S.F.¶¶ 15, 19, 38, 42, 61, 65, 85, 89). They do not have employees in New York. (J.S.F.¶ 4). They do not own any real or personal property in New York. (J.S.F.¶¶ 5, 15, 19, 38, 42, 61, 65, 85, 89). And, there is no evidence that they entered into any contracts in New York. The evidence does not support a finding that the Trusts are doing business in New York.

In *Taylor*, the District of Utah considered whether a sister trust of the Defendant Trusts had violated a Utah registration statute similar to Section 18. *See* 2021 WL 673458, at *11. Specifically, Utah law requires a business trust to register before doing business in Utah. *Id.* The plaintiff

[15] While the *Carvalho* and *Page* decisions dealt with motions to dismiss, they are important because they set forth what a court looks to to determine whether an entity is doing business in New York under Section 18 of the General Associations Law.

claimed the 2007-1 Trust was violating that provision because the trust was "in the business of suing on defaulted student loans." *Id.* The court held that bringing suit to enforce a debt obligation is not transacting business under Utah law. *Id.* The Utah court relied on Utah statutory law to reach this conclusion. *Id.* But, that statutory law is very similar to the common law followed by New York courts. Both agree that bringing suit is not doing business in the state. *Compare Fieland v. Chase Manhattan Mortg. & Realty Tr.*, 67 A.D.2d 888 (1st Dep't 1979) (bringing lawsuit on behalf of noteholders does not mean that trust is doing business in New York State); *Page*, 2019 WL 5696108, at * 2; *Carvalho,* 2004 WL 1555193, at *1 *with* Utah Code Ann. § 16-10a-1501 (2024) ("The following, nonexhaustive list of activities does not constitute 'transacting business' ... maintaining, defending, or settling in its own behalf any legal proceeding.").

The Trusts' actions were warranted by existing law. *Pick*, 2022 WL 193197, at *2 (holding a lawsuit is not objectively baseless when it is "arguably warranted by existing law" or "based on an objectively good faith argument."). The Trusts are not doing business in New York and Plaintiffs have no evidence that says they do.

#### 3. Plaintiffs Cannot Demonstrate That The Trusts Intended To Cause Harm With Any Lawsuit.

The Court need not even reach the question of Defendants' intent because Plaintiffs cannot demonstrate that the lawsuits in question were objectively baseless. *See Pro. Real Est. Invs., Inc.*, 508 U.S. at 60–61. Nonetheless, and unsurprisingly, Plaintiffs cannot carry their burden to demonstrate that the Trusts "intended to cause harm to the defendant through the use of governmental process – as opposed to the outcome of that process." *Shetiwy*, 980 F. Supp. 2d at 475–76 (cleaned up). There is nothing in the record which indicates that the Defendants intended to use the process of litigation for any reason besides enforcing delinquent payment obligations.

## IV. Defendants Are Entitled To Summary Judgment For Additional Reasons.

### A. Plaintiffs Cannot Prove All Elements Of Their GBL § 349 Claim.

In order to prevail on a GBL § 349 claim a plaintiff must show "that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)) (internal quotation marks omitted). Plaintiffs cannot prove two of the three required elements.

The materially misleading activity Plaintiffs allege is the "sham lawsuits." But, Plaintiffs cannot prove that there were any "sham lawsuits." (*See* § III, supra). Accordingly, Plaintiffs cannot prove there was materially misleading conduct or that Plaintiffs were injured by such conduct.

### B. Plaintiffs Cannot Prove Their FDCPA Claim.

Plaintiffs' FDCPA claims depend on their "sham litigation" theory as well.[16] ECF No. 124 ¶ 274 (a)–(b).

This Court has recognized that "sham" lawsuits can give rise to potential violations of the FDCPA. *See* ECF No. 423, pp. 38–40. But, consistent with the standard set forth above, a plaintiff must prove that the lawsuit the FDCPA claim is based on was "objectively baseless in the sense that no reasonable litigant would realistically expect success on the merits." *See Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 885 F. Supp. 522, 525 (S.D.N.Y. 1995) (quoting *Pro. Real Est.*

---

[16] Plaintiff Bifulco alone maintains a claim for communicating credit information which is known or should be known to be false. ECF No. 124 ¶ 274(h)). Bifulco's negative credit reporting claim fails because the claim is based on reporting knowingly false information, but as shown above the information was not false (much less known to be false). It should further be dismissed with respect to F&G, as F&G indisputably did not credit report any of the Plaintiffs. (J.S.F. ¶¶ 120, 134, 142, 156, 166).

