UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHERINE SEAMAN, MARY RE SEAMAN, SANDRA TABAR, CHRISTINA BIFULCO, FRANCIS BUTRY and CORI FRAUENHOFER individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,

Defendants.

No. 18-cv-1781-PGG-BCM

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RULE 56 MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' RULE 56 CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

STANDARDS ........ 4

BACKGROUND ........ 7

ARGUMENT ........ 9

I. Defendants Prosecuted Sham Debt Collection Suits ........ 9

II. Defendants Cannot Produce Evidence Any Trust Owns Any Loan ........ 23

III. Defendants' Hearsay Documents Do Not Show Trust Ownership ........ 27

IV. Defendants' Miscellaenous Arguments All Fail ........ 36

CONCLUSION ........ 43

**TABLE OF AUTHORITIES**

**Cases**

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
No. 14-cv-6544,
2019 U.S. Dist. LEXIS 91965 (E.D.N.Y. May 31, 2019) ........ 23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 4

*Baptiste v. Carrington Mtge. Servs., Inc.*,
No. 17-cv-1494,
2017 U.S. Dist. LEXIS 103609 (E.D.N.Y. July 5, 2017) ........ 6

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988) ........ 4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 4

*Chase Bank USA, N.A. v. Hershkovits*,
No. 62213-09,
2010 N.Y. Misc. LEXIS 2818 (Civ. Ct. Kings Cnty., June 22, 2010) ........ 24

*Citibank (S.D.), N.A. v. Martin*,
11 Misc. 3d 219 (Civ. Ct., N.Y. Cnty. 2005) ........ 41

*Clomon v. Jackson*,
988 F.2d 1314 (2d Cir. 1993) ........ 5

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ........ 37, 38, 39, 40

*Gigli v. Palisades Collection, L.L.C.*,
No. 06-cv-1428, 2008 U.S. Dist. LEXIS 62684 (M.D. Pa. Aug. 14, 2008) ........ 10, 18

*Harte v. Ocwen Fin. Corp.*,
No. 13-cv-5410,
2018 U.S. Dist. LEXIS 21843 (E.D.N.Y. Feb. 8, 2018) ........ 21, 22

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
251 A.3d 116 (Del. Ch. 2020) ........ 21, 22

*In re Taranto*,
No. 10-bk-76041,
2012 Bankr. LEXIS 1320 (Bankr. E.D.N.Y. Mar. 27, 2012) .... 41

*Kuria v. Palisades Acquisition XVI, LLC*,
752 F. Supp. 2d 1293 (N.D. Ga. 2010) .... 39

*Leach v. NCO Fin. Sys.*,
No. 15-cv-890,
2015 U.S. Dist. LEXIS 129414 (W.D. Wash. Sept. 25, 2015) .... 23, 27, 35

*Maco v. Baldwin Union Free Sch. Dist.*,
249 F. Supp. 3d 674 (E.D.N.Y. 2017) .... 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .... 4

*Mayfield v. Asta Funding, Inc.*,
95 F. Supp. 3d 685 (S.D.N.Y. 2015) .... 37

*Meyer v. Ward*,
No. 13-cv-3303, 2017 U.S. Dist. LEXIS 70431
(N.D. Ill. May 9, 2017) .... 21

*Midland Funding LLC v. Austinnam*,
No. 2959-13, 2015 N.Y. Misc. LEXIS 9
(City Ct. Mt. Vernon, Jan. 6, 2015) .... 10, 29

*Midland Funding LLC v. Brent*,
644 F. Supp. 2d 961 (N.D. Ohio 2009) .... 10, 17

*Midland Funding v. Giraldo*,
39 Misc. 3d 936, 937–38 (N.Y. Dist. Ct. Nassau Cnty. 2013) .... 10, 15, 37

*Nat'l Collegiate Student Loan Trust 2007-4 v. Seldal*,
No. 21CV192 (Wisc. Cir. Ct., Dane Cnty. June 14, 2024) .... 41

*Nat'l Collegiate Student Loan Trust 2007-4 v. Seldal*,
No. 21CV192 (Wisc. Cir. Ct., Dane Cnty. Sept. 22, 2021
[transcript of oral argument; filed Oct. 4, 2021]) .... 23, 27

*New Hampshire v. Maine*,
532 U.S. 742 (2001)........................................................................................................ 22

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
85 N.Y.2d 20 (1995) .......................................................................................................... 6

*Page v. Forster & Garbus, LLP*,
No. 18-cv-3611,
2019 U.S. Dist. LEXIS 101832 (E.D.N.Y. June 17, 2019) ................................................... 42

*Palisades Collection, LLC v. Gonzalez*,
10 Misc.3d 1058[A],
2005 N.Y. Misc. LEXIS 2774 (Civ. Ct., N.Y. Cnty. Dec. 12, 2005) ..................................... 41

*Pepper v. United States*,
562 U.S. 476 (2011)........................................................................................................ 39

*Ray v. Watnick*,
182 F. Supp. 3d 23 (S.D.N.Y. 2016) .................................................................................. 7

*Saks International, Inc. v. M/V "Export Champion"*,
817 F.2d 1011 (2d Cir. 1987) ...................................................................................... 5, 24

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*,
163 F. Supp. 3d 109 (S.D.N.Y. 2016) ......................................................................... 10, 17

*SEC v. Hughes Capital Corp.*,
124 F.3d 449 (3d Cir. 1997) ............................................................................ 5, 24, 25, 35

*SEC v. Meltzer*,
440 F. Supp. 2d 179 (E.D.N.Y. 2006) ................................................................................ 4

*Shetiwy v. Midland Credit Management*,
980 F. Supp. 2d 461 (S.D.N.Y. 2013) ................................................................. 36, 38, 39

*Sykes v. Mel Harris & Assocs., LLC*,
757 F. Supp. 2d 413 (S.D.N.Y. 2010) .............................................................................. 37

*Town of Islip v. Datre*,
No. 16-cv-2156,
2022 U.S. Dist. LEXIS 26044 (E.D.N.Y. Feb. 14, 2022)...................................................... 40

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965) .......... 37, 38, 39, 40
*Webb v. Midland Credit Mgmt.*,
No. 11-cv-5111,
2012 U.S. Dist. LEXIS 80006, at *13–15 (N.D. Ill. May 31, 2012) .......... 24, 25, 26, 35
*Wi-Lan Inc. v. Sharp Elecs. Corp.*,
992 F.3d 1366 (Fed. Cir. 2021) .......... passim
*Wilson v. NW Mut. Ins. Co.*,
625 F.3d 54 (2d Cir. 2010) .......... 6
*Winslow v. Forster & Garbus, LLP*,
No. 15-cv-2996,
2017 U.S. Dist. LEXIS 205113 (E.D.N.Y. Dec. 13, 2017) .......... passim

**Statutes**

12 Del. C. § 3801 .......... 21
12 Del. C. § 3809 .......... 21
12 Del. C. § 3816 .......... 21
12 Del. C. §§ 380-06 .......... 21
Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. .......... passim
N.Y. Gen. Bus. Law § 349 .......... passim
N.Y. Jud. Law § 487 .......... 6, 17, 37

**Rules**

22 NYCRR § 130-1.1 .......... 11
Fed. R. Civ. P. 56 .......... 4, 9, 18, 22
Fed. R. Evid. 801 .......... 21, 22, 23, 27
Fed. R. Evid. 803 .......... passim

The evidence proves that Defendants[1] are liable for filing sham college loan debt collection lawsuits against Plaintiffs and the Class without possessing admissible evidence proving that they owed debts to the Trusts. Defendants' internal documents reveal that the Trusts did not have, and cannot produce, documents proving ownership of individual debts. Nevertheless, the Trusts' servicer TSI-NCO ordered their debt collection lawyers, Forster & Garbus' attorneys, to falsely certify in state court lawsuits that they had reviewed proof of ownership to fraudulently obtain default judgments.

Student loan asset backed trusts (or "SLABS") like the Trusts here operate entirely on hearsay documents, as those collecting debts on behalf of these Trusts almost never have first-hand knowledge of the originating or securitization of the debts. It is therefore essential that the Trusts' documents be complete, reliable, and trustworthy, so as to meet the high standard of the business records exception to the rules barring hearsay. *See* Fed. R. Evid. 803(6) & -(E) (requiring sufficient indicia of "trustworthiness" for documents submitted by non-creator to be considered reliable).

According to Defendants' internal documents, the underlying loans were supposed to be sold by (1) a lending bank (e.g., Bank One), to (2) a pass-through entity called National Collegiate Funding LLC ("NCF") and then sold again to a specific Trust (e.g., National Collegiate Student Loan Trust 2004-2). To collect on any loans issued by a lending bank, the

---

[1] Unless otherwise indicated, all capitalized terms used herein has the definitions set forth in Plaintiffs' Consolidated Class Action Complaint (ECF No. 124). "Br. __" refers to Defendants' summary judgment brief (ECF No. 490). "CFPB" means Consumer Financial Protection Bureau; "NYAG" means the Attorney General of the State of New York; and "PHEAA" means the Pennsylvania Higher Education Assistance Agency, a.k.a "AES." References to "Defs.' 56.1 & Pls.' Resps., at Nos. __" are to Plaintiffs' responses to Defendants' statements per Local Rule 56.1; to "Defs.' Exs." are to Defendants' exhibits accompanying their motion; and to "Pls'. Add'l 56.1, at Nos. __ & Pls.' Decl. Exs. __" to Plaintiffs' additional Rule 56.1 facts and accompanying exhibits.

Trusts need to include all of the loan documents and full chain of title in whole, or else their documents cannot be considered trustworthy and reliable business records.

Far from "trustworthy," the Trusts' records are a mess. The Trusts are missing: (1) essential pages in their chain of title documents; (2) the terms and conditions of the loans, and (3) the "program guidelines" that were supposed to dictate how specific loans were lent through various banks' various originating programs focusing on education loans. Plaintiffs' individualized details in the Trusts' systems are sometimes simply wrong. The Trusts' records are so bad that the Trusts' owners are suing TSI-NCO. The Trusts' records are so bad, the Trusts were prosecuted by both the NYAG, and the CFPB.

The Trusts' creators screwed up the Trusts' documents so badly that when TSI-NCO employees needed evidence of a debt for state court collections, they often resorted to scouring the internet, including searching the U.S. Securities and Exchange Commission's ("SEC") website, k own as "EDGAR."

