**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KATHERINE SEAMAN, MARY RE SEAMAN, SANDRA TABAR, CHRISTINA BIFULCO, FRANCIS BUTRY, and CORI FRAUENHOFER individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,

Defendants.

Case No.: 18-cv-1781-PGG-BCM

**JOINT MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


Page

Table of Authorities ... ii

Argument ... 1

I. Plaintiffs Provide No Evidence Demonstrating Defendants Brought "Sham Lawsuits." ... 1

A. Plaintiffs' Arguments About The Application Of *Noerr-Pennington* Miss The Mark. ... 3

B. Plaintiffs Speculate And Suppose But Offer No Evidence To Substantiate Their Claims. ... 5

1. Plaintiffs Cannot Prove Their Registration Theory. ... 6

2. Plaintiffs Cannot Prove Their "Sham Litigation" Theory. ... 7

i. Plaintiffs Cannot Prove Their Ownership And Litigation Conduct Claims. ... 8

a. The Documents Plaintiffs Point To Prove Nothing. ... 8

b. Plaintiffs Cannot Prove There Were "False" Affidavits. ... 11

ii. Plaintiffs Cannot Prove The Required Intent. ... 14

a. Plaintiffs Do Not Show An Intent To Bring "Sham Litigation." ... 14

b. Plaintiffs Do Not Show An Intent To Deceive, Which Is Required For Their Judiciary Law Claim. ... 15

iii. Plaintiffs Improperly Try To Shift Their Burden To Defendants. ... 16

C. Plaintiffs' Attacks On Defendants' Evidence Do Not Save Their Case. ... 18

1. Plaintiffs' Challenges To The PHEAA Evidence Have No Merit. ... 18

2. Defendants' Declarations Are Competent Evidence And Plaintiffs' Attacks On Them Fail. ... 20

i. Jens Meyer (First Marblehead Corporation) ... 21

ii. Jennifer Wilbert (PHEAA) ... 23

II. Plaintiffs' Motion For Summary Judgment Should Be Denied. ... 25

A. Delaware Chancery Action ... 26

B. CFPB Action ... 28

C. NYAG Action ... 30

Conclusion ... 30

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 2

*BE&K Constr. Co. v. N.L.R.B.*,
536 U.S. 516 (2002) .......... 3

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988) .......... 2, 7

*Bridgeforth v. City of New York*,
No. 16-cv-273, 2018 WL 3178221 *4 (S.D.N.Y. June 28, 2018) .......... 22

*Carvalho v. Mel S. Harris & Assocs., L.L.C.*,
No. 04-cv-0425 (JBW), 2004 WL 1555193 (E.D.N.Y. July 13, 2004) .......... 6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 2

*CFPB v. Nat'l Collegiate Master Student Loan Trust et al.*,
No. 17-cv-1323 (D. Del. Jan. 16, 2025) .......... 29

*Christian Faith Fellowship Church v. adidas AG*,
841 F.3d 986 (Fed. Cir. 2016) .......... 21

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013) .......... 2

*Creighton v. City of New York*,
12-cv-7454, 2017 WL 636415 (S.D.N.Y. Feb. 24, 2017) .......... 27

*Dorce v. City of New York*,
2 F.4th 82 (2d Cir. 2021) .......... 25

*Fischer v. Gov't Emps. Ins. Co.*,
No. 23-cv-2848 (SJB), 2025 WL 964152 (E.D.N.Y. Mar. 31, 2025) .......... 22

*Gabriele v. Am. Home Mortg. Servicing, Inc.*,
503 F. App'x 89 (2d Cir. 2012) .......... 5

*GE Funding Cap. Mkt. Servs., Inc. v. Neb. Inv. Fin. Auth.*,
No. 15 Civ. 1069, 2017 WL 2880555 (S.D.N.Y. July 6, 2017),
*aff'd*, 767 F. App'x 110 (2d Cir. 2019) .......... 24

*Gosse v. Transworld Sys., Inc.*,
Case No. 20-cv-01446-RDM (M.D. Pa.) .......... 22

*Graham v. Lewinski*,
848 F.2d 342 (2d Cir. 1988) .......... 27

**TABLE OF AUTHORITIES**

Page

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ... 2

*Hernandez v. Coca Cola Refreshments USA, Inc.*,
12-cv-234, 2013 WL 6388654 (S.D.N.Y. Dec. 6, 2013) ... 27

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
791 F.2d 288 (4th Cir. 1986) ... 2

*In re Elysium Health-Chromadex Litig.*,
354 F. Supp. 3d 330 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019) ... 2

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
13-cv-7789 (LGS), 2022 WL 4087842 (S.D.N.Y. Sept. 6, 2022) ... 29, 30

*In re Fosamax Prods. Liab. Litig.*,
707 F.3d 189 (2d Cir. 2013) ... 23

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014) ... 27

*In re Sia*,
2013 WL 4547312 (Bankr. D.N.J. Aug. 27, 2013) ... 21

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
863 F.3d 1178 (9th Cir. 2017) ... 3

*Kropelnicki v. Siegel*,
290 F.3d 118 (2d Cir. 2002) ... 25

*Kuria v. Palisades Acquisition XVI, LLC*,
752 F.Supp.2d 1293 (N.D.Ga. 2010) ... 5

*La. Health Serv. & Indem. Corp. v. Celgene Corp.*,
No. 23-cv-7871 (ER), 2025 WL 1056668 (S.D.N.Y. Apr. 8, 2025) ... 3

*Lautman v. 2800 Coyle St. Owners Corp.*,
No. 14–cv–1868 (ARR)(VVP)
2014 WL 4843947 (E.D.N.Y. Sept. 26, 2014) ... 5

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ... 29

*Matsushita Elecs. Corp. v. Loral Corp.*,
974 F. Supp. 345 (S.D.N.Y. 1997) ... 4, 16

*Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*,
419 F. Supp. 3d 668 (S.D.N.Y. 2019) ... 4

**TABLE OF AUTHORITIES**

Page

*Microsoft Corp. v. Motorola, Inc.*,
795 F.3d 1024 (9th Cir. 2015). .... 29

*New York by James v. Red Rose Rescue*,
771 F.Supp.3d 311 (S.D.N.Y. 2025) .... 2, 7

*Ortho Pharm. Corp. v. Cosprophar, Inc.*,
828 F. Supp. 1114 (S.D.N.Y. 1993),
*aff'd*, 32 F.3d 690 (2d Cir. 1994) .... 21

*Paddack v. Dave Christensen, Inc.*,
745 F.2d 1254 (9th Cir. 1984) .... 27, 28

*Page v. Forster & Garbus, LLP*,
No. 18CV3611SJFARL,
2019 WL 5696108 (E.D.N.Y. June 17, 2019) .... 6, 7

*Pick v. Kay*, No. 20-55804,
2022 WL 193197 (9th Cir. Jan. 21, 2022) .... 3

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus.*,
508 U.S. 49 (1993) .... *passim*

*Ray v. Balestriere Fariello*,
No. 23-274-cv, 2024 WL 390293 (2d Cir. Feb. 2, 2024) .... 15, 16

*Raytman v. Jeffrey G. Lerman, P.C.*,
No. 17 CIV. 9681 (KPF), 2018 WL 5113952 (S.D.N.Y. Oct. 19, 2018) .... 2

*Saks Int'l, Inc. v. M/V Exp. Champion*,
817 F.2d 1011 (2d Cir. 1987) .... 21

*Seaman v. Natl. Collegiate Student Loan Tr. 2007-2*,
No. 18-cv-1781 (PGG) (BVM), 2023 WL 2975152 (S.D.N.Y. Mar. 13, 2023),
*report and recommendation adopted in part, rejected in part*,
No. 18-cv-1781 (PGG) (BVM) (S.D.N.Y. Sept. 27, 2023) .... 1, 3

*Shelton v. U. of Med. & Dentistry of New Jersey*,
223 F.3d 220 (D.N.J. 2000) .... 20, 21

*Shetiwy v. Midland Credit Mgmt.*,
980 F. Supp. 2d 461 (S.D.N.Y. 2013) .... 3

*Simmons v. Roundup Funding, LLC*,
622 F.3d 93 (2d Cir. 2010); .... 5

*Superb Motors Inc. v. Deo*,
No. 23-cv-6188 (JMW), 2025 WL 888464 (E.D.N.Y. Mar. 21, 2025) .... 2

# TABLE OF AUTHORITIES

Page

*T.F.T.F. Cap. Corp. v. Marcus Dairy, Inc.*,
312 F.3d 90 (2d Cir. 2002) .......... 3

*United States v. Gilbert*,
668 F.2d 94 (2d Cir. 1981) .......... 29

*WAKA LLC v. DC Kickball*,
517 F. Supp. 2d 245 (D.D.C. 2007) .......... 4, 16

**State Cases**

*Bill Birds, Inc. v. Stein Law Firm, P.C.*,
35 N.Y.3d 173 (2020).......... 15, 16

