UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHERINE SEAMAN, MARY RE SEAMAN, SANDRA TABAR, CHRISTINA BIFULCO, FRANCIS BUTRY and CORI FRAUENHOFER individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP,

Defendants.

No. 18-cv-1781-PGG-BCM

**PLAINTIFFS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' RULE 56 CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

ARGUMENT ..... 2

I. The Record Shows Defendants Prosecuted Sham Lawsuits ..... 2

II. Defendants Cannot Explain The Inconsistencies In Their Belated Production ..... 9

III. Defendants' Hearsay Challenges To Plaintiffs' Proof All Fail ..... 14

IV. The Trusts Do Business In New York ..... 17

CONCLUSION ..... 17

# TABLE OF AUTHORITIES

**Cases**

*Adeniji v. N.Y. State Off. of State Comptroller*,
557 F. Supp. 3d 413 (S.D.N.Y. 2021) ........ 16, 17

*Au New Haven v. Ykk Co.*,
No. 15-cv-3411, 2019 U.S. Dist. LEXIS 45044
(S.D.N.Y. Mar. 19, 2019) ........ 4

*Citibank (S.D.), N.A. v. Martin*,
11 Misc. 3d 219 (Civ. Ct. N.Y. Cnty. 2005) ........ 4, 6

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
735 F. Supp. 2d 560 (E.D. Tex. 2010) ........ 4

*Creighton v. City of N.Y.*,
No. 12-cv-7454, 2017 U.S. Dist. LEXIS 21194
(S.D.N.Y. Feb. 14, 2017) ........ 15

*Hernandez v. Coca Cola Refreshments USA*,
No. 12-cv-234, 2013 U.S. Dist. LEXIS 172400
(E.D.N.Y. Dec. 6, 2013) ........ 15

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
No. 13-cv-7789, 2022 U.S. Dist. LEXIS 160642
(S.D.N.Y. Sep. 6, 2022) ........ 16

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014) ........ 15

*Kewazinga Corp. v. Microsoft Corp.*,
No. 18-cv-4500, 2021 U.S. Dist. LEXIS 169521
(S.D.N.Y. Sept. 1, 2021) ........ 4

*Leach v. NCO Fin. Sys.*,
No. 15-cv-890, 2015 U.S. Dist. LEXIS 129414
(W.D. Wash. Sept. 25, 2015) ........ 12

*Looney v. Walters-Tucker*,
98 F. Supp. 2d 1 (D.D.C. 2000) ..... 10

*Mayfield v. Asta Funding, Inc.*,
95 F. Supp. 3d 685 (S.D.N.Y. 2015) ..... 2

*Meyer v. Ward*,
No. 13-cv-3303, 2017 U.S. Dist. LEXIS 70431
(N.D. Ill. May 9, 2017) ..... 16

*Midland Funding v. Giraldo*,
39 Misc. 3d 936 (Dist. Ct. Nassau Cnty. 2013) ..... 2, 3

*Nat'l Collegiate Student Loan Trust 2007-4 v. Watson*,
No. 9265-14/BX, 2016 N.Y. Misc. LEXIS 5116
(Civ. Ct. Bronx Cnty. Jan 7, 2016) ..... 4, 5, 6, 8

*Paddack v. Dave Christensen, Inc.*,
745 F.2d 1254 (9th Cir. 1984) ..... 15, 16

*Palisades Collection, LLC v. Kedik*,
67 A.D.3d 1329 (4th Dep't 2009) ..... 4

*Phila. Workforce Dev. Corp. v. KRA Corp.*,
156 F. Supp. 3d 616 (E.D. Pa. 2016) ..... 16

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*,
163 F. Supp. 3d 109 (S.D.N.Y. 2016) ..... 2

*Sykes v. Mel Harris & Assocs., LLC*,
757 F. Supp. 2d 413 (S.D.N.Y. 2010) ..... 2

*U.S. v. Franzone*,
No. 21-cr-446, 2025 U.S. Dist. LEXIS 69258
(S.D.N.Y. Apr. 10, 2025) ..... 17

*Webb v. Midland Credit Mgmt.*,
No. 11-cv-5111, 2012 U.S. Dist. LEXIS 80006
(N.D. Ill. May 31, 2012) ..... 7, 11

*Wi-Lan Inc. v. Sharp Elecs. Corp.*,
992 F.3d 1366 (Fed. Cir. 2021) ..... 14

*Winslow v. Forster & Garbus, LLP*,
No. 15-cv-2996, 2017 U.S. Dist. LEXIS 205113
(E.D.N.Y. Dec. 13, 2017) .......... 17

**Rules**

Fed. R. Evid. 801(c) .......... 12
Fed. R. Evid. 803(6) .......... 7, 12
Fed. R. Evid. 803(8) .......... 16
Fed. R. Evid. 902(11) .......... 7

Defendants do not possess chain of title documents showing specific student loans being assigned from specific banks to specific Trusts as required by basic contract law. Because of this Defendants used a manual for prosecuting state court lawsuits that instructed their lawyers that chain of title documents were not available <u>at all and must not be requested</u>.

