USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___07/17/26___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KATHERINE SEAMAN, *individually and on behalf of all others similarly situated*, et al.,

        Plaintiffs,

    -against-

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, *et al*.,

        Defendants.

---

18-CV-1781 (PGG) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs Katherine Seaman, Mary Re Seaman, Sandra Tabar, Christina Bifulco, Francis Butry, and Cori Frauenhofer, suing individually and on behalf of a certified class, *see Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, 2023 WL 6290622, at *32 (S.D.N.Y. Sept. 27, 2023), assert claims for violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p, N.Y. Gen. Bus. Law § 349, and N.Y. Jud. Law § 487, against defendants National Collegiate Student Loan Trust 2007-2 (Trust 2007-2), National Collegiate Student Loan Trust 2007-3 (Trust 2007-3), National Collegiate Student Loan Trust 2004-2 (Trust 2004-2), and National Collegiate Student Loan Trust 2006-4 (Trust 2006-4) (collectively, the Trust Defendants or the Trusts); Transworld Systems, Inc. (TSI), in its own right and as successor to NCO Financial Systems, Inc. (NCO), and NCO, now known as EGS Financial Care Inc. (collectively, TSI-NCO); and Forster & Garbus LLP (Forster).

After the class was certified, the Court permitted defendants to serve an expert report "regarding the student loan securitization process and the structure and related documentation of student loan securitizations." 12/17/24 Order (Dkt. 470) ¶ 1. On March 7, 2025, the Trust Defendants served the report of their chosen expert, Roger ("Rusty") W. Saylor. *See* Hawkins Decl. (Dkt. 481) Ex. 1 (Saylor Rep.) (Dkt. 481-1). Now before the Court is plaintiffs' motion to

exclude Saylor's testimony (Dkt. 479), pursuant to Fed. R. Evid. 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. For the reasons set forth below, the motion will be granted in part and denied in part.

## I.    BACKGROUND

I assume familiarity with the facts underlying this case, which are described in detail in several prior opinions by the Hon. Paul G. Gardephe, United States District Judge, and by the undersigned Magistrate Judge.[1] I recite those facts here only to extent necessary to provide context for the parties' current dispute.

### A.    Factual Background

Plaintiffs Katherine Seaman (K. Seaman), Mary Re Seaman (M.R. Seaman), and Sandra Tabar are current or former New York City residents and holders of student loan debt. *See* Consolidated Class Action Complaint (CCAC) (Dkt. 124) ¶¶ 23-25. Plaintiffs Christina Bifulco, Francis Butry, and Cori Frauenhofer are residents of Erie County, New York, and likewise hold student loan debt. *Id.* ¶¶ 26-28. Each of the named plaintiffs was sued by one of the Trusts in a state court debt-collection proceeding initiated in New York between 2013 and 2015. *Id.* ¶¶ 88, 119, 161, 193, 222. In each of these lawsuits, the Trust that initiated the suit alleged that it was the "original creditor" on the loan at issue, *id.* ¶¶ 8, 72, 92, 123, 186, 217, 246, and obtained an uncontested default judgment. *Id.* ¶¶ 115, 149, 188, 219, 248.[2]

---

[1] *See Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668 (S.D.N.Y. 2019) (granting in part and denying in part defendants' first motion to dismiss); *Seaman v. Nat'l Collegiate Student Loan Tr. 2007-2*, 2023 WL 2975152 (S.D.N.Y. Mar. 13, 2023), *adopted in part, rejected in part*, 2023 WL 6290622 (S.D.N.Y. Sept. 27, 2023) (granting in part and denying in part defendants' second motion to dismiss and plaintiffs' motion for class certification).

[2] One of the plaintiffs – Tabar – later succeeded in vacating the default judgment against her, after which Trust 2007-2 discontinued the collection action with prejudice. CCAC ¶¶ 154, 159.

In fact, the Trusts did not originate any of the student loans on which they sued. Rather, they were "the ultimate owners of bundles of student loan debt following a byzantine securitization process." CCAC ¶ 10. A total of 15 National Collegiate Student Loan Trusts (NCSLTs) were created between 2001 and 2007 by First Marblehead Corp. (First Marblehead). *Id*. ¶ 46. A First Marblehead subsidiary, known as National Collegiate Funding LLC (NCF), "purchased, in bulk, student loans that had been originated by large lenders," and then resold those loans to the NCSLTs, including the four Trusts named as defendants herein. *Id.* The NCSLTs, in turn, "issued [student loan] asset-backed securities" (SLABS) to investors. *Id*.

The NCSLTs "have no employees." CCAC ¶¶ 2, 47. Consequently, "all acts performed nominally by a Trust, or on its behalf, are actually done by servicing agents or attorneys hired by these servicing agents." *Id*. 47. Specifically, TSI-NCO, the Trusts' default servicing agent, directed the New York debt collection lawsuits and managed the Trusts' lawyers. *See id*. ¶¶ 47-57, 89, 120, 162, 194, 223.[3] Forster served as the Trusts' counsel of record in the state court cases brought against plaintiffs and other debtors in New York. *See id*. ¶¶ 35, 88, 119, 161, 193, 222.

As relevant here, plaintiffs allege that, due to the "byzantine securitization process" used to transfer large bundles of loans to the various NCSLTs, the Trusts "cannot prove they are owed" the sums that they attempted to collect in state court. CCAC ¶ 10. In particular, according to plaintiffs, defendants lack the "chain of title" documentation needed to prove which NCSLT owns which loan. *See id*. ¶¶ 255, 259, 261. Thus, in plaintiffs' view, defendants filed thousands of state court collection lawsuits – against plaintiffs and other class members – "without the intent or ability

---

[3] NCO served as the Trusts' default servicing agent until approximately November 1, 2014, at which point, plaintiffs allege, TSI took over that role. CCAC ¶¶ 49-50. However, "[t]he same personnel, practices, and form documents were employed by NCO and [TSI] in collecting the [Trusts'] debts before and after the changeover from NCO to [TSI]." *Id*. ¶ 51. NCO is now doing business as EGS Financial Care Inc. *Id*. ¶ 34.

to prove the claims, if contested," "for the sole purpose of procuring default judgments against [them] and/or extracting settlements from them." *Id.* ¶¶ 274(a)-(b); 280(a)-(b). Once the default judgments were obtained, defendants "extract[ed] money" from the class members through, among other things, liens, income execution, and wage garnishment. *Id.* ¶¶ 115-18, 189-91, 220 249-51.

### B.      Procedural History

This action (*Seaman*) was originally filed on February 27, 2018, by Mutinta Michelo, K. Seaman, and M.R. Seaman, against Trust 2007-2, Trust 2007-3, TSI-NCO, and Forster, alleging violations of FDCPA and state law. On August 23, 2018, the Erie County plaintiffs – Bifulco, Butry, and Frauenhofer – filed a separate action against Trust 2004-2, Trust 2006-4, TSI-NCO, and Forster, which was docketed as No. 18-CV-7692 (*Bifulco*) and accepted as related to *Seaman*. On September 14, 2018, the *Seaman* plaintiffs filed an amended complaint (Dkt. 60), adding Tabar as a named plaintiff and expanding their factual allegations, but preserving the same causes of action. After defendants signaled their intent to move to dismiss the then-operative complaints in both *Seaman* and *Bifulco*, Judge Gardephe consolidated the cases and set coordinated briefing schedules for the motions to dismiss. (Dkts. 73-74.)

On October 11, 2019, Judge Gardephe granted in part and denied in part defendants' motions, made pursuant to Rule 12(b)(6), to dismiss the amended complaint in *Seaman* and the complaint in *Bifulco*. In a detailed written opinion, the Court dismissed Michelo's FDCPA claim as time-barred; dismissed portions of the Seamans' FDCPA claim as time-barred; trimmed plaintiffs' state law claims on several grounds; and otherwise denied the motions to dismiss. *Michelo*, 419 F. Supp. 3d at 715.

On December 10, 2019, plaintiffs filed the CCAC, which remains the operative pleading in the consolidated actions. On April 28, 2020, Judge Gardephe referred the case to me for general

4

pretrial management. (Dkt. 144.) On May 12, 2021, while the parties were engaged in discovery, they stipulated to the dismissal of Michelo's remaining claims. (Dkt. 298.)