*Invs., Inc.*, 508 U.S. at 60. *Cf., e.g., Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) ("sham" litigation because summonses were known not to be served but knowingly false affidavits of service were filed anyway, resulting in default judgment without due process); *Arias v. Gutman, Mintz, Baker, & Sonnenfeldt, LLP*, 875 F.3d 128, 133 (2d Cir. 2017) ("sham" litigation because social security benefits known to be exempt from garnishment were garnished). Accordingly, Plaintiffs must "disprove the challenged lawsuit's legal viability" in order to prevail on their FDCPA claims. *Novo Nordisk of N. Am., Inc.*, 885 F. Supp. at 525. Plaintiffs cannot do that for all the reasons set forth above.

In fact, this case is analogous to *Gwiazda. See generally*, 2023 WL 8595402. There the Third Circuit affirmed dismissal of plaintiff's FDCPA claims because the plaintiff failed to present evidence that it was objectively baseless for a debt buyer to have sued her. *Id.*, at *2. A plaintiff pursuing FDCPA claims based on a "sham" lawsuit does not prevail by simply alleging the debt collector (or buyer) lacks proof of the debt (or assignment), but must *affirmatively* establish the debt is *not* owed (or is not assigned to the debt buyer):

> Gwiazda still must provide sufficient evidence upon which a reasonable juror could conclude that LVNV and P&F made false or deceptive statements to succeed at summary judgment.
>
> As the District Court explained, "Gwiazda could have met this burden by putting forth evidence she was making payments to someone else on the debt, that she was receiving notices of payments due to someone else, or any other affirmative evidence the debt had been assigned to someone else." Gwiazda's documentary evidence is insufficient.

*Id.* (internal citation omitted).

While it is not their burden to do so, Defendants present overwhelming evidence that the Trusts owned the loans–-or, at a minimum, that they possessed such documentation, coupled with a successful track record in contested lawsuits that they had a reasonable expectation of success

on the merits. Defendants are accordingly entitled to summary judgment on Plaintiffs' FDCPA claims.

**C. The Plaintiffs Cannot Prove Their Judiciary Claim.**

The "deceit" that forms the basis for Plaintiffs' § 487 claim is F&G's alleged participation in the prosecution of the "sham lawsuits." As demonstrated above, Plaintiffs cannot prove that the collections lawsuits were a "sham" and therefore cannot establish any "deceit," rendering their § 487 claim meritless. (*See* III, *supra*). F&G's filings in the collections lawsuits were legally and factually supportable. There was therefore no deceit. *See Urias v. Daniel P. Buttafuoco & Assocs., PLLC*, 41 N.Y.3d 560, 570–71 (2024); *Bill Birds, Inc. v. Stein Law Firm, P.C.*, 35 N.Y.3d 173, 179–80 (2020).

Judiciary Law § 487 provides for liability for an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party…[i]s guilty of a misdemeanor…" Because, a violation of section 487 is a crime, courts "must be circumspect to ensure that penal responsibility is not extended beyond the fair scope of the statutory mandate." *Bill Birds, Inc.*, 35 N.Y.3d at 179–80 (citation and internal quotations omitted). Thus, there is a very high burden of proof to establish a violation under Judiciary Law § 487, requiring a showing of "deceit that reaches the level of egregious conduct." *Ray v. Balestriere Fariello*, No. 23-274-cv, 2024 WL 390293, at *1 (2d Cir. Feb. 2, 2024) (citation omitted); *see also Ray v. Watnick*, 182 F. Supp. 3d 23, 30 (S.D.N.Y. Apr. 26, 2016) (holding "liability under §487 is reserved for extreme or egregious cases").

Unsurprisingly, the record is devoid of any evidence that F&G had any *intent* to deceive either a court or a party in the prosecution of any collection lawsuit. This is a second fatal flaw in Plaintiffs' §487 claim. *See Ray*, 2024 WL 390293, at *1 (granting summary judgment and

dismissing §487 claim as there was no "record evidence that [the defendant] intended to deceive [the plaintiff])."