Even worse, where the Trusts' records have documents, the documents in the Trusts' records are often different than the documents filed with the SEC. We are left to guess which is the true sale document. Yet, Defendants ask the Court to certify that the Trusts' copies as reliable business records without offering up any reason for the discrepancy. The Trusts records are missing numerous other critical documents, proving a botched securitization.

The Trusts documents also reveal that Defendants knew that they did not possess proof of assignment. In its procedures' manual for debt collection attorneys, TSI-NCO told Forster & Garbus that the Trusts would not provide them with copies of documents evidencing chain of title, bill of sale, assignment, or loan terms for National Collegiate Trust accounts. Because they knew they didn't have them.

Recognizing the insufficiency of the documents that Defendants relied on to obtain thousands of default judgments against the Class, Defendants now attempt to rely on hearsay documents obtained from third parties PHEAA and FMC during the pendency of this lawsuit.

On their face, PHEAA's documents actually prove that the Trusts are not the owners. Notes for each account contain a field indicating who the "OWNER" is—they do not name the Trusts. PHEAA's account notes also indicate who the "APPLIED OWNER" is. Again, no mention of the Trust name that should be there. PHEAA's declarant offers no reason or explanation why the "OWNER" fields would not list the owner. This problem is compounded, because PHEAA's records also contradict Defendants' assertions as to which banks originated which loans.

The hearsay documents offered by a declarant from third party First Marblehead Corporation ("FMC") originate from the same botched securitization as the Trusts' documents and so suffer from the same defects. The metadata from FMC's documents reveal that they were made after the securitization and so do not qualify for any hearsay exception under Fed. R. Evid. 803(6), because they were not made at the time of the events they recorded. Further, the lack of simultaneous recordation is a violation of the terms of pre-securitization documents that FMC and the Trusts filed with the SEC.

In short, Defendants' conduct of sham student loan debt collection litigation in state court—leading to thousands of judgments against individuals despite no evidence of ownership of the loan—calls for summary judgment as to liability against Defendants. Plaintiffs hereby oppose Defendants' motion for summary judgment, and cross-move for summary judgment in Plaintiffs' favor.

## STANDARDS

### I. Standard Of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to establish the lack of any factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An otherwise properly supported motion for summary judgment will not be defeated because of "the mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, the requirement is that there be no "genuine issue of material fact." *Id.* at 248.

When considering a motion for summary judgment, the Court must draw all inferences from the underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." *Id.* at 586. Moreover, the party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' [as] the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *SEC v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)); *see also Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 678 (E.D.N.Y. 2017).

## II. Legal Standards

### A. Federal Rule of Evidence 803(6)

"The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Saks International, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987).

Where a proponent proffers hearsay records that are missing pages or are inconsistent, the records are not considered sufficiently trustworthy for admission to evidence under Fed. R. Evid. E 803(6)'s business records exception. *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1373 (Fed. Cir. 2021) (refusing to admit documents with inconsistent metadata); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 456 (3d Cir. 1997) (refusing to admit records under Rule 803(6) because the records had "a lack of trustworthiness" on their face). This is particularly where the proponent fails to provide evidence that might clear up the inconsistencies. 992 F.3d at 1373.

### B. Fair Debt Collections Practices Act ("FDCPA")

The FDCPA prohibits debt collectors from the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The statute sets forth a list of various representations which are prohibited, including, inter alia, "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken," and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(5), -e(10). The statutory list is non-exhaustive. As such, "a debt collection practice can be a 'false, deceptive, or misleading' practice in violation of § 1692e even if it does not fall within any of the subsections of § 1692e." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993).

Congress enacted the FDCPA to protect consumers. Courts in this circuit evaluate FDCPA "misstatement" claims based from the objective perspective of the "least sophisticated consumer." *Baptiste v. Carrington Mtge. Servs., Inc.*, No. 17-cv-1494, 2017 U.S. Dist. LEXIS 103609, at *4–5 (E.D.N.Y. July 5, 2017). A false statement must be material to be actionable, and is deemed material if it would influence a consumer's decision or ability to pay or challenge a debt. *Id.*, at *11–12. In light of the objective nature of the least sophisticated consumer standard, "the determination of how the least sophisticated consumer would view" the statement presents a question of law. *Id.*, at *5.

**C. General Business Law ("GBL")**

The GBL makes it unlawful to commit "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service . . . ." N.Y. Gen. Bus. Law § 349. It allows for private rights of action seeking injunctive relief, damages and attorneys' fees. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24 (1995). To establish a violation, a plaintiff must demonstrate: (1) that the act or practice was consumer oriented; (2) that it was misleading in a material respect; and (3) that the plaintiff was injured as a result. *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).

Like the FDCPA, the GBL has a "reasonable consumer" standard that is objective, and the plaintiff need not show reliance on the deception. *Id.* The GBL does not require that a plaintiff to be a consumer of a product or service provided by the defendant. *Oswego*, 85 N.Y.2d at 25.

**D. New York Judiciary Law ("NYJL")**

The NYJL makes liable in a civil action any "attorney or counselor" who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party." N.Y. Jud. Law § 487(1). "[C] ourts interpreting th[is] statute, as well as federal

courts construing the state court decisions, have concluded that liability attaches" under this law where a counsel has engaged in deceit that the court finds "extreme" or "egregious," causing the plaintiff damages. *Ray v. Watnick*, 182 F. Supp. 3d 23, 29 (S.D.N.Y. 2016), *aff'd* 688 F. App'x 41 (2d Cir. 2017).

## BACKGROUND

In the early 2000s, banks and investment firms began to look for ways to profit from securitizing student loan debt, just as they had from securities backed by residential mortgages. As with the mortgage debt bubble, the securitization of student loans (also known as "student loan asset-backed securities" or "SLABs") would lead to a bubble that ultimately would burst due to unrealistic expectations, irresponsible lending protocols, and mismanagement of records.

The market for selling SLABs to investors and analysts on Wall Street was mainly led by FMC. Working both alone and with hired marketers, FMC targeted students who hoped to figure out a way to enroll in a local commuter college. To effectuate its plan, FMC acquired a nonprofit guaranty fund called TERI, and worked with each major bank to create a variety of "Program Guidelines" pursuant to which banks would target certain customers for inclusion in SLABs based on various financial and demographic indicators, such as credit scores of parents, intended subject for major upon matriculation, etc. These Program Guidelines varied not only from bank to bank, but also within banks, as most banks set up numerous private-student-loan "programs" that allowed banks to experiment with marketing strategies and risk profiles.

The banks, FMC, and TERI signed several contracts amongst themselves that cemented their plan to go forward with a series of SLABs spanning the next several years. They called these SLABs "National Collegiate Student Loan Trusts." FMC and TERI promised investors—in documents filed with the SEC to promote their securities sales—that there would be strictly

maintained recordation of the assets within each National Collegiate Student Loan Trust, of which there are fifteen in total (including the four Trusts here). They also memorialized these promises in contracts between themselves and lending banks that were reached before securitizations even began.

Specifically, each time a bank assigned a "pool" of debts to a Trust, there had to be a precisely dated list (also known as "schedule" or sometimes "roster") that showed which supposed loans had become part of which National Collegiate Student Loan Trust. Also, the National Collegiate SLABs were perhaps the most prominent, but not the only SLABs that the banks had arranged for. The schedules were essential because, if precise debts could not be proved against specific individuals, the investors' assets would be functionally worthless.

Ultimately, none of the assumptions proved true concerning how National Collegiate Student Loan Trusts' assets would perform, or would be administered, or have promised records maintained. First, TERI was so poorly funded that, once a few loans went bad, the entire guaranty structure failed, and TERI had to file for bankruptcy by 2009. The trust administrators and collection agents working on behalf of the National Collegiate Student Loan Trusts thus faced immense pressure to seek more and more money from people who they guessed had been included in a National Collegiate Student Loan Trust, even though there was no proof that a specific loan connected to a specific individual for a specific amount was owned by a specific National Collegiate Student Loan Trust.

The collection agents—Defendant TSI-NCO as national coordinator of local attorneys such as Defendant Forster—adopted wildly aggressive collection tactics including lawsuits in state court and default judgments against individuals including Plaintiffs here. Defendants knew, and memorialized in internal documents, that proof of ownership and amount were unavailable

for the National Collegiate Student Loan Trusts' supposed debts. They prosecuted collection lawsuits in state court anyway.

In 2015, the National Collegiate Student Loan Trusts' owners ordered an audit of proof of asset ownership, found it was missing (if it ever existed), and filed a lawsuit in Delaware Chancery Court against agents including TSI-NCO. Meanwhile, the CFPB commenced a regulatory action against Defendants here. Earlier this year, that action ended in an agreed judgment that confirmed the existence of a master list of state court collection suits in which judgments were obtained despite there being no proof of ownership. Similarly, the NYAG has also penalized TSI-NCO after its investigation found the same violations as had previously been identified.

This Court denied Defendants' Rule 12 motion in 2019. In 2023, it certified the Rule 23 Class here. After Defendants lost their appeal to the Second Circuit concerning the certification ruling in Plaintiffs' favor, this case proceeded to the Rule 56 motion practice, which commenced with Defendants' motion. Plaintiffs oppose Defendants' motion and hereby cross-move that summary judgment be entered in their favor as to all claims and all Defendants.

## ARGUMENT

### I. Defendants Prosecuted Sham Debt Collection Suits Against Plaintiffs

Defendants violated the FDCPA, GBL, and Judiciary Law by engaging in sham college loan debt collection suits while knowing that proof of their ownership of the debt was absent and not readily available. Ord. of Sept. 27, 2023, 2023 U.S. Dist. LEXIS 173057, at *28–29 (summarizing law prohibiting "sham lawsuit scheme[s]"). Numerous on point cases below support Plaintiffs' cross motion for summary judgment. Defendants have no authority absolving their conduct.