*Cullin v. Spiess*,
122 A.D.3d 792 (2d Dep't 2014) .......... 16

*In re Nat'l Collegiate Student Loan Trs. Litig.*,
251 A.3d 116 (Del. Ch. 2020).......... 27

*Int'l Fuel & Iron Corp. v. Donner Steel Co.*,
242 N.Y. 224 (1926).......... 6

*Interline Furniture, Inc. v. Hodor Indus., Corp.*,
140 A.D.2d 307 (2d Dep't 1988) .......... 6

*Midland Funding LLC v. Austinnam*,
No. 2959-12, 2015 N.Y. Misc. Lexis 9 (City Ct. Mt. Vernon, Jan. 6, 2015) .......... 16

*Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*,
No. 2018-0167 (Del. Ch. June 15, 2018).......... 26

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*,
No. 21-cv-192 (Wis. Cir. Ct. Dane Cnty. June 14, 2024).......... 17

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*,
19 N.W.3d 287(Table), at *7 (Wis. Ct. App. June 2, 2022) .......... 17

**Statutes**

28 U.S.C. § 1257.......... 25

NY GEN'L ASS'NS. LAW § 18 (McKinney) .......... 6

Defendants National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3 (collectively, the "Trusts"), Transworld Systems, Inc. ("TSI"), EGS Financial Care, Inc. f/k/a NCO Financial Systems, Inc. ("NCO"), and Forster & Garbus, LLP ("F&G") (collectively "Defendants"), respectfully submit this joint memorandum in further support of their motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment. For the following reasons, and for those stated in Defendants' moving brief, Defendants' Motion should be granted and Plaintiffs' motion denied.

## ARGUMENT

### I. Plaintiffs Provide No Evidence Demonstrating Defendants Brought "Sham Lawsuits."

After "deep discovery" (according to Plaintiffs) has been conducted, the record is devoid of any evidence that substantiates the essential allegations behind their claims. This case has iterated over the years, affected by decisions of this Court, and now it is one premised solely on "the alleged sham lawsuit scheme," *i.e.*, that "defendants filed debt collection lawsuits 'without the intent or ability to prove the claims, if contested,' for the sole purpose of 'procuring default judgments against consumers and/or extracting settlements from them.'" *Seaman v. Natl. Collegiate Student Loan Tr. 2007-2*, No. 18-cv-1781 (PGG) (BVM), 2023 WL 2975152, at *7 (S.D.N.Y. Mar. 13, 2023), *report and recommendation adopted in part, rejected in part*, No. 18-cv-1781 (PGG) (BVM) (S.D.N.Y. Sept. 27, 2023).[1] This means that to survive summary judgment, Plaintiffs must demonstrate their ability to prove that Defendants brought lawsuits without the

[1] The Court specifically rejected Plaintiffs' "claims 'based on specific false statements made in state court debt-collection proceedings.'" *Seaman v. Natl. Collegiate Student Loan Tr. 2007-2*, No. 18-cv-1781 (PGG) (BVM), 2023 WL 2975152, at *18 (S.D.N.Y. Sept. 27, 2023).

intent or ability to prove the claims they asserted and did so with the sole intent of procuring default judgments or settlements. This is a very heavy burden and Plaintiffs cannot carry it. *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 336 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019) (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)); *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 791 F.2d 288, 292–93 (4th Cir. 1986); *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) ("[*Pro. Real Est. Invs., Inc.*]'s exacting two-step test properly places a heavy thumb on the scale in favor of the defendant.").

It is Plaintiffs who bear the burden of proof, not Defendants. *Raytman v. Jeffrey G. Lerman, P.C.*, No. 17 CIV. 9681 (KPF), 2018 WL 5113952, at *2 (S.D.N.Y. Oct. 19, 2018) (an FDCPA or GBL § 349 claim requires plaintiff prove the elements of those claims); *Superb Motors Inc. v. Deo*, No. 23-cv-6188 (JMW), 2025 WL 888464, at *44 (E.D.N.Y. Mar. 21, 2025) ("To demonstrate a violation of Section 487, a plaintiff must meet a very high burden of proof."). Because the burden is on Plaintiffs, Defendants are entitled to summary judgment if there is "a lack of evidence to go to the trier of fact on an essential element of [Plaintiffs'] claim." *New York by James v. Red Rose Rescue*, 771 F.Supp.3d 311, 324 (S.D.N.Y. 2025) (quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)) (cleaned up); *see also Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In their moving brief, Defendants showed Plaintiffs lacked the evidence to prove their "sham litigation" claims. Plaintiffs do not respond with "significantly probative" evidence of a material factual dispute to justify allowing the case to proceed to trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Red Rose Rescue*, 771 F.Supp.3d at 324. Defendants' summary judgment motion must be granted. *See Celotex*, 477 U.S. at 323.

### A. Plaintiffs' Arguments About The Application Of *Noerr-Pennington* Miss The Mark.

Instead of pointing to "significantly probative" evidence to support their claims, Plaintiffs quibble about what "sham litigation" is.

But, this Court has set the parameters of what the Plaintiffs need to prove. Liability depends entirely on whether Defendants brought "sham lawsuits," *i.e.*, "defendants filed debt collection lawsuits 'without the intent or ability to prove the claims, if contested,' for the sole purpose of 'procuring default judgments against consumers and/or extracting settlements from them.'" *Seaman*, 2023 WL 2975152, at *6–7; *Seaman*, 2023 WL 6290622, at *31.

The case law construing the *Noerr-Pennington* doctrine provides a framework for evaluating whether a lawsuit rises to the level of "sham litigation." *La. Health Serv. & Indem. Corp. v. Celgene Corp.*, No. 23-cv-7871 (ER), 2025 WL 1056668, at *25 (S.D.N.Y. Apr. 8, 2025) (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 56; *BE&K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 532 (2002)). In order to be "sham litigation" the challenged suit must be objectively baseless *and* intended to cause harm to the defendant "through the use [of] governmental process–as opposed to the outcome of that process." *Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 475 (S.D.N.Y. 2013) (citations and emphasis omitted); *T.F.T.F. Cap. Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002). This is consistent with the Court allowing Plaintiffs' "sham litigation" theory to survive Defendants' Rule 12 motion, which simply required allegations that the lawsuits were filed while being known to be meritless. *See* ECF No. 423, pp. 38-39.

A lawsuit is not objectively baseless if it is "arguably warranted by existing law" or "based on an objectively good faith argument." *Pick v. Kay*, No. 20-55804, 2022 WL 193197, at *2 (9th Cir. Jan. 21, 2022) (citing *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1188 (9th Cir. 2017) (quoting *Pro. Real Est. Invs., Inc.*, 508 U.S. at 65)). It can be objectively

baseless *only* if no reasonable litigant could realistically expect success on the merits. *See Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 356 (S.D.N.Y. 1997); *see also WAKA LLC v. DC Kickball*, 517 F. Supp. 2d 245, 251 (D.D.C. 2007) (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 60–61).

Plaintiffs do not respond by pointing to evidence that demonstrates Defendants brought "objectively baseless," "sham lawsuits." Instead, they argue it is law of the case that Defendants cannot rely on the *Noerr-Pennington* doctrine as a defense. But, this mischaracterizes the Court's previous decision. When it denied Defendants' motion to dismiss, the Court held:

> Even assuming arguendo that *Noerr-Pennington* could preclude Plaintiffs' FDCPA, GBL, and Judiciary Law claims, …
>
> The sham exception applies here, *given Plaintiffs' allegations concerning Defendants' participation in a "fraudulent scheme to make false representations ...* in court filings in order to obtain payment on debts they cannot prove they are owed[.]"

*Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668, 693–94 (S.D.N.Y. 2019) (citations and quotations omitted) (emphasis added). The Court did not hold that Defendants could not raise a *Noerr-Pennington* defense. It held Plaintiffs' *allegations* brought the suits within an exception to the *Noerr-Pennington* doctrine. Now, Plaintiffs must *prove* these allegations.

Nevertheless, Defendants are not relying on the *Noerr-Pennington* doctrine as a defense. If Plaintiffs are going to try to hold Defendants liable for bringing "sham lawsuits" they need to prove that Defendants did in fact bring "sham lawsuits." Nothing precludes Defendants or the Court from considering *Noerr-Pennington* decisions that deal with "sham lawsuits" in determining whether Plaintiffs can prove that Defendants brought "sham litigation."