The Trusts and TSI, nevertheless, had their law firms prosecute student loan debt collection cases without review knowing they could not prove ownership of the debt because no such proof exists. Defendants unlawfully collected debts that they cannot prove they own by filing false affidavits in state court.

When securitizations are done correctly, a SLAB[1] can easily prove ownership using the securitization documents. The Trusts' documents expressly required that assignment of loans be made in "Schedules." Defendants do not have the Schedules. No one knows whether Defendants lost them or if they were never created. Defendants' expert, Roger Saylor, argues that the securitizations were done correctly, leaving the Court to conclude that Defendants' untrustworthy recordkeeping is the culprit.

Further, Defendants ask this Court to certify documents of unknown origin as "trustworthy business records," even while the absence of the Schedules calls into question the trustworthiness of all of Defendants' documents. The Court should decline this invitation. Likewise, the Court should refuse to consider the two last-minute declarations from Jennifer Wilbert, a details-devoid employee of PHEAA. Wilbert and Defendants try to explain away the many contradictions in PHEAA's documents—yet these explanations only serve to admit that

[1] "SLAB" means student loan asset backed securitizations. Unless otherwise indicated, capitalized terms, acronyms, and shorthand references have the meanings attributed to them in Plaintiffs' main brief ("Pls.' Br.") (ECF No. 496).

PHEAA's record-management protocols are incapable of recording chain of title on any Trust loan.

This Court should grant Plaintiffs summary judgment, while denying Defendants' Rule 56 motion.

## ARGUMENT

### I. The Record Shows Defendants Prosecuted Sham Lawsuits

Defendants' Rule 56 reply and opposition to Plaintiffs' motion ("Defs.' Reply") (ECF No. 501) includes no authority absolving their conduct of prosecuting sham lawsuits.

#### A. Defendants' Documents Demonstrate That Sham Lawsuits Were Knowingly Filed

Plaintiffs' case for summary judgment is straightforward: Defendants "commence[d] a lawsuit," when "evidence to support the[ir] claim does not exist or is not readily available." *Midland Funding v. Giraldo*, 39 Misc. 3d 936, 937–38, 947–50 (Dist. Ct. Nassau Cnty. 2013).[2]

During the Class period Defendants' internal protocol called the "Media Ordering Manual" said Forster and the other Network Firms would not be provided copies of the actual documents (or "media") evidencing "Chain of Title," "Bill of Sale/Assignment," or "[Loan] Terms" for "National Collegiate Trust" accounts, even if Network Firms requested such media. The following chart from TSI's Media Ordering Manual details what documents are and are not available for each client. The top row lists types of proof. The "ANS Client" column lists the

[2] *See e.g.*, *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 691–703 (S.D.N.Y. 2015) (Preska, J.) (upholding FDCPA, GBL, and NYJL claims) (citing, inter alia, *Giraldo*, 39 Misc. 3d at 936); *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 428 (S.D.N.Y. 2010) (Chin, J.) (same result); *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109, 114 (S.D.N.Y. 2016) (Rakoff, J.) (summary judgment against collector on FDCPA claim where the collector sued in state court "[without] good faith" basis for suit); *see also* Pls.' Br., 10–17 (listing foregoing and other cases). Defendants do not even bother to address this authority in their reply.

entity for which TSI and the Firms are collecting debt—here, the unredacted "Client" is "FMH/National Collegiate Trust," i.e., Trusts. An "x" in a box indicates documents are available; a blank box indicates not. For clarity, the text under the chart says, "If you request an item that is not available by client, your request is invalid and you will receive [a reject ]code [] for the request."

**Client PCode Availability Table**

| | S126 | S128 | S127-S129-Z105 | Z107 | Z106 | Z111 | Z112 | Z114 |
|---|---|---|---|---|---|---|---|---|
| ANS Client | Affidavit | Applications | Statements | Payment History | Terms/Card Member Agreements | Bill of Sale/Assignment | Loan Documents | Chain of Title |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| [redacted] | x | x | x | | x | | | |
| FMH/National Collegiate Trust | x | | | x | | | x | |
| [redacted] | x | x | x | | x | x | | x |
| [redacted] | x | x | x | | x | x | | x |
| [redacted] [redacted] | x | x | x | | x | x | | x |
| [redacted] [redacted] | x | x | | x | x | | x | |
| [redacted] | x | | x | | | | | |

If you request an item that is not available by client, your request is invalid and you will receive a pcode Z128 for that request.