On September 27, 2023, the District Judge granted in part defendants' second motion to dismiss, made on standing grounds after fact discovery was completed. *Seaman*, 2023 WL 6290622, at *32. The Court ruled, among other things, that plaintiffs could not pursue their claims "based on specific false statements made in state court debt-collection proceedings," because no plaintiff testified that he or she ever read or detrimentally relied on any of those statements. *Seaman*, 2023 WL 6290622, at *18. However, the Court sustained plaintiffs' claims under FDCPA and state law based on defendants' "sham lawsuit" scheme, that is, their alleged practice of filing debt collection lawsuits in bulk, "without the intent or ability to prove the claims, if contested," for the "sole purpose" of obtaining default judgments or extracting settlements before being put to their proof, as alleged in CCAC ¶¶ 274(a)-(b), 280(a)-(b). *See Seaman*, 2023 WL 6290622, at *10-11. In the same opinion, the Court certified a single class pursuant to Fed. R. Civ. P. 23(b)(3), "comprised of all persons who have been sued in New York State court debt collection lawsuits from November 1, 2012 through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster as plaintiff's counsel, and where a default judgment was obtained, but excluding any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits." *Seaman*, 2023 WL 6290622, at *20-32.[4]

As noted above, plaintiffs' "sham lawsuit" theory posits, among other things, that defendants lack the chain-of-title evidence necessary to prove that the Trust bringing a collection

---

[4] On October 16, 2023, defendants petitioned the Second Circuit under Fed. R. Civ. P. 23(f), seeking permission to appeal the certification of the class. The petition was denied on February 21, 2024. (Dkt. 447.)

suit owned the loan it sought to collect. *See* CCAC ¶¶ 1, 255, 259. Specifically, plaintiffs charge that the Pool Supplements (the contracts by which the various originating lenders conveyed loans in bulk to NCF), which were supposed to include rosters or schedules (Schedules) listing all of the loans thereby conveyed, in fact had no Schedules attached – and that the metadata associated with the various electronic spreadsheets maintained by defendants shows that these spreadsheets "cannot be the contemporaneous records described in the text of the pool agreements." Pl. Supp. Mem. in Supp. of Class Cert. (Dkt. 409) at 2-3. Thus, in plaintiffs' view, the Trusts could not prove ownership of the loans they sought to collect. *Id*. at 3 ("Without Schedules, no Trust can prove it owns anything."). Defendants, for their part, argued that the electronic documents they maintain are in fact the Schedules referenced in the Pool Supplements, *see*, *e.g*., Def. Suppl. Mem. in Opp. to Class Cert. (Dkt. 414) at 9, and that there is no basis for plaintiffs' "supposition" that "a schedule must be created at the same time the agreement is executed." *Id*.  In any event, defendants assert, in order to defeat the "sham lawsuit" theory, they need only show that the Trusts "brought lawsuits based on loans that they *believe* that they own," *id*. at 8 (all emphases added unless otherwise indicated), and that in those collection suits they "submitted evidence which they were advised was sufficient at the outset of a litigation to demonstrate their ownership." *Id*.[5]

On December 17, 2024 – after extensive briefing and oral argument concerning what, if any post-class certification expert discovery would be permitted – this Court exercised its "discretion in the interest of ensuring that the record is full and complete to permit the defendants to serve one [] merits oriented expert report" going to the issues of "how securitizations work, what they are, [and] how they operate," and what documentation is generated to demonstrate that a trust

---

[5] For a more detailed description of the parties' competing claims (at the time of class certification) as to the Pool Supplements and the Schedules, *see Seaman*, 2023 WL 2975152, at *27 n.32; *Seaman*, 2023 WL 6290622, at *24 n.10.

"owns the loans that it holds." 12/17/24 Tr. (Dkt. 471) at 34-36, 49; *see also* 12/17/24 Order (Dkt. 470) ¶ 1 (permitting "defendants [to] serve one expert report, pursuant to Fed. R. Civ. P. 26(a)(2)(A) and (B), regarding the student loan securitization process and the structure and related documentation of student loan securitizations."). According to defendants, their expert would explain how "a specific trust can prove that it owns a specific loan" "outside of the schedules." 12/17/24 Tr. at 35, 43-44.

### C. The Saylor Report

The Trust Defendants served the expert report of Rusty Saylor on January 24, 2025. Hawkins Decl. ¶ 2(1). From 2001 until his retirement in 2009, Saylor was the Managing Director of the Education Finance group within the Citigroup Global Securitized Market business. Saylor Rep. ¶ 1. Before that, from 1997 to 2001, he was the Managing Director of Structured Products for PNC Capital Markets, where he was responsible for "all education finance-related transactions." *Id*. He has an M.B.A. in Finance from the University of Virginia. *Id*. Ex. A at 2. Although Saylor "did not lead, manage, or structure" any of the securitizations at issue in this matter, he served as the underwriter (or "Joint Book-Runner") for several of the NCSLTs while he was at Citigroup. Saylor Rep. ¶ 2. In that role, he was responsible for placing the Trust Certificates (the bonds backed by the pooled student loans) with investors, which "required [him] to review and become familiar with all the relevant agreements, Prospectuses, Prospectus Supplements, and other documents related to and governing the NCSLT securitizations prior to their closings." *Id*.

Saylor was retained by counsel for the Trust Defendants to do three things:

a. Provide an overview of the typical process by which student loan securitizations are structured, documented, placed, and managed pre- and post-closing;

b. Opine as to whether the Defendant NCSLTs followed this standard process resulting in a standard securitization structure; and

     c.      If the Defendant NCSLTs, followed this process and have this structure, opine as to the effects of this structure and its implication on the loans securitized into the Trust, including whether industry participants would understand that the Defendant NCSLTs are the owners of the securitized student loans following the closing of the securitization.

Saylor Rep. ¶ 6.

Saylor bases his opinions and conclusions on his "previous experience with securitizations structured by First Marblehead" and on the documents provided to him by counsel, including numerous documents generated during the securitization process, such as the Note Purchase Agreements or Loan Purchase Agreements (Purchase Agreements) between the originating banks and First Marblehead; the Pool Supplements among the banks, First Marblehead, and NCF; the Deposit and Sale Agreements between NCF and the Trust Defendants; the Prospectuses and Prospectus Supplements for each Trust Defendant; True Sale Opinions; Servicing Agreements; and two declarations originally submitted in a case entitled *Gosse, et al. v. Transworld Sys. Inc., et al.*, No. 3:20-CV-01446-RDM (M.D. Pa.) (*Gosse*). *See* Saylor Rep. ¶¶ 8(a)-(s), 9.[6]

Saylor's report is broken into four sections. In Part A, he provides a high-level overview of the usual "two-step sale" process for the securitization of SLABS, the actors ordinarily involved, and the "True Sale Opinions" rendered by counsel in connection with that process. Saylor Rep. ¶¶ 11-22.

In Part B, Saylor opines that the four Trust Defendants named in this action "generally followed . . . and conformed with" the securitization process described in Part A, Saylor Rep. ¶ 23,

---

[6] In *Gosse*, which was a putative class action brought under FDCPA and Pennsylvania law, the court granted summary judgment to defendants on the state law claim after finding that "there is no genuine dispute that defendant National Collegiate Student Loan Trust 2007-3 . . . owned Gosse's loan at the time it filed suit against her, and therefore the Trust had a good-faith basis for bringing suit" against Gosse in state court. *Gosse v. Transworld Sys., Inc.*, 2025 WL 894427, at *1 (M.D. Pa. Feb. 7, 2025), *aff'd sub nom. Gosse v. Transworld Sys. Inc*, 2026 WL 962492 (3d Cir. Apr. 9, 2026).

and provides "further, specific detail," *id.*, relevant to the NCSLTs: (1) First Marblehead's creation of a "consistent process for banks to originate student loans," to be guaranteed by The Education Resources Institute, Inc. (TERI) and "securitized into an NCSLT," thus providing "a flow of loans" to be securitized in this manner, *id.* ¶¶ 24-31; (2) the True Sale Opinions issued by "experienced and reputable" law firms for each securitization, *id.* ¶¶ 32-38; and (3) the role of Trusts' pre-default loan servicer, Pennsylvania Higher Education Assistance Agency (PHEAA). *Id.* ¶¶ 39-45.