Plaintiffs' baseless allegations that F&G engaged in "robosigning complaints" and filing papers without meaningful review does not establish a §487 claim. Plaintiffs' allegations are, in fact, contradicted by the record. Upon retention, F&G received loan documentation from NCO (and later TSI). (D.S.F.¶ 122). Before any collection lawsuit was commenced, the account data was reviewed for accuracy. (D.S.F.¶ 125). After a complaint was created, the complaint was reviewed and facts verified by two separate attorneys before being signed and filed. (D.S.F.¶ 126–28). A similar process was utilized prior to the filing of a default judgment against any borrower. (D.S.F.¶ 131–36). In cases where no default judgment application was submitted, F&G proceeded to trial on behalf of the respective NCSLT. (D.S.F.¶ 137). There was thus meaningful review and attorney involvement in the collection actions. Plaintiffs have nothing that shows otherwise.

But, putting aside Plaintiffs' evidentiary problems, at best Plaintiffs tell a story that questions F&G's professional competency. The New York Court of Appeals has recently confirmed this is insufficient under §487. *Bill Birds, Inc.*, 35 N.Y.3d at 178 ("Given the requirement that the conduct involve 'deceit or collusion' and be intentional, liability under the statute does not extend to negligent acts or conduct that constitutes only legal malpractice, evincing a lack of professional competency."). Filing a purported defective or frivolous lawsuit is not a basis for a §487 claim. *See id.* at 180 (holding that "[t]he statute does not encompass the filing of a pleading or brief containing nonmeritorious legal arguments, as such statements cannot support such a claim under the statute."); *Baram v. Doe*, No. 23-CV-1758 (ER), 2024 WL 232319, at *10 (S.D.N.Y. Jan. 22, 2024), *appeal dismissed*, No. 24-599 (2d Cir. June 12, 2024) ("filing an action, raising non-meritorious arguments, and pleading unfounded or false allegations are not bases for

§487 liability"); *Remler v. Cona Elder L., PLLC*, No. 21CV5176ARRLB, 2022 WL 4586243, at *7 (E.D.N.Y. Sept. 29, 2022) (holding that even if the "underlying state court litigation was a frivolous lawsuit", the plaintiff cannot invoke sanctions under §487).

**CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment should be granted.

Dated: May 15, 2025
New York, New York

TROUTMAN PEPPER LOCKE LLP

*/s/ R. James DeRose, III*

R. James DeRose, III
Gregory T. Casamento
Christopher B. Fontenelli
875 Third Avenue
New York, New York 10022
(212) 704-6000
rj.derose@troutman.com
greg.casamento@troutman.com
christopher.fontenelli@troutman.com

J. Matthew Goodin
111 South Wacker Drive, Suite 4100
Chicago, Illinois 60606
(312) 443-0700
matt.goodin@troutman.com
*Attorneys for Defendants National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3*

SESSIONS, ISRAEL & SHARTLE LLC

*/s/ Michael D. Alltmont*

Michael D. Alltmont
3838 N. Causeway Blvd., Ste. 2800
Metairie, Louisiana 70002
P: 504-846-7954
malltmont@sessions.legal
*Attorneys for Defendant Transworld Systems, Inc. and EGS Financial Care, Inc.*

RIVKIN RADLER LLP

*/s/ Carol A. Lastorino*
Carol A. Lastorino
Amanda R. Griner
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3101
carol.lastorino@rivkin.com
amanda.griner@rivkin.com
*Attorneys for Defendant Forster & Garbus LLP*

# WORD COUNT CERTIFICATION

I hereby certify that the foregoing Memorandum of Law in support of Defendants' Motion for Summary Judgment contains 9,597 words and therefore complies with the word limitation set forth in the Scheduling Order dated April 8, 2025 (ECF. No. 485). This memorandum also complies with the typeface and type-style requirements of Local Rule 11.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York because it was prepared in Times New Roman 12-point typeface using Microsoft Office Word.

*/s/ R. James DeRose, III*
R. James DeRose, III

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2025, I caused the foregoing Notice of Defendants' Motion for Summary Judgment, Declaration of Chris Fontenelli in Support of Defendants' Rule 56.1 Statement of Material Facts as to which There Is No Genuine Issue to Be Tried with its accompanying exhibits, and Joint Memorandum of Law in support of Defendants' Motion for Summary Judgment, to be served on all parties entitled to notice by filing them with the Clerk of the Court using the Court's CM/ECF system.

*/s/ R. James DeRose, III*
R. James DeRose, III