### A. Plaintiffs' Proof Warrants Summary Judgment Against Defendants

From November 2012 through at least 2015, Defendants ran a debt collection lawsuit mill obtaining default judgments on unprovable debts. (*See* Pls'. Add'l 56.1, at Nos. 1–48 & Pls.' Decl. Exs. A–L). Where the purported assignee of a debt—such as each Trust Defendant here—"commences a lawsuit" through its collectors, without "evidence to support the[ir] claim does not exist or is not readily available," they are liable for damages. *Midland Funding v. Giraldo*, 39 Misc. 3d 936, 937–38, 947–50 (N.Y. Dist. Ct. Nassau Cnty. 2013) (approving FDCPA and GBL claims for sham collection suits that collector prosecuted in state court despite lack of chain of title); *see Winslow v. Forster & Garbus, LLP*, No. 15-cv-2996, 2017 U.S. Dist. LEXIS 205113, *25–39 (E.D.N.Y. Dec. 13, 2017) (Shields, Mag. J.) (granting summary judgment for plaintiffs on FDCPA and GBL claims against state court counsel for deceitful actions in furtherance of state court suits on behalf of National Collegiate Student Loan Trust 2005-3); *Midland Funding LLC v. Brent*, 644 F. Supp. 2d 961, 963–72 (N.D. Ohio 2009) (summary judgment for plaintiffs' claims under FDCPA and Ohio law where debt buyer accused of sham suits in state court).[2]

TSI-NCO's attorneys violated the Judiciary Law by engaging in sham litigation without review of evidence concerning chain of title and the ownership of the alleged debt before filing suit. *Midland Funding LLC v. Austinnam*, No. 2959-13, 2015 N.Y. Misc. LEXIS 9, at *15–16 (City Ct. Mt. Vernon, Jan. 6, 2015) ("In order for any inquiry by counsel into the merits of the

---

[2] *See also Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109, 114 (S.D.N.Y. 2016) (Rakoff, J.). (summary judgment against collector on FDCPA claim where the collector sued in state court "[without] good faith" basis for suit); *Gigli v. Palisades Collection, L.L.C.*, No. 06-cv-1428, 2008 U.S. Dist. LEXIS 62684, *4–37 (M.D. Pa. Aug. 14, 2008) (denying collector-defendant summary judgment given evidence it sued in state court without chain of title).

instant matter to be reasonable, counsel had an obligation to obtain the required documentation substantiating a prima facie case, including proof of the entire chain of assignment(s) of the alleged debt, prior to filing the instant action.") (citing, inter alia, 22 NYCRR § 130-1.1(a)).

**B. Defendants Did Not Have Or Could Not Get Chain of Title Or Proof Of Assignment**

The Trusts cannot prove that they own specific debts. This is why the Trusts are being sued by their owners, the CFPB, and the NYAG. The first set of documents that Defendants produced as proof of debt was provided to Plaintiffs in connection with the Rule 30(b)(6) deposition of Bradley Luke, who served as corporate designee for both TSI-NCO and the Trust Defendants. This discovery occurred in late 2019 early 2020, ahead of the discovery deadline in early 2021. This discovery contained a number of inconsistencies:

**1. Conflicting Pool Supplement Documents**

The documents that Defendants initially produced, and about which Luke testified, included documents that Luke described as "Pool Supplements," i.e., the contract assigning a specific pool of loans to a specific Trust. Luke testified that this is part of the chain of title for each purported Trust debt. However, supposed Pool Supplements initially produced contains the page that would inform the reader where to locate the Schedule listing individual loans purportedly being assigned: the first page of each Pool Supplement identifies an "attached Schedule" listing such loans, yet there is no accompanying attachment, or even attached placeholder page. (*See* Pls.' Add'l 56.1, at Nos. 20-30).

Luke testified that Defendants' catalogue of supposed Pool Supplements is patchy. According to Luke, some of the Pool Supplement documents produced to Plaintiffs were PDFs that had been provided by FMC to TSI-NCO in early 2012, around the time TSI-NCO began servicing Trust collection accounts that were about to be subject to state court collection suits

(including Plaintiffs'). In other instances, he said, FMC never provided a Pool Supplement, and Luke or someone else at TSI-NCO would check the SEC EDGAR database to try to locate a copy of that Pool Supplement for download. Last, there were some instances when, as Defendants prepared for Luke's depositions, Defendants somehow located a PDF version of a Pool Supplement that they thought existed only on EDGAR. (*See* Pls.' Add'l 56.1, at Nos. 20-32).

All this meant that, for each Pool Supplement, Defendants have two, sometimes three competing copies of supposedly the same document. Rather than proving that any one copy is valid, Defendants attempt a scattershot approach, asking the Court to assume that at least one of these conflicting documents must be valid. This reasoning is flawed, because the competing Pool Supplements conflict on the crucial issue of where to locate each Schedule listing loans that was supposed to be attached to each Pool Supplement. For example, one copy of the Bank One/2004-2 Pool Supplement that Defendants produced is one that Luke (or a co-worker) downloaded from EDGAR; this copy contains no attachment page. A second copy of the Bank One/2004-2 Pool Supplement that Defendants produced is a PDF that contains an attachment page stating that the "Schedule" listing loans is located on a "supplemental loan roster CD"; Defendants never produced this CD (and still haven't). (*Id.*,; *see also* Pls.' Decl. Ex. G). A third copy of the Bank One/2004-2 Pool Supplement that Defendants produced is a PDF that contains an attachment page stating that the "Schedule" listing loans is "[o]n file with the Indenture Trustee," which SEC records identify as U.S. Bank National Association. (*See id.*).

**2. Conflicting Spreadsheet Production**

Defendants never had chain of title and instead have attempted to construct chain of title during this lawsuit. In March 2020, the Trust Defendants produced a spreadsheet that they

described as the Schedules for each Plaintiff's alleged debt. At deposition, however, Luke admitted that the spreadsheets cannot be the Schedules referenced in the Pool Supplements, because they were actually extracts from a larger spreadsheet that was the actual Schedule referenced in the Pool Supplement. These documents simply aren't reliable, suffering fatal inconsistencies. Specifically, the extracts were supposed to contain unique identifiers for each Plaintiff and his/her debt, including social security number. For one out of five Plaintiffs, the data in the extracts did not match the Plaintiff's personal information.

The Court recognized the importance of the Schedules to prove chain of title and ordered Defendants to produce them, but the Defendants did not comply because they simply don't have them. For example, in August 2020 this Court instructed Luke to produce the "supplemental loan roster CD" mentioned in the second copy of the Bank One/2004-2 Pool Supplement. (Ord. of Aug. 6, 2020 U.S. Dist. LEXIS 140889, at *5; *see* Pls'. Add'l 56.1, at Nos. 23–24). Defendants admitted they were unable to locate that CD after many months' efforts. (Pls'. Add'l 56.1, at Nos. 24–27 & Pls.' Decl. Ex. G). Defendants have never produced this CD, and it's unclear if it ever actually existed. Without the Schedules, the Pool Supplements and accompanying assignment agreements did not transfer any specific loans to the Trusts.

### C. Defendants' Collection Attorneys Were Not Allowed To Review Evidence Of Ownership Before Filing Suit, Despite Certifying That They Had

TSI-NCO's documents reveal that it did not allow its debt collection attorneys to review and certify that it owned the debt before filing a debt collection lawsuit. Under TSI-NCO's written guidelines, debt collection attorneys were required to sue in state court all individuals listed in the Trust's paperwork, even though the Trust could not prove ownership of the debt.

Bradley Luke, as TSI-NCO's Rule 30(b)(6) corporate designee, testified that during the relevant time period, TSI-NCO maintained a document called the "Manual" or "Standard

Operating Procedure" (or "SOP") that TSI-NCO provided to law firms within the Attorney Network, including Forster. (Pls'. Add'l 56.1, at Nos. 7–15 & Pls.' Decl. Exs. B & E). Mr. Luke further testified that law firms within the "Attorney Network"—a nationwide network of local firms specializing in debt collection suits and retained and overseen by TSI-NCO as state-court counsel suing on behalf of the Trusts—were required to comply with the SOP with respect to debt collection lawsuits in state court in which any Trust Defendant was the plaintiff. (*Id.*). Forster's corporate designee confirmed this. (*Id.*).

TSI-NCO uses an online communications portal called "eRecoverEase" ("eRE"), so the Network Firms may communicate with TSI-NCO concerning collections issues using "P-codes." An appendix to the SOP contains a list of all P-codes. *(Id.)*. In conjunction with issuing the SOP, TSI-NCO also issued Network Firms a written instruction called a "Media Ordering Manual" concerning how and when Network Firms would be provided, or could request, evidence supporting claims being made in state court actions. (*Id.*; *see also* Pls.' Decl. Ex. C).

In the Media Ordering Manual, there is a "Client P-Code Availability Table" which states that Network Firms would not be provided copies of the actual documents (or "media") evidencing "Chain of Title," "Bill of Sale/Assignment," or "[Loan] Terms" for "National Collegiate Trust" accounts, even if Network Firms requested such media. (*Id.*). That Availability Table is reproduced below[3]:

[3] This Court, in recommending certification of the Rule 23 Class here, described Defendants' SOP and accompanying documents as a "unified playbook" by which "sham suits [against Plaintiffs] were filed and litigated" by Defendants in state court. R&R of Mar. 13, 2023, 2023 U.S. Dist. LEXIS 43041, at *72 (Moses, Mag. J.).

**Client PCode Availability Table**

| ANS Client | S126 Affidavit | S128 Applications | S127-S129-Z105 Statements | Z107 Payment History | Z106 Terms/Card Member Agreements | Z111 Bill of Sale/Assignment | Z112 Loan Documents | Z114 Chain of Title |
|---|---|---|---|---|---|---|---|---|
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| FMH/National Collegiate Trust | x | | | x | | | x | |
| [redacted] | x | x | x | | x | x | | x |
| [redacted] | x | x | x | | x | x | | x |
| [redacted] [redacted] | x | x | x | | x | x | | x |
| [redacted] [redacted] | x | x | | x | x | | x | |
| [redacted] | x | | x | | | | | |

If you request an item that is not available by client, your request is invalid and you will receive a pcode Z128 for that request.

This proof, alone, warrants summary judgment against Defendants on all causes of action pleaded. It is a de facto violation of the law to knowingly prosecute cases in state court where chain of title and other necessary proof of debt "does not exist or is not readily available." *Giraldo*, 39 Misc. 3d at 937–38, 947–50 (defining test for liability for sham suits).

Through this Table, the Trusts and TSI-NCO unequivocally admitted that (1) chain of title is <u>never</u> available, (2) that any request for such proof "is invalid," yet nevertheless (3) Forster and the Network Firms still must prosecute collection suits against individuals like Plaintiffs. Forster did what it was ordered to do thousands of times, taking millions of dollars, knowing it wrong, and knowing the co-Defendants knew it was wrong. (Pls'. Add'l 56.1, at Nos. 7–15 & Pls.' Decl. Exs. B–C & E).