Plaintiffs realize their claims cannot survive summary judgment on the record they have created, so they try to spin up a different, relaxed gloss on how their claims should be viewed. They posit that there is a "separate and distinct cause of action" that differs from "the *Noerr-*

*Pennington* defense's sham concepts." (ECF No. 496, p. 39). They cite to a single case from the Northern District of Georgia, *Kuria v. Palisades Acquisition XVI, LLC*, 752 F.Supp.2d 1293, 1302 (N.D.Ga. 2010), for the proposition that "[s]ome courts refer to this cause of action as 'sham suit,' while others use language like 'sui[ing] in bad faith." (ECF No. 496, p. 39). But applying the *Noerr-Pennington* analysis or stating that it is a "bad faith" lawsuit is a distinction without meaning. An "objectively baseless" lawsuit brought to harass is almost certainly one that was brought in "bad faith." That is what Plaintiffs are required to establish to survive summary judgment, and they have failed to do so.[2]

### B. Plaintiffs Speculate And Suppose But Offer No Evidence To Substantiate Their Claims.

Plaintiffs' claims depend on two distinct assertions. First, Plaintiffs claim Defendants' lawsuits were improper because the Trusts were not properly registered and therefore were barred from suing in New York. Thus, any suit brought in New York is a "sham lawsuit" because it was in a forum that was known to be unavailable to the Trusts. Second, Plaintiffs claim Defendants brought suits without the intent or ability to prove that the Trusts owned their loans, and that they used false affidavits to do so.

---

[2] While courts have recognized "sham litigation" as a predicate to FDCPA and GBL claims, the Plaintiffs still need to prove that there was "sham litigation." Courts have also recognized that "the protective purposes of the FDCPA typically are not implicated 'when a debtor is instead protected by the court system and its officers,'" and noting that "the state court's authority to discipline will usually be sufficient to protect putative-debtors ... from legitimately abusive or harassing litigation conduct." *See Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 F. App'x 89, 96 n.1 (2d Cir. 2012) (*quoting Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 96 (2d Cir. 2010)); *Lautman v. 2800 Coyle St. Owners Corp.*, No. 14–cv–1868 (ARR)(VVP), 2014 WL 4843947, at *12 (E.D.N.Y. Sept. 26, 2014) ("courts in this Circuit have been reluctant to impose liability under the FDCPA for statements made by creditors' attorneys during the course of debt collection litigation" and recognizing that plaintiffs merely alleged the defendant "misled *the state court*," but did not allege they "mislead *plaintiff*[.]") (emphasis in original).

But Plaintiffs cannot – and do not – point to any admissible, "significantly probative" evidence that supports such a "scheme" under either theory.

**1. Plaintiffs Cannot Prove Their Registration Theory.**

The assertion that Defendants brought "sham lawsuits" because they sued in New York, even though the Trusts were not registered under New York General Associations Law § 18, is a non-starter. Plaintiffs have no evidence that demonstrates Section 18 applies to the Trusts.

Section 18 only applies if the Trusts are doing business in New York. (ECF 490, pp. 21–24); *see* NY GEN'L ASS'NS. LAW § 18 (McKinney); *Carvalho v. Mel S. Harris & Assocs., L.L.C.*, No. 04-cv-0425 (JBW), 2004 WL 1555193, at *1 (E.D.N.Y. July 13, 2004) (citing *Int'l Fuel & Iron Corp. v. Donner Steel Co.*, 242 N.Y. 224, 229 (1926); *Interline Furniture, Inc. v. Hodor Indus., Corp.*, 140 A.D.2d 307, 308 (2d Dep't 1988)). To establish that the Trusts are doing business in New York – at a minimum – Plaintiffs must show that the Trusts own real or personal property in New York, have entered into contracts in this state, have offices or employees here, or that their New York collection activities represent a disproportionate share of their business. *Page v. Forster & Garbus, LLP*, No. 18CV3611SJFARL, 2019 WL 5696108, at *8 (E.D.N.Y. June 17, 2019); *Carvalho*, 2004 WL 1555193, at *1. Plaintiffs present no such evidence.

The evidence actually adduced shows that the Trusts, which are Delaware statutory trusts, do not have employees in New York, and do not own or rent any real or personal property in New York. (J.S.F. ¶¶ 4, 5, 15, 19, 38, 42, 61, 65, 85, 89). There is no evidence that the Trusts entered into any contracts in New York or that a disproportionate share of their business (assuming that the Trusts even do business) takes place in New York. In other words, *all of* the indicia of doing business in the cited case law are missing.

Plaintiffs' response to this is telling. To counter the precise, factual information Defendants point to, Plaintiffs do not cite a single piece of evidence. (ECF No. 496, p. 42). Instead, they

misconstrue the *Page* decision and assert it held that the National Collegiate Student Loan Trusts do business in New York. (*Id.*). In a brief rife with misconstruction, this is a particularly egregious example. In *Page*, the Eastern District *dismissed* registration claims because the plaintiff there did not properly allege the defendants were doing business in New York. The court did not cite *Winslow v. Forster & Garbus, LLP* with approval; it distinguished that case because the plaintiff there alleged the indicia of doing business in New York, *i.e.*, that the "the Trust maintains an office in New York City, is organized under New York law, is composed of significantly New York debt, and enters into contracts (including buying and selling its securities) in New York." *Page*, 2019 WL 5696108, at *8. The evidence in this case shows that every indicia of doing business mentioned in *Page, Carvalho* and *Winslow* has either been refuted or is unsupported.

Summary judgment is put up or shut up time. Plaintiffs point to no "significantly probative" evidence that calls any of the foregoing into question, which means summary judgment should be granted in Defendants' favor.

**2. Plaintiffs Cannot Prove Their "Sham Litigation" Theory.**

Plaintiffs spend more time on their theory that Defendants brought "sham lawsuits" because the Trusts allegedly cannot prove ownership of their loans, and they allegedly used "false affidavits" in prosecuting those lawsuits. That time is ineffectively spent.

In order to prevail, Plaintiffs must prove either that (a) the Trusts do not own their loans or (b) the Trusts cannot prove that they own their loans. And, they must prove that the Trusts intended to harm Plaintiffs, not via judgments but merely by bringing the lawsuits. In their moving brief, Defendants showed that there is a lack of evidence to go to the trier of fact on these essential elements of Plaintiffs' claims. (ECF No. 490, pp. 4–21); *Red Rose Rescue*, 771 F.Supp.3d at 324; *Brady*, 863 F.2d at 210–11. Plaintiffs' opposition does not point to any "significantly probative" evidence that demonstrates otherwise.

Plaintiffs instead make, and ask the Court to make, a series of inferences that are either unsupported or contradicted by the actual evidence. This is not sufficient to overcome summary judgment.

### i. Plaintiffs Cannot Prove Their Ownership And Litigation Conduct Claims.

With respect to the question of ownership, and the ability to prove it, Plaintiffs point to two things. First, they claim Defendants produced "conflicting" Pool Supplements and spreadsheets and this means the Trusts cannot prove they own their loans. (ECF No. 496, pp. 11–13). Second, they claim that Defendants improperly conducted their collection litigation because TSI would not permit attorneys representing the Trusts to access certain documents and they provided "false affidavits." (*Id.*, pp. 13–16). The supposed "conflicting" documents do not raise any material issue of fact regarding the Trusts' ownership of any loans. The evidence actually disproves Plaintiffs' statements about Defendants' litigation activity, what the collection attorneys had access to, and the "falsity" of the affidavits.

#### a. The Documents Plaintiffs Point To Prove Nothing.

The fact that Defendants produced versions of Pool Supplements that were PDFs and others that were taken from the SEC EDGAR database does not support any inference that the Trusts do not own the loans that were deposited into them.

Pool Supplements are agreements between the Originating Banks, First Marblehead Corporation, and The National Collegiate Funding, LLC ("NCF") regarding the pools of loans the Originating Banks sold to NCF (which on the same day would sell those same loans to the respective Trust pursuant to the Deposit and Sale Agreement between NCF and the Trust). They are not bearer instruments where possession of an original document conveys some special privilege or status. It is immaterial that sometimes TSI would rely on PDFs, while other times it

would look to the version of that document filed with the SEC. Notably, Plaintiffs do not contend that the terms of the supplements differ between the PDF versions and those filed with the SEC.[3] Plaintiffs do not show how these "conflicting" documents prove the Trusts do not own their loans or affect the documentation regarding ownership held by PHEAA and in the First Marblehead database.