The "Bill of Sale/Assignment" box is blank, as is "Chain of Title." The fact Defendants told their attorneys not to request such proof, means they knowingly prosecuted cases in state court where chain of title and other necessary proof of debt "does not exist or is not readily available." *Giraldo*, 39 Misc. 3d at 937–38, 947–50 (defining liability test for sham suits under GBL). It also means lawsuits were filed in state court by attorneys who hadn't and couldn't verify proof, violating NYJL specifically. *Id.*

Defendants, nevertheless, argue that their knowing prosecution of lawsuits without evidence does not demonstrate "intent" to prosecute sham suits. (Defs.' Reply., at 14–15). A corporate manual like the one here is de facto proof of intent to commit violations such as

Plaintiffs plead here. Specifically, Black's Law Dictionary defines "intent" as "the mental resolution or determination to do" "some act," "esp. a forbidden act." Black's Law Dictionary (8th ed. 2004). Here, "[D]efendant[s'] training manuals" were written such "that if the steps were taken as [D]efendants designed them to be [taken, then a violation of the law] would occur." *Kewazinga Corp. v. Microsoft Corp.*, No. 18-cv-4500, 2021 U.S. Dist. LEXIS 169521, at *44–45 (S.D.N.Y. Sept. 1, 2021) (Woods, J.).[3]

In short, the sale documents (Pool Supplements) that would ordinarily identify which loans were transferred in a securitization fail to identify specific loans being transferred. Instead, the Pool Supplements reference the existence of Schedules that Defendants do not have and have been unable to produce. Defendants engaged in a fraudulent default judgment scheme, (*see* Pls.' Br., 16–28), because Defendants knew New York courts required they possess chain of title upon demand. *Citibank (S.D.), N.A. v. Martin*, No. 47354-03/NY, 11 Misc. 3d 219, 225–26 (Civ. Ct. N.Y. Cnty. 2005) (discussing necessity of chain in assigned-debt suit). Where such proof purportedly resides in a "spreadsheet," the agents handling the collection suit—here, must be able to (1) produce it if ordered by the judge, and (2) explain how it was created. *Palisades Collection, LLC v. Kedik*, 67 A.D.3d 1329, 1330 (4th Dep't 2009).

Specifically as to the Trusts, in a state court case filed in the Bronx in 2014, the consumer fought back and the judge assigned the case ordered Forster and TSI in 2016 to produce proof of chain title. They couldn't. *Nat'l Collegiate Student Loan Trust 2007-4 v. Watson*, No. 9265-14/BX, 2016 N.Y. Misc. LEXIS 5116, at *7–8 (Civ. Ct. Bronx Cnty. Jan 7, 2016) (dismissing Trust's claims against alleged debtor, because Forster and TSI couldn't produce proof of chain).

---

[3] *See ClearValue, Inc. v. Pearl River Polymers, Inc.*, 735 F. Supp. 2d 560, 573 (E.D. Tex. 2010); *see also Au New Haven v. Ykk Co.*, No. 15-cv-3411, 2019 U.S. Dist. LEXIS 45044, at *33 & n.95 (S.D.N.Y. Mar. 19, 2019) (Netburn, Mag. J.) (discussing *ClearValue*).

The *Watson* court rejected the testimony of TSI Affiant Team member Jonathan Boyd—one of the Affiants against Plaintiffs here—because "Mr. Boyd's unsupported testimony that the [consumers'] loan was part of the assignment from The National Collegiate Funding LLC assigned to the [Trust] is insufficient based upon the pool supplements [and] Mr. Boyd did not provide any testimony that identified [their alleged] Charter One Continuing Education Loan as part of [the] Schedule [referred to in the pool supplements]." *Id.*[4] Though *Watson* and similar rulings would've compelled a <u>legitimate</u> collections operation to stop filing suits without proof, Defendants kept up the pace.[5]

**B. The Record Shows Defendants Did Not Have Chain of Title**

Defendants have no answer for the failure of their Pool Supplements documents to identify and transfer specific loans to the Trusts. Instead, they argue that their copies of Pool Supplements are consistent with those filed with the SEC at the time of securitization. (Defs.'Reply, 8–9). Even if this were true, which it is not, the versions of the documents on the SEC's website lack the Schedule that would actually confer ownership of particular loans to the Trusts—there is no contention that SEC copies can serve as chain of title.

All copies of Pool Supplements here refer on the first page to an "attached Schedule" used for listing loans being assigned to a specific Trust—yet, for approximately 65% of the copies in Defendants' possession the document does not include any accompanying placeholder

---

[4] The *Watson* decision is one of several the Trusts' owners cited in the Delaware litigation as demonstrating not only that the Trusts lack chain of title, but also that this lack functionally bars them collecting (without deceiving courts and alleged debtors). *See* Del. Ch. Am. Verified Compl. ¶¶ 73–89.