In Part C, Saylor discusses the "timing" of the NCSLT securitization and data updating processes, explaining that after a securitization closes, PHEAA "updates the Legend for the respective loan in its platform" to reflect that it is now owned by the relevant Trust. Saylor Rep. ¶ 47. Thereafter, Saylor explains, there is a post-closing period "of approximately 30 days for reconciliation[.]" *Id.* ¶¶ 48-50.

Finally, in Part D, Saylor opines that, after completion of the two-step sale process, and in light of the structure of the NCSLT transactions and the content of various transactional documents, the "parties to the securitization" and other "[i]ndustry participants" "would treat the respective Defendant NCSLT as the owner of the respective student loan assets," Saylor Rep. ¶ 54, and "understood that the Defendant Trusts would own" the loans. *Id.* ¶ 58. Indeed, according to Saylor, "the fact that a loan was originated by a particular program, subject to one of these [Purchase Agreements] with a particular Trust, clearly indicates that that loan was sold to that Trust." *Id.* ¶ 60. Saylor further opines that the data maintained by PHEAA "would also allow certain parties to the securitization to make a determination as to which Defendant NCSLT is the owner of which student loan," *id.* ¶ 64, and that "industry participants understood that PHEAA's record of ownership of the loans is up-to-date and accurate." *Id.* ¶ 71.

### D.    Plaintiffs' Daubert Motion

On March 7, 2025, plaintiffs filed the instant *Daubert* motion, supported by a memorandum of law (Pl. Mem.) (Dkt. 480), and the Hawkins declaration, together with its accompanying exhibits, including selected excerpts from Saylor's February 28, 2025 deposition. Plaintiffs argue that Saylor's testimony should be excluded because he does not have the appropriate qualifications, Pl. Mem. at 5-6; he was given the wrong evidence by the Trust Defendants' counsel, *id*. at 6-9; his report exceeds the scope of expert testimony authorized by this Court, *id*. at 9-10; his conclusions as to what "parties to the securitization" thought are irrelevant to the key question in this case, which is whether defendants "possessed admissible chain-of-title evidence," *id*. at 10-11; he offers impermissible legal opinions, *id*. at 11-12; his conclusions are unsupported by the evidence he reviewed, *id*. at 12-18; and he improperly relied on hearsay and "multiple layers of *ipse dixit*." *Id*. at 18-21.

On March 21, 2025, the Trust Defendants filed a memorandum in opposition (Def. Opp.) (Dkt. 482), supported by the declaration of Gregory T. Casamento (Casamento Decl.) (Dkt. 483) and its accompanying exhibits, including additional excerpts from Saylor's deposition.[7] According to the Trust Defendants, Saylor is qualified due to his years of industry experience, Def. Opp. at 6-9; his opinions are relevant to the "sham lawsuit" theory of liability, because they will help show that defendants "believed – or, at the very least, were justified in believing – that the Trusts owned the loans on which they attempted to collect," *id*. at 9-11; Saylor does not offer any improper "legal

---

[7] Some but not all of the parties' selected deposition excerpts overlap. *See* Hawkins Decl. Ex. 2 (Dkt. 481-2) (including pp. 1-2, 18-19, 49, 95, 108-14, 156-60, 173-77, 193-99, 214-17, 220-22); Casamento Decl. Ex. 2 (Dkt. 483-2) (including pp. 2-21, 42-53, 98-105, 122-37, 154-61, 182-97, 214-21, 230-237). For the sake of brevity, the Court cites to these excerpts collectively as "Saylor Dep. Tr. ___."

conclusions," *id*. at 11-12; and his opinions are adequately supported, *id*. at 12-19, 21-22, and within the scope of testimony authorized by the Court. *Id*. at 19-21.

      **E.**      **Summary Judgment Motions**

On May 15 and June 17, 2025 – after plaintiffs' *Daubert* motion was fully briefed – the parties cross-moved for summary judgment. According to plaintiffs, the evidence shows that defendants filed "sham college loan debt collection suits while knowing that proof of their ownership of the debt was absent and not readily available." (Dkt. 496 at 9.) Specifically, plaintiffs contend, the Trusts could not prove (and knew that they could not prove) "that they own specific debts," because there were no Schedules attached to the Pool Supplements. *Id.* at 11 ("[T]he first page of each Pool Supplement identifies an 'attached Schedule' listing such loans, yet there is no accompanying attachment, or even attached placeholder page."). "Without the Schedules," plaintiffs contend, "the Pool Supplements and accompanying assignment agreements did not transfer any specific loans to the Trusts." *Id*. at 13.

Defendants respond that it does not matter whether the Schedules were physically attached to the Pool Supplements when the securitizations closed, because they exist (albeit in electronic form), and the underlying data, showing which Trust owns which loan, "is held by PHEAA and the default servicer," TSI-NCO. Def. Summ. Judg. Mem. (Dkt. 490) at 17-19. Defendants add that their "experienced industry expert Roger Saylor testified that he would not have expected to receive or review a schedule attached to the loan sale agreement." *Id*. at 18. Defendants go on to argue – again relying on Saylor – that in light of the "marketplace and the structure of the Trusts," securitization "industry participants" would understand that the Trusts would own the underlying loans upon closing." *Id*. at 19-20.

## II.  LEGAL STANDARDS

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[T]he proponent of expert testimony must show its admissibility by a preponderance of the evidence." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 700 n.6 (S.D.N.Y. 2003). In *Daubert*, 509 U.S. at 597, the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, explaining that the Rules of Evidence – and Rule 702 in particular – "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").

### A.  Reliability

Reliability depends on the indicia identified in Rule 702, "namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). However, "the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Id.* at 266. Thus, the law grants "broad latitude" to district courts to determine reliability in

context. *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (because "there are many different kinds of experts, and many different kinds of expertise," court are granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

An expert's analysis must be "reliable at every step," meaning that "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994)). However, it is not the role of the court to determine whether the expert's conclusions are right or wrong. *See In re Paoli*, 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). Thus, courts properly focus on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Amorgianos*, 303 F.3d at 266 (courts "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.").

If there are flaws in an expert's reasoning, only flaws "large enough" such that "the expert lacks 'good grounds' for his or her conclusions" should lead to a court excluding evidence. *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli*, 35 F.3d at 746). By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (cleaned up). Thus, "expert testimony should be excluded if it is speculative or conjectural . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Id.* (internal quotation marks omitted). Likewise, the Court should not

13

"admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

However, "if an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *Lickteig*, 589 F. Supp. 3d at 330 (quoting *Kumho Tire*, 526 U.S. at 153). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" is not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Moreover, "exclusion remains the exception rather than the rule." *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see also* Fed. R. Evid. 702, advisory committee's note to 2023 amendment ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."). Accordingly, "[i]n a close case, a court should permit the testimony to be presented at trial, where it can be tested by cross-examination and measured against the other evidence in the case." *Lippe*, 288 B.R. at 700 n.6; *accord Crawford v. Franklin Credit Mgmt. Corp.*, 2015 WL 13703301, at *2.

## B.    Relevance

In assessing whether the proffered testimony is "relevant," courts look to whether it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401). However, the expert's role, under Rule 702(a), is to assist the trier of fact in "understand[ing] the evidence" or "determin[ing] a fact in issue," not to dictate either the facts or the law to the jury. *See Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at 2-3 (S.D.N.Y. Apr. 18, 2018)

14

("[E]xpert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations."), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019). Thus, the Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (collecting cases). This rule appropriately guards against "the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 advisory committee's note to 1972 proposed rule. Moreover, "[s]uch ultimate legal conclusions cannot be saved by couching them in terms of industry practices." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008) (excluding testimony from securities experts about "whether there was a binding contract or whether Rauch had authority to bind the Schneiders").

Likewise, a subject-matter expert may not make inferences concerning "the intent or motive of parties or others," which lies "outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also*, *e.g.*, *Highland Capital Mgmt.*, 551 F. Supp. 2d at 182, 187 (prohibiting experts from testifying as to what the defendant "believed," making "inferences regarding the knowledge and intent of RBC employees," or stating that parties were "concerned" or "pleased"); *Travelers Indem. Co. v. Northrop Grumman Corp.*, 2014 WL 464769, at *5 (S.D.N.Y. Jan. 28, 2014) (prohibiting experts from testifying about what parties "must have known" or "could reasonably have anticipated," as such opinions are "not based on science but on conjecture").