Defendants offer no evidence explaining away or contradicting the Availability Table's clear meaning. *See Winslow*, 2017 U.S. Dist. LEXIS 205113, *25–39 (granting plaintiffs summary judgment on basis of small number of unambiguous documents authored or used by defendant). Like in *Winslow*, the Trusts and counsel named as Defendants herein had a policy of

suing individuals in state court even though the Trusts were not registered as entities with the state. *Id.*; *see also* Pls.' Add'l 56.1, at No. 1. Here, however, the evidence is even more compelling than in *Winslow*, because the evidence here is that Defendants' also had a policy to prosecute state court suits to judgment despite having no proof of debt. (Pls'. Add'l 56.1, at Nos. 7–15 & Pls.' Decl. Exs. B–C & E). Last, as discussed below, Defendants additionally made it their policy to further violate the law by using false affidavits to secure their state court judgments.

### D. Affiants Falsely Swore To Boilerplate Pre-Printed Affidavits Without Review Of Debt Ownership

TSI-NCO's scheme also required employees of TSI-NCO's "Affiants Team," supervised by Bradley Luke, to swear out boilerplate affidavits by the dozen that falsely attest to personal knowledge of the debt asserted, when Affiants could not review chain of title. Specifically, a senior TSI-NCO manager oversaw a team of professional affiants employed by TSI-NCO (the "Affiants") who robo-signed affidavits that falsely attested to having personal knowledge of proof of debt. These fraudulent affidavits were then filed by Forster in support of state court applications for default judgments like the ones entered against Plaintiffs. Affiants were given pre-printed affidavits based on a boilerplate, were told to sign dozens of affidavits each day, and were directed by superiors to sign the affidavits without reviewing chain of title. Nevertheless, the affidavits falsely attested that they had reviewed chain of title. The overall theme is that individuals with a duty to check proof of debt were told they couldn't. *See id.*

TSI-NCO's internal documents confirm that the Affiants signed affidavits while falsely swearing to personal knowledge and review of proof of debt. Testimony in this case from Affiants themselves shows they never had a clue about chain of title for Trust debt, and to this day do not. One Affiant felt so strongly about the Trusts' failure to possess chain of title that he

eventually sent the CFPB a whistleblower statement about the ongoing violations concerning chain of title on debt allegedly owed to Trusts. He believed that Trusts were obtaining judgments unlawfully in state court by misrepresenting chain of title.

Courts have granted summary judgment for FDCPA, GBL, and NYJL claims when presented with similar evidence of systematic prosecution of sham suits without evidence. For example, in a 2017 case in the Eastern District of New York the court analyzed competing summary judgment motions concerning whether Forster was liable for (among other violations) submitting state-court complaints on behalf of one National Collegiate trust where the complaint incorrectly designated the trust as an "original creditor." The evidence showed Forster knew that the trust was not the original creditor but sued anyway (as well as knowing no Trust was registered in the state, also a violation). The plaintiffs won summary judgment as the evidence left zero doubt of the fact that the defendant committed the violation and had no excuse for it. *Winslow*, 2017 U.S. Dist. LEXIS 205113, *25–39 (summary judgment for plaintiffs where evidence left no triable question as to Forster's liability for actions in state court on behalf of Trusts).

Similarly, in a 2009 case in the Northern District of Ohio, a debt collector was accused of using false affidavits in state court in which employees of the debt collector pretended to personal knowledge of an assigned debt. The defendant argued it had reasonably relied on information from the assigning credit card company, but the court rejected this, emphasizing that the collector's corporate policy uniformly required employee-affiants to swear to the same, false statement of personal knowledge in every single instance. *Brent*, 644 F. Supp. 2d at 963–72 (N.D. Ohio 2009); *see also Samms*, 163 F. Supp. 3d at 114 (same result, for false statements on jurisdictional facts).

Even if this Court were inclined to deny Plaintiffs' cross-motion, all of the cited evidence which Plaintiffs cite in these papers, when viewed collectively and in the light most favorable to Plaintiffs as non-movants on Defendants' Rule 56 motion, raises a triable question as to whether Defendants prosecuted sham suits, thus justifying denial of Defendants' motion. *Gigli*, 2008 U.S. Dist. LEXIS 62684, *4–37 (denying defendant's Rule 56 motion against FDCPA claim given evidence arguably showing it sued in state court without proof of debt).

### E. Multiple Other, Trustworthy Sources Confirm Defendants' Fraud As Plaintiffs Allege In This Action

Multiple other, trustworthy investigations into Defendants have confirmed that Plaintiffs' evidence is definitive proof of fraud by Defendants, and that the fraud necessitates a judgment against Defendants for millions of dollars at least.

#### 1. The Trusts' Delaware Chancery Action

In 2018, the NCSLT trusts' owners filed a Delaware Chancery Court case against TSI and other agents, alleging they failed to safeguard assignment documents for the NCSLT trusts, making it impossible to prove the right to collect under state law—a sine qua non for any creditor. *See* Am. Verified Compl. ¶¶ 70–79, *Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*, No. 2018-0167 (Del. Ch. June 15, 2018) [Transaction ID 62138855]. The Delaware Chancery case confirmed that, in late 2015, a company called Boston Portfolio Advisors, Inc. ("BPA") conducted an audit of PHEAA, at the instruction of the NCSLT trusts' owners, and made the following conclusions:

- Assignments were not present in any of the collateral files provided and PHEAA did not indicate if an Assignment existed elsewhere. Based on representations made by PHEAA, it is likely that the Assignments do not exist. Without appropriately issued Assignments, collection efforts are more challenging and costly to defend in Court.

- PHEAA is not aware of the criteria FMC used for assigning a batch of loans to any given trust except the general knowledge that FMC was able to package loans to

appeal to investors. PHEAA would change the owner on its system upon notification from FMC. Loans were not bundled by disbursement year or period (i.e. the 2007 trust does not contain all loans originated in the 2006-2007 academic year) and the criteria that FMC used to formulate the trusts was never disclosed to PHEAA. The first trust (National Collegiate Master Student Loan Trust) was replenished with 6 independent securitizations from 2001 to 2006, while the other 14 trusts were one and done transactions. . . . . .

BPA-PHEAA Audit, (Pls'. Add'l 56.1, at Nos. 2–5 & Pls.' Decl. Ex. A, at 7, 17).

The Trusts' owners' complaint in the Delaware Chancery case explained that the BPA audit revealed insurmountable doubts about the lists of loans ("Schedules") that were supposed to contemporaneously record which loan, from which Bank to which consumer, was part of which Trust securitization, and in what amount. *See* Del. Ch. Am. Verified Compl. ¶¶ 1–76. The audit's conclusion that Schedules (if they ever existed) had gone missing or were not properly maintained, meant the Trusts were unable to prove chain of assignment if challenged in state court. *Id.* The Trusts admit and assert in their Delaware Chancery Action complaint the following facts:

- To establish standing and obtain a judgment against a defaulted borrower [in state court], the Trusts, who were not the original lenders, must demonstrate their ownership of the loan [being alleged]." (*Id.*, ¶ 73).
- "The transaction documents dealt with this as follows. First, each deal included Pool Supplement agreements, whereby the originator of the loans (called the 'Program Lender') 'transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the 'Depositor') . . . each student loan set forth on the attached Schedule 1 [or 2].' Each Schedule[] states that the list of loans is 'On file with FMC' (i.e., First Marblehead)." (*Id.*, ¶ 74).
- "[TSI-NCO and the Trusts' other servicers], however, have failed to obtain and safeguard the Schedule [] to each Pool Supplement agreement. . . ." (*Id.*, ¶ 76 (emphasis added)).

**2. NYAG's Action**

In September 2020, NYAG announced that after investigation it found TSI-NCO had collected Trust debt that was unprovable and uncollectable. *In re Transworld Sys., Inc.*, NYAG

Assurance No. 20-061 (the "NYAG Action"). The NYAG's investigation uncovered that TSI-NCO concealed their lack of proof of ownership of the debt they were collecting on. *Id.* ¶¶ 3–4, 31. According to the NYAG, Defendants have extracted money from individuals despite lacking documentation "demonstrat[ing] a link between the loan at issue and the [specific] Trust" that supposedly owns the loan. *Id.* ¶ 31.

**3. CFPB's Action**

In the CFPB's 2017 complaint in its regulatory action concerning National Collegiate, the agency stated that National Collegiate entities including the Trusts named herein had prosecuted "lawsuits [in state court where] documentation of a complete chain of assignment evidencing that the subject loan was transferred to the [Trusts] was missing" and "where the documentation did not support the Trusts' ownership of the loans"; despite the fact the Trusts "could not prove that a debt was owed to [them] if contested," and they "knew, or their processes should have uncovered, that these chain of assignment documents were missing, [the Trusts] continued to file collection lawsuits." Compl., ¶¶ 52–57, *CFPB v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 17-cv-1323 (D. Del. Sept. 18, 2017).

Earlier this year, the CFPB announced that it and other parties to the regulatory action, including Defendants herein, had reached a stipulation and judgment confirming the existence of a "Master List" of instances wherein individuals were sued in state court in collection lawsuits naming Trusts as plaintiffs despite the absence of proof of assignment. *See* Agency Announcement, "National Collegiate Student Loan Trusts" (CFPB Jan. 16, 2025);[4] *see also*-Stip.

[4] As of the date of Plaintiffs' filing, the CFPB's above-referenced announcement is available at: https://www.consumerfinance.gov/enforcement/actions/national-collegiate-student-loan-trusts/

Final J. & Ord., at ¶¶ 5(a), (d), (f) & (j), *CFPB v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 17-cv-1323 (D. Del. Jan. 16, 2025).

**4. These Other Actions Are Admissible, Compelling Evidence In This Case**

This Court is empowered by the Rules and caselaw to consider and rely upon the above-cited other actions concerning Defendants. These other actions have been, and remain, admissible and compelling evidence in this case for several reasons.

*First*, the findings by the CFPB and the NYAG constitute admissible and compelling evidence from "a public office [in which] it sets out . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii); *see Meyer v. Ward*, No. 13-cv-3303, 2017 U.S. Dist. LEXIS 70431, at *9 (N.D. Ill. May 9, 2017). *Second*, the BPA audit findings highlighted in the Delaware Chancery action are the kind of "third party investigative reports" that "are frequently admitted" by federal courts, and relied on as compelling evidence, because "they are trustworthy." *Harte v. Ocwen Fin. Corp.*, No. 13-cv-5410, 2018 U.S. Dist. LEXIS 21843, at *51 (E.D.N.Y. Feb. 8, 2018) (Reyes, Mag. J.), *adopted*, 2018 U.S. Dist. LEXIS 55420 (Mar. 30, 2018) (Brodie, J.).