Plaintiffs' "evidence" regarding the loan roster "spreadsheets" fares no better. Plaintiffs essentially argue that Defendants cannot prove the Trusts own their loans because TSI relied on "extracts" from the Schedules to the Pool Supplements. (ECF No. 496, p. 13). Plaintiffs' argument is premised on supposition about the "extracts," not rooted in actual admissible evidence. But, Defendants have produced various copies of the data that makes up the Trusts' loan rosters from various sources. They have produced it from First Marblehead, the entity that selected the loans that went into each Trust in their role as the Structuring Agent. *See* ECF No. 492 (Declaration of Christopher Fontenelli), Exs. 3 (Meyer Declaration), 3-1 through 3-65 (Bates Nos. Michelo-Bifulco_Cognition_000001–65). They have produced supporting information from PHEAA, which serviced the loans from origination through securitization and supported First Marblehead in creating the securitizations. *See* ECF No. 492, Ex. 1 (Wilbert Declaration). The PHEAA data is particularly noteworthy because they have been involved with the loans from origination until today. *Id.*, Ex. 1 ¶ 19. And, Defendants also produced what TSI relied on, which NCO (TSI's predecessor) received directly from a First Marblehead entity. *See* ECF No. 492, Ex. 2 (Luke Declaration ¶ 14(c-f)). In each instance, the data in one set corresponds to the data in the other sets.

[3] Various documents relating to the Trusts were required to be filed with the United States Securities and Exchange Commission. *See, e.g.*, J.S.F. ¶ 6.

*See, e.g.*, ECF No. 492, Exs. 1 (Wilbert Declaration ¶¶ 25–26), 2 (Luke Declaration Ex. 1-B), 3-65 (Row 42474).

The weakness of Plaintiffs' loan roster "spreadsheets" argument is underscored by the way they quibble about one loan roster Defendants produced in discovery. (ECF No. 496, p. 13). They claim that a redaction error – which they know is a redaction error – calls every bit of data produced into question. Specifically, an excel spreadsheet was produced in native form with the wrong last four digits of Plaintiff Tabar's social security number. But, as Plaintiffs know, that "inconsistency" was the result of an error made while manually redacting the spreadsheet, which contained extensive personally identifiable information. *See* July 16, 2025 Declaration of Christopher Fontenelli ("Fontenelli Reply Decl.") Ex. A (Casamento Declaration, dated October 13, 2024 (ECF No. 338-3)). The document was subsequently re-produced with its original metadata intact, reflecting the correct last four digits of Plaintiff Tabar's social security number. *See* ECF No. 492, Ex. 22 (row 240).[4] That Plaintiffs justify their case based on a redaction error that was disclosed, explained, and then rectified certainly demonstrates that they do not have any "significantly probative" evidence. If anything, it broadcasts the opposite.

In reality, the record very clearly shows that a First Marblehead entity assisted with originating the loans. *Id.*, Ex. 58 (Saylor Report ¶ 24). PHEAA serviced each loan from origination, prior to it being sold to its ultimate Trust. *See* ECF. 492, Ex. 1 (Wilbert Declaration ¶ 6). PHEAA received information about the loans being originated through the origination process. *Id.*, Ex. 1 (Wilbert Declaration Ex. B Section 2.03) ("FMER, has an obligation to the Insurer to ensure the adequate conversion of the Committed Student Loans from FMER's origination system to

[4] Notably, the information relating to the Tabar Loan in row 240 of the excel spreadsheet matches the Tabar Loan information in the loan roster provided by First Marblehead in this action. *Compare* ECF No. 492, Ex. 3-64 (Michelo-Bifulco_Cognition_000064 (row 1551)) *with* Ex. 22 (row 240).

Servicer's Servicing system."). PHEAA along with First Marblehead and TERI all had access to PHEAA's system during this process. *Id.*, Ex. 1 (Wilbert Declaration Ex. B Section 4.07). Prior to any sale of loans to a Trust, First Marblehead was required to provide notice of that sale to PHEAA. *See Id.*, Ex. 1 (Wilbert Declaration Ex. B Section 13.04). The documentary evidence and testimony shows PHEAA would receive notice of the sale from First Marblehead, which would identify the loans that were subject to the sale. *See* ECF No. 492, Ex. 1 (Wilbert Declaration ¶ 14). PHEAA would then record the change in ownership once the sale was completed. *Id.,* ¶ 15. PHEAA continued to service each loan – now on behalf of the specific Trust that owned it – after the sale and securitization. *Id.,* ¶ 18. First Marblehead also maintained a database with information about the loans, including information from the loan tapes that came from the originating banks. *See* ECF No. 492, Ex. 3 (Meyer Declaration ¶¶ 4, 6). First Marblehead also had in its possession the Excel spreadsheets referred to as the Schedule to the pool supplements, which were populated using First Marblehead's and PHEAA's data. *Id.,* ¶ 9.

Plaintiffs' sole rebuttal to all of this evidence is a redaction error.

**b. Plaintiffs Cannot Prove There Were "False" Affidavits.**

Plaintiffs' claims directed at the way Defendants prosecuted their lawsuits fares equally poorly. The evidence does not support Plaintiffs' contention that the collection attorneys were not permitted to review documents. And, the evidence does not show – in fact, it contradicts – Plaintiffs' claims that Defendants relied upon "false affidavits" to support the relevant lawsuits.

Plaintiffs argue that TSI's "documents reveal that it did not allow its debt collection attorneys to review and certify that it owned the debt before filing a debt collection lawsuit." (ECF No. 496, p. 13). Plaintiffs claim there was a standard operating procedure that TSI provided to its Attorney Network, which said that "Network Firms would not be provided copies of actual

documents" and they cite a chart from what they say is the standard operation procedure. *Id.* (emphasis in Plaintiffs' brief). But, Plaintiffs' assumptions about that procedure are not supported by the record. Joel Leiderman, one of the attorneys at F&G who worked on the lawsuits at issue, testified that F&G had access to, maintained, and reviewed documents relating to the Trusts' loans, including credit agreements, disclosure forms, terms and conditions, payment histories, "chain of title documents," "assignment documents," and others. *See* Fontenelli Reply Decl., Ex. B (Rule 30(b)(6) Deposition of F&G ("F&G Dep. Tr.") at 50:3-20; 51:4-20; 60:19-23; 185:4-18). Other F&G attorneys testified that they would receive from TSI various borrower and Trust related documents, including "the application, promissory note, [and] chain of title documents." *See* Fontenelli Reply Decl., Ex. C (Deposition of Valerie Watts ("Watts Dep Tr.") at 134:17-135:14). TSI confirmed this, testifying that upon request, it would provide those documents, including an excerpt of a loan roster that made up Schedule 1 or 2 to a particular Pool Supplement. *See* Fontenelli Reply Decl., Ex. D (TSI Rule 30(b)(6) Deposition Transcript ("TSI 30(b)(6) Dep. Tr.") at 301:11-302:2). And, in addition to receiving those documents at the time of the loan referral (or through document requests in litigation) and electronic data files from NCO and TSI, F&G also had access to NCO and TSI's systems and could review various data points relating to a particular loan. *See* D.S.F.¶¶ 122–25. Far from being prevented, lawyers at F&G had no problem getting documents from TSI. (*Id.*). Plaintiffs' counsel's supposition – which is based on a single page of a document taken out of context – is not borne out by the actual testimony.

Plaintiffs simply misrepresent the evidence when they assert that TSI provided "false affidavits." (ECF No. 496, pp. 16–18). Most flagrantly, Plaintiffs assert that "[o]ne Affiant felt so strongly about the Trusts' failure to possess chain of title that he eventually sent the CFPB a whistleblower statement." (*Id.*, at pp. 16–17). Even though there is no evidentiary cite, Plaintiffs

appear to be referring to James Cummins, who was a TSI employee. Mr. Cummins made a complaint to the CFPB, but the complaint is not what Plaintiffs describe. In fact, Mr. Cummins' CFPB complaint states:

> It is critical to note that, after reviewing hundreds of files during my employment, I did not find any errors or missing documents in the records of the Trusts, including American Educations [sic] Services ("AES") ….

*See* ECF No. 498, Ex. H. Clearly, Mr. Cummins did not feel strongly that there was a "failure to possess chain of title."

During his deposition in this case, Mr. Cummins repeated this: "On the records, I think the training was pretty good in most respects … I think I made the point a couple times, all of the records of the Trust are there. … I've never looked for a loan record for any of the trusts and not been able to find it." *See* Fontenelli Reply Decl., Ex. E (Declaration of James Cummins ("Cummins Dep. Tr.") at 89:21-91:1). He testified he could "verify through the schedule when the individual loan transferred and I can see in [PHEAA] when the payments and things are made. … I can verify all the information from the loan documents included in the affidavit." (*Id.* at 96:14-22). Mr. Cummins had access to all of PHEAA's records. (*Id.* at 90:7-94:5). He also understood that the loan documents that PHEAA had came from the Trusts, but that as a custodian TSI possessed that documentation as well. (*Id.* at 95:12-13).

Far from stating that the Trusts lacked chain of title documentation, Mr. Cummins stated there were not "any errors or missing documents in the records of the Trusts" and he "never looked for a loan record for any of the trusts [without being] able to find it." *See Id.* at 90:24-91:1. And, he had multiple sources to access for that information. *Id.*, at 89:21-90:21.