[5] Thus, Defendants prosecuted Plaintiff Tabar in the Bronx until 2018, when she appeared, fought back, and demanded proof including chain of title—at which point they dropped the litigation. *See* Jt. L.R. 56.1 (ECF No. 487), at ¶¶ 127–132 & Jt. Exs. W–Z (ECF Nos. 488-23–488-26) (state court documents concerning Tabar).

page telling the reader the Schedule's location. (*Compare, e.g.*, Defs.' Exs. 60-38, -40–41, & -43–51 (copies of Pool Supplements for Trust 2006-4 lacking final page), *with* 60-39, -42, & -52–53) (same but with final page) (ECF Nos. 492-150–492-165)). The Schedule is required to be included in the Pool Supplement per the securitization-planning agreements signed in the years before the Trust securitizations began; these agreements impose specific requirements on what the format of each Pool Supplement must be at the time of securitization, and there is no leeway or discretion not to include the final page identifying the Schedule's location.[6] If Defendants' copies of Pool Supplements lack this final page, then they are not the genuine article. *Watson*, 2016 N.Y. Misc. LEXIS 5116, at *7–8; *Martin*, 11 Misc. 3d 219, 225-26.

In the limited instance a Pool Supplement copy contains the final page, it only creates more confusion: if it references a "CD" containing the Schedule, Defendants are unable to produce that "CD" because it never existed or was lost. (Pls.' Br., 25–26). Also, in several instances the copy possessed by Defendants contains the final page, but the copy of the same Pool Supplement as maintained by the SEC contains a different final page stating the Schedule resides with the "Indenture Trustee," U.S. Bank—which Defendants here never identified as a source. All these conflicts call into question the reliability of all competing versions of Pool Supplements. To illustrate how untrustworthy Defendants' records are, Plaintiffs have prepared the following table summarizing production of purported Pool Supplements that Defendants allege contained Named Plaintiffs' debts:

---

[6] *Compare, e.g.*, Defs.' Ex. 4 (ECF No. 492-6), at NCSLT_000511–514 (ECF Pages of 50–53 of 67) (final location page included in "Form of Pool Supplement" annexed as template to "Purchase Agreement" between FMC and KeyBank, May 12, 2006), *with* Defs.' Ex. 5 (ECF No. 492-7), at NCSLT_000529–532 (Defendants-produced copy of KeyBank supplement dated 2007 lacks final page).

| **Trust Listed** | **Date Listed – Bank** | **Defs.' Copy's Language** | **Defs.' Ex. (ECF No.)** | **Bates** | **SEC Copy's Language** |
|---|---|---|---|---|---|
| 2004-2 | 10-28-04 Bank One | "See supplemental loan roster CD" | 34 (492-36) | NCSLT_ 000102-108 | "[On file with the Indenture Trustee]"[7] |
| 2006-4 | 12-7-06 M & T | No last page | 49 (492-51) | NCSLT_ 000188-192 | N/A |
| 2007-2 | 6-14-07 Nat'l City | No last page | 60-25 (492-137) | NCSLT_ SLF_000 181-185 | N/A |
| None | 9-20-07 KeyBank | No last page | 5 (492-7) | NCSLT_ 000529-532 | N/A |

The above inconsistencies show Defendants are wrong when they say it was acceptable "that sometimes TSI would rely on PDFs [existing in TSI's folders], while at other times it would look to the version of that document filed with the SEC." (Reply, 8–9). For certain Pools of loans purportedly assigned to specific Trusts, no Pool Supplement was filed with the SEC, which means the SEC was not a reliable resource. With Trust 2007-2, for example, there were at least 18 individual Pools supposedly part of that securitization—but only three Pool Supplements were filed with the SEC at the time of securitization. Also fatal to Defendants' reliance on the SEC database is the fact that Defendants do not know who filed the documents with the SEC, where they came from, or why the versions that Defendants possess would differ from those filed with the SEC. *Webb v. Midland Credit Mgmt.*, No. 11-cv-5111, 2012 U.S. Dist. LEXIS 80006, at *9–15 (N.D. Ill. May 31, 2012) (rejecting debt buyer's purported chain of title documents as layers of hearsay) (citing Fed. R. Evid. 803(6) & 902(11)).

[7] The following URL contains the SEC copy: https://www.sec.gov/Archives/edgar/data/1305287/000088237704002294/d277098.txt.

### C. The Record Shows Defendants Did Not And Could Not Look At Documents They Today Claim To Be Chain of Title

Defendants incorrectly argue that their personnel reviewed proof of chain of title and checked to confirm it existed before proceeding with suits in state court for the Trusts' benefit. (Reply, 12).[8] In support of this argument, Defendants mischaracterize the testimony of Forster corporate designee Joel Leiderman by cherry-picking conclusory statements by Leiderman that "lawyers at [Forster] had no problem getting documents [for chain of title] from TSI." (*Id.*). Defendants' argument is irrelevant, because the record shows Schedules were missing, and whatever secondary documents Defendants possess are insufficient as chain of title, even if available. *See* Parts I.A–B, *supra*.