## III.   ANALYSIS

Plaintiffs begin by challenging Saylor's qualifications to provide any expert testimony at all, on the ground that he lacks formal training, published scholarship, or professional certifications relating to the student loan securitization process. Pl. Mem. at 5. They further argue that Saylor

15

has not "provide[d] any evidence of a standardized securitization process across the industry" and, to the contrary, acknowledged at deposition that such processes are "proprietary" to individual financial institutions "with no external guides, whatsoever." *Id.* On this basis, plaintiffs contend that Saylor's prior professional experience does not confer the type of "*specialized* knowledge" necessary for him to opine on "*all* the fine points" of such transactions. *Id.* at 6 (emphases in original). The Trust Defendants respond that Saylor's "experience of more than 20 years in education finance at global financial institutions during the time when each of the loans in the Trusts were originated and each of the [Trusts was] securitized qualifies him as an expert" in this case. Def. Opp. at 7-8. On this threshold issue, defendants are correct.

"The qualification of experts falls within the broad discretion of the trial court[.]" *Peretz v. Home Depot Inc.*, 2009 WL 3124760, at *2 (E.D.N.Y. Sept. 29, 2009). A proposed expert with the requisite "knowledge," "skill," or "experience" need not also have formal training, published scholarship, or professional certifications in the relevant field. *See* Fed. R. Evid. 702. This is particularly true in the case of an industry expert such as Saylor, who "may be qualified by means of his or her particular experience." *United States v. Am. Exp. Co.*, 2014 WL 2879811, at *16 (E.D.N.Y. June 24, 2014); *see also*, *e.g.*, *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC,* 467 F.3d 107, 132-33 (2d Cir. 2006) (insurance industry expert was qualified to testify about "custom and usage" in that industry based on thirty years' experience in various roles); *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2025 WL 1276513, at *12 (S.D.N.Y. May 2, 2025) (former investment bank executive who was "broadly familiar with the steps involved and capital required in forming a mortgage REIT business" was qualified by his "relevant experience" to opine as to how long it would take to "form and capitalize a new mortgage REIT"); *LoanCare, LLC v. Dimont & Assocs., LLC*, 2025 WL 951585, at *19 (S.D.N.Y. Mar. 28, 2025) ("Mr. Bryar's decades-

16

long career in the federally-backed mortgage industry has provided him with superior knowledge and experience directly relating to investor claims processing, which is the subject matter of his proffered testimony."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15044626, at *49 (E.D.N.Y. Oct. 26, 2022) (30-year veteran of the "payments industry" was qualified to testify as an industry expert about various "agreements and business relationships among issuers, networks, and other entities," in part because those agreements and relationships "hinge on concepts specific to the payments industry"). Further, as the Trust Defendants point out, another district court recently rejected a similar *Daubert* challenge to Saylor's qualifications. *See Hoffman v. Transworld Sys. Inc.*, 2022 WL 4463419, at *4 (W.D. Wash. Sept. 26, 2022) ("These arguments are unavailing. An expert can testify based on his or her professional experience[.]").

Nor is Saylor unqualified to testify about the Trust Defendants' securitization process because – according to plaintiffs – there was no "standardized securitization process across the industry." Pl. Mem. at 5. To the extent Saylor observed common features and recurring practices across institutions over the course of his career, he may explain those features and practices. *See Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 508-09 (2d Cir. 1977) (expert in securities regulation "was competent to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC"). Moreover, although Saylor "did not lead, manage, or structure any of the [Trust Defendants'] securitizations," Saylor Rep. ¶ 2, he served as an underwriter for several of the NCSLT bond issuances while working at Citigroup, which "required [him] to review and become familiar with all the relevant agreements, Prospectuses, Prospectus Supplements, and other documents related to and governing the NCSLT securitizations prior to their closings." *Id*. In addition, he managed billions of dollars in short-term financing used to create "warehousing facilities," which are special purpose entities

17

(SPEs) created to purchase and pool student loans to later be securitized and sold to investors. *Id.* ¶ 3 & n.1. As a component of this role, he also conducted at least annual, in-person due diligence reviews of the major student loan servicers, including the Trusts' servicer, PHEAA. *Id.* ¶ 4; *see also* Saylor Dep. Tr. at 42-52. Given the breadth and depth of his relevant experience, Saylor's testimony should not be excluded on the ground that he is wholly unqualified to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

A.      **The Student Loan Securitization Process**

Part A of the Saylor Report explains the "two-step sale" process for the securitization of SLABS, identifies the actors ordinarily involved, and describes one of the documents generated in the course of that process. Prior to the securitization process, Saylor explains, an originator, such as a bank or credit union, issues a student loan to a debtor (typically the student or the student's parents). Saylor Rep. ¶¶ 11-12. A structuring advisor, such as First Marblehead, then designs and oversees the securitization process, which involves conveying a large group of student loans to a depositor, such as NCF, which then conveys them to a trust or other special-purpose entity (SPE), such as an NCSLT, which in turn issues debt instruments (notes or bonds) to investors, backed by the cash flows produced by the underlying pool of loans. *Id.* ¶¶ 15-17; *see also id.* ¶ 31 (illustrating two-step process for Trust 2007-3). Both steps, Saylor states, "happen simultaneously at the closing of the securitization." *Id.* ¶ 17.

The role of the depositor, Saylor explains, is to "pool[]" many loans "from disparate sources" so they can be packaged and securitized. Saylor Rep. ¶ 16. By contrast, the role of the trust (or other SPE) that "ultimately owns the assets" is "narrowly defined and extremely limited." *Id.* ¶ 19. "Virtually its sole purpose is to purchase and hold the underlying assets with funds raised in the capital markets." *Id.* ¶ 20. Those funds are provided, for the most part, by "large,

sophisticated institutional securities buyers," which purchase interests in the proceeds generated by the student loan assets "in the form of bonds or other securities." *Id.* ¶¶ 14 n.2, 17.

Because of its "extremely limited" role, the trust created to "hold legal title" to the loan assets is "not an operating company" and "has no employees." Saylor Rep. ¶¶ 19-20. Such an entity relies on other contractually retained entities, including servicers, to "collect the cash-flows generated from the assets and distribute them to the investors and to monitor and report on the performance of the assets in the trust." *Id*. ¶¶ 21-22.

Concurrent with the two-step sale, "opinions are rendered by counsel representing parties to the securitization." Saylor Rep. ¶ 18. According to Saylor, these "True Sale Opinions" "confirm[] that each step in this two-step sale process occurred and constitutes a 'True Sale,' meaning that all the underlying assets are legally sold as of the date of the sale, first by the originators to the Depositor and second by the Depositor to the trust." *Id*. ¶ 18; *see also id.* ¶ 32 (explaining that the True Sale Opinions for the four Trust Defendants were "issued by Thacher Proffitt & Wood LLP for the 2004-2 Trust, 2006-4 Trust, and 2007-3 Trust, and Stroock & Stroock & Lavan LLP for the 2007-2 Trust").

Plaintiffs do not seriously contest the portion of the Saylor Report, summarized above, that provides an overview of the general two-step sale structure for student loan securitizations and identifies the typical industry participants and their roles. Plaintiffs thereby concede – and the Court agrees – that this portion of Saylor's proposed testimony is relevant to the parties' claims and defenses and potentially helpful to the finder of fact. Indeed, plaintiffs contend – and will attempt to persuade the finder of fact – that the process was so "byzantine," CCAC ¶ 10, and the resulting documentation so flawed (particularly as to chain of title for the individual loans conveyed to each Trust), that defendants could not prove that the Trusts serving as plaintiffs in the state court

19

collection lawsuits owned the loans upon which they sued. Defendants, by the same token, are entitled to show, if they can, that there are ways other than through a paper-based chain-of-title analysis to reliably establish which Trust owned which loan. Given the complexity of the securitization process, lay jurors would likely struggle to comprehend the specialized terminology and mechanics of these transactions without the assistance of expert testimony. Moreover, this portion of the Saylor Report comes well within the boundaries of my order authorizing defendants to serve an expert report "regarding the student loan securitization process and the structure and related documentation of student loan securitizations." 12/17/24 Order ¶ 1. Accordingly, Saylor may provide information concerning the background and general structure of a private loan securitization. He may also opine, based on his review of the documents provided to him by counsel, that the securitization of the four Trust Defendants "generally followed the process and conformed with the structure described above." Saylor Rep. ¶ 23.