*Third*, the Trust owners' statements in Delaware Chancery are admissible and compelling evidence here, because they constitute a party admission of sham suits as against the Trust Defendants. *Harte*, 2018 U.S. Dist. LEXIS 21843, at *57–58 (citing Fed. R. Evid. 801(d)(2)). Specifically, the Trusts' owners are the only parties empowered under Delaware law to pursue a derivative claim on behalf of any Trust. *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 190–92 (Del. Ch. 2020) (citing, inter alia, 12 Del. C. §§ 3801, 3805–06, 3809 & 3816). In turn, the Trusts' owners owe a fiduciary duty to each Trust that owners will, among other duties, fight fraud taking place against any Trust. *Id.* Given the unique privileges and responsibilities that Delaware law grants the Trusts' owners, any statements that the owners

make are admissible against the Trust Defendants when submitted by an opposing party here (i.e., Plaintiffs). Fed. R. Evid. 801(d)(2)(A)–(D);[5] *Harte*, 2018 U.S. Dist. LEXIS 21843, at *57–58 (applying Rule 801(d)(2) to admit and rely upon statements inculpatory against defendants and authored by defendants' own agent).

The Trusts' owners' complaint in Delaware Chancery is verified, obviating any concern that their statements there lack evidentiary weight under Rule 56. *See* Del. Ch. Ct. R. 3(c)(1)(A), -(E), & -(2) (Delaware law requires Chancery complaints contain verification with oath of veracity); *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d at 130 n.16 (confirming verified complaint); *see also* Fed. R. Civ. P. 56(c)(1)–(2) (evidentiary standards for materials regarding summary judgment).

*Fourth*, the allegations in the Delaware Chancery case are admissible and compelling evidence that the Trust Defendants must be judicially estopped from denying the existence of the fraud centering on sham suits. The Trusts' owners "owe fiduciary duty to the Trusts" to report fraud against the Trusts, so as to protect the Trusts' assets and compensate for any undue losses, for the benefit of all investors. *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d at 190–92. The Trust Defendants here cannot take an inconsistent position from the Trusts' owners, even if the lawyers nominally representing them here wish they could. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (judicial estoppel must be applied where two factual positions are maintained by the same party, "prohibiting parties from deliberately changing positions according to the exigencies of the moment."); *Am. Tech. Ceramics Corp. v. Presidio*

[5] Any of several of Rule 801(d)(2)'s provisions applies in this context—for example, the Trusts' owners' statement to Delaware Chancery that TSI-NCO caused sham suits qualifies as a "statement offered against" the Trust Defendants and "made by the[ir] agent . . . on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

*Components, Inc.*, No. 14-cv-6544, 2019 U.S. Dist. LEXIS 91965, at *20 (E.D.N.Y. May 31, 2019) (Matsumoto, J.) (emphasizing that "defendant may be bound by positions it took in a different litigation.").

## II. Defendants Cannot Produce Evidence Showing The Trusts Own Any Loans

The evidence clearly shows that Defendants do not have chain of title—the key piece of proof in any collection case in state court over an assigned debt—and thus cannot prove that any Trust's ownership of any of specific loans. Unavailingly, Defendants devote much of their brief to contending that they are able to prove full chain of title connecting each alleged loan and each Trust that allegedly owns it—even though, again, their own internally recorded corporate policies belie their assertion. *Compare* Br. 8–17, *with* Pls.' Decl. Ex. C.

To manufacture their argument, Defendants selectively quote portions of documents that this Court should not even consider, because these are hearsay. Plaintiffs maintain that the documents which Defendants cite, even if considered, betray fatal inconsistencies both internally and with other documents in the record, as discussed further below. However, the fact that these documents are hearsay should compel this Court to disregard them without even reviewing them.

### A. Defendants' Documents Must Be Struck As Hearsay

None of the documents that Luke offers to prove ownership of a debt are admissible into evidence, as they are all hearsay. *Nat'l Collegiate Student Loan Trust 2007-4 v. Seldal*, No. 21CV192 (Wisc. Cir. Ct., Dane Cnty. Sept. 22, 2021 [transcript of oral argument; filed Oct. 4, 2021]) ("*Seldal I*") (finding Luke's submitted documents ineligible for business records exception to rule against hearsay); *see, e.g.*, *Leach v. NCO Fin. Sys.*, No. 15-cv-890, 2015 U.S. Dist. LEXIS 129414, at *8–11 (W.D. Wash. Sept. 25, 2015) (refusing to apply business records exception to documents submitted by TSI-NCO in support of unsuccessful summary judgment motion) (analyzing Fed. R. Evid. 801(c) & 803(6)). Defendants' declarants discuss documents

concerning securitization events and purported student loans that occurred years before these declarants even became aware they existed (if at all).

While the "principal precondition to admission of documents as business records pursuant to [Fed. R. Evid.] 803(6) is that the records . . . be considered reliable," here Defendants did not consider their own records reliable to prove their debts. *Saks*, 817 F.2d at 1013. Luke testified that because Defendants' records were often missing documents sufficient to prove a debt, TSI-NCO employees would search the SEC EDGAR database to try to locate a copy of that Pool Supplements necessary to prove chain of title. (Pls'. Add'l 56.1, at Nos. 31–32 & Pls.' Decl. Ex. H).

No wonder Defendants did not trust their own documents—the Trusts' documents are a mess, replete with incorrect data entries, missing documents, and missing pages of documents. This demonstrates a lack of reliability and trustworthiness. Fed. R. Evid. 803(6); *Wi-Lan*, *Inc.*, 992 F.3d at 1373 (refusing to admit documents with inconsistent metadata); *Hughes Capital Corp.*, 124 F.3d 449 at 456 (refusing to admit records under Rule 803(6) because the records had "a lack of trustworthiness" on their face); *accord Webb v. Midland Credit Mgmt.*, No. 11-cv-5111, 2012 U.S. Dist. LEXIS 80006, at *13–15 (N.D. Ill. May 31, 2012) (applying 803(6)(E) as bar to consideration of defendants' documents) (rejecting as "[un]trustworthy" testimony and documents submitted by assignee-collector's declarant, where documents purportedly came from assignor but declarant lacked knowledge of how they were created.); *see also, e.g.*, *Chase Bank USA, N.A. v. Hershkovits*, No. 62213-09, 2010 N.Y. Misc. LEXIS 2818, at *9–18 (Civ. Ct. Kings Cnty., June 22, 2010) (refusing documents per New York's hearsay rule where declarants testimony was "contradicted by the documents she produced" or ignored absence of documents she failed to produce).

The errors and inconsistencies in Defendants' records are numerous. *First*, Defendants have produced conflicting sets of the Pool Supplements, the contracts by which loans purportedly were sold to NCF for subsequent securitization into one of the Trusts. (Pls'. Add'l 56.1, at Nos. 21–30). Defendants have produced competing copies of these, in that each Pool Supplement is supposed to have attachment page identifying the location of the Schedule listing individual loans in the pool—but Defendants' copies either (1) don't have the attachment page, or (2) there are competing copies of the same Pool Supplement with different attachment pages identifying different locations of the Schedule. (*Id.*). Defendants' pool supplements are also often different than the copies of those documents filed with the SEC by the Trusts' creators. Also, again, when TSI-NCO first began working on Trust collections in late 2012, they received from FMC an incomplete set of Pool Supplements and had to search the SEC database to look for copies of a particular Pool Supplement not supplied by FMC.

*Second*, there are at least 23 distinct Program Guidelines setting forth the financial and demographic criteria for each of the many unique lending programs under which student loans purportedly were originated in the early 2000s for subsequent securitization in a National Collegiate Student Loan Trust. (*See* Wilbert Decl. Exs. A–B (ECF No. 494-1, at ECF Pages 98–102) (listing separate Program Guidelines). However, Defendants have produced <u>one</u> copy of an alleged Program Guideline and wrongly cite to it in their Local Rule 56.1 statement as if it is identical to every single other Program Guideline. (*See* Defs.' 56.1 & Pls.' Resps., at Nos. 65–67). The absence of dozens of separate copies indicts a lack of reliability of Defendants' source of documents, meaning what they have produced is hearsay. *Webb*, 2012 U.S. Dist. LEXIS 80006, at *13–15 (applying Rule 803(6)(E)); *Wi-Lan Inc.*, 992 F.3d at 1373; *Hughes Capital Corp.*, 124 F.3d at 456.

*Third*, Defendants Pool Supplements' are often missing critical pages, including attached Schedules located on a "CD." Defendants said that Luke would try to locate any such CD but ultimately admitted none could be found. (Pls'. Add'l 56.1, at Nos. 21–27 & Pls.' Decl. Ex. G). As with all of the mistakes in Defendants' documents, Defendants provide no excuse for the existence of holes and errors in its records. *Wi-Lan Inc.*, 992 F.3d at 1373 (documents considered unreliable under Fed. R. Evid. 803(6), because the offeror failed to offer any explanation for errors).

*Fourth,* errors in in the data fields in Defendants' records demonstrate a lack of trustworthiness. For one out of five Plaintiffs, the data in the extracts did not match the Plaintiff's personal information. (Pls'. Add'l 56.1, at Nos. 33–36 & Pls.' Decl. Ex. I).

*Fifth*, the metadata for Defendants' spreadsheets demonstrates that they were made well after the securitization, and therefore were not recorded at or near the time of the securitizations. *Wi-Lan*, 992 F.3d at 1373 (refusing to admit documents with inconsistent metadata).

Any one of these instances indicating of lack of trustworthiness would be sufficient basis for the Court to refuse all of the documents that Defendants submit as business records. *See* Fed. R. Evid. 803(6)(E). The repeated nature of all these indicia of untrustworthiness, taken together, should compel this Court to outright reject Defendants' evidentiary proffer as inadmissible hearsay. *Webb*, 2012 U.S. Dist. LEXIS 80006, at *13–15 (refusing outright to consider defendant's proffered documents).