Plaintiffs claim that affiants "were directed by supervisors to sign affidavits without reviewing chain of title" is equally flimsy. (ECF No. 496, p. 16). Unsurprisingly, again, there is no evidentiary cite that accompanies this. What the evidence does show is that in connection with

signing affidavits, NCO and TSI affiants had access to and reviewed credit agreements, disclosure statements, pool supplements, loan rosters relating to the schedules to the pool supplements, deposit and sale agreements, servicing files (including payment histories, loan activity, correspondence between the borrowers and servicers), and various other documents evidencing the Trusts' loan ownership. *See* Fontenelli Reply Decl., Exs. F (Deposition of Jonathan Boyd ("Boyd Dep. Tr.") at 50:24-51:4; 53:18-54:4; 64:24-65:7; 94:24-95:9; 97:13-15; 98:5-16; 168:10-14); E (Cummins Dep. Tr. at 39:22-43:14; 47:10-13; 52:17-23; 52:24-53:4; 55:2-17; 89:17-91:1; 91:11-92:8; 137:19-138:4). Those same affiants also received training on PHEAA's system of record, "had access to" it and would often verify information and "pull" information from it. *See* Fontenelli Reply Decl., Exs. F (Boyd Dep Tr. at 156:17-157-7); E (Cummins Dep. Tr. at 56:11-18; 89:17-91:1); ECF No. 492, Ex. 2 (Luke Decl. ¶ 20).

None of this supports Plaintiffs' claims. It undercuts them and demonstrates why Defendants are entitled to summary judgment.

**ii. Plaintiffs Cannot Prove The Required Intent.**

**a. Plaintiffs Do Not Show An Intent To Bring "Sham Litigation."**

Plaintiffs deal with the element of intent endemic to their "sham litigation" theory by ignoring it. The lack of evidence of Defendants' intent is writ large when Plaintiffs' counsel substitutes their opinion for evidence on this point. Consider the "motivation" Plaintiffs posit for why Defendants brought the alleged "sham lawsuits." According to Plaintiffs,

> The trust administrators and collection agents working on behalf of the National Collegiate Loan Trusts thus faced immense pressure to seek more money from people who they guessed had been included in a National Collegiate Student Loan Trust, even though there was no proof that a specific loan connected to a specific individual for a specific amount was owned by a specific National Collegiate Student Loan Trust.

(ECF No. 496, p. 8).

What stands out in this articulation – which is the only instance where Plaintiffs attempt to address the intent requirement – is that there is not a single record citation in it. One would expect Plaintiffs to cite something to show there actually was "immense pressure" or that Defendants were "guessing," or even that one of the Trusts was "seek[ing] more money." Surely there should be some deposition testimony or document that supports these assertions. If all Defendants, plus unnamed administrators and collection agents were acting in concert, there should be some evidence of that. But, Plaintiffs point to nothing, not an e-mail or a letter. There is only Plaintiffs' counsel's speculation and supposition.

Plaintiffs have nothing which evidences the requisite intent embedded in Plaintiffs' "sham litigation" theory and summary judgment in Defendants' favor is appropriate.

**b. Plaintiffs Do Not Show An Intent To Deceive, Which Is Required For Their Judiciary Law Claim.**

Distinct from their FDCPA and GBL claims, there is an intent requirement for Plaintiffs' Judiciary Law § 487 claim. So, in addition to failing to demonstrate that the collection lawsuits were a "sham," which is the necessary prerequisite to proving "deceit" under § 487 (*see* § I, *supra*), Plaintiffs fail to identify a single piece of evidence which shows F&G *intended* to deceive. Both failures are fatal to Plaintiffs' motion and require dismissal of Plaintiffs' Judiciary Law § 487 claim. *See Ray v. Balestriere Fariello*, No. 23-274-cv, 2024 WL 390293, at *1 (2d Cir. Feb. 2, 2024); *Bill Birds, Inc. v. Stein Law Firm, P.C.*, 35 N.Y.3d 173, 179–80 (2020).

Plaintiffs do not address, much less rebut, the arguments Defendants raised concerning the Judiciary Law claim. (ECF No. 490, pp. 27–29). Rather, Plaintiffs state, in conclusory fashion, that "Courts have granted summary judgment for FDCPA, GBL, and NYJL claims when presented with similar evidence…" (ECF No. 496, p. 17). However, consistent with Plaintiffs' theme of misconstruction throughout their brief, Plaintiffs fail to identify a single case where a Court has,

in fact, granted summary judgment or held an attorney liable under Judiciary Law § 487 for "sham litigation."[5] This is unsurprising, given the extremely high burden needed to establish a violation of Judiciary Law § 487. *See Ray*, 2024 WL 390293, at *1; *Bill Birds, Inc.*, 35 N.Y.3d at 179–80.

Plaintiffs' claim is entirely predicated on counsel's own supposition that F&G had some intent to participate in a "sham" litigation scheme. But at this stage, Plaintiffs are required to put forth actual proof of F&G's intent and they do not. *See Cullin v. Spiess*, 122 A.D.3d 792 (2d Dep't 2014) (granting summary judgment to attorney because there was no evidence of intent to deceive).

**iii. Plaintiffs Improperly Try To Shift Their Burden To Defendants.**

Throughout Plaintiffs' briefing there is an apparent misunderstanding of what summary judgment is. Plaintiffs argue as if Defendants need to prove some defense in order to obtain summary judgment against Plaintiffs. Not so. (*See supra* § I.A). This effort to shift the burden onto Defendants is most apparent when Plaintiffs argue that Defendants are wrong that a reasonable litigant would have sued in state court. (*See* ECF No. 496, pp. 41–42).

Plaintiffs have the burden of proving that Defendants brought "sham lawsuits," *i.e.*, lawsuits which no reasonable litigant could realistically expect success on the merits. *See Matsushita Elecs. Corp.*, 974 F. Supp. at 356; *see also WAKA*, 517 F. Supp. 2d at 251 (D.D.C. 2007) (citing *Pro. Real Est. Invs., Inc.*, 508 U.S. at 60–61). Defendants do not need to prove that they were reasonable litigants to prevail on summary judgment (though Defendants believe they have). But, Plaintiffs need to prove the opposite to avoid summary judgment.

[5] Plaintiffs' citation to *Midland Funding LLC v. Austinnam*, No. 2959-12, 2015 N.Y. Misc. Lexis 9, at *15-16 (City Ct. Mt. Vernon, Jan. 6, 2015) is wholly misplaced. That case involved the Court's assessment of sanctions under 22 N.Y.C.R.R. § 130-1.1(a). Not only is it such a completely different statute, with different requirements to be met, but the facts of the case are wholly inapposite.

Plaintiffs do not cite a single shred of evidence that demonstrates Defendants brought "objectively baseless" lawsuits. Hypothetically, such evidence might be that Plaintiffs did not incur the loans, or repaid or satisfied the loans, or someone other than the Trusts claimed ownership of the loans, but the Trusts, despite knowing this, filed suit anyway. Plaintiffs present nothing of the sort.[6]

Instead, they continue to try to invert the burden of proof. But as the *Seldal* court explained, that is not the law. Asserting what might be a defense to claims asserted *by a creditor* in a collection action is not providing "*affirmative proof* that the Trust[s] did something wrong in moving forward on [their] collection action[s]. … Put differently, [Plaintiffs] may be able to defeat the Trust[s'] claims based on evidentiary objections. But this is very different than *proving* [a] Trust did not have an assignment (and knew it)." *Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*, No. 21-cv-192 (Wis. Cir. Ct. Dane Cnty. June 14, 2024), Decision & Order, ECF No. 380 at 7–8, *aff'd*, 2025 WI App. 15 (Jan. 30, 2025) (emphasis in the original). The Wisconsin court distilled what Plaintiffs are trying to do here and why it is wrong. Plaintiffs' entire submission denies that they

> bear the burden to prove that the loans were not actually assigned to the Trust, which requires more than pointing out problems with the admissibility of any evidence that the Trust might offer on that issue. *See Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 30, 290 Wis. 2d 514, 714 N.W.2d 155 (the burden of proving that a contract is invalid rests with the party making the claim).

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Seldal*, 19 N.W.3d 287(Table), at *7 (Wis. Ct. App. June 2, 2022).

[6] Plaintiffs did not file any affidavits in their Opposition/Cross-Motion, but instead disingenuously played games in response to Defendants' Rule 56 Statement, not denying that they took out thousands of dollars in loans, but instead claiming that they could not remember and were not certain if their signatures were on the loan documents. *See* Plaintiffs' Response to Rule 56 Statement, ECF No. 497, ¶¶ 1, 2, 12, 13, 14, 15, 25, 26, 31, 39, 40, 49, 50.