In fact, Leiderman's testimony supports Plaintiffs' contention that sufficient chain of title was never made available. Leiderman stated that, from 2013 through 2015, documents concerning chain of title were not provided to Forster upon account referral. (Tr., 184:2–187:6).[9] During discovery Forster revealed it did not get these documents and therefore could not have reviewed them.[10] None of the copies of purported chain-of-title documents produced to Plaintiffs here have come from Forster's records. [11]

---

[8] Again, the above-reproduced chart from Defendants' manual shows chain of title wouldn't and couldn't be given to Forster and other firms filing state court collection lawsuits.

[9] "Tr. __" means Leiderman's deposition transcript, relevant excerpts of which are attached to Plaintiffs' counsel's declaration for this brief.

[10] Leiderman said Forster personnel would have remotely accessed TSI documents electronically, and that if this had occurred then copies of any documents so accessed would have been downloaded onto Forster's servers. (Tr., 49:2–50:25).

[11] Leiderman stated that, "subsequent" to the years at issue here, documents concerning chain of title automatically transferred to Forster upon account referral. (Tr., 184:2–187:6). This doesn't address what occurred during the Class period here, and anyway Defendants provide no support for Leiderman's assertion of delayed propriety. *Watson*, 2016 N.Y. Misc. LEXIS 5116, at *7–8.

Finally, Leiderman's conclusory language that Forster had reviewed sufficient chain of documentation must be taken with a grain of salt. Leiderman testified that he does not know what a Schedule is or the role it was supposed to play in Trust securitizations. Specifically, Leiderman testified that he believes the Pool Supplement document alone is the necessary piece of chain of title. Even though each Pool Supplement documents reference on its first page an attached "Schedule," Leiderman is unfamiliar with this term and the fundamental concept that each Pool Supplement had to be accompanied by a list of assigned loans. (Tr., 60:2–61:17, 144:8–147:16). Leiderman was shown a one-page document TSI produced as a purported excerpt from a Schedule pertaining to one Plaintiff; Leiderman couldn't identify it as such. (*Id.*).

## II. Defendants Cannot Explain The Inconsistencies In Their Belated Production

Defendants' production in this case has been marked by belated rounds of document dumps, each one backfiring on Defendants by further inculpating them. The latest belated round of production involved PHEAA employee Jennifer Wilbert, from whom Defendants suddenly, and improperly, transmitted a declaration on the eve of the instant motion practice. (Pls.' Br., 32). Plaintiffs' main brief similarly scrutinizes this first Wilbert declaration and production, which is (1) due to be struck as procedurally improper, but anyway (2) substantively unavailing even if considered, due to fatal inconsistencies both internally and compared to Defendants' other production. (*Id.*, 32–36).

### A. Wilbert's Second Declaration Should Be Struck As Improper

Incredibly, Defendants have responded to Plaintiffs' critique of Wilbert's eve-of-motion declaration and production, by submitting a <u>second</u> last-minute declaration from Wilbert (dated July 16, 2025) (ECF No. 503-7). As an initial matter, the second Wilbert declaration must be struck as procedurally improper. Defendants have treated this Rule 56 motion practice like reality television, with factual twists and turns constantly, years after close of discovery. (*See*

Pls.' Br., 32). In fact, Rule 56 is designed to prevent a party from shifting the factual landscape, demanding a singular set of facts when the motion is made. *See Looney v. Walters-Tucker*, 98 F. Supp. 2d 1, 3–4 (D.D.C. 2000) ("The [defendant's] technique of submitting successive declarations leaves [the plaintiff and the court] to wonder—is this declaration complete and accurate? What else is missing?" (record cite omitted)).

Even if considered (which it should not be), Wilbert's second declaration does nothing to explain away the defects illuminated by her first declaration.

**B. PHEAA's Account Notes Never List Any Trust As "OWNER"**

On their face, PHEAA's records do not identify any Trust Defendant under the "OWNER" field of any account for any Plaintiff. This is fatal to Defendants' defense. For each of the Plaintiffs' purported accounts, the "OWNER" is listed as an alphanumeric consisting of the numbers "122962" which are "followed by a two-letter code and reference to 'NCT'". (2d Wilbert Decl. ¶ 7 (ECF No. 503-7)).[12]

Wilbert is not qualified to interpret PHEAA's records. She has no ability to interpret the "OWNER" field and glaringly fails say what the two-letter codes mean. Wilbert does not offer any manuals or written documents explaining why the "OWNER" field should not list the actual owner. Wilbert offers no explanation why the "OWNER" field should be incorrect on its face, nor does she explain who at PHEAA implemented this policy, or what their reasoning was. Defendants absurdly ask the Court to ignore the apparently unreliable "OWNER" field, while certifying the "BOND ISSUE" field as a trustworthy business record. By arguing that the

[12] Without explanation, Wilbert insists PHEAA records "the specific Trust that owns the loan" through a "BOND ISSUE" notation such that, for example, Trust 2004-2 "is denoted as 'NCT20042.'" *Id.* ¶ 7–8.