However, Saylor may not testify as to the "meaning" of the True Sale Opinions. *See* Saylor Rep. ¶ 18 (construing the term "True Sale" as "meaning that all of the underlying assets are legally sold as of the date of the sale," ultimately to "the trust"); *id*. ¶ 34 (similar). First, this is a legal opinion, which an industry expert may not render. *See Marx*, 550 F.2d at 509 (industry expert could not opine as to "the meaning of the contract terms at issue" or "construe the contract"); *Levinson v. Westport Nat'l Bank*, 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) ("[A]n expert may not . . . testify about the meaning of legal terms."); *Roundout Valley Cent. Sch. Dist. v. Coneco Corp.,* 321 F. Supp. 2d 469, 480 (N.D.N.Y.2004) ("[I]t is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within

the province of the court.") (collecting cases).[8] Second, even if an industry expert were permitted to interpret a True Sale Opinion, Saylor's interpretation would be inadmissible because it is irrelevant to any of the parties' claims or defenses. The question in this case is not whether plaintiffs' loans were "legally sold" to the NCSLTs through the two-step sale process Saylor describes; it is whether the defendants in this action could prove to a state court (or, at a minimum, reasonably believed that they could prove to a state court) that any *particular* delinquent loan was owned by any *particular* NCSLT.

The remainder of Saylor's report, as discussed below, is also problematic, particularly insofar as his ultimate opinions focus on what the "parties to the securitization" (and other "industry participants")[9] *believed* about the ownership of the loans upon which the Trusts sued. Saylor Rep. ¶ 54 (opining that "parties to the securitization would treat the respective [Trust] as the owner of the respective student loan assets"); *id*. ¶ 58 (opining that "potential investors [in the bonds issued by the Trusts] understood that the . . . Trusts would own the loans"); *id*. ¶ 71 (opining that "participants understood that PHEAA's record of ownership of the loan[s] [was] up-to-date

---

[8] Moreover, as plaintiffs point out, *see* Pl. Mem. at  11-12, Saylor read more into the True Sale Opinions than their text would bear. For example, in the True Sale Opinion issued by Thatcher Proffitt, counsel to Trust 2007-3 with respect to the second step of the two-step sales process for that Trust, *see* Hawkins Decl. Ex. 11 (Dkt. 481-11), the firm opines only that, in the event of the bankruptcy of the depositor (NCF), a court would determine that the transfer of the loans from NCF to the Trust 2007-3 "constituted a sale of the Transferred Assets [the loans] rather than a loan to the Depositor secured by the Transferred Assets," and on that basis would conclude that the loans and their proceeds were not the property of NCF's estate, and thus would not be subject to an automatic bankruptcy stay. *Id*. at 6. In rendering this advice, the firm specified that it was not expressing "any opinion concerning any law other than Title 11" of the Bankruptcy Code. *Id*. at 5.

[9] Defendants define "industry participants" to include "the investment banks serving as Placement Agents and Book-Runners, investors in the Trusts, the rating agencies rating the tranches of certificates sold to investors, servicers, including PHEAA, and last, but not least, the Defendant NCSLTs." Def. Opp. at 10 (internal record citations omitted).

and accurate"). I address each area of proposed testimony in turn, and I conclude that much of it must be precluded.

### B.    Process and Structure of the Trusts Defendants' Securitizations

In Part B of his report (after opining that the securitizations of the Trusts at issue in this action generally followed the two-step structure typical of such transactions), Saylor provides additional details – and opinions – regarding three aspects of the NCSLT securitizations.

### 1.    First Marblehead-TERI Loan Programs

Saylor explains that First Marblehead, which served as the "Structuring Advisor for each Trust," worked with TERI, which was a private student loan guarantor, to develop loan programs that "provided a consistent process for banks to originate student loans, a guarantee to protect the principal and accrued interest of the private student loan, and created a flow of loans to be securitized into what became the NCSLTs." Saylor Rep. ¶¶ 24-25. As part of these programs, First Marblehead and TERI created Program Guidelines, including "criteria for the borrowers and the loans, by which lenders," known as Program Lenders, "would agree to originate loans that would ultimately be securitized into an NCSLT and guaranteed by TERI." *Id*. ¶¶ 26-27.

Further, Saylor explains, the Purchase Agreements between First Marblehead and the Program Lenders required First Marblehead (or an affiliate) to purchase "*all of the loans* originated by [that] Program Lender pursuant to a First Marblehead/TERI Program Guideline[.]" Saylor Rep. ¶ 28 (emphasis in original) (citing §§ 2.01 and 2.04 of the Loan Purchase Agreement for the TERI-Guaranteed KeyBank Private Education Loan Program). "This means," according to Saylor, that a loan originated by a Program Lender "had a ready buyer in a particular NCSLT." *Id*. ¶ 29; *see also id*. ¶ 60 (asserting that the Purchase Agreements "also set forth that a loan originated by a Program Lender pursuant to the First Marblehead/TERI program Guidelines that fits within the seasoning [disbursement] criteria for the securitization must be sold to the Trust"). The actual sale

22

of the loans, Saylor notes, occurred via the two-step process he previously described: first, pursuant to the Purchase Agreements and Pool Supplements, from the Program Lender to the Depositor (NCF), and then, pursuant to Deposit and Sale Agreements, "from NCF to the ultimate owner NCSLT." *Id*. ¶ 30; *see also id*. ¶ 31 (illustration of two-step process).

This portion of Saylor's testimony is based largely on his reading of various transaction documents provided to him by counsel, including Purchase Agreements, Program Guidelines, Pool Supplements, and Deposit and Sale Agreements. Saylor Rep. ¶¶ 26, 30. Additionally, Saylor relies on a declaration (the *Gosse*-Meyer Declaration) (Dkt. 481-3) that was signed in 2022 by Jens Meyer, Senior Vice President of Cognition (formerly known as First Marblehead), and filed in *Gosse*. *See* Saylor Rep. ¶¶ 8(q), 24-25.

Plaintiffs raise two objections to this portion of the Saylor Report. First, they argue that Saylor should not have relied upon the *Gosse*-Meyer Declaration because ¶ 6 of that declaration is inconsistent with ¶ 5 of a declaration filed by the same witness in this action in 2021 (Dkt. 338-6). *See* Pl. Mem. at 6-9. However, there is no suggestion anywhere in the record that Saylor relied on ¶ 6 of the *Gosse*-Meyer Declaration. *See* Saylor Rep. ¶¶ 24-25 (citing *Gosse*-Meyer Decl. ¶¶ 3-5). Moreover, as the Trust Defendants point out, *see* Def. Opp. at 15, "it is not for this Court to preclude expert testimony simply because there is additional contradictory testimony that will be available to the jury." *Cortland Racquet Club v. Oy Saunatec, Ltd.*, 2003 WL 1108740, at *4 (S.D.N.Y. Mar. 12, 2003).

Second, defendants argue that Saylor should be "rejected as an expert here" because, although he discussed the Program Guidelines in his report, he "did not notice" that Program Guidelines were "not attached" to three of the four Purchase Agreements he reviewed. Pl. Mem. at 13. This too, in my view, goes to the weight, not the admissibility, of Saylor's testimony,

23

particularly given that plaintiffs nowhere explain why it matters (or if it matters) whether the Program Guidelines – that is, the document specifying the "quality and characteristics" of the loans that NCF agreed to purchase from a particular Program Lender, Saylor Rep. ¶ 29 – were consistent across the various First Marblehead Purchase Agreements. Moreover, "[a]s the Second Circuit has repeatedly counseled, concerns about the adequacy of data underpinning an expert opinion are best addressed via cross-examination." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 499 (S.D.N.Y. 2009); *see also Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) ("gaps or inconsistencies in the reasoning leading to [the expert's opinion] . . . go to the weight of the evidence, not to its admissibility.").