**B. Courts Agree That Defendants Violate The Rule Against Hearsay**

The Trusts' documents should also not be considered reliable business records for purposes of Fed. R. Evid. 803(6), because they were not "made at or near the time by—or from information transmitted by—someone with knowledge." Fed. R. Evid. 803(6)(A). As the *Seldal* court held in rejecting as hearsay similar documents that Luke had submitted there, Luke's

written testimony "is drafted really primarily to confuse" and "[h]e feels that simply saying that something is a true and correct copy made at or near the time of the event giving rise to the document, [and] if he says it over and over again, [then] it certainly must be true and accepted by the court." *Nat'l Collegiate Student Loan Trust 2007-4 v. Seldal*, No. 21CV192 (Wisc. Cir. Ct., Dane Cnty. Sept. 22, 2021 [transcript of oral argument; filed Oct. 4, 2021]) ("*Seldal I*") (finding Luke's submitted documents ineligible for business records exception to rule against hearsay); *see, e.g.*, *Leach v. NCO Fin. Sys.*, No. 15-cv-890, 2015 U.S. Dist. LEXIS 129414, at *8–11 (W.D. Wash. Sept. 25, 2015) (refusing to apply business records exception to documents submitted by TSI-NCO in support of unsuccessful summary judgment motion) (analyzing Fed. R. Evid. 801(c) & 803(6)).

## III. Defendants' Hearsay Documents Do Not Show The Trusts Own Any Loans

For the reasons above, Defendants' documents as submitted in support of their motion are hearsay not admissible as evidence. However, even if the Court were to consider them, they show fatal inconsistencies. Also, most of the documents they now rely upon were produced years after the close of discovery, immediately calling into question Defendants' depiction of them (and possibly requiring a penalty by this Court).

### A. FMC's Declarant Jens Meyer Cannot Produce Proof Of Debt

Once the deficiencies in the Defendants' documents as produced by Luke became clear, Defendants sought proof of debt from third party FMC. In the stead of Defendants' own incomplete and untrustworthy records, Defendants submit a declaration form FMC employee Jens Meyer, attached to which are several dozen spreadsheets. The Trusts' securitization documents clearly state that each Pool Supplement must "include a Schedule" identifying which loans the trust owns. (Pls' Resps. re Defs.' 56.1, at Nos. 4, 17, 28, 42, 54). Meyer falsely

represents that his spreadsheets are the Schedules from the Pool Supplements that the Trusts are missing.

The metadata data from the spreadsheets Meyer attaches, however, reveal that Meyer's assertions are false, and the spreadsheets cannot by the missing Schedules because they were created well after the securitization. Meyer submitted 61 spreadsheets, and none of them is contemporaneous to the securitization. (Pls' Resps. re Defs.' 56.1, at Nos. 4, 17, 28, 42, 54, 74, 105).

Moreover, because Meyer's spreadsheets are all hearsay, they are inadmissible into evidence because they were not created at the time of the events they recorded, which would have been during the securitization. Fed. R. Evid. 803(6).

### B. Meyer's Declaration Obscures The Source Of Data

Meyer states in his declaration that his spreadsheets were created using Microsoft applications, and that the "source" of the information within the spreadsheets "is derived from loan tapes received in connection with the origination and servicing of the Trusts' loans." (Pls.' Decl. Ex. D). Meyer does not provide technical details describing these "loan tapes," nor does he say who created the "tapes" nor who sent them to FMC.[6] Meyer provides no information to authenticate this. Meyer either does not know these details, or he is intentionally obscuring them because they are detrimental to Defendants. Either way, this Court cannot accept any of Meyer's assertions about the timeliness and accuracy of the spreadsheets. *See* Fed. R. Evid. 803(6)(E) (courts must reject evidentiary proffers where "source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

---

[6] Meyer also expressly disclaims that FMC owes any "obligation, contractual or otherwise, to maintain any documents or data for the Trusts." (*Id.*).

### C. Defendants' Proposed "Expert" Cannot Conjure Proof Of Debt

After the deficiencies in the Meyer documents became obvious during the Rule 23 briefing, Defendants invented yet a third strategy to try and conjure a chain of title—again years after they swore in open court that they had reviewed chain of title. In late 2024—nearly four years after the close of discovery—Defendants suddenly announced that they needed an expert witness to explain why this was a typical securitization. The new expert, Roger Saylor, whose field of expertise seems to be unique to he alone, did not address why the CFPB, the NYAG, and the Trusts owners all think Defendants' documents depict the opposite to what he opines.

Defendants now argue that the Schedules actually are <u>not</u> the true proof of Trust debt, and that a former Wall Street banker, Roger "Rusty" Saylor, with no personal knowledge of what any facts herein, would explain it all away. Saylor's testimony concerns an area he has not worked in for almost two decades, and so it is not surprising that he has limited memory of the circumstances of student loan securitizations. There are numerous instances in his testimony where Saylor's statements are flat out wrong. Plaintiffs have moved separately to strike Saylor's report and preclude him from being admitted as an expert here. (*See generally* Pls.' Strike Br. (ECF No. 480)). That motion remains sub judice, but because Defendants cite to Saylor's we briefly summarize the essential flaws in his opinions.

#### a. Saylor's Excuses For Defendants' Lack of Evidence Are Unavailing

Saylor attempts to excuse Defendants' lack of complete sales contracts by bizarrely arguing that sales contracts are not what transfer ownership of debts. Instead, Saylor invents the idea never seen before at law of passing title of a debt through "servicer notes," a feature in third party servicer software. This is simply not the law. Courts look to chain of title documentation to determine chain of title. That is why the documentation was supposed to be created for these Trusts, and why the Trust' owners are suing them. *Midland Funding LLC v. Austinnam*, No.

2959-13, 2015 N.Y. Misc. LEXIS 9, at *15–16 (City Ct. Mt. Vernon, Jan. 6, 2015) (emphasizing necessity of "proof of the entire chain of assignment(s) of the alleged debt" when suing in state court as assignee).

As an initial matter, the Account Notes in PHEAA's records plainly indicate on their face, that the Trusts are not the "OWNER" of any of the alleged debts, as discussed below. Moreover, Saylor's theory is contradicted by the Trusts' own documents. Prior to the Trusts' creation, the numerous participants arranging the anticipated securitizations—FMC, TERI, PHEAA, all the banks, all the legal counsel specializing in pre-securitization contracts—expressly contracted in writing—via servicing agreements—that each Pool Supplement would be accompanied by a Schedule that had to be finalized before the securitization.

Further, Saylor's theory of Schedule-irrelevance conflicts with the securities documents filed with the SEC at the time of each Trust's securitization. As part of a securitization, the Trusts filed sales documents with the SEC that represented to the public that, following securitization, there would be a way to identify the specific loans held by the trusts. The only way described in the sales documents was that Schedules would be attached to Pool Supplements. For each Trust securitization, the sales documents repeated to investors the promise that each Pool Supplement would be accompanied by a Schedule timely as of the date of each securitization. There was no mention of any servicer notes.

Saylor's theory of Schedule-irrelevance also conflicts with Defendants' and their counsel's prior words and actions in this case. Defendants spent years arguing to Plaintiffs and this Court that the Schedules exist and are valid. They had Meyer gather dozens of spreadsheets to produce as the Schedules and defended their authenticity in multiple briefings also spanning several years. All of this must have required dozens of working hours from counsel and

company staff. If the Saylor theory was correct, Defendants would have simply presented it here years ago, instead of spending all that time and energy trying to defend Meyer's inadequate spreadsheets.

Finally, for all these reasons, the account notes are unreliable, and therefore are hearsay and should not be admitted into evidence.

**b. Saylor Is Wrong That All Loans From Some Banks Went To Trusts**

Saylor's conclusions rest on several unfounded assumptions—particularly that all of the loans from certain originators ended up in the Trusts, and so one could simply use the method of time to sort out which loan belongs where, even if the schedules are lost. This could only be true, however, where all of the originating banks assigned all of their loans to the Trusts. According to this theory by Saylor, one can tell that a particular loan is owned by one of the Trusts simply by looking at the year a particular loan was allegedly lent, and the bank that allegedly lent it. Even if true, this point is irrelevant here, there are multiple Trusts for each year and what matters in this case is whether an alleged loan can be traced to a specific Trust, not just that a loan might be owned by some nonspecific one. (There is a total of fifteen National Collegiate Student Loan Trusts, including the four Trusts named herein; there were often multiple Trusts per year during the 2000s, for example Trusts 2007-2 and 2007-3).

In fact, the documents Saylor cites actually show that it is impossible to determine the final ownership of a private student loan based on the year and bank. In the early 2000s, banks—including those that allegedly originated loans for Plaintiffs—used a variety of securitization strategies. The National Collegiate Student Loan Trusts constituted a substantial securitization strategy, perhaps, but far from the only one. Banks originating student loans in the early 2000s could have been assigning loans towards not just any of the fifteen National Collegiate entities, but also numerous other securitization structures, which is why it was crucial

to track which banks' purported loans went to which securitization. (*See* Pls.' Resp. re Defs.' 56.1, at No. 69).

Again, even if Saylor is correct the debt collection attorneys and Affiants neither knew or relied on this theory.

**D. PHEAA's Declarant Cannot Produce Proof Of Debt**

On the eve of their deadline to file the Rule 56 motion—four years after the close of discovery—Defendants produced to Plaintiffs a declaration from an employee of PHEAA, Jennifer Wilbert, who submitted a set of entirely new documents which Defendants had never mentioned before.

The documents in PHEAA's possession originate from the same flawed securitization process that made the Trust's and FMC's records a mess. It is no surprise, therefore, that the BPA audit of PHEAA's records found them to be spotty and unreliable. Wilbert's testimony is similarly inconsistent and unhelpful.

**a. PHEAA's Account Notes Prove The Trusts Aren't The Owners**

PHEAA's account notes are designed to list the owners of the accounts in its system, but none of PHEAA's account notes lists any Trust as the "OWNER" of any Plaintiff's alleged loan. Instead, there's a strange alphanumeric coding next to "OWNER" that Wilbert bizarrely ignores, rather than explain. For example, Plaintiff Tabar is accused of owing money to Trust 2007-2, but the PHEAA account notes for her list the "OWNER" as "122962QC – NCT." This proves that Trust 2007-2 <u>does not own</u> Plaintiff Tabar's loan. Similarly, PHEAA account notes for Plaintiff Bifulco list the "OWNER" of her loan as "122962QT – NCT." This disproves assertions by Trust 2004-2 that it owns the loan. This defect repeats itself throughout the Wilbert-provided documents. (*See* Pls.' Resp. re Defs.' 56.1, at Nos. 5, 18, 29, 43, 55).