Plaintiffs' response to *Seldal* is that it "avoids the central merits question of whether Defendants sued without proof." (ECF No. 496, p. 41). Plaintiffs inadvertently get precisely to the point: like the plaintiff in Wisconsin, Plaintiffs do not provide any evidence that proves the loans were not assigned to the Trusts or that the Trusts lacked an objectively reasonable belief that they owned the loans, which is the critical issue behind Plaintiffs' claims.

**C. Plaintiffs' Attacks On Defendants' Evidence Do Not Save Their Case.**

In moving for summary judgment, Defendants chose to put forth evidence that demonstrates the Trusts own Plaintiffs' loans, that Defendants have evidence to prove ownership, and that it was reasonable for Defendants to treat the Trusts as the loan owner. Defendants had no obligation to put forth this evidence – Plaintiffs bear the burden of proving their case and do not have the evidence to do that – but Defendants' showing provides context.

This evidence demonstrates how far Plaintiffs are from being able to carry their "heavy burden" to prove that Defendants brought "objectively baseless" lawsuits. Given the structures and parties surrounding the Trusts, the roles those entities played, and ultimately what the Trusts are, Plaintiffs need to demonstrate that none of that matters and the Trusts never took ownership of billions of dollars in loans such that the securitizations failed.

Plaintiffs' response to this is very strange. Like that of the plaintiff in *Seldal*, Plaintiffs play the role of a defendant in a collection lawsuit rather than a plaintiff in a class action consumer fraud lawsuit. They merely argue Defendants' evidence is inadmissible and, for that reason, they win. Plaintiffs are wrong.

**1. Plaintiffs' Challenges To The PHEAA Evidence Have No Merit.**

Though Plaintiffs claim that Defendants' evidence proves the Trusts do *not* own the loans, the opposite is in fact true.

Plaintiffs argue that PHEAA's testimony about how the loans were securitized "is contradicted by the Trust's own loan documents." (ECF No. 496, pp. 33–34). This is because, according to PHEAA: "[w]hen a pool of Loans was sold, PHEAA received from First Marblehead Corporation electronic data identifying all of the Loans serviced by PHEAA that were subject to the particular sale to the National Collegiate Student Loan Trust entity." (*Id.* at 34.). Plaintiffs say "this cannot be true, because the contracts that PHEAA and FMC signed required that PHEAA, not FMC, create the Schedule for each Pool Supplement." (*Id.*).

Plaintiffs are arguing that PHEAA – who they say created the Schedules they spend so much time arguing is the only indicia of ownership that matters – does not have the data to determine which loan was on which Schedule and which Trust owns each loan. It is logically incoherent that PHEAA created the Schedules but does not know what was on them. This should be the end of Plaintiffs' game and is clear proof that there is no issue of material fact that precludes summary judgment in Defendants' favor.

PHEAA did not "guess" which loans went into each securitization; it got the information about which loan went into a securitization, and onto each Schedule, from First Marblehead Corporation, which structured each securitization, who also had that data (and produced it). *See* ECF No. 492, Exs. 1 (Wilbert Decl. ¶ 14), 3 (Meyer Decl. ¶¶ 4-7). This is not the "aha" Plaintiffs claim it is; it is an admission they have no case.

Plaintiffs' argument that PHEAA's notes prove the Trusts are not the owners is equally baseless. Plaintiffs speculate what the "OWNER" and "BOND ISSUE" fields in PHEAA's account notes mean. (ECF No. 496, pp. 32–33). But, PHEAA's representative, Jennifer Wilbert – not Plaintiffs – has personal knowledge of PHEAA's account notes and expressly stated these data points are used by PHEAA to identify the owner Trust. Ms. Wilbert has expressly stated the data

field "BOND ISSUE" in COMPASS reflects the specific Trust that owns the loan. *See* Fontenelli Reply Declaration, Ex. G (Declaration of Jennifer Wilbert ("Wilbert Reply Decl."), ¶ 9). PHEAA uses the number "122962" in the OWNER data field to denote that the loan is owned by a National Collegiate Student Loan Trust. *See id.* ¶ 7. That number is followed by a reference to NCT. (*Id.*). No matter what column the information is in, the data identifies which Trust owns which loan. And, PHEAA knows which record column indicates that ownership; Plaintiffs certainly do not point to anything that shows that PHEAA does not understand its own records.

Finally, Plaintiffs' cavil that the "wrong" banks are listed as originators (ECF 496, pp. 34-35) is disproven by PHEAA's declaration testimony. As Ms. Willbert explained: "If an originating bank merged into or was acquired by another entity during the time period PHEAA serviced the Loans, COMPASS [PHEAA's system of record] was updated to reflect the name change. For example, during the time period PHEAA serviced Plaintiffs' loans, National City Bank merged into PNC Bank and Bank One merged into JPMorgan Chase Bank." *See* ECF No. 492, Ex. 1 (Wilbert Decl. ¶ 7). The fact that this data field was updated to reflect the corporate realities does not call the information into question. If anything, it demonstrates the accuracy of the information.

### 2. Defendants' Declarations Are Competent Evidence And Plaintiffs' Attacks On Them Fail.

Plaintiffs' attacks on the admissibility of Defendants' evidence are equally ineffective.

Declarations "used to support … a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the … declarant is competent to testify on the matters stated." FRCP 56(c)(4). Like live testimony, declarations may be based on business records. *See Shelton v. U. of Med. & Dentistry of New Jersey,* 223 F.3d 220, 223 n.2 (D.N.J. 2000). The declarant "need not be an employee of the [record-keeping] entity so long as he understands the system." *Id.* Nor must the declarant have

"personally participated in the creation of the document," "know who actually recorded the information," or "personally attest to the accuracy of the records." *In re Sia*, 2013 WL 4547312, at *5–6 (Bankr. D.N.J. Aug. 27, 2013). In fact, even "hearsay statements can be considered on … summary judgment if they are capable of admission at trial." *Shelton*, 223 F.3d at 223 n.2. The Jens Meyer and PHEAA declarations are admissible, as are the documents that they rely on.[7]

**i. Jens Meyer (First Marblehead Corporation)**

Plaintiffs ask this Court to ignore First Marblehead's document production and Mr. Meyer's testimony about those documents because Plaintiffs speculate about their reliability. (ECF 496, pp. 27-28).

In their brief, Plaintiffs argue the Meyer declaration is unreliable because it "does not provide technical details describing" the loan tapes containing the data that First Marblehead received, which populated the spreadsheets attached to his Declaration. (*Id.*, p. 28). But, the MS Access database and loan rosters pulled therefrom are admissible business records. *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987) ("[T]here is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person."); *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993), *aff'd*, 32 F.3d 690 (2d Cir. 1994); *see also Christian Faith Fellowship Church v. adidas AG*, 841 F.3d 986, 990 (Fed. Cir. 2016). This data was collected and relied upon during the course of creating the securitizations. The "technical details" of the loan tapes are not at issue; rather it is the manner in which the data was organized and maintained on First Marblehead's database to reflect what went into each Trust that is the

[7] Plaintiffs' arguments about Roger Saylor's report and testimony are dealt with in Defendants' Opposition to Plaintiffs' Motion to Exclude Roger W. Saylor As Expert (ECF No. 482).

record, which Mr. Meyer testifies "has remained unchanged from the dates it was entered into the database." *See* ECF No. 492, Ex. 3 (Meyer Decl., ¶ 4).

In their response to Defendants' Rule 56.1 Statement, Plaintiffs improperly attack the admissibility of Mr. Meyer's declaration.[8] Plaintiffs argue that Mr. Meyer's declaration is "inherently unreliable" because it initially contained a typo in Paragraph 5 regarding a date associated with the 2007-2 Trust. *See* ECF No. 497 (responses to ¶¶ 4, 17, 28, 42, 54, 74). Paragraph 5 should have read "National Collegiate Student Loan Trust 2007-2 (*May 31, 2007*)" instead of "National Collegiate Student Loan Trust 2007-2 (*November 30, 2006*)." *See* ECF No. 492, Ex. 3 (Meyer Decl. ¶ 5). But, like the social security number above, (*see* § B.2.i.a., *supra*), the error was immediately resolved. (*Id.*). In doing so, Mr. Meyer gave the reason for correcting Paragraph 5 and included a data point titled "createdate" that showed the May 31, 2007 date was correct. The pre-correction error does not call into question the reliability of Mr. Meyer. *See, e.g.*, *Fischer v. Gov't Emps. Ins. Co.*, No. 23-cv-2848 (SJB), 2025 WL 964152, at *10 (E.D.N.Y. Mar. 31, 2025) ("petty arguments like this do not further the claims or defenses in this case.").