"OWNER" field is untrustworthy, Defendants tacitly concede that all PHEAA's records are unreliable. *See Webb*, 2012 U.S. Dist. LEXIS 80006, at *9–15 (requiring precise chain proof).

Wilbert's second declaration also fails to cure the concerns raised by Plaintiffs' that the "BOND ISSUE" notation is unhelpful, because relying on the timing of bonds related to "National Collegiate" securitizations is not a faithful way to ascertain ownership in specific Trusts. (Pls.' Br., 32–33). In her second declaration, Wilbert again ignores that the first "National Collegiate" securitization was for a trust called National Collegiate Master Student Loan Trust, which issued bonds based on six independent securitizations from 2001 to 2006 ("NCMSLT"). Meanwhile, there were fourteen (14) additional trusts known as "National Collegiate Student Loan Trust 2004-1" through "2007-4" that were securitized during those years. As BPA found in auditing PHEAA, the existence of the NCSLMT securitizations caused confusion for PHEAA staff trying to keep track of loan pools, because PHEAA initially treated all fifteen (15) of these trusts as if they were one single entity. (*See* Pls.' Br., 33 (citing BPA Audit, at 7, 17 (Pls'. Ex. A) (ECF No. 498-1))). Likewise, Luke testified at deposition that the existence of the NCSLMT securitizations caused TSI to use a coding system that didn't match the alphanumeric of official trust names like "Trust 2007-2," and so is unintelligible. (Pls.' Br., 33).

Wilbert is also wrong that the "122962[xx]NCT" notation used by PHEAA performs the purported task of identifying debts serviced by PHEAA but owned by one of the Trusts. In the limited time furnished by Defendants' surprise submissions, Plaintiffs have found multiple instances, including at least one in New York, where PHEAA's account notes allowed for debts supposedly "OWN[ED]" by "122962[xx]NCT" to be collected as if owned by a non-Trust entity. Apparently, PHEAA partnered with a third-party company called Student Loan Solutions, LLC

("SLS") to collect money from individuals on the basis that SLS owned a student loan debt which PHEAA's records identified as "OWN[ED]" by an entity coded as "122962[xx]NCT." PHEAA's reliance on the "122962[xx]NCT" coding destroys any supposed chain of title within PHEAA's account notes.[13]

Next, Wilbert's testimony does not provide sufficient facts to authenticate PHEAA's hearsay records. Wilbert offers no details on the who, when, and how the "OWNER" and "BOND ISSUE" data fields came to exist or be entered into PHEAA's electronic system. Wilbert does not explain how she knows what she knows, not citing any documents or other evidence—she doesn't say how her roles of "Remediation Analyst" and "Director of Client Relations" at PHEAA caused her to learn or use this information, nor even the dates she had these roles. (2d. Wilbert Decl. ¶ 2). Even if PHEAA's account notes which Wilbert relies upon were facially valid—which they aren't—Wilbert still is unqualified to authenticate these data as business records excepted from hearsay. *E.g.*, *Leach v. NCO Fin. Sys.*, No. 15-cv-890, 2015 U.S. Dist. LEXIS 129414, at *8–11 (W.D. Wash. Sept. 25, 2015) (refusing documents submitted via TSI-NCO employee declaration in support of unsuccessful summary judgment motion) (analyzing Fed. R. Evid. 801(c) & 803(6) in finding business records exception to hearsay).

**C. Defendants Still Cannot Say Who Created The Schedules**

Neither Wilbert's second declaration, nor any other document submitted by Defendants thus far, explains the fundamental hole in Defendants' defense: there are no documents contemporaneous to the Trust securitizations demonstrating specific loan transfer. All of the

[13] *See* Not. Removal & State-Ct. Compl., *Dedcovich v. Williams & Fudge et al.*, No. 18-cv-2440 (E.D.N.Y. Apr. 25, 2018) (ECF No. 1); *see also id.*, at Attachment (ECF Page 28–29 of 34) (PHEAA's account records state "OWN: 12292[xx]NCT" for debt supposedly owned by SLS). That case quietly settled in early 2019. *Id.* at ECF Nos. 25–27.

contracts and similar binding agreements signed in advance of the securitizations required that Schedules be created for every Pool. The securitizations' organizers repeated this promise to the SEC and everyone on Wall Street who might invest in the securities. Yet, when the securitizations took place, such Schedules either never were created, or were lost. PHEAA's Wilbert said FMC was supposed to create the schedule. (1st Wilbert Decl. ¶ 14 (ECF No. 494-1)). Meanwhile the pre-securitization contracts and agreements said PHEAA was supposed to. (Defs.' Ex. 61 (ECF No. 492-176), at NCSLT_000630 (ECF Page 54 of 73) (servicing agreement between PHEAA and FMC requires PHEAA do this 10 days pre-securitization)). Wilbert's second declaration does not resolve this inconsistency, because this flaw is irresolvable.[14]