There are, however, two more fundamental problems with Saylor's proposed expert testimony concerning the First Marblehead-TERI loan programs. First, Saylor did not negotiate or create the Purchase Agreements, Program Guidelines (whether or not attached to the Purchase Agreements), Pool Supplements, or Deposit and Sale Agreements. At best, he "was familiar with" them, *see* Saylor Rep. ¶ 2, at least with respect to the NCSLTs for which Citigroup served as Joint Bookrunner. Nor does he claim that the First Marblehead-TERI loan programs were typical of any then-typical industrywide custom or practice.[10] Consequently, this portion of his report consists of little more than Saylor reviewing documents supplied to him by counsel and summarizing what he believes to be their significant features. It is well-settled, however, that it is "inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'" *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2021 WL 4810266, at *16 (S.D.N.Y. Sept. 30,

---

[10] To the contrary: according to Saylor, First Marblehead was "one of the first entities to begin structuring SLABS on a large scale," Saylor Rep. ¶ 14, and pioneered many of these features. *See* Saylor Dep. Tr. at 214 ("This was a unique program back when it first started. It was innovative.").

2021) (quoting *Scentsational Techs.*, 2018 WL 1889763, at \*4); *see also*, *e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 481 (S.D.N.Y. 2016) (excluding portion of expert report that "largely consists of copied and pasted statements from internal Bayer documents"); *Am. Home Assur. Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 449 (S.D.N.Y. 2006) (allowing transit insurance industry expert to testify about "the standard practices and customers of his business," but not as to "his understanding" of a specific policy where he had "nothing to do with the negotiating, drafting or performance of it").

Second, the Purchase Agreements that Saylor reviewed do *not* show that all of the loans originated by a Program Lender pursuant to that lender's Purchase Agreement were destined for "a *particular* NCSLT." Saylor Rep. ¶ 29. Instead, those Purchase Agreements show that the Program Lenders were required to sell their conforming loans to "*a* Purchaser Trust." *Id*. ¶ 28 (quoting Loan Purchase Agreement for the TERI-Guaranteed KeyBank Private Education Loan Program). In discussing the Purchase Agreements, Saylor neglects to mention that they contemplate multiple securitizations of the loans originated by each Program Lender, and predate (in some cases substantially) the actual two-step sale process with respect to any particular securitization. Neither the Purchase Agreements nor the Pool Supplements name any specific NCSLT as the ultimate purchaser of the loans originated by the relevant Program Lender.[11]

---

[11] For example, the Loan Purchase Agreement for the TERI-Guaranteed KeyBank Private Education Loan Program (KeyBank Purchase Agreement), which Saylor quotes in ¶ 28 of his report, was entered into by KeyBank and First Marblehead (referred to therein as FMC) on May 12, 2006. *See* Hawkins Decl. Ex. 13 (Dkt. 481-13) at 1. The KeyBank Purchase Agreement states that KeyBank "has agreed to sell, *from time to time*, pools containing KeyBank Private Education Conforming Loans originated by Program Lender to FMC or *a Purchaser Trust* . . . and FMC has agreed to purchase (or cause *a Purchaser Trust* to purchase) such Loans." *Id*. "Purchaser Trust" is defined generically as "a trust or other SPE formed or sponsored by FMC or by any Affiliate of FMC for the purpose of purchasing, directly or indirectly, KeyBank Private Education Conforming Loans though an Interim Financing Transaction or Permanent Financing Transaction." *Id*. at 8, § 1. Saylor is correct that this Purchase Agreement obligates KeyBank to sell – and FMC "or a

In short, none of the language that Saylor highlights in the Purchase Agreements and transaction documents he discusses connects the dots between any particular loan originated in accordance with one of those Purchase Agreements and any particular NCSLT. Nor does he explain *how* defendants could rely on the documents he discusses to connect the dots if required to do so in a state court collection lawsuit. Consequently, even if Saylor were qualified to testify as an expert about deal documents that he did not negotiate or create (and that his former employer was not party to), he could not opine that the language he highlights from the KeyBank Purchase Agreement "means" that a loan originated by a Program Lender "had a ready buyer in a particular NCSLT." Saylor Rep. ¶ 29. Nor may he opine, in Part D of his report, that "the fact that a loan was originated by a particular program, subject to one of these agreements with a particular Trust, clearly indicates that that loan was sold to that Trust." *Id*. ¶ 60.

---

designated Purchaser Trust" to buy – "every Seasoned [fully-disbursed] Loan owned by Program Lender on the Purchase Date." *Id.* at 11, § 2.01. But he fails to note that "Purchase Date" is defined as "the date of consummation of a Securitization Transaction with respect to a *particular* Pool of Seasoned Loans originated by Program Lender," and that "FMC may schedule up to twelve (12) Purchase Dates per calendar year." *Id*. at 7-8, § 1.

The Pool Supplement among KeyBank, FMC, and NCF (step one of the two-step securitization process for Trust 2007-3) was signed more than a year later, on September 20, 2007. *See* Hawkins Decl. Ex. 19 (Dkt. 481-19). The Pool Supplement states that KeyBank, as Program Lender, "hereby transfers, sells, sets over, and assigns" to NCF, as Depositor, "each KeyBank Private Education Conforming Loan described in the attached Schedule 1." *Id*. at 1, art. 1. However, Schedule 1 is blank. *Id*. at 52, Sched. 1. The Pool Supplement also states that NCF "in turn will sell the KeyBank Private Education Conforming Loans to *a* Purchaser Trust." *Id*. at 1, art. 1. However, nowhere in the Pool Supplement is any specific Purchaser Trust identified.

It is only in the Deposit and Sale Agreement (step two of the two-step securitization process for Trust 2007-3) that the "Purchaser Trust" is identified. The Deposit and Sale Agreement, which is also dated September 20, 2007, was entered into by NCF, as Seller, and Trust 2007-3, as Purchaser. *See* Hawkins Decl. Ex. 23 (Dkt. 481-23) at ECF p. 2. It states that NCF "is selling" and Trust 2007-3 "is purchasing the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on the attached Schedule A." *Id*. at ECF p. 2, art. 1. Schedule A lists 19 different Pool Supplements – with various banks – including the September 20, 2007, Pool Supplement among KeyBank, FMC, and NCF (which, as noted above, has a blank Schedule 1). *Id*. at ECF pp. 11-12.

### 2.    True Sale Opinions

Next, Saylor reviews the True Sale Opinions issued for each Trust Defendant, noting that the law firms that authored them are "very experienced and reputable firms that worked on many SLABS and other types of securitizations during this time period." Saylor Report ¶ 32. He then construes these opinions as concluding that "the student loans were legally sold from the originators to the Depositor and then ultimately from the Depositor to the purchasing NCSLT." *Id.* ¶¶ 34-36. Finally, he asserts that he, "as a Joint Book-Runner for billions of dollars worth of SLABS," "relied on True Sale Opinions, like the ones [] reviewed here, for assurance that the loans were owned by the purchasing trust." *Id.* ¶ 38.

Plaintiffs contend that Saylor's discussion of the True Sale Opinions consists of "impermissible legal conclusions that he is not qualified to make and that are instead within the exclusive purview of this Court," Pl. Mem. at 11-12, and that, in any event, he has misinterpreted the opinions, which concluded only that the trust assets were "bankruptcy remote," *Id.* at 11 (quoting Saylor Dep. Tr. at 156-160), not that any particular trust owned any particular loan. The Trust Defendants respond that plaintiffs "misinterpret" this portion of Saylor's testimony, which merely states "how industry participants like himself would have understood and treated the True Sale Opinions." Def. Opp. at 11.

Plaintiffs did not misread Saylor's report. In ¶¶ 18 and 34 he tells the reader (and proposes to tell the jury) what the True Sale Opinions "mean," namely, that the loans were "legally sold" by the originator to the depositor and then by the depositor to the "purchasing NCSLT." This he may not do. *See Marx*, 550 F.2d at 509; *Levinson*, 2013 WL 3280013, at *4; *Roundout Valley Cent. Sch. Dist.,* 321 F. Supp. 2d at 480. As Judge Forrest explained in *Scentsational Techs.*, if an expert's statements about a document "go beyond recitation of how [that] document is supportive of an opinion and are instead a characterization of the document for the purposes of having the fact

27

finder accept that interpretation as fact, the expert goes too far." *Scentsational Technologies, LLC* 2018 WL 1889763, at *4.