Further, for three out of five account notes that Wilbert submits, the name of the bank that purportedly lent the loan does not appear, and instead reflects the name of a different bank. (*See* Pls.' Resp. re Defs.' 56.1, at Nos. 17, 28, 42). Wilbert provides no explanation for this.

Likewise, Wilbert provides no explanation for ignoring the plain meaning of the "OWNER" field. Similarly, Wilbert provides no explanation why the Trusts' names appear nowhere in PHEAA's account notes. Instead, Wilbert attempts to scrap together an association with the Trusts using unrelated data fields. For example, for Plaintiff Tabar, Wilbert points to a field in the PHEAA account notes that "BOND ISSUE: NCT20072"— Wilbert does not account for the fact that FMC's first "National Collegiate" securitization was for a trust called National Collegiate Master Student Loan Trust, which issued bonds based on six independent securitizations from 2001 to 2006 ("NCMSLT"). As BPA found in auditing PHEAA, the existence of the NCSLMT securitizations caused confusion for PHEAA staff trying to keep track of loan pools. This means that Wilbert, as a PHEAA employee, cannot be trusted if she asserts that "BOND ISSUE: NCT20072" definitively connects to Trust 2007-2. (*See* Pls.' Decl. Ex. A). She does not even explain why she thinks "BOND ISSUE: NCT20072" means National Collegiate Trust 2007-2. She does not cite any training, experience, or manuals upon which she bases this conclusion. Likewise, Luke testified at deposition that the existence of the NCSLMT securitizations caused TSI to use a coding system for NCSLT trusts that didn't match the alphanumeric of official trust names like "Trust 2007-2," and so is unintelligible to outsiders. (*See* Pls.' Strike Br. (ECF No. 480))

**b. Wilbert's Depiction Of The Flow Of Data Is Contradicted By The Record**

Wilbert's testimony is unreliable, as it is contradicted by the Trust's own loan documents. According to Wilbert: "When a pool of Loans was sold, PHEAA received from First Marblehead

Corporation electronic data identifying all of the Loans serviced by PHEAA that were subject to the particular sale to the National Collegiate Student Loan Trust entity." (Defs.' Ex. 1). This cannot be true, because the contracts that PHEAA and FMC signed required that PHEAA, not FMC, create the Schedule for each Pool Supplement. The servicing agreement clearly states that it was PHEAA that was required to send FMC a copy of the Schedule shortly before the securitization date, and then also send FMC a confirmatory copy of the list shortly after the securitization date. (*See* Br., 12–13 (Defendants' brief discusses PHEAA's obligations).

**c. PHEAA's Account Notes List The Wrong Banks As Originators**

Most of the documents that Wilbert submits are screenshots of account notes in PHEAA's computer systems, which are unreliable hearsay. There are a total of five collection accounts that Defendants associate with Plaintiffs here. Each account note purports to list the name of the bank that Defendants have alleged originated each alleged loan. However, for three out of five accounts here, PHEAA's account notes identify the <u>wrong bank</u>: For Plaintiff Tabar, PHEAA's systems indicate a debt owed to Trust 2007-2 with the originating bank as PNC Bank, while Defendants' assert that the loan Tabar owes to Trust 2007-2 was originated by National City Bank. Similarly, PHEAA's account notes for accounts purportedly owed by Trust 2004-2 state that the originating bank as "JPMORGAN CHASE BANK." while Defendants insist those debts were originated by Bank One, N.A. (*See* Pls.' Resp. re Defs.' 56.1, at Nos. 17, 28, 42). PHEAA's account notes are not reliable evidence of anything. Wilbert does not attempt to explain away these fatal inconsistencies.

Moreover, PHEAA's Account Notes have clearly been changed since at least 2008, and so cannot be considered to have been created at or near the securitizations in 2007. National City was acquired by PNC on October 23, 2008, according to records from the government's Federal

Deposit Insurance Corporation ("FDIC"). Since they list PNC as originator, PHEAA's account notes must have been created after October 23, 2008, and so could not have been created on or near the securitization in 2007. Again, Defendants offer no facts in the record to excuse these discrepancies. PHEAA's account notes simply cannot be proof of chain of title.

PHEAA's account notes similarly fail in supporting chain of title against Bifulco and Butry, as those documents also have signs of having been altered. Bank One was acquired by JP Morgan Chase on November 13, 2004, according to FDIC records. Defendants have always maintained that the alleged Bifulco loan was lent on September 6, 2004, and was sold to Trust 2004-2 on October 28, 2004. As to Butry, Defendants have maintained that his alleged loan was lent on August 27, 2004, and was sold to Trust 2004-2 on October 28, 2004. But PHEAA's account notes for Bifulco and Butry could not have been created on or near either date—the reference to JP Morgan confirms that these account notes were created after November 13, 2004, the date when Bank One was acquired by JP Morgan. (*See* Pls.' Resp. re Defs.' 56.1, at Nos. 17, 28, 42).

#### d. Wilbert's Documents Do Not Meet The Business Records Exception To Hearsay, Because They Are Unreliable

On their face, the documents that Wilbert attempts to enter are hearsay. Before applying any exception to the hearsay rules, the Court must assess the document's trustworthiness. *See* Fed. R. Evid. 803; *Wi-Lan, Inc.*, 992 F.3d at 1373; *Hughes Capital Corp.*, 124 F.3d 449 at 456; *Webb*, 2012 U.S. Dist. LEXIS 80006, at *13–15 The defects demonstrating that PHEAA's account notes are not contemporaneous, mean that they cannot be accepted as evidence by this Court under Rule 803(6). *See* Fed. R. Evid. 801(c) & 803(6) (documents proffered as business records must be rejected as hearsay if they are non-contemporaneous and/or their source is untrustworthy); *Leach*, 2015 U.S. Dist. LEXIS 129414, at *8–11 (refusing to apply business

records exception to collection account notes that bore indicia of untrustworthiness). Accordingly, this Court would be justified in ignoring Wilbert's declaration and documents altogether. But, even if the Court does review these, the inconsistencies outlined above mean they cannot be proof of debt as Defendants assert.

## IV. Defendants' Miscellaneous Arguments All Fail

Defendants raise miscellaneous other arguments, none of which has merit. Each is addressed below.

### A. Defendants Have No Authority That Supports Either Their Actions Or Their Motion

Defendants incorrectly rely on *Shetiwy v. Midland Credit Management*, 980 F. Supp. 2d 461, 475–476 (S.D.N.Y. 2013) (Scheindlin, J.) (cited by Br. 5–6, 24), which dismissed the FDCPA claims there at the Rule 12 stage due to a poorly-written complaint.

In *Shetiwy*, the pro se plaintiffs' complaint consisted of nothing more than copy-and-paste newspaper reports about wrongful practices in the debt collection industry generally, without reference to the defendants' actual practices. *Id.* at 469–71. After the *Shetiwy* defendants moved under Rule 12, Judge Scheindlin implored the plaintiffs to amend their pleading "to satisfy the minimal pleading standards of Rule 8"—but the plaintiffs for whatever reason did not listen to the court, forcing Judge Scheindlin to order dismissal. *Id.* at 475. Even so, Judge Scheindlin emphasized that "there is little doubt that at least some of the debt collection litigation practices described in the newspaper accounts pasted into the Amended Complaint would constitute violations of the FDCPA" if properly pleaded. *Id.* Here, Plaintiffs plead, and back up with proof, the case that Judge Scheindlin anticipated in *Shetiwy*. *Id.*.

Contradicting Defendants' twisted reading of *Shetiwy*, numerous other courts in this Circuit have held conduct like Defendants' here to be illegal. For example, in a 2015 case in this

District, then-Chief Judge Preska denied a motion to dismiss claims that a collector sued on assigned credit card debts in thousands of state court suit, even though the only proof it had was a spreadsheet from the card company rather than actual documentary proof. The court emphasized that corporate policy caused the collector and its attorneys to file, in every single case, affidavits falsely attesting to possession and review of true proof. *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 691–703 (S.D.N.Y. 2015) (Preska, J.) (upholding FDCPA, GBL, and NYJL claims) (citing, inter alia, *Giraldo*, 39 Misc. 3d at 936). Similarly, in the *Sykes* litigation Judge Chin found that collectors and attorneys involved in a similar scheme may be held liable for the same causes of action. *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 428 (S.D.N.Y. 2010) (Chin, J.) (same).

**B. Defendants Try To Rewrite The Law Of This Case By Raising A Defense Already Rejected By This Court**

Defendants incorrectly argue that there is a strict "test" for successfully proving liability for sham suits, and that Plaintiffs cannot pass this (fictional) test. (Br. 4–9). In so arguing, Defendants distort the precedent they cite and also violate the law of the case.

Specifically, Defendants wrongly argue that a claim about sham suits in state court, like Plaintiffs' here, only exists as a function of an exception to a defense called the "*Noerr-Pennington* defense." (Br. 4–9 (citing *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961))). During the Rule 12 motion phase here, this Court summarized *Noerr-Pennington* and explained why it does not apply here:

> "The *Noerr-Pennington* doctrine generally immunizes from liability a party's commencement of a prior court proceeding." *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002). "'The essence of the *Noerr-Pennington* [d]octrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under antitrust laws even though their petitions are motivated by anticompetitive intent.'" *Metro.*

> *Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, No. 00 CIV. 3613 (LAP), 2004 U.S. Dist. LEXIS 17093, 2004 WL 1943099, at *20 (S.D.N.Y. Aug. 27, 2004) (quoting *Video Int'l Production, Inc. v. Warner-Amex Cable Commc'ns., Inc.*, 857 F.2d 1073, 1082 (5th Cir. 1988)). "[C]ourts have expanded [the doctrine] to protect First Amendment petitioning of the government from claims brought under Federal and State law, including claims pursuant to 42 [U.S.C.] § 1983 and common-law tortious interference with contractual relations." *Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*, 268 A.D.2d 101, 107, 707 N.Y.S.2d 647 (2d Dept. 2000); *see also Metro. Opera Ass'n[]*, 2004 U.S. Dist. LEXIS 17093, 2004 WL 1943099, at *20 (S.D.N.Y. Aug. 27, 2004) (observing that "some courts . . . have extended the doctrine to state tort actions analogous to anti-trust claims," but declining to apply the doctrine to defamation claims) (emphasis in original)). Defendants have cited no case suggesting that the *Noerr-Pennington* doctrine has any application here, and "[s]everal courts have concluded that the Noerr-Pennington doctrine does not bar suits under the FDCPA based on litigation misconduct by debt collectors." *Shetiwy*[], 980 F. Supp. 2d [at] 475 n.81.
> . . . .
> Even assuming arguendo that *Noerr-Pennington* could preclude Plaintiffs' FDCPA, GBL, and Judiciary Law claims, however, the underlying state court actions cited by Plaintiff would appear to fall within the "sham exception" to the doctrine. "In the antitrust context, the 'sham exception' applies 'where the litigation is (1) "objectively baseless" and (2) intended to cause harm to the defendant "through the use [of] governmental process — as opposed to the outcome of that process."'" *Shetiwy*[], 980 F. Supp. 2d [at] 475-476[] (emphasis omitted) (quoting *T.F.T.F. Capital Corp.*, 312 F.3d at 93 (quoting *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993)). "More generally, the sham exception "excludes any abuse of process that bars access to the courts," including "unethical conduct in the setting of the adjudicatory process or the pursuit of a pattern of baseless, repetitive claims." *Id.* (internal quotation marks and citations omitted); *see also Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen*, 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004) ("Fraudulent acts are not protected by the *Noerr-Pennington* doctrine when they occur in the adjudicatory process or where false information is filed with an administrative agency with deceptive intent."). The sham exception applies here . . . .
>
> Ord. of Oct. 11, 2019, 419 F. Supp. 3d 668, 693–94 (Gardephe, J.)