Plaintiffs finally argue in their Rule 56.1 response that Mr. Meyer's declaration is a "sham affidavit" because it is purportedly contradicted by a declaration he submitted in *Gosse v. Transworld Sys., Inc.*, Case No. 20-cv-01446-RDM (M.D. Pa.). *See* ECF No. 497 (response to ¶ 63). The "contradiction" Plaintiffs believe they have uncovered is not one. In his declaration in this case, Mr. Meyer states that the "data for the loans owned by each of the Trusts" has remained

---

[8] Plaintiffs use their "responses" to Defendants Rule 56.1 Statement to advance several additional pages of legal argument regarding Meyer's testimony. This is improper. *See Bridgeforth v. City of New York*, No. 16-cv-273, 2018 WL 3178221, at *4 (S.D.N.Y. June 28, 2018) ("[L]egal arguments ... belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact."). Defendants also note that the Court set specific word limits and Plaintiffs have unilaterally taken for themselves extra space to argue, albeit ineffectively.

unchanged since it was entered into Cognition's (f/k/a First Marblehead) database. *See* ECF No. 492, Ex. 3 (Meyer Decl. ¶ 4). In the *Gosse* Declaration, Mr. Meyer stated—virtually identically—that the data "for each loan owned by each of the Trust[s]," has "remained unchanged from the date the data was entered into the database." *See* ECF No. 492, Ex. 57 (Gosse Meyer Decl. ¶ 5). He then added—which Plaintiffs latch onto, ignoring the previous statement—that the data has "remained unchanged from the completion of the securitization reconciliation process." (*Id.* ¶ 6). These statements are consistent. The individual data for each loan remains unchanged from when it is entered. The lists of loans that go into each Trust are finalized during the securitization reconciliation process, and they remain unchanged after that. This is also confirmed by Roger Saylor's testimony. *See* ECF No. 492, Ex. 58 (Saylor Report ¶ 49). This is far from the "sham issue of fact" that Plaintiffs try to portray. *See cf. In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013).

**ii. Jennifer Wilbert (PHEAA)**

PHEAA's testimony, via Jennifer Wilbert, and its business records are devastating to Plaintiffs' case. Instead of introducing their own evidence that contradicts what PHEAA says (there is none), Plaintiffs are desperate for this Court to ignore PHEAA's evidence. Again, Plaintiffs make arguments in their brief and then improperly use their Rule 56.1 response to lodge additional attacks. (ECF No. 496, pp. 32-36; ECF No. 497 (responses to ¶¶ 1, 2, 4, 6, 12, 15, 19, 25, 26, 28, 30, 39, 40, 42, 44, 49, 54, 56)).

Plaintiffs first ask this Court to ignore PHEAA's declaration and exhibits because Defendants filed it in connection with their summary judgment briefing. (ECF No. 496, p. 32). As this Court previously observed, such declarations are commonplace. *See* ECF No. 471 (December 17, 2024 Transcript, 21:14-19 ("Court: It happens all the time, probably in the majority of cases that I oversee, summary judgment motions or oppositions are accompanied by affidavits or

declarations, sometimes from people who never had their depositions taken for one reason or another…")).

Plaintiffs nonetheless argue it is unfair because they did not have the opportunity to depose Ms. Wilbert. But, they have known about PHEAA since the filing of their Complaint. *See* ECF No. 60 (Amended Complaint ¶¶ 6, 159–60). The Complaint references an "audit" of PHEAA's record. *Id.* at ¶ 159. The Trusts' initial disclosures referenced their servicers – which includes PHEAA – as having relevant knowledge of the dispute. *See, e.g.*, Fontenelli Reply Decl., Ex. H (Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26 of Defendant NCSLT 2007-2). Defendants produced various PHEAA and PHEAA-related documents, including its servicing agreement, during discovery. Plaintiffs even questioned various witnesses about PHEAA during depositions. *See, e.g.*, Fontenelli Reply Decl., Exs. I (Rule 30(b)(6) Deposition of Trust Defendants ("NCSLT 30(b)(6) Dep. Tr.") at 75:6-7); D (TSI 30(b)(6) Dep. Tr. at 129:21-25); E (Cummins Dep. Tr. at 103:4-7). In fact, as early as 2019, *Plaintiffs* produced to Defendants correspondence between the named Plaintiffs and PHEAA. *See, e.g.*, Fontenelli Reply Decl., Ex. J. The idea that Plaintiffs have been unfairly surprised by a PHEAA declaration at summary judgment is absurd.

Next, Plaintiffs cry "hearsay." They brush aside that Ms. Wilbert's declaration is made "on [her] personal knowledge obtained in the regular course of [her] employment with PHEAA," and her responsibilities include "knowledge of PHEAA's maintenance and storage of data, record-keeping, document retention, and destruction policies." *See* Fontenelli Declaration, Ex. 1 (Wilbert Decl., ¶ 2). Ms. Wilbert can testify at trial if called upon. *See GE Funding Cap. Mkt. Servs., Inc. v. Neb. Inv. Fin. Auth.*, No. 15 Civ. 1069, 2017 WL 2880555, at *3 (S.D.N.Y. July 6, 2017), *aff'd*, 767 F. App'x 110 (2d Cir. 2019) ("Hearsay evidence is admissible at the summary judgment stage if the contents would [or could] otherwise be admissible at trial.") (alterations in original).

Finally, Plaintiffs end their scattershot attack on Wilbert's declaration and PHEAA's business records with an argument that is based on pure speculation about what the OWNER data point in PHEAA's system of record means. (ECF No. 496, p. 32). As shown above, this argument ignores actual record evidence. (*See* § C.1, *supra*). It certainly does not point to any dispute of material fact.

With their challenges to the admissibility of the above, Plaintiffs appear to be seeking to re-litigate the state court default judgments. This is clear when they argue Defendants' evidence should be stricken because some courts have done so (ECF No. 496, p. 23), despite numerous courts finding the opposite. (ECF No. 490, p. 7). Questions about whether Defendants' evidence is admissible and is sufficient to prove ownership are the domain of the trial courts where the collection actions were brought. For this Court to entertain Plaintiffs' argument and make such a determination here would necessarily require it to review the state court judgments, something *Rooker-Feldman* prohibits. *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021) (citing 28 U.S.C. § 1257) (*Rooker-Feldman* doctrine "bars federal district courts from hearing cases that in effect are appeals from state court judgments, because the Supreme Court [of the United States] is the only federal court with jurisdiction over such cases."); *Kropelnicki v. Siegel*, 290 F.3d 118, 128 (2d Cir. 2002).

Plaintiffs have failed to present any evidence that Defendants filed the state court lawsuits without an objectively reasonable basis to do so, and for this reason alone they fail to meet their burden. In fact, the only evidence indicates the opposite. There are no genuine issues of material fact and summary judgment should be granted in favor of Defendants.

## II. Plaintiffs' Motion For Summary Judgment Should Be Denied.

Plaintiffs' case was born out of *allegations* in a CFPB enforcement action against The National Collegiate Student Loan Trusts and *allegations* from a complaint filed in a derivative

action in the Delaware Chancery court brought by third parties who claimed to own The National Collegiate Student Loan Trusts. *See Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*, No. 2018-0167 (Del. Ch. June 15, 2018) (Amended Complaint (Transaction ID 62138855)). Along the way, Plaintiffs have also frequently cited to alleged "findings" from an Assurance of Discontinuance entered between the New York Attorney General and TSI. *See* ECF No. 496, pp. 19–20.

It is clear that after filing their Amended Complaint, Plaintiffs expected to piggyback on the CFPB's enforcement action and the Delaware Chancery lawsuit. But, that did not work out. After years of "deep discovery," Plaintiffs have no evidence in support of their theories of liability.

So now, on their cross-motion, Plaintiffs look to rely on the mere existence of these enforcement actions as supposed proof of the allegations asserted in the Amended Complaint. (ECF No. 496 at 18–22.) But the case law is clear. They cannot be used as evidence to establish the essential elements of Plaintiffs' claims. Even if the allegations and enforcement actions were admissible and could be considered for some purpose, Plaintiffs grossly mischaracterize those actions.

**A. Delaware Chancery Action**

Plaintiffs claim the Trusts have admitted that they do not have proof of ownership based on a complaint in the Delaware Chancery Court and a document referenced in that Complaint. (ECF No. 496, pp. 18–20). Plaintiffs argue that "the Trust owners' statements in Delaware Chancery are admissible and compelling evidence here, because they constitute a party admission of sham suits as against the Trust Defendants" and therefore the Trust Defendants are now "judicially estopped from denying the existence of the fraud centering on sham suits." (*Id.*, pp. 21-22). They also claim that certain "findings" made by Boston Portfolio Advisors, Inc. ("BPA") referenced in the Delaware Chancery complaint, are admissible and support their claims. (*Id.*, pp.

18–19, 21). As is their wont, Plaintiffs mischaracterize both the Delaware Chancery action and the BPA audit. And, they are simply wrong about the admissibility and probative value of this material.