**D. Defendants Cannot Explain PHEAA's False Records**

Wilbert offers no explanation why, for a majority of Named Plaintiffs, PHEAA's records list an originating bank that contradicts the originating bank listed in PHEAA's other records. For example, a loan purportedly originated by National City Bank (allegedly lent to Plaintiff Tabar) is listed in PHEAA's account notes as PNC Bank, which acquired National City long after the events which the account notes are supposed to record. (Pls.' Br., 34–35). Defendants offer no authority for their proposition that this Court should admit PHEAA's hearsay documents as trustworthy and reliable business records, even while these records contradict themselves

---

[14] Defendants mischaracterize Plaintiffs' argument on this point. Defendants say Plaintiffs admit <u>someone</u> created Schedules contemporaneous to securitization, and Plaintiffs quibble about which entity created them. (Reply, 19). This isn't what Plaintiffs argue. Plaintiffs' argument is PHEAA was obligated to create the Schedules at securitization; PHEAA did not create or adequately safeguard the Schedules at that time; and now PHEAA and FMC are pointing the finger at one another to avoid blame. (Pls.' Br., 32–36).

without explanation—both in the "OWNER" field and the field supposed to show originating bank.

Defendants' defense that PHEAA globally changed the name in the originator field automatically, whenever one bank acquired or merged with another, actually hurts Defendants' case. (Reply, 20). Defendants and Wilbert do not tell the Court when, by whom, or why these changes were made—and so violate the law against hearsay. PHEAA's account notes should not have allowed for a global change absent the ability to capture these essential details. *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1373 (Fed. Cir. 2021) (hearsay blocks documents indicating changesf after time with which they were supposed to be contemporaneous).

Defendants wrongly argue that, "[i]f anything," PHEAA's post hoc changing of its account notes "demonstrates the accuracy of the information." (Reply, 20). The problem with this argument is that it ignores that PHEAA's account notes can be changed without recordation of when, by whom, or why the change occurred. How can the Court know that PHEAA didn't change other details after-the-fact? *See Wi-Lan*, 992 F.3d at 1373 (rejecting proffer as hearsay).[15]

**III. Defendants' Hearsay Challenges To Plaintiffs' Proof All Fail**

Defendants are wrong that certain pieces of evidence cited by Plaintiffs must be disregarded as hearsay. First, Defendants are incorrect that the law requires this Court to ignore the statements which the Trusts themselves have made in Delaware Chancery Court in an action

[15] Wilbert also ignores the possibility that such a global change would break the chain as to debts allegedly originated by a bank acquired by a second bank also previously involved in Trust securitizations. For example, PNC acquired National City in 2008, but both banks participated in pre-2008 securitizations, such as Trust 2006-4. *See* Defs.' Exs. 492-154 (PNC/2006-4 pool) & 492-155 (National City/2006-4 pool) (ECF Nos. 492-154–492-155). With PHEAA's global-change system, it became impossible after 2008 to differentiate these pools.

filed by the Trusts' owners. (Reply, 26–28). As Plaintiffs' main brief explains—and Defendants do not even try to dispute—Delaware law not only solely authorizes the Trusts' owners to make claims like the ones made there, it affirmatively requires them to lodge such claims when they accrue, and requires that they swear out such claims in a verified pleading equivalent to an affidavit in federal court. Accordingly, the Trusts here are bound by the owners' sworn statements in Delaware and cannot take here any inconsistent position. (Pls.' Br., 21–32). Defendants do not refute these points, because there is no counter to them. (Reply, 26–28).[16]

Instead, Defendants rely on distinguishable cases where, unlike in the Trusts' Delaware action, the complaints were unverified and so not eligible for affidavit-like treatment. *Creighton v. City of N.Y.*, No. 12-cv-7454, 2017 U.S. Dist. LEXIS 21194, at *116 n.47 (S.D.N.Y. Feb. 14, 2017) (Gardephe, J.) (cited by Defs.' Reply, 27) (no verified complaint; plaintiff tried to rely on his own prior, unverified complaint).[17] Here, the Delaware complaint was verified, so none of the concerns apply.

Second, Defendants are wrong that the Court may not consider the BPA audit of PHEAA that provides the gravamen for the Trusts' Delaware complaint. (Reply, 28). Defendants cite a single, old, out-of-Circuit case in support of the proposition that an audit by an accounting firm was inadmissible hearsay. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1257–58 (9th Cir. 1984) (cited by Defs.' Reply, 28). However, *Paddack* is inapposite, as the audit there was prepared specifically in anticipation of litigation. *Id.* Here, there is no evidence the BPA audit

[16] Nor do Defendants refute Plaintiffs' point that the Trusts' statements in Delaware are considered opposing-party statements by the Trusts and thus nonhearsay. (Pls.' Br., 22 & n.5).