It is true that Saylor approaches the issue somewhat differently in ¶ 38 of his report, stating that *he* relied on the True Sale Opinions "for assurance that the loans were owned by the purchasing trust." This is not an impermissible legal opinion. Neither, however, is it relevant to the issues in this case. Citigroup – Saylor's former employer – was a Joint Bookrunner, responsible for underwriting the SLABS and selling them to investors, not a default servicer, responsible for collecting delinquent loans (or a law firm responsible for pursuing collection actions in state court). What Citigroup's employees believed about the True Sale Opinions does not bear on whether the defendants in this action could prove to a state court (or reasonably believed that they could prove to a state court) that any particular delinquent loan was owned by any particular Trust Defendant. Consequently, Saylor may not testify, as an expert, about the meaning or implications of the True Sale Opinions.

### 3.    PHEAA's Role as Servicer

Saylor next discusses the work of PHEAA, which serviced all of the loans acquired by the Trust Defendants, in most cases "from the point of origin by the Program Lenders." Saylor Rep. ¶¶ 39, 44. He explains that "between 1999 and 2006, [he] visited PHEAA at least once per year to perform detailed reviews of its private loan servicing operations." *Id*. ¶ 41; *see also* Saylor Dep. Tr. at 46-53 (testifying about his visits to PHEAA, which included – in addition to a "nice dinner" – "check[ing] the compliance certificate" and "check[ing] . . . collateral"). During this period, Saylor also visited other major student loan servicers, and performed "detailed reviews of . . . their . . . loan servicing operations." Saylor Rep. ¶ 4; *see also* Saylor Dep. Tr. at 42-44 (testifying that he conducted at least annual on-site visits to "every servicer," which included in-person random sampling to "test[] the collateral" of the underlying loans). Additionally, Saylor reviewed a

declaration (the *Gosse*-Wilbert Declaration) (Dkt. 481-21) that was signed in 2023 by Jennifer Wilbert, an employee of PHEAA since 2002, and originally filed in *Gosse. See* Saylor Rep. ¶¶ 8(s), 66-67. The *Gosse*-Wilbert Declaration "confirm[ed] [his] recollection" of PHEAA's operations. *Id.* ¶ 39.

According to Saylor, "industry custom and practice required student loan servicers to maintain data allowing them to identify, at least, the entity that owned the loan it serviced." Saylor Rep. ¶ 42. He explains that PHEAA, "consistent with other student loan servicers, maintained on its servicing platforms a unique code (a 'Legend') by which to identify the lender and the owner of each loan it serviced." *Id.* Thus, PHEAA's "servicing platform would identify the specific NCSLT that owns each loan being serviced by PHEAA on behalf of any NCSLT." *Id.* As an example, Saylor states that upon the origination of a student loan by Bank of America (BoA), "PHEAA's platform would have a Legend indicating that BoA was the lender and owner of the loan. Whenever the owner changed, such as pursuant to a sale to a third-party like one of the NCSLTs, PHEAA would run a batch file update to the Legend on its platform to indicate that ownership had changed and to indicate the effective date of the change." *Id.* ¶ 43. Saylor adds that in his experience (and as "confirm[ed] by the *Gosse*-Wilbert Declaration) "this servicing data was used to generate reports for parties to the securitization." *Id.*

Saylor emphasizes that PHEAA "was the servicer of (almost all) the Defendant NCSLT loans from inception through securitization." Saylor Rep. ¶ 44 (citing the Prospectus Supplements for Trust 2006-4, Trust 2007-2, and Trust 2007-3). This is important, Saylor explains, because "it allowed the loans to transfer ownership and remain on the same servicing system of record." *Id.* ¶ 45. When a loan was sold to one of the Trusts, "PHEAA simply took a list of loans sold to the purchasing Trust and updated its systems by amending the Legend to reflect the new owner." *Id.*

29

Plaintiffs object to this portion of Saylor's report on two grounds: first, that he is exceeding the limits set by this Court by submitting "new percipient witness . . . evidence," Pl. Mem. at 10 (quoting 12/17/24 Tr. at 35); and second, that he is impermissibly relying on "hearsay" – specifically, the *Gosse*-Wilbert Declaration – and that his "blind reliance" on that declaration caused him to miss key facts calling the reliability of PHEAA's records into question. *Id*. at 19. Neither of these (somewhat inconsistent) objections requires the exclusion of the testimony summarized above. It is true that Saylor draws on his own visits to PHEAA between 1999 and 2006 to support his testimony about its loan servicing operations. *See* Saylor Rep. ¶ 41. An industry expert, however, must have some personal experience in the subject industry. Saylor's visits to PHEAA therefore do not disqualify him from providing expert opinions based in part on its operations. Further, while an expert witness may not serve as a mere "mouthpiece" for the views of others, *see Joint Stock Co. Channel One Russia Worldwide*, 2021 WL 4810266, at *15 (collecting cases), "[u]nder Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993)).

In any event, I do not read this portion of Saylor's report as an effort to vouch for the reliability of PHEAA's records. (That comes later.) Here, he is merely explaining that PHEAA (like other loan servicers) was responsible for keeping track of what entity owned the loans it serviced; that it did so by means of a Legend; and that it ran a batch file update to the relevant Legend when the ownership of a pool of loans changed due to a securitization. As an industry expert, Saylor may permissibly so testify.

## C.      Timing Issues

In Part C of his Report, Saylor goes into more detail about *when* PHEAA updated its records. Saylor Rep. ¶¶ 47-52. He begins by explaining that the process of updating the Legends to reflect a change in the ownership of a pool of loans due to a securitization is not instantaneous. *Id*. ¶ 47. Not only must the servicer update the ownership information; it must also confirm that it has "all prior servicing data relating to the loan" and all underlying loan documents (if it did not have them already). *Id*. This process takes place "prior to publishing the final list of secured collateral (which is delivered to the Indenture Trustee and other required parties) typically within 48 to 72 hours after the closing date." *Id*. Thereafter, there is a "period of approximately 30 days for reconciliation," as disclosed in the Prospectus Supplements for the Trusts. *Id*. ¶ 48. This "timing lag," Saylor states, "is not unique to the NCSLTs and could take even longer in federal student loan-backed securitizations[.]" *Id*. ¶ 51. Indeed, a post-closing period of reconciliation is "expected as a matter of custom in the industry." *Id*. ¶ 52.

In the case of the NCSLTs, Saylor points out, the servicer – PHEAA – "largely did not change during the securitization process," meaning that "post-closing reconciliation would occur within PHEAA's system." Saylor Rep. ¶ 53. Therefore, Saylor concludes, "for purposes of repayment, deferment, pre-payment, and/or collection activities, the records on PHEAA's platform are the most reliable source of information." *Id*.

Plaintiffs attack this portion of Saylor's testimony on the ground that his discussion of the "reconciliation period" is (i) improperly based on ¶ 6 of the *Grosse*-Meyer declaration, which is inconsistent with the *Seaman*-Meyer Declaration (Dkt. 338-6), *see* Pl. Mem. at 7-8, and (ii) designed to "provide a reason why the metadata from the [electronic] Schedules . . . would show a date after the date of the securitization." *Id*. at 7. As noted above, however, Saylor never cites ¶ 6 of the *Grosse*-Meyer declaration. His discussion of the reconciliation period is based upon his

own knowledge of how loan servicers operate and upon the Prospectus Supplements. *See* Saylor Rep. ¶ 46-52. Moreover, as defendants correctly point out, Saylor "does not discuss the loan 'Schedules' in his Report." Def. Opp. at 17.[12] Plaintiffs objection thus appears to be based, at bottom, on their fear that Saylor's testimony about a reconciliation period might prove to be *relevant* to defendants' claims about the authenticity of their electronic rosters. This is not a basis upon which to exclude that testimony.