Defendants' argue without authority that the "sham exception" test under *Noerr-Pennington* for the antitrust context <u>must be</u> applied to Plaintiffs' claims here, and that essentially no litigant outside the antitrust context can satisfy this test. (Br. 4–9). It should come as no surprise that Defendants' could not find authority for this proposition.

First, Defendants' argument confuses (1) the *Noerr-Pennington* defense's sham concept, with (2) the separate and distinct cause of action that Plaintiffs plead here, i.e., that Defendants prosecuted state court collection suits without ability or intent to prove the debt asserted. Some courts refer to this cause of action as "sham suit," while others use language like "su[ing] in bad faith." *Kuria v. Palisades Acquisition XVI, LLC*, 752 F. Supp. 2d 1293, 1302 (N.D. Ga. 2010). This cause of action exists independently of the *Noerr-Pennington* defense. *See id.* (approving FDCPA claim action where assignee had sued in state court "in bad faith," i.e., over alleged debt it "could not ever prove, intending to either obtain a default judgment [in state court] or coerce [the consumer] into a settlement") (no mention of *Noerr-Pennington*).

Second, as this Court already ruled as the law of the case that *Noerr-Pennington* doctrine has any application here, a defense based on the *Noerr-Pennington* doctrine is therefore foreclosed. *Pepper v. United States*, 562 U.S. 476, 506 (2011) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.")

Even if this Court were to consider Defendants' renewed application for the *Noerr-Pennington* defense—which it should not—Defendants' argument makes no sense. The "sham suit" exception to the *Noerr-Pennington* defense authorizes claims targeting "unethical conduct in the setting of the adjudicatory process or the pursuit of a pattern of baseless, repetitive claims." Ord. of Oct. 11, 2019, 419 F. Supp. at 694 (quote omitted) (listing cases).

Next, Defendants' *Noerr-Pennington* argument is contradicted by the cases they cite in support of it. Defendants again mischaracterize Judge Scheindlin's decision in *Shetiwy*. (Br. 6 (citing 980 F. Supp. 2d at 475–76)). They say *Shetiwy* supports their *Noerr-Pennington* defense, when in reality *Shetiwy* confirmed that the doctrine must not "appl[y] at all" to claims like

Plaintiffs' here—and that, even if applied, it would not absolve claims concerning fraudulent state court collection suits. 980 F. Supp. 2d at 475–76 (refusing to apply *Noerr-Pennington* to FDCPA claims).

Defendants also say their *Noerr-Pennington* challenge is supported by *Town of Islip v. Datre*, No. 16-cv-2156, 2022 U.S. Dist. LEXIS 26044 (E.D.N.Y. Feb. 14, 2022) (Brodie, J.) (cited by Br. 9). But, the *Islip* court expressly endorsed this Court's decision that *Noerr-Pennington* does not apply to this case. *See id.*, at *20–27 (citing but distinguishing this Court's Ord. of Oct. 11, 2019, 419 F. Supp. 3d at 693–94). Defendants' assertion that the *Islip* court disagreed with this Court's decision against application of *Noerr-Pennington* is simply false.

As described above, the evidence here is substantial enough to withstand any *Noerr-Pennington* challenge that Defendants might think up. Even if the Court were to consider Defendants' improper second *Noerr-Pennington* challenge, the sham exception definitively applies here, beyond any question of fact, requiring summary judgment for Plaintiffs. Alternatively, if this Court, viewing the evidence in the light most favorable to Defendants, were to conclude that such a question of fact remains, and so deny Plaintiffs summary judgment on their cross-motion, the Court still must recognize that the evidence, viewed in the light most favorable to Plaintiffs as non-movants' on Defendants' motion, creates sufficient question of fact regarding the sham execution to justify denying Defendants summary judgment on their defense that *Noerr-Pennington* applies here without the sham exception. *Cf. Islip*, 2022 U.S. Dist. LEXIS 26044, at *20–27 (indicating that *Noerr-Pennington* defense, even if considered, may be subject to sham exception as matter of law depending on facts).

### C. Defendants Are Wrong That "A Reasonable Litigant" Would Have Sued In State Court And Sought Default Judgment, As Defendants Did

Defendants wrongly argue that any "reasonable litigant" in their position would have prosecuted suits against Plaintiff through to collection, and they accuse Plaintiffs of somehow trying to create a false burden proof for collectors under state law. (Br. 17–20). Defendants cite no New York case in support of these arguments, (*id.*), and none exists. In fact, New York courts have consistently held for many years that complete, clear chain of title is the sine qua non in any state court collection case in which the plaintiff has sued over a debt it did not originate and claims to own via assignment. *Citibank (S.D.), N.A. v. Martin*, 11 Misc. 3d 219, 226 (Civ. Ct., N.Y. Cnty. 2005) (denying judgment to assignee where it lacked "proof of assignment of [the] particular" debt allegedly owed); *Palisades Collection, LLC v. Gonzalez*, 10 Misc.3d 1058[A], 2005 N.Y. Misc. LEXIS 2774, at *11–12 (Civ. Ct., N.Y. Cnty. Dec. 12, 2005); *see also In re Taranto*, No. 10-bk-76041, 2012 Bankr. LEXIS 1320, at *28–29 & n.8 (Bankr. E.D.N.Y. Mar. 27, 2012) (listing *Martin*, *Gonzalez*, and multiple other cases emphasizing necessity of chain of title in collection suits in New York state court).

Instead of New York law, Defendants cite a single case from a Wisconsin court. (Br. 17–18 (citing *Nat'l Collegiate Student Loan Trust 2007-4 v. Seldal*, No. 21CV192 (Wisc. Cir. Ct., Dane Cnty. June 14, 2024) ("*Seldal II*") (declining to certify class against Trust under Wisconsin law) [submitted as Defs.' Decl, Ex. 72; ECF No. 492-187])). Defendants' reliance on *Seldal II* fails for several reasons. First, it does not analyze New York law, and anyway never could be authoritative regarding New York law. *(See id.).* Second, *Seldal II* avoids the central merits question of whether Defendants sued without proof, as the decision simply addressed whether claims against a Trust could be class-certified under Wisconsin law, concluding they could not. *(See id.).* Third, *Seldal II* considered this Court's 2023 decision certifying the Rule 23 Class

here, but ruled that this Court's certification analysis should not be followed there. (*Id.*). This Court should not be required to follow decisions that contradict its own rulings.

### D. Defendants Are Wrong That The Trusts Do Not "Do Business" In New York For Purposes Of New York Law

Defendants argue that they cannot be held accountable for violations of New York law, because (they say) they do not "do business" in New York as that term has been applied by caselaw from another court in this Circuit. (Br. 21–24 (citing *Page v. Forster & Garbus, LLP*, No. 18-cv-3611, 2019 U.S. Dist. LEXIS 101832, at *21–24 (E.D.N.Y. June 17, 2019) (Lindsay, Mag. J.))). The *Page* court emphasized that jurisdiction would apply to National Collegiate Student Loan Trusts, because, in addition to filing numerous collection suits in New York courts, each "'Trust maintains an office in New York City, is organized under New York law, is composed of significantly New York debt, and enters into contracts (including buying and selling its securities) in New York.'" *Id.*, at *24, *quoting with approval Winslow*, 2017 U.S. Dist. LEXIS 205113 at *31 (awarding summary judgment against Forster on claims under New York law concerning collections on behalf of National Collegiate Student Loan Trust 2005-3).

Defendants also argue that several state courts have issued merits rulings in favor of various National Collegiate Student Loan Trusts over the years. (Br. 7 (listing cases)). Courts may not have had all the facts that this Court does: deep discovery, the CFPB investigation, the NYAG investigation, the Delaware Chancery suit based on the PHEAA audit.

Last, Defendants are wrong that the Court implicitly found that Defendants prosecuted meritorious state court cases when the Court narrowed the Class definition here to exclude instances in which Defendants obtained a judgment from a judge after trial or motion practice. (Br. 7). The reason for this narrowing was to ensure there were no *Rooker-Feldman* complications with the Class definition; this narrowing was <u>not</u> a finding that judge-granted state

court judgments were based on valid claims. *See* R&R of Mar. 13, 2023, 2023 U.S. Dist. LEXIS 43041, at *8 n.2.

## CONCLUSION

For the reasons set forth above, Defendants' motion should be denied in all respects, and Plaintiffs' cross-motion granted as to all claim and against all Defendants.

Dated: New York, New York
June 16, 2025

Respectfully submitted,

**FRANK LLP**

By: */s/ Gregory A. Frank*
Gregory A. Frank (GF0531)
Marvin L. Frank (MF1436)
Asher Hawkins (AH2333)
305 Broadway, Suite 700
New York, New York 10007
Tel: (212) 682-1853
Fax: (212) 682-1892
gfrank@frankllp.com
mfrank@frankllp.com
ahawkins@frankllp.com

*(Word Count Certification: this Brief contains fewer words than the limit set forth in the Order of April 8, 2025, and otherwise conforms to all Local Rules for brief formats.)*