As an initial matter, the unproven allegations from the 2018 Delaware Chancery complaint, including those made about the BPA audit, are inadmissible. *See Creighton v. City of New York*, 12-cv-7454, 2017 WL 636415, at *45 n.47 (S.D.N.Y. Feb. 24, 2017) ("Allegations in a complaint provide no basis for opposing summary judgment."); *Hernandez v. Coca Cola Refreshments USA, Inc.*, 12-cv-234, 2013 WL 6388654, at *3 (S.D.N.Y. Dec. 6, 2013) (citing *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988)); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014); *see also Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1257 (9th Cir. 1984) (report prepared by accounting firm hired for purpose of performing compliance audit of certain employee trust funds was inadmissible hearsay). Courts regularly reject attempts to use allegations from complaints to support (or oppose) summary judgment.

Nonetheless, Plaintiffs argue the Delaware Chancery allegations should be admissible here because the complaint that contained them was verified. (ECF No. 496, p. 22). But this does not, as Plaintiffs suggest, "obviat[e] any concern that [the allegations] lack evidentiary weight." (*Id.*). Critically absent from Plaintiffs' submission is the fact that the Delaware Chancery action was filed by the Trusts' noteholders—without proper delegation or authority from the Trusts' Owner Trustee—who were not authorized to act on the Trusts' behalf.[9] *See, e.g., In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 169, 201 (Del. Ch. 2020). Plaintiffs know full well that the allegations in the Delaware Action are not admissions of the Trust Defendants here, yet they attempt to mislead this Court. And, beyond that, Plaintiffs do not actually cite any specific

[9] Plaintiffs took discovery from the entity claiming to be the Trusts owners. Notably, Plaintiffs do not point to any documentation they received from it and continue to try to rely on allegations in a pleading.

allegation from the Delaware Action where the Trusts "admit" they do not have evidence to prove loan ownership. This is not surprising because no such allegation exists.

Plaintiffs' reliance on the Delaware Chancery complaint's allegations about the BPA audit of PHEAA is also unavailing. (ECF No. 496, pp. 18–19, 21). As an initial matter, the BPA audit is inadmissible hearsay, incapable of being converted into admissible evidence. *See Paddack*, 745 F.2d at 1257.

The BPA audit never actually says the Trusts cannot prove ownership. What it says is that the issues identified (which the Trusts contend are specious) make "collection efforts … more challenging and costly to defend in Court." (ECF No. 481-20, p. 17). More "challenging and costly" is not impossible. And, returning to what this case is about, Plaintiffs need to prove that it is impossible for the Trusts to prove they own their loans, not that it might be difficult for them.

Furthermore, in a separate action, BPA's corporate representative, Thomas Glanfield, confirmed that the audit's conclusions were "made based on an assumption and in fact that it was 'perfectly acceptable' for other entities to maintain those [assignment] documents." *See* Fontenelli Reply Decl., Ex. K (Deposition of Thomas Glanfield ("Glanfield Dep. Tr.") at 98:17-99:19). Mr. Glanfield admitted that BPA assumed what documentation should be present, but that "[m]any times, other parties will maintain the documents, which is perfectly acceptable." (*Id.* at 99:1-8). Mr. Glanfield also acknowledged that BPA did not request or review assignment documents from any of the other entities involved with the Trusts. (*Id.* at 81:3-21).

The BPA audit does not provide any "proof" that loans were not sold and assigned to the Trust Defendants and does not create any dispute of material fact.

**B. CFPB Action**

Plaintiffs similarly attempt to convert allegations from a prior CFPB enforcement action against The National Collegiate Student Loan Trusts into evidence against Defendants. (ECF No.

496, p. 21). Plaintiffs also point to a purported stipulation between the CFPB and NCSLTs, which Plaintiffs claim "confirm[ed] the existence of a 'Master List' of instances wherein individuals were sued in state court in collection lawsuits naming Trusts as plaintiffs despite the absence of proof of assignment." (*Id.*, p. 20). The Court should disregard Plaintiffs' improper attempt to use the CFPB enforcement action as "evidence" here.

Plaintiffs do not mention that on April 25, 2025, the CFPB dismissed its enforcement action against The National Collegiate Student Loan Trusts before the court adopted any consent order. *See CFPB v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 17-cv-1323 (D. Del. Jan. 16, 2025) (ECF No. 474). The proposed stipulation was never entered by the court. For that reason alone, the Court should ignore this purported "evidence."

Even if the Court were to consider the allegations from the CFPB's dismissed complaint or consent order, none of what Plaintiffs point to is admissible or probative evidence vis-à-vis Plaintiffs' claims against Defendants. These documents contain nothing more than unproven allegations, which cannot be used as evidence here. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[A] consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues cannot be used as evidence in subsequent litigation."); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 13-cv-7789 (LGS), 2022 WL 4087842, *3 (S.D.N.Y. Sept. 6, 2022) (*citing United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981)) ("Most consent orders are properly analogized to *nolo contendere* pleas . . . . In such a case, the evidentiary value of the allegations or 'findings' is inextricable from the fact of compromise itself, which cannot be introduced."); *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1055 (9th Cir. 2015).

Plaintiffs point to a "Master List" and speculate it documents the "instances wherein individuals were sued in state court in collection lawsuits naming Trusts as plaintiffs despite the absence of proof of assignment" (ECF No. 496, p. 20). But again, Plaintiffs present no admissible evidence that substantiates their speculation. This is insufficient to sustain or oppose summary judgment.

**C. NYAG Action**

Finally, Plaintiffs argue certain "findings" made by the NYAG in an unrelated enforcement action against TSI are admissible and support Plaintiffs' claims. (ECF No. 496, pp. 19–21 (citing *to In re Transworld Sys., Inc.*, NYAG Assurance of Discontinuance, No. 20-061)). But allegations contained in the Assurance are inadmissible here for the same reasons the CFPB consent order and its "findings" are inadmissible. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 4087842 at *3. The Assurance expressly states that "[t]his Assurance may not be used by any third party in any other proceeding. This Assurance is not intended to be, and should not be construed as, an admission of liability by TSI." *See* Fontenelli Reply Decl., Ex. L (Assurance of Discontinuance, ¶ 72). Moreover, not only were the Trust Defendants and F&G not parties to the Assurance, but it also expressly acknowledged instances where TSI submitted evidence that "provide[d] a definitive link [of ownership] between the loan and the [National Collegiate Student Loan] Trust." (*Id.*, ¶ 32). Ultimately, the Assurance does nothing to assist Plaintiffs in meeting their burden or create a dispute of fact as to the issues material to Defendants' motion.

**CONCLUSION**

For the reasons stated in Defendants' moving brief and above, summary judgment should be granted in Defendants' favor. Plaintiffs' motion for summary judgment should be denied.

Dated: July 16, 2025
New York, New York

TROUTMAN PEPPER LOCKE LLP

*/s/ R. James DeRose, III*

R. James DeRose, III
Gregory T. Casamento
Christopher B. Fontenelli
875 Third Avenue
New York, New York 10022
(212) 704-6000
rj.derose@troutman.com
greg.casamento@troutman.com
christopher.fontenelli@troutman.com

J. Matthew Goodin
111 South Wacker Drive, Suite 4100
Chicago, Illinois 60606
(312) 443-0700
matt.goodin@troutman.com
*Attorneys for Defendants National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-2, and National Collegiate Student Loan Trust 2007-3*

SESSIONS, ISRAEL & SHARTLE LLC

*/s/ Michael D. Alltmont*

Michael D. Alltmont
3838 N. Causeway Blvd., Ste. 2800
Metairie, Louisiana 70002
P: 504-846-7954
malltmont@sessions.legal
*Attorneys for Defendant Transworld Systems, Inc. and EGS Financial Care, Inc.*

RIVKIN RADLER LLP

*/s/ Carol A. Lastorino*

Carol A. Lastorino
Amanda R. Griner
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3101
carol.lastorino@rivkin.com
amanda.griner@rivkin.com
*Attorneys for Defendant Forster & Garbus LLP*

## WORD COUNT CERTIFICATION

I hereby certify that the foregoing Memorandum of Law in support of Defendants' Motion for Summary Judgment contains 9,966 words and therefore complies with the word limitation set forth in the Scheduling Order dated April 8, 2025 (ECF. No. 485). This memorandum also complies with the typeface and type-style requirements of Local Rule 11.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York because it was prepared in Times New Roman 12-point typeface using Microsoft Office Word.

*/s/ R. James DeRose, III*
R. James DeRose, III

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2025, I caused the foregoing Joint Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment, Defendants' Responses to Plaintiffs' Additional Statement Of Material Facts Pursuant to Local Civil Rule 56.1, and Declaration Of Chris Fontenelli in Further Support of Defendants' Motion For Summary Judgment with its accompanying exhibits, to be served on all parties entitled to notice by filing them with the Clerk of the Court using the Court's CM/ECF system.

*/s/ R. James DeRose, III*
R. James DeRose, III