[17] *Hernandez v. Coca Cola Refreshments USA*, No. 12-cv-234, 2013 U.S. Dist. LEXIS 172400, at *9–10 (E.D.N.Y. Dec. 6, 2013) (Cogan, J.) (cited by same) (same scenario); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 620 (S.D.N.Y. 2014) (Scheindlin, J.) (cited by same) (rejecting defendant's assertion that "Second Circuit precedent indicates such a broad rule" that an outside complaint never can be evidence).

was prepared in anticipation of a specific litigation. The audit is admissible under the business records exception to the rule against hearsay. *Phila. Workforce Dev. Corp. v. KRA Corp.*, 156 F. Supp. 3d 616, 633 (E.D. Pa. 2016) (distinguishing *Paddack* and accepting audit as business record evidence).

Third, Defendants are wrong that the Court may not consider the investigative findings made against Defendants by government agencies, i.e., the CFPB's and the state NYAG's. (Reply, 28–30). Defendants do not address Plaintiffs' argument on this issue, (Pls.' Br., 21), which is that the facts in CFPB and NYAG findings are admissible as documents from "a public office [in which] it sets out . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii); *see Meyer v. Ward*, No. 13-cv-3303, 2017 U.S. Dist. LEXIS 70431, at *9 (N.D. Ill. May 9, 2017). Defendants unavailingly cite precedent where the plaintiffs asked the court to impose liability under specific statutes, solely based on the fact that the agency had accused the defendant of such violations. (Reply, 29–30 (citing *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, 2022 U.S. Dist. LEXIS 160642, at *9 (S.D.N.Y. Sep. 6, 2022) (Schofield, J.))).

Defendants only argue against adopting the agencies' legal conclusions. However, Plaintiffs here are seeking consideration of the agencies' factual findings "as one of multiple factors that undermine [Defendants'] claim that" they possess chain of title for the student loan debt upon which they collect—a defect identical to what was confirmed by direct discovery here against Defendants. *Adeniji v. N.Y. State Off. of State Comptroller*, 557 F. Supp. 3d 413, 422–23 (S.D.N.Y. 2021) (Engelmayer, J.) ("Under Second Circuit law, it was proper for Judge Moses to consider the findings of the [agency] investigation, as [she] did not [automatically] give the findings of the investigation preclusive effect [legally].") (citing Fed. R. Evid. 803(8)(A)(iii));

*accord U.S. v. Franzone*, No. 21-cr-446, 2025 U.S. Dist. LEXIS 69258, at *20 (S.D.N.Y. Apr. 10, 2025) (Broderick, J.) (same logic) (citing same).

The CFPB's finding that there is a "master list" of state court cases where the Trusts obtained judgment without chain of title supports Plaintiffs' argument that the Trusts lack chain of title. Defendants do not deny this list's existence, and there is no reason for this Court to ignore the fact that this list exists and inculpates Defendants as surely as the evidence Plaintiffs propounded here. *Adeniji*, 557 F. Supp. 3d at 422–23.

## IV. The Trusts Do Business In New York

Defendants wrongly argue the Trusts didn't have to be registered as businesses in New York. (Reply, 6-8). This issue was resolved in *Winslow v. Forster & Garbus, LLP*, No. 15-cv-2996, 2017 U.S. Dist. LEXIS 205113, at *31 (E.D.N.Y. Dec. 13, 2017). Defendants' assertion of no New York connection makes no sense. The Trusts had their underlying contracts done in New York; were organized under New York law; were prepared for securitization by New York-based lawyers disclaiming any law but New York's; were securitized on Wall Street; and claim to own more debts against New Yorkers than any other state, save perhaps California and a couple others. *See, e.g.*, Jt. Ex. C. (ECF No. 488-3) (2007-2 Prospectus), at ECF Pages 46–86, 172–178 of 179; Defs.' Ex. 24 (ECF No. 492-26) (2007-2 sale agreement), at NCSLT_000200 (ECF Page 7 of 15); Defs.' Ex. 25 (ECF No. 492-27) (2007-2 letter pre-securitization by Wall Street attorneys), at ECF Page 24 of 31. The record here supports *Winslow*'s conclusion.

## CONCLUSION

For the reasons above and in Plaintiffs' main brief, the Court should grant Plaintiffs' cross-motion on all claims against all Defendants, whose motion should be denied.

Dated: New York, New York
July 30, 2025

Respectfully submitted,

**FRANK LLP**

By: *<u>/s/ Gregory A. Frank</u>*

Gregory A. Frank (GF0531)
Marvin L. Frank (MF1436)
Asher Hawkins (AH2333)
305 Broadway, Suite 700
New York, New York 10007
Tel: (212) 682-1853
Fax: (212) 682-1892
gfrank@frankllp.com
mfrank@frankllp.com
ahawkins@frankllp.com

*(<u>Word Count Certification:</u> this Brief contains fewer words than the limit set forth in the Order of April 8, 2025, and otherwise conforms to all Local Rules for brief formats.)*