However, Saylor may not opine that PHEAA's records are the "most reliable source of information" about the loans it serviced. Saylor Rep. ¶ 53. To begin with, the opinion is ambiguous. It is not clear whether Saylor is comparing the reliability of PHEAA's records to those kept by other participants in the NCSLT securitizations, or to those kept by the other major servicers whose operations Saylor reviewed. Nor does he explain the basis for either comparison – except to suggest that PHEAA had an advantage over other servicers because, thanks to the First Marblehead-TERI loan programs, it was the servicer of most of the loans in its system "from inception to securitization," *id*. ¶ 44, such that there was no "interruption or break in the process" when a loan

---

[12] At deposition, he was asked whether any of the "documents at the time of sale actually identify the specific loans being sold," to which he replied that there would be a "roster that was provided by the servicer to the administrator." Saylor Dep. Tr. at 191-92. Asked if he ever identified the loans being sold on a "schedule attached to the loan sale agreement," he answered, "No," explaining that "the record of the loans is at the servicer. You don't take – you don't take 50,000 loans and run a – a schedule and attach them to the document." Saylor Dep. Tr. at 193-94. In plaintiff's view, this is inconsistent with the language of the Pool Supplements and the Deposit and Sale Agreements. But it is not a reason to exclude Saylor's (potential) testimony on this point. Should he offer similar testimony at trial, plaintiffs may challenge it through "[v]igorous cross-examination" and "presentation of contrary evidence," which are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Rutledge v. Walgreen Co.*, 2026 WL 2015284, at *17 (2d Cir. July 13, 2026) (expert's reliance on study "like the rest of his opinion, can be tested by cross-examination, contested by opposing experts who may evaluate the evidence differently, and forcefully advocated for and against by the parties' attorneys").

was securitized. *Id*. ¶ 45. Saylor may point out this feature, but he may not generally vouch for the reliability of PHEAA's records, because that opinion is itself unreliable.

Notably, throughout Saylor's discussion of PHEAA's operations, he states that it "would" have a Legend indicating the owner of a loan; that it "would" run a "batch file update to the Legend" when a pool of loans was securitized; and that post-closing reconciliation "would" occur within PHEAA's system. Saylor Rep. ¶¶ 43, 53. But he never points to any evidence that PHEAA did any of these things consistently or accurately. Nor, for that matter, does he ever explain where PHEAA got the information it used to identify the new "owner of each loan it serviced," *id*. ¶ 42, when a group of those loans was securitized.[13] I therefore conclude that the Trust Defendants have not met their burden, *see Lippe*, 288 B.R. at 700 n.6, of showing that Saylor's opinion concerning the reliability of PHEAA's records is "grounded on sufficient facts or data," Fed. R. Civ. P. 702(b), to be admitted as expert testimony. *See Joiner*, 522 U.S. at 137 ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

### D.    Recognition by Industry Participants of the Trusts' Ownership

The last section of Saylor's report is almost entirely inadmissible, because – in accordance with the third mandate he was given by counsel for the Trust Defendants – it consists primarily of testimony (based either on Saylor's impermissible interpretation of the underlying legal documents

---

[13] According to Wilbert, this information was received by PHEAA "from First Marblehead Corporation." *Grosse-Willbert* Decl. ¶ 12. Wilbert does not state when PHEAA received that information (in relation to the closing date of the relevant securitization), or in what form.

or on his inadequately-supported opinion as to the reliability of PHEAA's data) as to what "industry participants would understand," Saylor Rep. ¶ 6(c), about the ownership of the loans that were securitized into the Trust Defendants or the corresponding documentation. For example, Saylor opines that:

- Once the two-step sale took place, "parties to the securitization *would treat the respective Defendant NCSLT as the owner* of the respective student loan assets." Saylor Rep. ¶ 54.

- "[F]rom inception of the securitization – before a single certificate is sold resulting in a single dollar of investment in the Defendant NCSLT (and before the Defendant NCSLT even technically exists) – *it is understood* that the student loan assets will ultimately be owned by the Defendant NCSLT." *Id.* ¶ 57.

- "Industry participants *generally understood* that potential investors in securitization securities – including those issued by the Defendant NCSLT(s) – were not eligible to purchase a security issued from the securitization trust without receiving a Prospectus and Prospectus Supplement from the Book-Runner(s). Thus, *potential investors in the Defendant NCSLT-issued certificates understood* that the Defendant Trusts would own the loans." *Id.* ¶ 58.

- "[T]he data maintained by PHEAA as the servicer of the loans would also *allow certain parties to the securitization to make a determination* as to which Defendant NCLST is the owner of which student loan that NCF sold to it in the relevant two-step sale." *Id.* ¶ 64.

- "Because PHEAA was responsible for updating the Legend to indicate a change in ownership of a loan, *industry participants understood* that PHEAA's record of ownership of the loan is up-to-date and accurate." *Id.* ¶ 71.

- "If PHEAA's system of record shows that the NCSLT owns the loan, then *industry participants know* that PHEAA changed the Legend to reflect the applicable NCSLT as the owner at the time of sale (or shortly thereafter), and that the Legend has remained as such since because the NCSLT has remained the owner of the loan." *Id.* ¶ 72.

The Trust Defendants are correct that there is an intent-based element to plaintiffs' "sham lawsuit" theory of liability. Plaintiffs implicitly so concede in their pleading, which alleges that defendants violated FDCPA and N.Y. Gen. Bus. Law § 349 by "filing lawsuits against Plaintiffs

and the other members of the class . . . without the *intent or ability* to prove the claims," CCAC ¶¶ 274(a), 280(a), and in their summary judgment brief, which argues that defendants filed "sham college loan debt collection suits *while knowing* that proof of their ownership of the debt was absent and not readily available." Pl. Summ. Judg. Mem. at 9. Nonetheless, Saylor may not offer any of the opinions reproduced above.

First, what bond purchasers and other vaguely-described "industry participants" thought or "understood" about the ownership of the securitized loans in general is hardly probative of whether the Trust Defendants themselves – acting through their default servicer, TSI-NCO and their New York counsel, Forster – reasonably believed that they could *prove*, in a New York State court, that a specific Trust owned a specific delinquent loan.[14] Second, it is well-settled that testimony of the sort offered by Saylor here – as to the state of mind of various parties and non-parties – lies "outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 209 F. Supp. 2d at 547; *see also*, *e.g.*, *CCM Touring LLC v. Moonbug Entertainment Ltd.*, 2026 WL 848392, at \*14 (S.D.N.Y. Mar. 27, 2026) (prohibiting expert from testifying, based on "documents for which he has no personal knowledge," that "the CCM Parties were purportedly aware of a distinction between a show and an immersive experience"); *Joint Stock Co. Channel One Russia Worldwide*, 2021 WL 4810266, at \*18 (prohibiting expert from testifying about "what Infomir 'knew,' 'should have known,' had 'knowledge of,' or 'had reason to know'"); *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at \*9 (S.D.N.Y. July 28, 2017) (prohibiting expert from testifying that a party was "unaware of the true risks presented by the DVB shipments"); *In re: Gen. Motors LLC Ignition Switch Litig.*, 2015 WL

---

[14] Defendants point to a single New York collection case in which one of the Trusts prevailed "on the merits." *See* Def. Summ. Judg. Mem. at 7; Fontenelli Decl. Ex. 73 (Dkt. 492-188) (transcript of oral decision after bench trial in *National Collegiate Student Loan Tr. 2007-3 v. Burnett*, Index. No. 6035/2014 (N.Y. Sup. Ct., Nassau Co., Feb. 22, 2016)). It is not clear from the limited record available to this Court whether the borrower in *Burnett* raised the chain-of-title issue.

9480448, at \*5 (S.D.N.Y. Dec. 29, 2015) (prohibiting expert from "offer[ing] opinions regarding New GM's knowledge or beliefs, both because he is not qualified to give such opinions and because such testimony would impermissibly tread on the role of the jury"); *Travelers Indem. Co.*, 2014 WL 464769, at \*5 (prohibiting expert from testifying about what parties "must have known" or "could reasonably have anticipated"); *Highland Capital Mgmt.*, 551 F. Supp. 2d at 182 (prohibiting experts from testifying as to what defendant "believed"). Consequently, Saylor may not testify as to what defendants – or any other "industry participants," understood, thought, believed, knew, or determined about any of the issues in dispute in this action.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion to exclude the testimony of Roger ("Rusty") W. Saylor (Dkt. 479) is GRANTED in part and DENIED in part, as described above.

Dated: New York, New York  
July 17, 2026

**SO ORDERED**.

**BARBARA MOSES**  
**United States Magistrate Judge**